**OPERATIONS TRANSFER AGREEMENT**

by and between

**Venetian Care & Rehabilitation Center, LLC**

a New Jersey limited liability company

"Old Operator"

and

**Venetian Healthcare and Rehab Center LLC**

a New Jersey limited liability company

"New Operator"

Dated as of: December 2, 2024

4919-5875-2000, v. 5

**OPERATIONS TRANSFER AGREEMENT**

This **OPERATIONS TRANSFER AGREEMENT** (this "Agreement") is made as of December 2, 2024 (the "Effective Date"), by and between Venetian Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Old Operator") and Venetian Healthcare and Rehab Center LLC, a New Jersey limited liability company ("New Operator").  Each of Old Operator and New Operator are sometimes referred to herein, individually as a "Party" and collectively as the "Parties".

WHEREAS, Venetian Healthcare LLC, a New Jersey limited liability company and an affiliate of Old Operator ("Seller") and Venetian Propco LLC, a New Jersey limited liability company and an affiliate of New Operator ("Purchaser") have entered into that certain Asset Purchase Agreement (the "APA"), dated as of the date hereof, pursuant to which Purchaser will purchase that certain real property (including the associated parking parcels as more fully described on Exhibit A to the APA, the "Property") improved with a one hundred eighty (180) licensed bed skilled nursing facility commonly known as "(The) Venetian Care & Rehabilitation Center" and located at 275 John T. O'Leary Blvd., South Amboy, NJ 08879 (the "Facility");

WHEREAS, Old Operator currently has the sole rights to act as operator of the Facility and wishes to assign such rights to New Operator;

WHEREAS, Old Operator currently owns certain furniture and equipment and other items of personal property, including as located on, used in connection with, the operation of the Facility (as will not be transferred from Seller to Purchaser pursuant to the APA, but not including the ERC (as defined in the APA), the "Personal Property"); and

WHEREAS, in order to ensure an orderly transition of operations of the Facility, the Parties desire to enter into this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and provisions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

1.	CLOSING.

a.	The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the first business day of the month following the day that all of the conditions to Closing set forth in Section 3 are satisfied or such other date as mutually agreed upon by the Old Operator and New Operator (such date on which the Closing occurs, the "Closing Date).  New Operator shall use commercially reasonable efforts to obtain (i) all approvals that are necessary or appropriate in order for New Operator to operate the Facility under New Jersey law as a one hundred eighty (180) bed skilled nursing facility (collectively, the "License"), including a nursing home license issued by the New Jersey Department of Health ("DOH") and all other permits, consents, approvals and other assurances as are, under local custom and practice, customarily obtained by prudent and reasonable operators of skilled nursing facilities similar to the Facility acting in good faith, before such an operator takes possession of, and begins to operate, a facility similar to the Facility, and (ii) Medicare and Medicaid provider agreements, including all managed care contracts with respect to the Facility (the "Provider Agreements" and collectively, clauses (i) and (ii), the "Regulatory Approvals").

b.	License Approval. Within ten (10) business days of the conclusion of the Due Diligence Period (as defined in the APA) ("Application Submission Period"), New Operator shall

1

submit to the DOH its License application (the "Application") seeking establishment and licensure of New Operator as the operator of the Facility ("License Approval"). New Operator will diligently prosecute the Application and will timely submit all information requested by the DOH. New Operator will deliver to Old Operator (i) evidence, reasonably satisfactory to Old Operator, that the Application was submitted pursuant to this Section 1.b and during the Application Submission Period, and (ii) all material correspondence with the DOH (with such redactions as are necessary or advisable in New Operator's reasonable discretion).  New Operator will not intentionally take any action prior to the Closing Date that would reasonably be expected to disqualify New Operator as the established and licensed operator of the Facility or materially delay approval of the Application.

2.        DUE DILIGENCE; COOPERATION; INTERIM OPERATIONS OF THE FACILITY.

a.        Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to effect an orderly transfer of the operation of the Facility. Subject to the provisions of this Agreement and provided that such access rights are not disruptive to the Facility operations and are at all times in compliance with all state and federal laws governing the rights of the residents of the Facility, upon reasonable prior notice to Old Operator and subject to any COVID-19 related State of New Jersey mandates or restrictions, New Operator and its agents, employees and contractors shall have the right to enter the Property during reasonable business hours to conduct any necessary diligence, and to, following the expiration of the Due Diligence Period, conduct interviews with employees and observe the day-to-day operations and management of the Facility.

b.        Subject to the express provisions of the ASA (as defined in the APA) from and after the effective date thereof, from the Effective Date until the earlier of the APA Closing, the Closing Date and the date that this Agreement is terminated, Old Operator shall operate the Facility in substantially the same manner as the Facility has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with third parties and use best efforts to keep available the services of all of the Facility's employees, including but not limited to the administrators, the directors of nursing and the employees responsible for public relations and marketing.  Without limiting the generality of the foregoing, until the earlier of (i) the APA Closing, or (ii) the Closing Date, or (iii) the termination of this Agreement, Old Operator shall, unless consented to otherwise by New Operator in writing:

i.        operate the Facility in the normal course of business consistent with past practice, diligently and in good faith, and in compliance with all applicable laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

ii.        maintain, repair and replace where appropriate, consistent with past practice, with no less than like kind, the real and personal property, equipment, furniture and fixtures, leasehold improvements in substantially the same condition that exists on the date hereof, reasonable wear and tear excepted and subject to the requirements to repair and replace as set forth in the APA, and refrain from delaying such repair and/or replacement as a result of the pending transfer, except where such delay is consistent with past practice;

iii.        maintain the Facility's licensure status, and Medicare and Medicaid provider agreements, in compliance with all applicable laws, rules and regulations;

4919-5875-2000, v. 5

iv.    exercise its commercially reasonable efforts to preserve Old Operator's existing relationships with suppliers, distributors, customers and others having business relations with Old Operator such that no Facility will be impaired;

v.    maintain the Facility's records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

vi.    use commercially reasonable best efforts to preserve the present residency occupancy levels of the Facility and the goodwill with all of the suppliers, residents and others having business relations with Old Operator or the Facility;

vii.    keep the Property free and clear of all liens, claims and encumbrances and promptly remove any created or caused by Old Operator or its employees or agents;

viii.    maintain all existing policies of insurance (or comparable policies) of or relating to the Facility or assets of Old Operator in full force and effect;

ix.    use its commercially reasonable best efforts maintain the quality of care to the residents of the Facility;

x.    invoice and collect revenue consistent with past practice;

xi.    take reasonable steps to safeguard, maintain and preserve all employee and medical records of the Facility transferred under this Agreement in accordance with the provisions of, and for the periods prescribed by, all applicable laws, which shall in no event be less than the steps taken by Old Operator in the operation of the Facility prior to the transactions contemplated under this Agreement;

xii.    avoid immediate jeopardy violations, maintain provider agreements without suspension, qualification or limitation or revocation, and avoid DPNAs or imposition of civil money penalties or the providing of substandard care;

xiii.    perform all of its obligations in respect of the Facility whether pursuant to any Contract, or other requirement;

xiv.    from the Effective Date through the Closing Date, cooperate with New Operator as necessary for New Operator's receipt of the Regulatory Approvals (including the License Approval); and

xv.    promptly inform New Operator in writing of any material event affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against, including any: violations related to the Facility; notice of termination of the certification issued by DOH or Centers for Medicare and Medicaid Services ("CMS") of the Facility to participate in the Medicare and/or Medicaid reimbursement programs; or notice of termination of the license issued by DOH to operate the Facility.

Notwithstanding that certain of Old Operator's requirements pursuant to this Section 2.b shall expire at the APA Closing, between the APA Closing and the Closing, Old Operator shall not actively take any action that would have been a breach of this Section 2.b prior to the APA Closing.

3

c.        Without limiting the effect of any other provision of this Agreement, between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Old Operator shall not do any of the following with respect to the Facility without the prior written consent of New Operator:

i.        increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any employee of the Facility except those reasonable bonuses and wage increases in the ordinary course of business consistent with past practice;

ii.        take any action which will or could reasonably be expected to cause any of the representations or warranties in this Agreement to become untrue;

iii.        decrease the private pay rates of the residents of the Facility;

iv.        sell, transfer or otherwise dispose of any of the Supplies (as defined below) except in the ordinary course of business consistent with past practice, in which event Old Operator shall replace the same with similar property of equal or greater quality, value and usefulness;

v.        enter into any contract, other than residential contracts, which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract (as hereinafter defined) which exists at present;

vi.        sell, lease, transfer, convey or otherwise dispose of (other than in the ordinary course of business consistent with past practice), or cause or permit any Exception (as defined in the APA) to exist on, any of the Purchased Assets (as defined in the APA) which will not be released at or prior to the Closing;

vii.        cancel any Assumed Contract (as defined below) or materially default in the performance of any Assumed Contract, or obligation, or waive any material default or potential material default by any other party, or waive, release, compromise, settle or assign any rights or claims under any Assumed Contract;

viii.        violate in any material respect, terminate, fail to preserve or permit the lapse of, any material license, permit or other authorization relating to the Facility as it exists on the date hereof, including the Facility's certificate of need, if any, or any provider agreements, including its provider agreements with Medicare and Medicaid, which are necessary or desirable for the operation of the Facility;

ix.        release, compromise or settle any material claim, action or legal proceeding that would result in a material adverse effect or may be construed as an obligation of New Operator, other than in the ordinary course of business consistent with past practice;

x.        enter into any transaction with any owner, officer, director, manager or affiliate of Old Operator or any of its affiliates, or any relative or affiliate of any such owner, officer, director, manager or affiliate;

xi.        remove, discharge or transfer residents from the Facility to a nursing facility owned, operated or managed by Old Operator or any of its affiliates, or voluntary

4

transfer any resident from the Facility to any other nursing facility, where such transfer is not in the ordinary course of business and not (A) for reasons relating to the health and well-being of the resident transferred, (B) in accordance with an election to transfer by the applicable resident or his or her family or attorney-in-fact, or (iii) otherwise required by law; or

xii.    (A) remove or relocate to any affiliate, any administrator, director of nursing or other key employee, or (B) hire any new employee except in the ordinary course of business consistent with past practice.

d.    <u>Resident Discharges for Nonpayment</u>. Notwithstanding the forgoing, prior to Closing, Old Operator shall use commercially reasonable best efforts to voluntarily discharge or transfer each resident of the Facility who has not timely paid his or her financial obligations to the applicable Facility and who owes the Facility in excess of twenty-five thousand dollars ($25,000.00) (each a "<u>Delinquent Resident</u>").  For the avoidance of doubt, the definition of Delinquent Resident shall not include residents who are awaiting approval of payment from a payor source.

e.    <u>Financing</u>.  Old Operator will reasonably cooperate with New Operator and its financing sources to enter into such agreements as are required by such financing sources.

f.    <u>Further Information</u>.  Old Operator shall (i) provide weekly census reports with respect to the Facility to New Operator, and (ii) updated year-to-date Financial Statements (as defined below) as they become available.  Old Operator hereby covenants to notify New Operator in writing of (A) the occurrence of a survey at the Facility within one (1) business day thereof (but in any case prior to the Closing Date), (B) the communications from any state and/or federal surveyor during the exit interview within two (2) business days thereof (but in any case prior to the Closing Date), and (iii) any citations or deficiencies identified in a survey report or form CMS-2567 related to the Facility within two (2) business days of the receipt thereof (but in any case prior to the Closing Date).

3.    <u>CONDITIONS PRECEDENT</u>.

a.    New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction (or waiver by New Operator) of the following conditions precedent on and as of the Closing Date:

i.    Old Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder and Seller shall have duly and timely performed all of its duties, obligations, promises, covenants and agreements under the APA, in each case, in all material respects.

ii.    Each of the representations and warranties of Old Operator contained in this Agreement shall be true and correct in all material respects as of the Effective Date, and (i) with respect to all such representations and warranties that relate to the operation of the Facility, shall be true and correct in all material respects as of the date of the APA Closing and (ii) with respect to all such representations and warranties other than those in the foregoing clause (i), shall be true and correct in all material respects as of the Closing Date, in each case, without giving effect to any materiality or similar qualifier therein, provided, however, that the conditions set forth in this Section 3(a)(ii), shall not apply where failure of the conditions to be met in clause (ii) above result from New Operator's

5

or Purchaser's use and operation of the Facility on and after the APA Closing, and through no fault of Seller or Old Operator.

iii.    Old Operator shall not be in material breach of any term, provision or condition of this Agreement and Seller shall not be in material breach of any term, provision or condition of the APA.

iv.    Old Operator shall deliver to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator:

A.    A duly executed assignment by Old Operator, in substantially the form annexed hereto as Exhibit A (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i.    the Patient Trust Funds and Property (as defined herein);

ii.    all resident contracts or other agreements with residents of the Facility;

iii.    all licenses, permits, accreditations, Medicaid and Medicare contracts, and other regulatory approvals, and all rights of Old Operator under any government or non-government provider agreements or any other third party payor programs, if any, issued by any federal, state, municipal or local governmental authority relating to the use, maintenance or operation of the Facility running to, or in favor of, Old Operator, to the extent legally assignable (including all modifications thereto or renewals thereof) (the "Permits");

iv.    all guaranties or warranties then in effect, if any, with respect to the Facility and all Personal Property (the "Warranties"); and

v.    any other assets required to be assigned to New Operator pursuant to this Agreement.

B.    a duly executed Bill of Sale;

C.    a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer or member of Old Operator, dated as of the Closing Date, certifying that the conditions to New Operator's obligations contained in Section 3 have been satisfied;

D.    a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer of Old Operator, certifying the resolutions authorizing the transactions contemplated hereby, and appearing on such certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement (and all documents to be executed and delivered pursuant hereto, (the "Other Documents"));

E.    the Clearance Letter (as defined in the APA);

F.    counterpart copies of all Warranties;

6

G.      copies of all Permits; and

H.      a termination of the Existing Lease (as defined below), duly executed by Seller and Old Operator.

v.      As of and on the Closing Date there shall not have been imposed against Old Operator, nor shall have Old Operator received notice of (a) any civil monetary penalty ("CMP") or other federal, state or local fine and/or penalty assessed for the period prior to the APA Closing which has not been paid or remedied by Old Operator or which are reserved for by Old Operator during such time as Old Operator contests such CMP or penalties, or (b) any withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment, including but not limited to state bed tax or assessment, assessed for the period prior to the APA Closing which has not been paid or remedied by Old Operator or which are reserved for by Old Operator during such time as Old Operator contests such withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment;

vi.     On or before the Closing Date, Old Operator shall have transferred to New Operator the Patient Trust Funds and Property (as defined below) in compliance with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5;

vii.    Between the date of this Agreement and the APA Closing, there shall not have been any Material Adverse Effect (as defined below) or any other material adverse change in the regulatory status or condition of any of Old Operator's licenses, permits or certifications, and the Medicare and Medicaid rates of the Facility or the business operations, financial conditions or prospects of the Facility;

viii.   Up to and on the date of the APA Closing, there shall be no (a) lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights or (b) actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of the transactions contemplated hereby;

ix.     The residency occupancy levels at the Facility on the date of the APA Closing shall be at least ninety-two and one-half percent (92.5%) of the occupancy level of the Facility as of the Effective Date; provided that Seller shall have fifteen (15) days to cure any shortfall below such ninety-two and one half percent (92.5%) threshold; provided, further, that any such cure may only be effected with admissions of residents in a manner consistent with past admissions standards and practices of the Facility (including with respect to payor type and ability to pay).

x.      The closing of the transactions contemplated by the APA (the "APA Closing") shall have occurred and the Lease (as defined in the APA) and the ASA, shall have been (A) entered into as of the APA Closing, (B) in effect as of immediately prior to the Closing and (C) terminated (or in the case of the Lease, at New Operator's election, assigned to New Operator) as of the Closing; and

7

xi.       New Operator shall have been issued or otherwise obtained all Regulatory Approvals, including the License (or assurance satisfactory to New Operator that the Regulatory Approvals, including the License will be issued effective as of Closing), consents and Permits that are not otherwise assigned under the General Assignment that are necessary for New Operator's legal operation of the Facility as of the Closing Date in substantially the same manner as operated by Old Operator.  The foregoing contemplates without limitation that New Operator shall have received, to the extent required, all consents for New Operator's assumption of the Assumed Contracts.

b.       Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction (or waiver by Old Operator) of the following conditions precedent on and as of the Closing Date:

i.       New Operator shall have duly and timely performed and fulfilled all of their duties, obligations, promises, covenants and agreements hereunder, in each case, in all material respects.

ii.       Each of the representations and warranties of New Operator contained in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date, without giving effect to any materiality or similar qualifier therein.

iii.       New Operator shall not be in breach of any term, provision or condition of this Agreement.

iv.       New Operator shall have executed and delivered to Old Operator the applicable Other Documents.

v.       New Operator shall deliver to Old Operator on or before the Closing Date the following, each of which shall be in form and substance reasonably satisfactory to Old Operator:  (1) a certificate of New Operator, executed by a duly authorized manager of New Operator, dated the Closing Date, certifying that the representations and warranties of New Operator set forth in this Agreement are true and complete on and as of the Closing Date and (2) a certificate from New Operator, executed by a duly authorized manager of New Operator, certifying the resolutions authorizing the transactions contemplated hereby and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement; and

vi.       The APA Closing shall have occurred.

In the event that either of the Parties (a "<u>Waiving Party</u>") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies hereunder or at law or equity with respect thereto.

4.       <u>CONVEYANCE OF SUPPLIES</u>**.**

a.       In consideration of this Agreement, on the Closing Date, Old Operator shall deliver to New Operator a bill of sale (the "<u>Bill of Sale</u>") for the Supplies (as defined herein), in the form annexed hereto as <u>Exhibit B</u>, as shall be necessary to convey to New Operator good and marketable

8

right, title and interest in and to the Supplies and any other property of Old Operator used in connection with the operation of the Facility, free and clear of all liens, claims, encumbrances, charges, restrictions, rights or interests of others of any kind.

b.       Old Operator shall have no obligation to deliver the Supplies to any location other than that at the Facility, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

5.       TRANSFER OF PATIENT TRUST FUNDS.

a.       On or prior to the Closing Date, Old Operator shall provide to New Operator a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Old Operator of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which is attached hereto as Schedule 5.a ("Patient Trust Funds and Property").

b.       Old Operator hereby agrees to transfer, or to cause to be transferred, to New Operator the Patient Trust Funds and Property on the Closing Date.  Old Operator shall comply with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property.  New Operator hereby agree that they will accept the Patient Trust Funds and Property in trust for the residents, in accordance with applicable statutory and regulatory requirements; provided, however, that such transfer shall not relieve Old Operator of its custodial and fiduciary responsibilities for such funds and property to the beneficiaries thereof for the period prior to the Closing Date.

c.       Old Operator hereby agrees to indemnify, defend and hold New Operator and their respective employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and permitted assigns (collectively, including New Operator, the "New Operator Parties") harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event the amount of funds, if any, transferred to New Operator does not represent the full amount of the funds delivered to Old Operator as custodian or with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Property prior to the Closing Date.

d.       New Operator will indemnify, defend and hold Old Operator and its employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and permitted assigns harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator by a patient for his or her Patient Trust Funds and Property if and to the extent that such funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator on and after the Closing Date with respect to Patient Trust Funds and Property actually received by New Operator.

6.       REGULATORY APPROVALS; COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.

a.       At New Operator's election, if New Operator is unable to obtain any of the Regulatory Approvals prior to the Closing Date, then, subject to applicable law, until such time that New Operator obtains such Regulatory Approval, Old Operator shall authorize New Operator to

9

4919-5875-2000, v. 5

use such Regulatory Approval of Old Operator (not including the License), provided, however, that New Operator shall indemnify and hold Old Operator harmless on account of any liabilities that result from New Operator's use of such Regulatory Approval.

b.        Effective on the Closing Date, Old Operator sells, assigns and conveys to New Operator the Medicare and Medicaid provider number(s) in use at the Facility (the "Existing Provider Numbers"). Notwithstanding the foregoing, Old Operator retains any and all rights and liabilities relating to the Existing Provider Numbers relating to any and all periods preceding the Closing Date. Old Operator and New Operator shall execute any and all documents necessary for, and will otherwise cooperate in connection with, the assignment of the Existing Medicare Provider Number. During the pendency of New Operator's CMS Form 855A (the "CHOW"), New Operator may bill Medicare and Medicaid under Old Operator's name and the Existing Provider Numbers, until the intermediary changes the electronic funds transfer account or special payment address to the New Operator. Notwithstanding the foregoing, New Operator shall be responsible for all rights and liabilities relating to the Existing Provider Numbers relating to any and all periods on or after the Closing Date. This Section 6.b is intended to satisfy the requirements of Chapter Section 15.7.7.1.5 of the Medicare Program Integrity Manual.

c.        Old Operator shall prepare and file with the appropriate Medicare and Medicaid agencies its final cost reports with respect to its operation of the Facility as soon as reasonably practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third-party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports. To the extent that there are any delays in payment by any third party payor to New Operator as a result of Old Operator's failure to timely file its cost reports under this Section 6.c, upon demand of such New Operator, Old Operator shall pay to such New Operator interest on the amounts withheld by such third party payor(s) equal to the then current prime rate of interest (as announced from time to time by the *Wall Street Journal*) plus three percent (3%) (the "Default Rate"). Old Operator agrees to cooperate with New Operator as necessary for enrollment of New Operator in the Medicare and Medicaid programs.

d.        Each Party agrees to notify the other within three (3) calendar days after receipt of any notice of any claim of recapture by DOH, CMS, the Office of Inspector General for the United States Department of Health ("OIG") or any other governmental or quasi-governmental authority with respect to an alleged Medicare or Medicaid overpayment or any alleged underpayment of any tax or assessment for periods relating prior to the Closing Date (each, a "Recapture Claim"). To the extent ascertainable on or prior to the Closing Date, Old Operator shall pay or cause to be paid any Recapture Claim which relates to or arising from any period prior to the Closing Date; provided, however, that nothing herein shall be deemed to prevent or restrict Old Operator from contesting any such Recapture Claim, and, if, based on the advice of its attorneys, by paying such Recapture Claim, Old Operator shall have forfeited its right to such contest, Old Operator may delay paying such Recapture Claim until final resolution of such contest, so long as Old Operator otherwise complies with the provisions of this Section 6.

e.        In the event DOH, CMS, OIG or any other governmental or quasi-governmental authority or agency making payments to New Operator for services performed at the Facility on or after the Closing Date make any Recapture Claim for any period prior to the Closing Date, then Old Operator shall be entitled to contest such Recapture Claim; provided, however, that New Operator shall be allowed the opportunity to participate in all meetings, and be provided with copies

4919-5875-2000, v. 5

of all audit adjustments and work papers.  Old Operator and New Operator shall cooperate to resolve such audit to their mutual satisfaction.  In the event that Old Operator fails to pursue any issue or issues raised in any such appeal, New Operator may, at its own expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.   If Old Operator does not prevail with regard to such contest, Old Operator hereby agrees to save, indemnify, defend and hold the New Operator Parties harmless from and against any loss, damage, injury or expense incurred by any such party arising from or related to any such Recapture Claim.  In connection with the foregoing indemnification obligation, in the event that CMS, DOH or any other governmental or quasi-governmental authority or agency or other third party payor source withholds amounts from any New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to such New Operator within ten (10) days following such New Operator's demand therefor.  Such payment shall be made regardless of whether Old Operator is then contesting such Recapture Claim.

f.       Old Operator shall be and remain obligated for and shall pay on or before the date due thereof all amounts of any license fees or taxes or other amounts payable to any other government authority with jurisdiction over the Facility accrued through the Closing Date, including any Medicaid provider taxes owed to DOH or state bed tax or assessment.  Old Operator shall provide to New Operator, on or before the Closing Date, evidence reasonably satisfactory to New Operator of payment of all of such fees and taxes.

g.       Old Operator shall at its sole and exclusive cost and expense be liable and responsible for the correction of all violations cited by DOH in any survey ("Survey") prior to, on or after the Closing Date as detailed in the Statement of Deficiencies issued by DOH ("Statement"), if any, accompanying such Survey, and all proposed or imposed remedies, including any CMP, that result from a condition or incident at the Facility prior to the Closing Date or as a result of an action or inaction of Old Operator prior to the Closing Date, until the cure thereof and, if applicable, any proposed denial of payment by, or termination of certification to participate in, the Medicare or Medicaid programs set forth in the Statement or otherwise resulting from the Survey or Statement is withdrawn.

h.       Old Operator shall deliver to New Operator copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports.

7.       CONTRACTS; RESIDENT AGREEMENTS.

a.       As soon as practicable after the Effective Date, Old Operator shall deliver to New Operator true, accurate and complete copies of all Contracts, a schedule of which is attached hereto as Schedule 7.a.

b.       Prior to the Closing Date, New Operator shall deliver written notice to Old Operator as to which of the Contracts New Operator desires to assume pursuant to the General Assignment and continue in full force and effect after the Closing Date (the "Assumed Contracts"), a listing of which shall then be attached hereto as Schedule 7.b.  Any Contract that New Operator does not indicate it desires to assume and continue shall be deemed rejected by New Operator ("Rejected Contracts") and Old Operator shall terminate such Rejected Contracts; provided, however, that such termination shall be made in compliance with the applicable provisions under such Rejected Contracts.

11

c. Old Operator shall transfer, convey and assign to New Operator, in accordance with the terms of the General Assignment, on the Closing Date all existing agreements with residents and any guarantors thereof, to the extent assignable by Old Operator (excluding only the right to any payments for periods prior to the Closing Date).

d. In addition to and not in lieu of any other indemnity set forth elsewhere herein, Old Operator hereby agrees to indemnify, protect, save, defend and hold the New Operator Parties harmless from and against any and all liabilities, obligations, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, asserted against or incurred by any of the New Operator Parties arising out of or connected with any (i) third parties claiming to have rights under contracts or other agreements that are not set forth or described in Schedule 7.a or (ii) Rejected Contracts.

e. Concurrently with the APA Closing, (i) Old Operator and New Operator shall enter into the ASA and (ii) Old Operator shall enter into, and New Operator shall ensure that Purchaser enters into, the Lease,

8. NO ASSUMPTION OF LIABILITIES.

a. Except for future obligations under contracts and commitments that are expressly assumed by New Operator hereunder, Old Operator has no liabilities, debts, claims or obligations, whether accrued, absolute, contingent or otherwise, whether due or to become due, that may be asserted against New Operator, Purchaser or, following the Closing, the Facility. Other than as specifically set forth in this Agreement, New Operator does not and shall not assume, and nothing in this Agreement shall be construed as an assumption by New Operator of, any liabilities, obligations or undertakings of Old Operator of any nature whatsoever, whether accrued, absolute, fixed or contingent, known or unknown, due or to become due, unliquidated, or otherwise, and whether or not associated with the Facility or the Purchased Assets.

b. Except as specifically provided in this Agreement, New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing Date, including any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom, and Old Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility on or after to the Closing Date, including any matters relating to cost reports, collections, audits, hearing, or legal action arising therefrom.

9. ACCOUNTS RECEIVABLE; ACCOUNTS PAYABLE.

a. New Operator shall not assume any accounts receivable owed or due to Old Operator from or relating to the operation, ownership or management of the Facility prior to the Closing Date. Old Operator shall retain the right to collect all unpaid accounts receivable as of the close of business on the day prior to the Closing Date with respect to the Facility, but only to the extent that such accounts receivable relate to services rendered prior to the Closing Date. All collections shall be conducted in accordance with normal business practices and no patients or residents shall be unreasonably harassed in the collection of such amounts. Old Operator shall engage sufficient personnel to bill and collect Old Operator's accounts receivable using Old Operator's legacy billing system, which Old Operator shall maintain as required to bill and collect

4919-5875-2000, v. 5

its accounts receivable hereunder.

b.       If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator.  New Operator and Old Operator shall send copies of all Medicare and Medicaid remittance advices to the other Party for purposes of recording and pursuing accounts receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each Party.  If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to any New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator.  Any such remittances pursuant to this Section 9.b shall occur within ten (10) days from the date the Party required to make such remittance receives payment thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

c.       Payments received by New Operator or Old Operator from non-governmental payment sources shall be paid to the party designated in such payments entitled to the payments for the services provided thereunder within ten (10) days from the date the party required to make such remittance receives payment thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.  Any non-designated payments received by New Operator or Old Operator from non-governmental payments sources after the Closing Date shall first be applied to any post-Closing Date monthly balances due to any New Operator for services provided after the Closing Date, with the excess if any, applied to any pre Closing Date monthly balances due for services rendered by Old Operator prior to the Closing Date. Notwithstanding the foregoing, New Operator hereby acknowledges and agrees that such pre-Closing Date monthly balances are the property of Old Operator and Old Operator reserves the right to continue to directly pursue the collection of such pre-Closing Date monthly balances.

d.       To the extent a Party receives any payments for accounts receivable of another Party, the Parties acknowledge that the Party receiving the payment belonging to another Party shall hold the payment in trust, that no Party shall have any right to offset with respect to such accounts receivable, and that the Party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the appropriate other Party within ten (10) days of receipt thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

e.       Nothing herein shall be deemed to limit in any way any Party's rights and remedies to recover accounts receivable due and owing to it under the terms of this Agreement.

f.       All accounts payable for services provided or goods furnished for or at the Facility prior to the Closing Date, notwithstanding whether such accounts payable were incurred in the name of Old Operator, shall remain the sole responsibility and obligation of Old Operator.  All accounts payable for services provided or goods furnished for or at the Facility on or after the Closing Date, notwithstanding whether such accounts payable were incurred in the name of New Operator (except with respect to Rejected Contracts), shall be the sole responsibility and obligation of New Operator.  To the extent accounts payable have accrued for a period that includes time both before and after the Closing Date, the Parties shall equitably apportion the responsibility for payment of such accounts payable.  The Parties hereby agree to cooperate with each other and to notify the merchants, suppliers or other third parties with respect to which of Old Operator or New Operator bears responsibility for accounts payable of the Facility based on the foregoing clauses of

13

4919-5875-2000, v. 5

this <u>Section 9.f.</u>

g.       This <u>Section 9</u> shall be subject to the express provisions of the ASA from and after the effective date of the ASA.

10.    <u>EMPLOYEES</u>.

a.       Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which is attached hereto as <u>Schedule 10.a</u> (such listing, to include the position and current base salary of each such employees) (each, a "<u>Current Employee</u>" and collectively, the "<u>Current Employees</u>"), effective as of the earlier of the Closing Date and the date of the APA Closing.  Old Operator shall be responsible for any "Continuation Coverage" (as that term is defined by COBRA Section 4980B of the tax code and Section 601, <u>et</u> <u>seq.</u> of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>")) for any employee of Old Operator terminated at any time prior to or on the Closing Date who does not become a Retained Employee (as defined below).  New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party.  From and after the date hereof, Old Operator shall not make any material changes in the compensation or benefits of the employees at the Facility.

b.       New Operator shall determine, in its sole discretion, which of the Current Employees shall be offered employment with New Operator, pursuant to employment terms acceptable to New Operator (each, a "<u>Retained Employee</u>" and collectively, the "<u>Retained Employees</u>").  Notwithstanding the foregoing, New Operator shall rehire or offer to rehire not less than the number of the Current Employees necessary to avoid WARN Act notice or similar notice requirements or other related liability contained in any applicable law.  Notwithstanding the foregoing, nothing in this <u>Section 10.b</u> shall create any right in favor of any person not a party hereto, including the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee or Retained Employee.

c.       At Closing, Old Operator shall provide New Operator with a credit (the "<u>Employee Accrual Credit</u>") in an amount equal to ninety percent (90%) of the accrued, vested and unvested, but unpaid vacation, sick and holiday pay and severance obligations, if any, plus all applicable employer withholding charges and payroll costs (including FICA, FUTA, SUTA and worker's compensation) and costs associated with processing payroll for a total of ten percent (10%) for withholding and payroll, as well as any insurance premium obligations of Old Operator, vested or unvested, with respect to the Retained Employees that have accrued prior to the earlier of the Closing Date and the effective date of the ASA ("<u>Old Operator's Vacation and Holiday Pay Expenses</u>").  New Operator agrees to pay when and as due, all of such Old Operator's Vacation and Holiday Pay Expenses, <u>provided</u>, <u>however</u>, that New Operator shall not be liable for, and Old Operator shall indemnify and hold the New Operator Parties harmless, on account of any and all other liabilities and obligations with regard to any of the Current Employees and with regard to the Retained Employees, any and all other liabilities and obligations that shall have accrued prior to the Closing Date.  A schedule of Old Operator's Vacation and Holiday Pay Expenses is attached hereto as <u>Schedule 10.c</u>.  If New Operator discovers after the Closing Date that the amount credited is less than the amounts required to be credited under this <u>Section 10.c</u>, Old Operator shall pay to New Operator within five (5) days after New Operator provides notice thereof, by an amount equal to such deficiencies, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

d.       New Operator and Old Operator acknowledge and agree that the employees at the

Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as licensed operator of the Facility is based upon the skills and qualifications of such employees.  As such, in the event that during the period beginning on the Effective Date and ending upon the date that is eighteen (18) months following the Closing Date: (i) any Current Employee is solicited for employment by any person or entity that either directly or indirectly controls, is under common control with or is otherwise affiliated with Old Operator (any of the foregoing, an "Old Operator Party"), or (ii) any of the employees listed on Exhibit C attached hereto (each, a "Scheduled Employee") are hired by an Old Operator Party, then Old Operator shall pay to New Operator an amount equal to the greater of (a) fifty thousand dollars ($50,000.00), or (b) an amount equal to such employee's annual salary as liquidated damages, for each such Current Employee or Scheduled Employee.  The Parties acknowledge and agree that actual damages with respect to the foregoing would be difficult to ascertain and that the amount set forth in the immediately preceding sentence is a fair and reasonable approximation of such actual damages. This provision shall not in any way limit such other remedies that may be available to New Operator.  Old Operator further acknowledges that the scope and duration of the provisions of this Section 10.d are reasonable.  The Parties acknowledge and agree that advertisements available to the general public, such as through website job postings and newspaper, Internet and trade journals shall not constitute solicitation for purposes of this Section 10.d.

e.        New Operator shall not be required to assume the CBA (as defined below) of the Facility between Old Operator, and the Union (as defined below), and any other union-related contracts or liabilities, including any Pension Liability (as defined below,  provided, however, that New Operator hereby acknowledges and recognizes the Union and covenants to advise the Union and the Retained Employees, either prior to, or at the time of, offering employment to the Retained Employees pursuant to Section 10(b) hereto, that New Operator does not intend to be bound by the existing CBA.

11.        EMPLOYMENT RECORDS.  Prior to the earlier of the Closing Date and the effective date of the ASA, Old Operator shall deliver to New Operator, either the originals or full and complete copies of all available employee records for all Retained Employees in its possession (including all employee employment applications, W-4's, I-9's, employee health records (including PPD results, screening and x-rays), OSHA 300 summary forms, state tax filing, including state unemployment rate determination letters, and any disciplinary reports) (collectively, the "Employee Records").  Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the earlier of the Closing Date and the effective date of the ASA with regard to the Retained Employees.

12.        ACCESS TO RECORDS.

a.        On the Closing Date, Old Operator shall deliver to New Operator all of the records of the Facility, including patient medical and financial records, provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; provided, further, that for a five (5) year period after the Closing Date, Old Operator shall give New Operator access to any information and the right of inspection (including the right to extract or make copies) in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b.        Subsequent to the Closing Date, New Operator shall allow Old Operator and its agents and representatives to have reasonable access to (upon reasonable prior notice and during

normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns or any other government agency actions or notices.

c.      Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove and/or copy any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation.  Any record so removed shall promptly be returned to New Operator (or, at New Operator's election, destroyed) following its use.

d.      New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including patient records and records of patient funds, to the extent required by law.

e.      This Section 12 shall be subject to the express provisions of the ASA from and after the effective date of the ASA.

13.     USE OF TELEPHONE NUMBER AND SOCIAL MEDIA WEBSITES   New Operator may use the current name and present telephone numbers of the Facility.  Old Operator shall, as of the Closing Date, transfer or cause to be transferred, at its expense, all right, title and interest in and to the telephone numbers and social media websites (the "Sites") used by the Facility.  Old Operator represents and warrants that the Facility has no website that will be functional or in existence from and after the Closing other than the Sites that will be transferred pursuant to the immediately prior sentence.

14.     POLICY AND PROCEDURE MANUALS.  Old Operator agrees to leave its policy and procedure manuals at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator.

15.     TAXES.  Old Operator shall discharge any provider or other tax charged by DOH or other government agency relating to any period prior to the Closing Date.  Old Operator shall file all returns, reports and filings of any kind or nature, required to be filed by Old Operator on a timely basis and will timely pay all taxes or other obligations and liabilities which are due and payable, including with respect to the Property or the Facility, in the ordinary course of business.  Old Operator shall pay before the same shall become due all taxes, duties and other governmental charges that accrue prior to the Closing Date, which, if not paid, would create or may hereafter create a lien on any of the assets of New Operator or for which New Operator could become liable as a successor operator of the Facility.  Old Operator shall also file any required bulk transfer filings necessary to establish that New Operator shall not succeed to any state tax liabilities.

16.     INDEMNIFICATION.

a.      New Operator shall indemnify, save, protect, defend and hold harmless Old Operator and its respective employees, affiliates, managers, members, partners, officers, directors and agents, from and against all claims, liabilities, losses, damages, demands and causes of action of any nature whatsoever (including demands and causes of action relating to injury or death to persons or loss of or damage to property), and all costs and expenses (including penalties and reasonable attorneys' and other professional fees and disbursements incurred in the investigation

16

or defense of any such claims, or in asserting, pursuing or enforcing any such claims), whether or not resulting from third-party claims (collectively, "Losses") arising from, out of, or relating to (i) operation of the Facility by New Operator on or after the Closing Date, (ii) New Operator's use or occupancy of the Property or the condition thereof on or after the Closing Date, and (iii) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of New Operator contained in this Agreement or in any of the Other Documents.

b.        Old Operator shall indemnify, save, protect, defend and hold harmless each of the New Operator Parties from and against all Losses arising from, out of, or relating to (i) the ownership or operation of the Facility by Old Operation prior to the Closing Date, (ii) Old Operator's use or occupancy of the Property or the condition thereof prior to the Closing Date, (iii) any Recapture Claim, (iv) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of Old Operator contained in this Agreement or in any of the Other Documents, (v)  the CBA or Union, including any Pension Liability, and Old Operator's, Seller's or the Facility's receipt of Stimulus Funds, (vi) any resident present at the Facility on the Closing Date for whom a recognized payor source cannot be obtained following the Closing, and (vii) the ERC.

c.        In the event that any liability, claim or demand for Losses which are subject to indemnification by or under any provision of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, such Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within thirty (30) calendar days of Indemnitee's receipt of written notice thereof, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitee's right to receive, and Indemnitor's obligation to provide, indemnification hereunder unless such failure directly and materially prejudices Indemnitor's right or ability to defend the Indemnitee's Claim.  Upon receipt of notice of any Indemnitee's Claim(s), Indemnitor shall, subject to Indemnitees other rights as set forth herein, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof promptly upon the final, unappealable resolution of such Indemnitee's Claim.  Indemnitor shall keep Indemnitee informed with respect to all aspects of the resolution of an Indemnitee's Claim.  Without limiting the foregoing, upon request by Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of any Indemnitee's Claim.  Indemnitor shall not, without the prior written consent of Indemnitee, which consent shall not be unreasonably withheld, settle, compromise or offer to settle or compromise any Indemnitee's Claim on a basis that would result in (i) the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of Indemnitor or any affiliate thereof, or (ii) any monetary liability on the part of Indemnitor or any affiliate thereof that will not be paid or reimbursed by the Indemnitee.  Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent.  In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be deemed an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law, intervene in and defend, settle or compromise such Indemnitee's Claim at Indemnitor's sole and

17

4919-5875-2000, v. 5

exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand thereof, Indemnitor shall promptly reimburse Indemnitee all amounts (including attorneys' fees) incurred by Indemnitee with respect to the resolution of such Indemnitee's Claims.

d.      If and when an Indemnitee desires to assert an Indemnitee's Claim in accordance with Section 16.a or Section 16.b, as applicable, other than with respect to a third-party claim in accordance with Section 16.c, Indemnitee shall notify Indemnitor of such Indemnitee's Claim and the Parties shall attempt in good faith to agree on resolution of the disputed amount. Any amount mutually agreed upon or awarded to the Indemnitee under a final judgment shall be paid by Indemnitor within five (5) business days following such agreement or the entering of such judgment, as applicable.

e.      Survival. Other than where a different survival period is expressly set forth (including in Section 16.f), all indemnification obligations of Old Operator and New Operator under this Agreement shall survive the Closing Date and shall continue in effect for a period of two (2) years after the Closing Date; provided, however, that the Fundamental Representations (as defined below) shall survive for forty-eight (48) months after the Closing Date; provided, further that if there is an Indemnitee's Claim made prior to the applicable survival period, such indemnification obligation shall continue to survive until the final, non-appealable resolution of such Indemnitee's Claim. "Fundamental Representations" mean the representations of Old Operator set forth in Section18.a (*Organization and Authority*), and Section 18.c (*No Consent*), Section 18.e (*Overpayments*), Section 18.f (*Audits*), Section 18.g (*Status of Licensure and Certification*), Section 18.h (*Status of Medicare/Medicaid Participation*) Section 18.t (*Labor Unions*) and Section 18.hh (*Stimulus Funds*).

f.      Limitation of Liability. An Indemnitor shall be liable under this Section 16 only when the total aggregate indemnification Claims of such Indemnitee under this Agreement and of such Indemnitor's affiliate under the OTA (which, for the avoidance of doubt, in the case of Old Operator is Seller and in the case of New Operator is Purchaser) exceed the Basket Amount (as defined in the APA), after which Indemnitor shall be liable for the amounts in excess of the Basket Amount. Furthermore, no Indemnitor shall be liable for Indemnitee Claims hereunder to the extent Indemnitee Claims paid by such Indemnitor hereunder and such Indemnitor's affiliate under the OTA exceeds the Cap (as defined in the APA). Notwithstanding the foregoing and anything to the contrary herein, all indemnification obligations of Old Operator arising from, relating to (i) any Recapture Claim and any other Losses relating to Medicaid and Medicare programs, (ii) power and authority to enter into this Agreement, (iii) liability for, and payment of, any taxes, (iv) regulatory compliance issues, (v) the CBA or Union, including any Pension Liability, (vi) any Fundamental Representations, (vii) any breach of any covenant or obligation, (viii) Old Operator's, Seller's or the Facility's receipt of Stimulus Funds, including if any payment that would otherwise be due to New Operator is withheld, demanded or recouped by any governmental authority or payor in connection with or relating to any receipt of Stimulus Funds by Old Operator, Seller or the Facility, (x) fraud or intentional misrepresentation, and (xi) the ERC, (A) shall survive indefinitely, subject to any applicable statutes of limitations and (B) shall not be subject to the Cap or Basket.

g.      Without limiting any of New Operator's rights pursuant to this Section 16, Old Operator acknowledges that New Operator's right to consummate the transactions contemplated hereby are unique, and recognizes and affirms that that in the event of a breach of this Agreement, money damages will be inadequate and New Operator will have no adequate remedy at law. Accordingly, Old Operator agrees that New Operator shall be entitled, in addition to any other rights and remedies existing in its favor pursuant to any other agreement between Old Operator and

New Operator or otherwise at law or in equity, to enforce its rights and Old Operator's obligations hereunder not only by an action or proceeding for damages but also by an action or proceeding for specific performance, injunctive and/or other equitable relief (without posting of bond or other security).

17.     REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR.  As an inducement to Old Operator to enter into this Agreement, New Operator hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

a.     Organization and Authority.  New Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  As of the Closing Date, New Operator will have all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

b.     No Violations.  Neither the execution and delivery of this Agreement, nor any agreement referred to or contemplated hereby, by New Operator will:

i.     violate any provision of the organizational or governing documents of any New Operator; or

ii.     conflict with or constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

c.     Survival of Representations and Warranties of New Operator.  Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all such representations and warranties shall survive the Closing Date for the applicable statute of limitations.

18.     REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR.  As an inducement to New Operator to enter into this Agreement, Old Operator hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

a.     Organization and Authority.  Old Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  Old Operator has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by Old Operator and is enforceable against Old Operator in accordance with its terms.

b.     No Violations.  Neither the execution and delivery of this Agreement, nor any agreement referred to or contemplated hereby, by Old Operator will:

i.     violate any provision of its organizational or governing documents;

ii.      conflict with or constitute a default or create a right of termination or cancellation under any agreement or commitment to which Old Operator is a party or which pertains to the Facility; and

iii.      result in the creation or imposition of any security interest, lien or other encumbrance upon any of the assets of Old Operator.

c.      No Consent Required.  No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance by Old Operator of this Agreement, prior to, or as of or at the Closing Date, or as a consequence thereof, or with the consummation by Old Operator of transactions contemplated hereby to be consummated prior to, as of or at the Closing Date, except as set forth on Schedule 18.c.

d.      Litigation.  Except as set forth on Schedule 18.d, there are no pending, nor, to Old Operator's Knowledge, threatened claims, lawsuits, governmental actions or other proceedings, including any desk audit or full audit described in below, involving the Facility or the operation thereof before any court, agency or other judicial, administrative or other governmental body or arbitrator.

e.      Overpayments.  Except as set forth on Schedule 18.e, there are no pending, nor threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor, nor is Old Operator aware of any grounds from such a claim or demand.

f.      Audits.  Old Operator represents and warrants that it will fully cooperate with New Operator in connection with any desk audit or full audit by CMS, DOH or other applicable governmental regulatory agency in connection with the desk audit or full audit of any Medicaid or Medicare cost reports filed by Old Operator, including providing New Operator with any and all necessary documentation, supporting schedules and personnel in its possession in order to properly support the dollar figures and classifications/characterizations contained in Old Operator's cost reports so that New Operator's Medicaid or Medicare reimbursements are maximized.

g.      Status of Licensure and Certification.  The Facility currently holds a license issued by DOH to Old Operator for a one hundred eighty (180) bed skilled nursing facility.  Such license is, and shall through the Closing Date be, unrestricted, unconditional, in good standing and in full force and effect and subject to no waivers or limitations.  There are no pending actions or claims or any threatened actions or claims, which, if adversely determined, could materially and adversely affect such licenses.  Old Operator has not received any written notice from DOH or any other governmental agency requiring the correction of any condition with respect to any such license which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of any such license is in jeopardy.  Old Operator has not received any written notice from DOH or any other governmental or quasi-governmental organization of any life safety code or similar violations, nor does Old Operator have any reason to believe that any condition exists at the Property that would violate any life safety codes or any similar regulations.  All deficiencies and violations cited in any Survey or resurvey have been corrected or corrective action plans have been submitted and approved therefor and will be fully implemented/corrected prior to Closing.  No Facility is currently designated as a "Special Focus Facility" (as such term is defined by the Centers for Medicare and Medicaid Services Special Focus Facility Program), and no Facility received any written notice of inclusion or intended

20

inclusion as a Special Focus Facility.

h.       The Facility is, and shall on the Closing Date be, certified for participation in the Medicaid and Medicare reimbursement program and such each certification is in full force and effect and in good standing and subject to no restrictions or limitations. Old Operator is in material compliance with the conditions of participation or requirements applicable with respect to such participation and is eligible for payment under the applicable Government Reimbursement Programs in which the Facility participates for services rendered to qualified beneficiaries. There are no pending actions or claims or, to the best of Old Operator's knowledge, any threatened actions or claims, which, if adversely determined, could materially and adversely affect such certification. Old Operator has not received any notice from DOH, CMS or any other governmental agency requiring the correction of any condition with respect to such certification which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of such certification is in jeopardy. Old Operator represents and warrants that it shall promptly comply with any violation notices concerning the Facility received after the Effective Date and before the Closing Date to the extent that any such notice requires compliance activities. Without limiting the generality of, the foregoing, during the three-year period prior to the Closing Date, except as set forth in Schedule 18.h, Old Operator has not received any of the following with respect to the Facility:

i.       A notice of violations with a scope and severity level of "F" or higher;

ii.       A notice of termination of the license issued by DOH to operate the Facility as a one hundred eighty (180) bed skilled nursing facility;

iii.       A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

iv.       A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

v.       A notice of a material Life Safety Code deficiency cited by CMS, DOH or state or local building, fire safety or health authorities that have not been corrected as of the Effective Date;

vi.       A notice that the Facility will be subject to a rate reduction for Medicaid or Medicare services provided therein as a result of a Medicare or Medicaid audit; and

vii.       A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

i.       Cost Reports; Audits. Old Operator has filed, or will file, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed pursuant to Titles XVIII and XIX of the Social Security Act prior to the Effective Date with respect to the Facility. All such reports have been or will be prepared and filed in good faith and in all material respects in accordance with all applicable laws, rules and regulations. All amounts shown as due from the Facility in the cost reports either were remitted with such cost reports or will be remitted when required by applicable law and are appropriately reflected in the Financial Statements, and all amounts shown in the Notices of Program Reimbursement as due have been, or prior to the Closing will be, paid when required by applicable law. Old Operator has been audited by the Medicaid program for all fiscal periods through December 31, 2020. The status of the pending

Medicare and Medicaid audits are attached as <u>Schedule 18.i</u>. Except as set forth in <u>Schedule 18.i</u>, there are no (A) current, pending or outstanding government reimbursement program audits or appeals, (B) cost reports that are subject to audits, (C) cost reports that remain "open" or unsettled, and (D) current or pending government reimbursement program or private program recoupment efforts (other than those conducted in the ordinary course), in each case with respect to the Facility. Old Operator has not, during the last two (2) years, received written notice of any dispute or claim by any governmental authority, fiscal intermediary or other person regarding the Facility and the government reimbursement programs or the participation by the Facility in such programs that have not been cured, and to Old Operator's knowledge, there are no (1) threatened recoupment claims for services provided by the Business, or (2) threatened suspensions, terminations, or restrictions to any contracts with Government Reimbursement Programs and/or their fiscal intermediaries or paying agents.

        j.      <u>Compliance with Applicable Laws</u>.

        i.      Old Operator is in compliance (without waivers) and as of the Closing Date will be in compliance (without waivers) with all applicable municipal, county, state and federal laws, regulations, ordinances, standards and orders, including all health, building, fire and zoning ordinances and life safety codes and the Americans with Disabilities Act, as the same may be amended.

        ii.      The Property has been and is presently used and operated in compliance in all material respects with, and in no material way violates any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Property or any part thereof, including the Nursing Home Act, Environmental Laws, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits.

        iii.      Old Operator has not received written notice of any claim, requirement or demand of any licensing or certifying agency supervising or having authority over Old Operator or otherwise to rework or redesign the Facility so as to conform to or comply with any existing law, code or standard which has not been fully satisfied prior to the Effective Date or which will not be satisfied prior to the Closing Date.

        iv.      All billing practices of Old Operator to all third party payors, including the Medicare and Medicaid programs and private insurance companies, have been in compliance with all applicable laws, regulations and policies of such third party payors and the Medicaid and Medicare programs.

        k.      <u>Life Care Contracts</u>. No Facility is party to any life care contract with respect to any resident of the Facility.

        l.      <u>Personal Property and Residents</u>. Unless specifically permitted pursuant to the terms of this Agreement, Old Operator shall not remove any items of Personal Property from the Facility nor shall it transfer residents from the Facility to a skilled care nursing home facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Seller and/or Old Operator. The information set forth in the admission agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls, and there are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the

22

Facility.

m.   Personal Needs Allowance.  Old Operator is currently in material compliance with all state and federal regulations relating to maintaining and accounting for the personal needs allowance ("PNA") for residents who request the establishment of a PNA account.  Except as set forth in Schedule 18.m, Old Operator has no knowledge of and has not received any notice from any governmental authority citing or alleging any violation by Old Operator or the Facility of any state or federal PNA regulations.

n.   Furniture.  There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility's license.  Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by DOH.

o.   Supplies.  Each and every item constituting the Supplies has been purchased by Old Operator and is owned by Old Operator free and clear of claims of all other parties.  Such supplies are sufficient in quantity for the proper conduct and operation of the (A) Facility as a skilled care nursing home facility for at least that number of residents residing at the Facility as of the Closing Date in substantial compliance with all applicable laws, including the minimum standards of DOH and in an amount sufficient to last not less than two (2) weeks.

p.   Accounts Receivables.  There are no encumbrances or liens against Old Operator's accounts receivables, provider agreements, bank accounts or licenses, and to the extent there are such liens extant, the obligations they secure will be paid in full at Closing and the liens on such assets will be released at Closing.

q.   Employees.

i.   Old Operator maintains an Employment Eligibility Form on Form I-9 for each employee currently employed by it in the United States in accordance with applicable law.

ii.   All employees of Old Operator are employed at-will, and may be terminated at any time with or without notice and for any reason or no reason at all, without material cost or penalty to Old Operator.

iii.   Except with respect to transactions contemplated by this Agreement, Old Operator has not implemented any employee layoffs that could implicate the WARN Act or any similar applicable foreign, state or local law, and no such events are currently planned, anticipated or announced and, to Old Operator's knowledge, no officer or executive of Old Operator (A) has any present intention to terminate his or her employment prior to the one (1) year anniversary of the Closing, or (B) is a party to any confidentiality, non-competition, proprietary rights or other such agreement that would materially restrict the performance of such employee's employment duties, or the ability of Old Operator to conduct its business.

r.   Independent Contractors.  All workers directly engaged by Old Operator (excluding any engagement through a staffing agency) and classified by Old Operator as independent contractors, have in good faith satisfied the requirements of applicable law to be so classified, and Old Operator has in good faith fully and accurately reported each such person's compensation on IRS Forms 1099 during such period when required to do so.

23

4919-5875-2000, v. 5

s.      Old Operator's Vacation and Holiday Pay Expenses.  Schedule 10.c contains a complete and accurate list of Old Operator's Vacation and Holiday Pay Expenses, and except as provided in Schedule 10.c, as of the Closing Date, Old Operator has no outstanding obligations with respect to vacation and holiday pay to any of the Retained Employees.

t.      Labor Unions.  Old Operator is a party to that certain collective bargaining agreement ("CBA") of the Facility between Old Operator, and Local 1040, Communication Workers of America, AFL-CIO (the "Union"). The CBA is the only collective bargaining agreement to which Seller or Old Operator is a party and the Union is the sole collective bargaining representative of Seller's or Old Operator's employees.  Except for the CBA, no Current Employee is presently a member of a collective bargaining unit and there are no threatened in writing or, to the knowledge of Old Operator, contemplated attempts to organize for collective bargaining or joint negotiation purposes any of the Current Employees.  There are no unremedied or outstanding unfair labor practice charges, unlawful practices, unlawful occupational safety practices or any charges, complaints or actions alleging a violation of any local, city, state or federal discrimination safety or employment-related law, statute or regulation, in each case, that would be material to the Facility. Neither Old Operator nor the Facility has experienced any strikes, disruptions, labor disputes or other work-stoppages, and Old Operator has complied with all legal requirements relating to the employment of personnel and labor, payment of wages and other amounts, occupational safety, plant closing, layoffs, collective bargaining and federal contracting, and has withheld all amounts required by statute, regulation or agreement to be withheld from wages, salaries or other compensation of employees.  Old Operator acknowledges that New Operator is expressly not assuming any of (i) the CBA and (ii) and any Union-related rights or obligations, including any obligations related to the Fund (as defined in the CBA) or any other pension-related obligations, including any withdrawal liability (collectively, "Pension Liability"), and the CBA and all such rights and obligations shall be retained by Old Operator as Rejected Contracts and rights and obligations of Old Operator, as applicable.  Old Operator shall pay any Pension Liability when due.

u.      Multi-Employer Plans.  Except for the multi-employer plan sponsored by the Union, Old Operator does not, and is not required to, contribute to a multi-employer plan, as defined in ERISA.

v.      Employee Benefit Plans.  Except as provided in Schedule 18.v:

i.      Old Operator does not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

ii.      Old Operator does not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section 414(i) of the Internal Revenue Code of 1986, as amended (the "Code"));

iii.      Old Operator does not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

iv.      Old Operator does not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

v.      Old Operator has not entered into, nor has Old Operator established or maintained, any change-in-control or severance agreements or plans.

w.      Environmental Condition.  Old Operator has not generated, stored or disposed of

24

any Hazardous Substances on the Facility or the Property, and Old Operator does not have any knowledge of any previous or present generation, storage, disposal or existence of any Hazardous Substance or hazardous waste on the Facility or the Property, except in such quantities that is customary in the operation of skilled care and in all events in compliance with all Environmental Laws.

x.      Status of Residents.      All of the residents at the Facility have full legal status as citizens of the United States of America.

y.      Taxes.  Old Operator has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns and all other taxes and governmental charges with respect to the Facility.

z.      Insurability.  Old Operator has not received any written notice or request from any insurance company or underwriters setting forth any defects in the Property which might affect the insurability thereof, requesting the performance of any work or alteration of the Property or setting forth any defect or inadequacy in Old Operator's operation of the Property which would materially and adversely affect the ability of New Operator to insure the Facility following Closing.

aa.      Special Assessments.  There are no (i) pending or threatened special assessments affecting the Property or (ii) any contemplated improvements affecting the Property that may result in special assessments affecting the Property.  There are no tax abatements, phase-ins or exemptions affecting the Property.

bb.      Personal Property; Liens.  All of the Personal Property is located at or on the Property and will be transferred to New Operator pursuant to this Agreement.  Such Personal Property is sufficient to operate the Facility in the manner conducted by Old Operator as of the date hereof and as of the Closing Date.  All of the assets necessary to operate the Facility are owned by Old Seller or Operator and shall be conveyed to Purchaser or New Operator pursuant to this Agreement and the APA.  The Property is free and clear of all liens, claims and encumbrances caused or created by Old Operator or its employees or agents.

cc.      Leases.  Other than the (i) lease dated as of May 12, 2012 (including any amendments), by and between Seller and Old Operator (the "Existing Lease"), which has been provided to New Operator and which Old Operator covenants and agrees to terminate as of the APA Closing and, at such time, and (ii) Lease which shall be, at New Operator's election, terminated or assigned to New Operator as of the Closing, there are not currently, and as of the Closing Date there shall not be, any occupancy rights (written or oral), leases or tenancies presently affecting the Facility and the portion of the Property on which it is located, except for any occupancy rights of then existing residents of the Facility.

dd.      Permits.  Old Operator currently maintains in good standing and full force all of the material certificates, licenses and permits from all applicable governmental authorities in connection with the ownership, use, occupancy, operation and maintenance of the Property and the Facility as necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

ee.      Financial Materials.      Old Operator has provided to New Operator true and correct copies of the Financial Statements (as defined in the APA).  The Financial Statements (i) have been prepared in strict accordance with the books and records of Old Operator, (ii) present fairly and accurately, and do not in any respect distort, the financial condition of Old Operator and

25

the Facility as of the date of the applicable balance sheet, (iii) present fairly and accurately, and do not in any respect distort, the results of operations of the Facility for the period covered by such statement, and (iv) have been prepared on the same basis as the Facility's prior financial statements. Except as set forth on the most recent Financial Statements or as disclosed in Schedule 18.ee, there are no liabilities, debts, claims or obligations related to the operation of the Facility by Old Operator prior to the Closing Date, whether accrued, absolute, contingent or otherwise, whether due or to become due, that would reasonably be expected to be asserted against New Operator or Purchaser, and/or the Facility following the Closing Date.

ff.    Anti-Kickback Compliance. Old Operator has complied with and is currently in compliance with all federal and state laws and regulations with respect to illegal kickbacks, referral fees, or payment arrangements, including the federal anti-kickback statute, with respect to ownership and operation of the Facility. No payment has been made by or on behalf of the Old Operator with the understanding that any part of such payment is to be used for any purpose other than that described in the documents supporting such payment, and neither Old Operator or any director, officer, employee, or agent of Old Operator, or any other person associated with or acting for or on behalf of, Old Operator has, directly or indirectly, made or received any illegal contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to or from any person, private or public, regardless of form, whether in money, property or services, to obtain or induce any patient referrals, purchases, orders or under any federal, state, or commercial health care program that violates federal or state law, including the federal anti-kickback statute.

gg.    Material Adverse Effect. Since April 1, 2023, other than as set forth on Schedule 18.gg there has not existed any state of facts, condition, change, development, circumstance, event or effect (a "Material Adverse Effect") that, alone or in the aggregate, has, or could reasonably be expected to have, a material adverse effect on the results of operations, prospects or the condition (financial or otherwise), of Seller, Old Operator, the Property or the Facility, including (i) any decrease in the census of the Facility below ninety-two and one half percent (92.5%) of the occupancy level of the Facility as of the Effective Date that continues below such ninety-two and one half percent (92.5%) threshold for fifteen (15) days (and is cured with admissions of residents in a manner consistent with past admissions standards and practices of the Facility (including with respect to payor type and ability to pay)), (ii) the loss of any licensure, certification, or other permit necessary to operate the Facility as a skilled nursing facility, (3) the designation of the Facility as a Special Focus Facility ("SFF") as defined by the Centers for Medicare and Medicaid Services Special Focus Nursing Home Facility Program or the placement of the Facility on the SFF watch list, (4) the decertification of Old Operator, Seller or the Facility from or with respect to participation under Medicare, Medicaid or any other governmental health care program, including being suspended or limited from, or otherwise deemed ineligible for, or having any denial of payment or admissions or other limitation imposed with respect to, whether permanently or temporarily, participation in the Medicare or Medicaid reimbursement program, (5) the issuance of a level "I" or higher survey deficiency, and (6) the identification of any deficiencies as a result of a survey that have not been cured and deemed to be in compliance by the applicable governmental entity within forty-five (45) days after the date of the survey during which such deficiency was first identified.

hh.    Stimulus Funds. Schedule 18.hh sets forth all amounts that Old Operator or the Facility has received with respect to any of the following (collectively, "Stimulus Funds"): (i) any grants or loan proceeds pursuant to the Paycheck Protection Program under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), (ii) any loan proceeds or funds offered by the U.S. Small Business Administration under its Economic Injury Disaster Loan assistance program, (iii) accelerated Medicare payments under the expanded Accelerated and Advance

26

Payments Program from Centers for Medicare & Medicaid Service or otherwise ("Accelerated Medicare Payments") and (iv) any employer payroll tax deferral afforded by Section 2302 of the CARES Act ("Payroll Tax Deferrals").  Old Operator and the Facility have complied with all applicable legal, regulatory and other requirements related to the Stimulus Funds.  Schedule 18.hh is true, accurate and complete in all respects, and Old Operator shall update Schedule 18.hh prior to Closing.

       ii.       Accuracy of Representations and Warranties of Old Operator.  No representation or warranty by Old Operator contained in this Agreement and no statement by Old Operator in any certificate, list, exhibit or other instrument, including the due diligence materials and financial statements (except for those prepared by a third party, which to Old Operator's knowledge are true and complete), furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement, or omits or will omit to state any fact which is necessary in order to make the statement of material fact contained therein, in light of the circumstances under which they are made, not misleading in any material respect.

       jj.       Survival of Representations and Warranties of Old Operator.  Each representation and warranty of Old Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date.  Each representation and warranty of New Operator hereunder shall survive in accordance with Section 16.e and Section 16.f.

19.       NON-COMPETE AND NON-SOLICITATION.

       a.       Neither Old Operator nor any of its affiliates or principals shall knowingly and intentionally solicit any residents of the Facility for a period commencing on the earlier of the effective date of the ASA and the Closing Date and ending on the date that is twelve (12) months following the Closing.  Old Operator acknowledges that if there is a violation of any provision of this Section 19.a, then Old Operator shall pay to New Operator an amount equal to fifty thousand dollars ($50,000.00) as liquidated damages, for each such resident.  The Parties acknowledge and agree that actual damages with respect to the foregoing would be difficult to ascertain and that fifty thousand dollars ($50,000.00) is a fair and reasonable approximation of such actual damages.  This provision shall not in any way limit such other remedies as may be available to New Operator hereunder or at law or in equity.  Old Operator further acknowledges that the scope and duration of the provisions of this Section 19.a are reasonable.

       b.       Except with respect to the Facility prior to Closing and as set forth in Schedule 19.b neither Old Operator nor any of its affiliates or principals, for a period commencing on the earlier of the effective date of the ASA and the Closing Date and ending on the date that is twelve (12) months following the Closing, will not, own, operate, develop, manage or consult a skilled nursing home or otherwise operate, own, develop, manage or consult with an entity or business involved with skilled nursing care within a ten (10) mile radius of the Facility.  Old Operator acknowledges that a violation of any provision of this Section 19.b will result in substantial and irreparable damage to the New Operator for which the New Operator will not have an adequate remedy at law and for which money damages would not be a sufficient remedy, and Old Operator agrees that, in addition to all other remedies, in the event of any violation or alleged or threatened violation of any of the provisions of this Section 19.b, New Operator shall be entitled to equitable relief, including temporary or permanent injunctive relief and specific performance, in each case without being required to prove irreparable harm or damages, post a bond or otherwise provide security.  This provision shall not in any way limit such other remedies as may be available to New Operator hereunder or at law or in equity.  Old Operator further acknowledges that the scope and duration

4919-5875-2000, v. 5

of the provisions of this <u>Section 19.b</u> are reasonable.

20.    INFORMATION SYSTEMS.

a.    Without limitation of <u>Section 12</u>, Old Operator shall use reasonable efforts to permit transfer of current data in fully operational form for use in New Operator's computer applications. Old Operator further agrees that in order to assist New Operator in ensuring the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility, Old Operator shall, for a period of no longer than ninety (90) days after the Closing Date, provide New Operator access to Old Operator's electronic medical records system to enable New Operator, at its expense, to print the medical treatment records and physician orders for each resident as of the Closing Date that was a resident as of the period between and including the Closing Date and the date that is eighteen (18) months prior to the Closing Date, and cooperate with New Operator regarding the delivery of all such records to New Operator, in electronic form (including the provision to New Operator of the last eighteen (18) months of MDS (Minimum Data Set) history in the format submitted to CMS by Old Operator), in order to enable New Operator to obtain the necessary copies of such medical records and physician orders.

b.    Prior to the Closing, Old Operator shall provide New Operator and its representatives with access to the Facility so that New Operator can install lines necessary for computer hardware, together with servers, computer hardware and software.  In addition, Old Operator shall cooperate with New Operator and provide New Operator with such assistance as New Operator may reasonably request in order to provide for an orderly, efficient and safe transition of the operations from Old Operator to New Operator and the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility.  During such time as Old Operator provides New Operator with access to the Facility under this <u>Section 20.b</u>, New Operator shall not connect with or hook into Old Operator's computer lines or computers.  Such access shall be prescheduled with Old Operator and shall not interrupt normal business operation.  New Operator shall indemnify Old Operator for any damage resulting from such access. If, for any reason, this Agreement terminates prior to the Closing Date, Old Operator shall remove any lines installed, at New Operator's cost and expense, and New Operator shall remit payment to Old Operator within five (5) days of receiving an invoice for such costs and expenses of removal.

c.    Upon reasonable request by New Operator for the purpose of resident care, Old Operator agrees to provide New Operator with printed copies of such files, charts and other information in Old Operator's control and possession or control relating to those residents who previously occupied the Facility for the period between and including the Closing Date and the date that is three (3) years prior to the Closing Date (including, but not limited to, all patient records, medical records, therapy records, pharmacy records, clinical records, and Resident Trust Funds records).

d.    Old Operator shall, at no cost to New Operator, (i) use reasonable efforts to provide to New Operator, upon its request, any pre-Closing Date Facility information technology vendor contact information, (ii) transfer Facility-specific web domains that were used by Old Operator in connection with its operation of the Facility, and (iv) use reasonable efforts to make accessible to New Operator during regular business hours any data or records relating to the past operation of the Facility which are held or stored offsite, to the extent necessary in order to facilitate New Operator's operation of the Facility after the Closing Date in compliance with applicable laws.

e. Old Operator agrees to arrange for current e-mail addresses of the Facility and its on-site staff to be forwarded to New Operator's new e-mail addresses for a period of ninety (90) days following Closing.

21. COVENANTS.

a. Effective from and after the Closing Date, Old Operator shall obtain and pay the cost of an extended term or "tail" policy of professional liability insurance for a coverage period of four (4) years after the Closing Date, with respect to any professional liability coverage which is written on a "claims-made" rather than "occurrence" basis for Old Operator's operations at the Facility. Upon request of New Operator, Old Operator shall furnish evidence of such insurance coverage.

b. At any time and from time to time after Closing, each Party shall, upon request of another Party, execute, acknowledge and deliver all such further and other assurances and documents, and shall take such action consistent with the terms of this Agreement, as may be reasonably requested to carry out the transactions contemplated herein and to permit each Party to enjoy its rights and benefits hereunder.

c. Any Stimulus Funds received by Old Operator or the Facility (i) prior to APA Closing, shall remain with Old Operator, and (ii) on or after the date of the APA Closing, shall be immediately delivered to New Operator. From and after the date of the APA Closing, Old Operator shall cooperate with New Operator to enable New Operator to obtain any available Stimulus Funds.

22. NO JOINT VENTURE. Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties with respect to the subject matter hereof. The Parties do not intend that any third party shall have any rights under this Agreement.

23. EVENTS OF DEFAULT; REMEDIES. Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by any Party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within five (5) business days of the earlier of such Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity, provided, however, that if a non-monetary breach is not reasonably capable of being cured within such five (5) business day period but the Defaulting Party promptly commences to cure within such period, within such period notifies the Non-Defaulting Party in writing of the commencement of such cure, and thereafter diligently pursues such cure to conclusion and successfully completes such cure within thirty (30) calendar days of its first receipt of notice of such breach or violation, it shall not be an Event of Default hereunder. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief. The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party.

24. Choice of Law. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE

STATE OF NEW JERSEY AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS WITHOUT REGARD TO ITS CONFLICT OF LAW PRINCIPLES THAT WOULD CAUSE THE LAWS OF ANY OTHER STATE TO APPLY.

25.     Jurisdiction; Venue.  ANY DISPUTES CONCERNING THIS AGREEMENT MAY BE BROUGHT BEFORE ANY COURT HAVING SITUS IN THE STATE OF NEW JERSEY.  EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID COUNTY AND STATE.  TO THE EXTENT LEGALLY WAIVABLE, EACH OF THE PARTIES HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.  THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.  THE PARTIES HEREBY WAIVE ANY RIGHT THEY MAY HAVE A TO A TRIAL BY JURY.

26.     ATTORNEYS' FEES IN THE EVENT OF DISPUTE.  In the event any dispute between the parties hereto that results in arbitration or litigation (including any enforcement action of an arbitration award or any action to compel arbitration or change venue), the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, reasonable attorneys' fees.

27.     DEFINITIONS.  For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

a.     *"Contracts"* shall mean all contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which the Old Operator or its predecessors or agents is a party and which relate to the Facility and the operations thereof.

b.     *"Environmental Laws"* shall mean all federal, state and local environmental, health, or safety laws or regulations now or hereafter enacted.

c.     *"Hazardous Substances"* shall mean any toxic or hazardous waste or pollutants, or substances, including asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances " or "Toxic Substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") as amended, 42 U.S.C. § 9601, et seq., "Hazardous Materials" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., "Hazardous Waste" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061, et seq., any "Toxic Pollutant" under the Clean Water Act, 33 U.S.C. §1251, et seq., as amended, any "Hazardous Air Pollutant" under the Clean Air Act, 42 U.S.C. § 7401, et seq., and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws.

d.     *"Supplies"* shall mean the food, central supplies, linens and housekeeping supplies and other consumable and non-consumable inventory present at the Facility as of the Closing Date

and any other property of Old Operator used in connection with the operation of the Facility.

28.    GENERAL PROVISIONS.

a.    Until the APA Closing, this Agreement is hereby explicitly cross-defaulted with the APA and any default or breach by (i) New Operator hereunder shall be a default by Purchaser under the APA, (ii) Purchaser under the APA shall be a default by New Operator hereunder, (iii) Old Operator hereunder shall be a default by Seller under the APA and (iv) Seller under the APA shall be a default by Old Operator hereunder.  This Agreement shall terminate in the event that the APA is terminated in accordance with its terms prior to the APA Closing.

b.    If, with the consent of the Parties, any exhibits or schedules are not completed or attached hereto as of the date of this Agreement, the Parties agree to attach such exhibits and schedules as soon as reasonably practicable, but in any event, this Agreement is subject to New Operator approving all exhibits and schedules or subsequent updates thereto within seven (7) days of submission thereof to New Operator.  Subject to the immediately preceding sentence, the Parties agree that the Party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

c.    Each Party agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date.  Each Party agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.  Each Party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

d.    Old Operator shall file and submit the Old Operator portion of New Operator's CMS Form 855A prior to Closing, as soon as practicable upon New Operator's request.

e.    All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (b) on the third (3rd) business day next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (c) upon recipient's confirmation of the receipt by email transmission (followed by delivery by one of the other means identified in (a)-(b)), addressed as follows:

if to Old Operator:          Venetian Care & Rehabilitation Center, LLC
                             100 McClellan Street
                             Norwood NJ 07648
                             Attn: Michael Jacobs
                                  Joshua Jacobs
                             Email:  mjacobs@windsorhc.com
                             jjacobs@windsorhc.com

31

4919-5875-2000, v. 5

|  |  |
|---|---|
| with copies to: | Baker, Donelson, Bearman, Caldwell & Berkowitz PC |
|  | 1900 Republic Centre |
|  | 633 Chestnut Street |
|  | Chattanooga, TN 37450 |
|  | Attn: Craig A. Penny, Esq. |
|  | Email: cpenny@bakerdonelson.com |
|  |  |
| if to New Operator: | c/o Peace Capital LLC |
|  | 229 NJ-70 |
|  | Toms River, New Jersey 08755 |
|  | Attn:    Sam Stein |
|  |         Raffi Klugman |
|  | Email:  sam@peacecap.com |
|  |         rklugman@peacecap.com |
|  |  |
| with a copy to: | Jacobowitz Newman Tversky LLP |
|  | 2361 Nostrand Avenue, Suite 902 |
|  | Brooklyn, NY 11210 |
|  | Attn:    Mordechai Biegeleisen, Esq. |
|  | Email:  mbiegeleisen@jntllp.com |

A Party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

f.      Each Party shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

g.      This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

h.      This Agreement may not be modified or amended except in writing signed by the Parties.

i.      No waiver of any term, provision or condition of this Agreement, in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

j.      This Agreement shall bind and inure to the benefit of the respective heirs, executors, administrators, personal representatives, successors and permitted assigns of the parties hereto; provided, however, that neither Party shall assign this Agreement without the prior written consent of the other Party.  Notwithstanding the foregoing, however, any New Operator may assign its rights under this Agreement to an affiliated or related entity or entities.  Any assignment not permitted hereunder and undertaken without such prior written consent shall be deemed null and void.  Notwithstanding anything in this Agreement to the contrary, in the event that New Operator is unable to obtain the Regulatory Approvals on or prior to the one-year anniversary of the date

32

hereof, New Operator may assign this Agreement to any entity that agrees to be bound by New Operator's obligations hereunder.

k.      Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

l.      All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

m.      This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.  Signatures sent by telecopy or electronic mail transmissions shall constitute originals.

n.      All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

o.      The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made a part hereof as if fully set forth herein.

p.      All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" and "including" shall mean "including without limitation".

q.      If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

r.      If the last day provided for in this Agreement for a Party to take a particular action or deliver a particular notice is a Saturday, Sunday or day on which the banking institutions in the State of New Jersey are not open for business, such last day shall be extended until the next day that is not a Saturday, Sunday or day on which the banking institutions in the State of New Jersey are not open for business.

s.      Each Party has been represented by counsel of its choosing in the preparation of this Agreement.  The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

[*Signature page follows*]

33

4919-5875-2000, v. 5

**IN WITNESS** WHEREOF**,** each of Old Operator and New Operator have caused this Operations Transfer Agreement to be executed as of the date first above written.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By: _____
Name: Michael Jacobs
Title: Authorized Representative

**NEW OPERATOR:**
VENETIAN HEALTHCARE AND REHAB CENTER LLC

By: _____
Name: Shalom Stein
Title:  Authorized Signatory

1

**IN WITNESS** WHEREOF, each of Old Operator and New Operator have caused this Operations Transfer Agreement to be executed as of the date first above written.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By: _____
Name: Michael Jacobs
Title: Authorized Representative

**NEW OPERATOR:**
VENETIAN HEALTHCARE AND REHAB
CENTER LLC

By: _____
Name: Shalom Stein
Title: Authorized Signatory

1

Exhibit A
FORM OF GENERAL ASSIGNMENT

THIS **GENERAL ASSIGNMENT** (this "Assignment"), is made as of the ___ day of _____ 202_, by Venetian Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Assignor"), to Venetian Healthcare and Rehab Center LLC, a New Jersey limited liability company ("Assignee").

W I T N E S S E T H :

**WHEREAS**, by Operations Transfer Agreement (the "OTA"), dated as of [●], 2024, by and among Assignor and Assignee, Assignor agreed to sell to Assignee certain personal property and such other assets, as more fully described in the OTA (the "Transferred Assets") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, the Permits, the Patient Trust Funds and Property, the Warranties, the Assumed Contracts, the resident contracts and agreements and such other items applicable to the Transferred Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agree as follows:

1.      **Transfer of Permits**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the Permits.

2.      **Transfer of Warranties**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the Warranties.

3.      **Transfer of Patient Trust Funds and Property**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Patient Trust Funds and Property.

4.      **Contracts**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Assumed Contracts, as well as all contracts and agreements with residents of the Facility.

5.      **Assumption**.  Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, and 4 hereof, provided, that such assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

6.      **Miscellaneous**.  This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of New Jersey and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  The provisions of Section 28 (Miscellaneous) of the OTA shall apply to this Assignment mutatis mutandis.

4919-5875-2000, v. 5

(*Signature page follows*)

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this General Assignment as of the day and year first above written.

**ASSIGNOR:**
VENETIAN CARE & REHABILITATION CENTER, LLC

By: _____

     Name:  Hyman Jacobs
     Title:  Manager

**ASSIGNEE:**
VENETIAN HEALTHCARE AND REHAB CENTER LLC

By: _____

     Name:
     Title:

4919-5875-2000, v. 5

Exhibit B
FORM OF BILL OF SALE

Venetian Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Old Operator"), in accordance with that certain Operations Transfer Agreement (the "OTA"), dated as of [●], 2024, by and among Old Operator and Venetian Healthcare and Rehab Center LLC, a New Jersey limited liability company ("New Operator") and in consideration of Ten and No/100 Dollars ($10.00) paid by New Operator to Old Operator, receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to, all of its right, title and interest in and to the following described personal property, to-wit:

All of the (i) Personal Property (as defined in the OTA) and (ii) Supplies (as defined in the OTA) (collectively, clauses (i) and (ii), the "Transferred Property").

Old Operator hereby represents and warrants to New Operator that Old Operator is the absolute owner of the Transferred Property, that the Transferred Property is free and clear of all liens, charges and encumbrances, and that Old Operator has full right, power and authority to sell the Transferred Property and to make this Bill of Sale.

(*Signature page follows*)

4919-5875-2000, v. 5

**IN WITNESS WHEREOF**, Old Operator has caused this Bill of Sale to be signed and sealed in its name by its officer thereunto duly authorized this ___ day of _____, 202_.

**OLD OPERATOR:**
VENETIAN CARE & REHABILITATION CENTER, LLC

By:  _____
          Name:  Hyman Jacobs
          Title:  Manager

**NEW OPERATOR:**
VENETIAN HEALTHCARE AND REHAB CENTER LLC

By:  _____
          Name:
          Title:

4919-5875-2000, v. 5

Exhibit C
SCHEDULED EMPLOYEES

Any employee with annual compensation in excess of $60,000.

To be completed pursuant to Section 28(b)

4919-5875-2000, v. 5

Case 26-01239-VFP   Doc 15-5   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 3 - OTA Venetian   Page 43 of 47

Schedule 19.b

To be completed pursuant to Section 28(b)

4919-5875-2000, v. 5

**FIRST AMENDMENT TO OPERATIONS TRANSFER AGREEMENT**

**THIS FIRST AMENDMENT TO OPERATIONS TRANSFER AGREEMENT** (this "Amendment") is made and entered into as of April 1, 2025 (the "Amendment Effective Date") by and between VENETIAN CARE & REHABILITATION CENTER, LLC, a New Jersey limited liability company ("Old Operator"), and VENETIAN HEALTHCARE AND REHAB CENTER LLC, a New Jersey limited liability company ("New Operator"). Old Operator and New Operator are sometimes collectively referred to as the "Parties."

**RECITALS:**

A.      By that certain Operations Transfer Agreement, dated December 2, 2024 (the "OTA") by and between Old Operator and New Operator, Old Operator agreed to transfer to New Operator and New Operator agreed to assume from Old Operator, the operations of that certain skilled nursing facility known as Venetian Care and Rehabilitation Center located in the State of New Jersey, as more particularly described in the OTA and subject to the terms and conditions set forth therein.

B.      Old Operator and New Operator desire to amend the OTA to (i) provide for the Old Operator to pay out the Old Operator's Vacation and Holiday Pay Expenses to all of the Retained Employees who are not members of the Union  (the "Non-Union Employees"), and (ii) modify the tail insurance requirements set out in the OTA, as more particularly set forth herein.

C.      Unless otherwise provided herein, all capitalized words and terms used in this Amendment shall have the same meanings ascribed to such words and terms as in the OTA.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      The following is added to the end of Section 10(c) of the OTA:

Furthermore, notwithstanding the forgoing portion of Section 10(c) set forth in the OTA, at Closing, Old Operator shall pay to all of the Non-Union Employees an amount equal to ninety percent (90%) of Old Operator's Vacation and Holiday Pay Expenses (which means the accrued, vested and unvested, but unpaid vacation, sick, personal and holiday pay, any other paid time off and any severance obligations with respect to such Non-Union Employee that has accrued prior to the earlier of the Closing Date and the effective date of the ASA) as payment in full to such Non-Union Employees and New Operator shall have no responsibility for such Old Operator's Vacation and Holiday Pay Expenses.  This payment shall be made no later than the first payroll date following the Closing.  Old Operator hereby indemnifies and holds New Operator Parties harmless for any Old Operator's Vacation and Holiday Pay Expenses to the extent the amount paid to the Non-Union Employees was less than the amount required to be paid, for any discrepancies in the Old Operator's Vacation and Holiday Pay Expenses and for all other amounts related to or owed to such Non-Union Employees, including on account of any and all other liabilities and obligations with regard to any of the Non-Union Employees that shall have accrued prior to the Closing Date. New Operator

indemnifies and holds Old Operator harmless for any claims by any Non-Union Employee that make a claim for more than ninety percent (90%) of the Old Operator's Vacation and Holiday Pay Expenses owed to such Non-Union Employee. Amounts paid to Non-Union Employees pursuant to this Section 10(c) shall be deducted from the credit otherwise payable to New Operator under this Section 10(c).

2.      The OTA is hereby amended to reduce the period for which Old Operator must maintain a "tail" policy of professional liability insurance, by replacing the words "four (4) years" where they appear in Section 21(a) of the OTA with "three (3) years".

3.      This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Amendment may be delivered by facsimile or electronic transmission and facsimile or electronically transmitted signatures shall have the same force and effect as originals.

4.      Except as amended hereby, the OTA, as amended shall remain in full force and effect. This Amendment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns under the OTA.

5.      In the event that any of the terms of this Amendment shall be inconsistent with or contradict the terms of the OTA, the terms of this Amendment shall control.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this First Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By:_____
Name: Michael Jacobs
Title: Manager


**NEW OPERATOR:**

VENETIAN HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Shalom Stein
Title: Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned have duly executed this First Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By:_____
Name: Hyman Jacobs
Title: Manager

**NEW OPERATOR:**

VENETIAN HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Norman Rokeach
Title: Authorized Officer