**EMMET, MARVIN & MARTIN, LLP**
120 Broadway, 32nd Floor
New York, NY 10271
Tel: 212-238-3000
Thomas A. Pitta, Esq.
Jennifer R. Pierce, Esq.
*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Venetian Care & Rehabilitation Center, LLC, *et al.* | Case No. 26-14510-VFP |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF JACEN DINOFF, CHIEF**
**WIND-DOWN OFFICER OF THE DEBTORS, IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Jacen Dinoff, make this declaration (the "**Declaration**") pursuant to 28 U.S.C. § 1746:

1.      I am the Chief Wind-down Officer at Windsor Healthcare Management LLC ("**Windsor Healthcare**"), which, along with its affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases (each a "**Debtor**" and together, the "**Debtors**"), is part of a family-owned and operated organization that provided clinically sophisticated post-hospital care and rehabilitation, as well as nursing care, in facilities throughout New Jersey.  As part of my duties, I am familiar with the Debtors' current day-to-day operations, business and financial

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Venetian Care & Rehabilitation Center, LLC (3447); Windsor Healthcare Management, LLC (8442); Buckingham at Norwood Care & Rehabilitation Center, LLC (8881); Ashbrook Care & Rehabilitation Center LLC (8833); Cornell Hall Care & Rehabilitation Center LLC (9141); Greenbrook Manor Care & Rehabilitation Center LLC (9365); Llanfair House Care & Rehabilitation Center LLC (9620); Merwick Care & Rehabilitation Center, LLC (9389); Canterbury at Cedar Grove Care & Rehabilitation Center LLC (8863). The location of the Debtors' principal place of business is 100 McClellan Street, Norwood, NJ 07648.

9268759v.6

affairs, books and records, and the circumstances leading to the commencement of the Debtors'

above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.      In addition to my experience with the Debtors, I am the Founder and Chief

Executive Officer of KCP Advisory Group, a national consulting firm specializing in corporate

restructuring, financial advisory, turnaround management, and litigation support.  Since founding

KCP in 2008, I have led the firm as advisors for lenders, investors, attorneys, and companies

navigating complex financial and operational challenges.  KCP has developed a reputation for

delivering hands-on, senior-level expertise across a broad range of industries, with services

spanning crisis management, performance improvement, interim management, and transaction

advisory.  The firm is known for its deploying experienced professionals to deliver practical,

results-oriented solutions in high-stakes situations.

3.      Over the course of my career, I have served in numerous fiduciary and court-

appointed roles, including as Chief Restructuring Officer, independent director, post-confirmation

trustee, state court receiver, and assignee in assignments for the benefit of creditors.  In these

capacities, I have been responsible for stabilizing distressed businesses, safeguarding stakeholder

interests, managing complex restructurings, and overseeing orderly liquidations and wind-downs.

4.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq.,

the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey

(the "**Court**").  The Debtors continue to operate their business and manage their assets as debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      To enable the Debtors to operate effectively and minimize potential adverse effects

in the Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions and

applications filed with the Court (collectively, the "**First Day Motions**") concurrently herewith. The First Day Motions, summarized below, seek, among other things, to: (a) ensure the continuation of the Debtors' cash management system and other business operations without interruption and (b) implement certain administrative procedures that will promote a seamless transition into chapter 11. This relief is critical to the Debtors' efforts to maximize value for the benefit of their creditors.

6.      This Declaration is submitted in support of the First Day Motions. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the skilled nursing industry. I am authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.      Section I of this Declaration is a preliminary statement. Section II provides a brief overview of the Debtors and their business and organizational structure while Section III describes the Debtors' capital structure. Section IV describes the Debtors' recent performance and events leading to the filing of these Chapter 11 Cases. Section V briefly describes the First Day Motions and finally, **Exhibit A** to this Declaration sets forth the First Day Motions.

I.      **PRELIMINARY STATEMENT**

8.      The Debtors are family-owned dedicated healthcare services providers committed to delivering high-quality, patient-centered care throughout New Jersey. Until the sale of their assets in or around April 2025, they operated 8 skilled nursing facilities that provide nursing care, rehabilitation and healthcare services, and assistance with activities of daily living to residents.

The Debtors' experience in the field of more than 35 years provided them the resources and capabilities to provide their guests with the highest quality care through a full range of services in comfortable settings that respect personal dignity.  As a result, the Debtors' facilities were rated among the best in New Jersey, for example – being listed on US News & World Report's 'Best Nursing Homes' lists.

9.    However, like many of their peers in the senior living care industry, the Debtors business was devastated by the COVID-19 pandemic. Unfortunately, senior living facilities became an epicenter of COVID-19 deaths due to residents' age, frailty, and communal living.  The Debtors experienced significant resident mortality, reducing admissions and occupancy rates at the facilities.  The Debtors' occupancy levels declined by approximately 33%, materially reducing revenue.  To compound the pandemic's impact, the Debtors incurred substantially increased operating costs attributed to personal protective equipment, staffing, testing and compliance protocols, and infection control measures.

10.    During the period following the pandemic, the Debtors' businesses were also challenged by (a) delays in Medicaid reimbursements and (b) the lack of increases in reimbursement rates by the State of New Jersey, which did not keep pace with inflation.  New Jersey's rates remained largely unchanged from prior to the pandemic (when they remained unchanged for ten years) until 2023, when certain increases were made that still left rates below the national market.  Since then, the legislature has been proposing legislation that would bring New Jersey closer to an amount that would reasonably reimburse providers for the services they provide.

11.    With these enormous headwinds, the Debtors' business still had not recovered by 2024, despite several cash infusions by the Debtors' members in the hopes that Debtors could turn

a profit. Debtors were still operating at net losses and their liabilities exceeded their assets. Accordingly, the Debtors' owners decided to sell the businesses and use the sale proceeds to pay down their debts. By April 2025, the Debtors' assets and portfolio were sold to various operating companies (the "**New Operators**") and each of the 8 facilities are now owned and/or operated by third parties not affiliated with the Debtors.

12.    Leading up to the Petition Date, the Debtors have continued existing solely to permit the New Operators to operate the Debtors' 8 facilities and to address the remaining claims against them. While the New Operators' application with the New Jersey Department of Health for the transfer of the Debtors' ownership in their licensed facilities under a Change of Ownership ("**CHOW**") process remains, they are required to operate under the Debtors' licenses and the proceeds of the sold business continues to flow through the Debtors' bank accounts associated with the Debtors' licenses. It is unclear when the New Operators' CHOW applications will be approved. Essentially, each Debtor exists as a mere conduit for payment of receipts to the New Operators of funds from insurers, Medicare, Medicaid, and other revenue sources – which are held in trust for each facility's New Operator.

13.    With respect to the remaining payables from the Debtors' business prior to the sale to the New Operators, the proceeds from the sale to the New Operators and the receipts on account of the Debtors' pre-sale receivables have proven insufficient to pay all of the Debtors' creditors. The Debtors commenced these Chapter 11 Cases to restructure their outstanding debts and achieve an orderly wind-down of operations that maximizes recoveries for creditors. The Debtors believe that the Chapter 11 process described in this Declaration will lead to the greatest recovery for their creditors under the circumstances.

## II.   THE DEBTORS' BUSINESS

### A.   The Debtors' Business Operations

14.   The Debtors are limited liability companies formed within the state of New Jersey. The Debtors historically ran daily operations for 8 licensed bed skilled nursing facilities in New Jersey that provided nursing care, rehabilitation and healthcare services, and assistance with activities of daily living to residents.  They are regulated by the New Jersey Department of Health.

15.   Beginning in or around March 2020 when the COVID-19 pandemic hit, each of the Debtors operated at massive losses, and their liabilities well exceeded their assets.  In an attempt to keep the Debtors' business going, manage cash flow challenges, ensure staff would be paid, and stabilize operations until the companies could recover on their own and turn a profit, members of the Debtors loaned the Debtors significant cash injections.  Unfortunately, by 2024, the Debtors' business was unable to recover and were unable to continue paying their debts as they became due. The Debtors' owners then decided to sell the Windsor Healthcare portfolio.  By approximately April 2025, the Debtors' assets and portfolio were sold to the New Operators for approximately $12,500,000 pursuant to various asset purchase agreements, and the Debtors' facilities are currently managed and operated by the New Operators.[2]

16.   As part of the transition of the Debtors' assets and operations to the New Operators, the New Operators are required to obtain CHOW approvals by the State of New Jersey, which will grant the New Operators the ability to operate the purchased facilities under their own licenses so that Debtors can extract themselves from the flow of funds related to the facilities.  As of the Petition Date, each of the New Operators has applied for CHOW approvals with respect to the

---

[2]   In addition to the Debtors' assets, various affiliated entities that owned the real property related to each of the facilities (the "**Propcos**") also sold that real property to entities affiliated with the New Operators.  The Propcos are not debtors in these Chapter 11 Cases.

license to operate each of the Debtors' 8 facilities and has been cooperating with the State of New Jersey to obtain approval.  All of the CHOW applications are currently pending, but it remains unclear when they will approved.

17.    While the New Operators' CHOW applications have been pending, and for as long as the CHOW applications remain pending, the New Operators are operating the Debtors' facilities using the Debtors' licenses.  Accordingly, the Debtors' business operations as of the Petition Date involve merely cooperating with the New Operators to operate the facilities and acting as a conduit through which the New Operators do business.  Pursuant to the agreements between the Debtors and the New Operators, the Debtors maintain their contracts with vendors under their respective licenses; collect and distribute revenues for the New Operators' operations of the facilities; and hold payments in trust/escrow for the New Operators.  Profits and losses in connection with operating the facilities flow directly to the facility's respective New Operator.

18.    The Debtors do not operate any of the facilities, they do not own or lease any property, and they have no employees.

19.    The Debtors' payors presently include the government (*i.e.* Medicare and Medicaid), private insurance, and self-paying residents.

III.    **The Creditors**

    A.    **Pre-Petition Unsecured Debt**

20.    A significant portion of the Debtors' revenue historically flowed from Change Healthcare Inc. ("**CHC**"), a healthcare technology company that provided revenue cycle management and payment processing services for healthcare providers and insurers.  In 2022, CHC was acquired by Optum, Inc., a subsidiary of UnitedHealth Group Inc.  In February 2024, however, CHC was hit by a cyber-attack that prevented UnitedHealth Group from processing payments and

medical claims.  Because of the unprecedented scale of the attack, UnitedHealth Group advanced payments and no-interest loans to affected providers, including some of the Debtors.

21.     Specifically, pursuant to a Temporary Funding Assistance Program Agreement dated March 20, 2024 between Change Healthcare Operations, LLC and Windsor Healthcare & Rehab Center, Buckingham at Norwood Care and Rehabilitation Center LLC, Windsor Gardens Care Center Inc., Merwick Care and Rehabilitation, Venetian Care and Rehabilitation Center LLC, Ashbrook Care and Rehabilitation Center LLC, Cornell Hall Care and Rehabilitation Center LLC, Abingdon Care And Rehabilitation Center and Llanfair House Care and Rehabilitation Center (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**CHC Funding Agreement**"), CHC made funding advances totaling $11,074,080.25, which are required to be repaid to CHC according to the following schedule:

| Repayment Date | Amount Due |
| --- | --- |
| 25-Oct-25 | $270,000.00 |
| 25-Nov-25 | $270,000.00 |
| 19-Dec-25 | $270,000.00 |
| 25-Jan-26 | $270,000.00 |
| 25-Feb-26 | $700,000.00 |
| 25-Mar-26 | $700,000.00 |
| 25-Apr-26 | $700,000.00 |
| 25-May-26 | $700,000.00 |
| 25-Jun-26 | $700,000.00 |
| 25-Jul-26 | $970,000.00 |
| 25-Aug-26 | $900,000.00 |
| 25-Sep-26 | $900,000.00 |
| 25-Oct-26 | $900,000.00 |
| 25-Nov-26 | $900,000.00 |
| 18-Dec-26 | $1,924,080.25 |

22.     Because the Debtors' CHOW (*i.e.*, the change of ownership process in New Jersey for transfers of ownership in licensed healthcare facilities) has not yet been approved by the State of New Jersey and the New Operators are operating under the Debtors' licenses, payments

pursuant from CHC on account of services provided by the New Operators are made into the Debtors' bank accounts and held in trust by the Debtors for the benefit of the New Operators. However, on a number of occasions, CHC has withheld amounts properly owing to the New Operators on account of amounts owed by the Debtors under the CHC Funding Agreement (the "**Prepetition Offsets**").[3]

B.    **General Unsecured Creditors**

23.    As of the Petition Date, the Debtors believe that unsecured claims against the Debtors are in excess of $25 million.  Unsecured claims against the Debtors include (a) accrued and unpaid unsecured debt incurred in the ordinary course of the Debtors' business, (b) unpaid amounts owed to the Debtors' vendors, (c) claims for unpaid rent and other obligations under the Debtors' leases, and (d) earned but unpaid employee benefits, such as  pension plans qualified under the Employee Retirement Income Security Act of 1974.

IV.    **THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS COMPELLING THE COMMENCEMENT OF THE CHAPTER 11 CASES**

A.    **Impact of the COVID-19 Pandemic**

24.    The Debtors, like many other companies operating senior living and long-term care communities, have faced a challenging environment over the past several years as a result of the COVID-19 pandemic.  The industry was particularly affected due to residents' age, frailty, and communal living, which led to significant mortality rates and thus reduced admission and occupancy rates at facilities.  The Debtor's occupancy levels declined by approximately 33%, materially reducing revenue.  As a result, the Debtors have seen meaningful revenue decline for the past five years.  At the same time, the pandemic caused the Debtors to incur greater operating

---

[3]    The Debtors trust that CHC will not attempt to exercise any such triangular offsets now that the automatic stay is in place.  The Debtors also expect to seek a ruling from this Court regarding the propriety of the Prepetition Offsets during the Chapter 11 Cases.

costs, including due to personal protective equipment, staffing, testing and compliance protocols, and infection control measures.

### B.    Impact of Medicaid Reimbursement Delays and Stagnant Rates

25.    The Debtors were also impacted by Medicaid reimbursement delays, which contributed to their declining operational stability.  The Debtors, like other nursing homes, rely heavily on Medicaid reimbursements as a primary revenue source, as Medicaid payments often constitute a substantial portion of the facility's income for providing skilled nursing care to eligible residents. When the New Jersey Department of Human Services experienced processing backlogs, administrative errors, or delayed claim adjudications, the Debtors faced prolonged gaps between the provision of services and the receipt of payment.  Compounding this problem, the Debtors would frequently admit patients who appeared to meet Medicaid eligibility criteria based on available information at the time of admission, only to discover months later, after care was rendered and expenses incurred, that the patient was not actually eligible for Medicaid coverage. In these situations, the Debtor facility already expended significant resources on staffing, medications, therapies, and other services in reasonable reliance on anticipated reimbursement, yet the delayed determination of ineligibility meant that the Debtor will never recover those costs. This combination of delayed payments for eligible patients and complete non-payment for patients whose ineligibility is discovered only after the fact created severe cash flow strain and made it increasingly difficult for the Debtors to meet ongoing operational expenses such as payroll, medical supplies, utilities, and vendor payments.

26.    In addition, the Debtors' businesses were also challenged by the failure of the State of New Jersey to adjust its Medicaid reimbursement rates to keep pace with inflation.  New Jersey's rates remained largely unchanged from prior to the pandemic (when they remained

-10-

unchanged for ten years) until 2023, when certain increases were made that still left rates below the national market. Since then, the legislature has been proposing legislation that would bring New Jersey closer to an amount that would reasonably reimburse providers for the services they provide.

### C.     Impact of Litigations

27.     The Debtors have also been named in a substantial number of creditor and patient-related litigations. These claims, whether ultimately meritorious or not, impose severe financial and operational burdens on the Debtor. The costs associated with defending such litigation, including attorneys' fees and discovery expenses, have taken resources that would otherwise be available to support patient care and facility operations. Moreover, settlements and adverse judgments in certain cases have resulted in significant monetary obligations.

### D.     Proposed Course of the Chapter 11 Cases

28.     The Debtors have commenced these Chapter 11 cases with the primary objective of achieving a comprehensive resolution of their outstanding indebtedness in a manner that maximizes value for all stakeholders. The Debtors intend to use the breathing room afforded by Chapter 11 of the Bankruptcy Code to bring a halt to the myriad litigations commenced by creditors, negotiate a reasonable Plan of Liquidation with those creditors, and achieve an orderly wind-down of operations that maximizes recoveries for creditors.

## V.     FIRST DAY MOTIONS

29.     To minimize the adverse effects of the commencement of these Chapter 11 Cases in a way that will allow the Debtors to maximize value of their estates, the Debtors have filed a number of First Day Motions designed to facilitate their transition into Chapter 11.

-11-

30.     I anticipate that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider many of the First Day Motions.  Certain of the First Day Motions seek authority to pay certain pre-petition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days following the filing of a Chapter 11 petition, except to the extent that the relief requested is necessary to avoid immediate and irreparable harm.  As the Debtors previously sold their operating businesses, there is no emergent relief sought and the Debtors have filed their first day motions (other than the Motion for Joint Administration in order to avoid confusion about where documents should be filed) on regular notice.

31.     I have reviewed each of the First Day Motions with the Debtors' counsel and the facts stated therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above, is necessary and critical to the Debtors' restructuring efforts, and is in the best interests of the Debtors' estates and creditors.  I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

## VI.     CONCLUSION

32.     This declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions.

-13-

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 28th day of April, 2026

> /s/ Jacen Dinoff
> JACEN DINOFF
> CHIEF WIND-DOWN OFFICER

## **Exhibit A**

A.     Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief

B.     Debtors' Motion Seeking Entry of an Order Extending Time to (I) File Schedules and Statements and (II) Granting Related Relief

C.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (III) Granting Related Relief

D.     Debtors' Motion for Entry of an Order (I) Dispensing with the Appointment of a Health Care Ombudsman and (II) Granting Related Relief