**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Michael S. Stein
Seth A. Goldberg
Katherine R. Beilin
**PASHMAN STEIN WALDER HAYDEN, P.C.**
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: mstein@pashmanstein.com
     sgoldberg@pashmanstein.com
     kbeilin@pashmanstein.com

-and-

Henry J. Jaffe (*pro hac vice* forthcoming)
**PASHMAN STEIN WALDER HAYDEN, P.C.**
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: hjaffe@pashmanstein.com

*Counsel to Defendants Michael Jacobs, Joshua Jacobs, Hyman Jacobs, David Jacobs, Andrew Masetti, Christopher Metternich, Millstone Riverview Real Estate Urban Renewal LLC, and Venetian Healthcare LLC*

|  |  |
|---|---|
| In re | Chapter 11 |
| VENETIAN CARE & REHABILITATION CENTER, LLC, et. al., | Case No. 26-14510 (VFP) |
| | Jointly Administered |
| Debtors.[1] | |

## NOTICE OF REMOVAL

---

[1] The "Debtors" in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Venetian Care & Rehabilitation Center, LLC (3447); Windsor Healthcare Management, LLC (8442); Buckingham at Norwood Care & Rehabilitation Center, LLC (8881); Ashbrook Care & Rehabilitation Center LLC (8833); Cornell Hall Care & Rehabilitation Center LLC (9141); Greenbrook Manor Care & Rehabilitation Center LLC (9365); Llanfair House Care & Rehabilitation Center LLC (9620); Merwick Care & Rehabilitation Center, LLC (9389); Canterbury at Cedar Grove Care & Rehabilitation Center LLC (8863).

Michael Jacobs, Joshua Jacobs, Hyman Jacobs, David Jacobs, Andrew Masetti, Christopher Metternich, Millstone Riverview Real Estate Urban Renewal LLC, and Venetian Healthcare LLC (the "Defendants") file this Notice of Removal from the Superior Court of New Jersey Law Division, Middlesex County to the United States Bankruptcy Court for the District ("Bankruptcy Court") pursuant to 28 U.S.C. § 1452(a), Rule 9027 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Local Rule 9027-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey ("Local Rules"). Under Local Rule 9027-1(a), this pleading is filed with the Clerk of Court for the Bankruptcy Court.

## BACKGROUND

1.      On April 23, 2026 (the "Petition Date"), the above-captioned debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). *See* **Exhibit A** (*Voluntary Petition for Non-Individuals Filing for Bankruptcy*, *In re Venetian Care & Rehabilitation Center, LLC*, No. 26-14510-VFP (Bankr. D.N.J. Apr. 23, 2026) [D.I. 1]).

2.      The Debtors formerly owned Skilled Nursing Facilities ("SNFs") providing medical care to patients following surgical and other procedures. In December 2024, the Debtors sold two of those SNFs, Merwick Care & Rehabilitation Center, located at 100 Plainsboro Road, Plainsboro, New Jersey 08536 and Venetian Care & Rehabilitation Center, located at 275 John T. O'Leary Blvd., South Amboy, New Jersey 08879, to Plaintiffs. *See* **Exhibit B** ¶¶ 3, 48-49.

3.      Each of those transactions was completed by way of two separate agreements, an Asset Purchase Agreement ("APA") and Operations Transfer Agreement ("OTA").  The APAs conveyed land, buildings, improvements and certain personal property to the Plaintiffs, whereas the OTAs conveyed rights to the Plaintiffs to act as new operators of the SNFs, including pending

regulatory and licensure of Plaintiffs as new operators of the SNFs. *Id*. at ¶¶ 49-51. Given

anticipated delays between the closing of the OTAs and such approvals, as well as the transfer by

Medicare and Medicaid of provider numbers from the selling entities to the purchasing entities,

under the OTAs the Plaintiffs' personnel provide caregiving services at the SNFs, and payment is

remitted to the Debtors' existing bank accounts using their provider numbers, which payments are

held in trust by the Debtors and transferred to Plaintiffs. *Id*. at ¶¶ 5-6.

4.       As set forth in the *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Claims; and (III) Granting Related Relief* [D.I. 24] (the "Interim Cash Management Order"), the Debtors'

existing agreements with other parties, including the Plaintiffs, remain in place:

> The Debtors receive and hold in trust for the benefit of the New Operators all amounts received on account of post-closing services performed at the skilled nursing facilities pursuant to the OTAs ("Post-Closing Receipts"). To the extent a Debtor received or receives any Post-Closing Receipts on or after the Petition Date, the Debtor shall (a) transfer from the Debtor accounts and maintain such funds in a segregated account pending remittance to the applicable New Operator; and (b) remit (i) 70% of the Post-Closing Receipts to the applicable New Operator no later than two (2) business days after such receipt and (ii) any remaining amounts owed to the New Operators on account of the Post-Closing Receipts within two (2) business days of confirmation that such funds are property of the New Operator. The Debtors shall perform a reconciliation of the Post-Closing Receipts not less than weekly and promptly remit the amounts required to be paid to the relevant New Operators in accordance with the prior sentence.

[Interim Cash Management Order at ¶ 19.]

5.       Consequently, the Debtors now "essentially exist as a pass-through entity for the

collection and distribution of payments to and from the New Operators, on the one hand, and

vendors/payors (such as insurers, residents, Medicare, and Medicaid), on the other hand." (the "Cash Management System"). *See Debtors' Amended Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Claims; and (III) Granting Related Relief* [D.I. 14] (the "Cash Management Motion"). Pursuant to the Cash Management Motion, Andrew Masetti, one of the named Defendants and a former Chief Financial Officer of Windsor Healthcare Management, LLC, maintains oversight over the Cash Management System.

6.      Notwithstanding the above, on May 13, 2026, Merwick Healthcare and Rehab Center LLC, Venetian Healthcare and Rehab Center LLC, Merwick Propco Urban Renewal LLC, and Venetian Propco LLC (the "Plaintiffs") filed their Complaint against Defendants in the Superior Court of New Jersey, Middlesex County in the action styled *Merwick Healthcare and Rehab Center LLC, et al., v. Jacobs, et. al.*, MID-L-003196-26 (the "State Court Action"). A true and accurate copy of the Complaint is attached hereto as **Exhibit B** and incorporated by reference.

7.      Counts 1-7 of the Complaint assert various claims sounding in tort against all Defendants; Counts 8-24 of the Complaint assert claims for alleged breaches of the OTAs against the corporate Defendants; and Counts 25 and 26 assert claims against an owner of the Debtors, Hyman Jacobs, for alleged breach of personal guarantees of the obligations purportedly owed by the Debtors under the OTAs.  The individual Defendants in the State Court Action are directors, officers, and/or owners of the Debtors, and the corporate defendants owned the property that was conveyed under the APAs. *See, e.g.,* **Exhibit B** ¶¶ 17-22.

8.      The Complaint seeks, among other relief, judgment directing the Defendants to turn over trust property to the Plaintiffs, which demand necessarily impacts estate funds governed by

the Interim Cash Management Order. Even if the Plaintiffs can claim a trust fund interest in post-closing receipts, to the extent that the Plaintiffs are seeking an order that all such funds should be turned over to them, such relief is plainly inconsistent with the requirements of the Interim Cash Management Order, and as such, Plaintiffs are seeking relief that is at odds with a binding order of this Court.

9.      None of the Defendants in the State Court Action is a party to the OTAs that are the subject of all the claims and alleged contractual obligations that appear at issue in the Complaint and, as such, those claims are derivative of claims against the Debtors named in those operating agreements.  Thus, the Complaint is an obvious attempt to circumvent the automatic stay under the Bankruptcy Code.

**BANKRUPTCY COURT'S JURISDICTION AND BASIS FOR REMOVAL**

10.      Section 1452 allows a party to "remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a). Section 1334 grants this court original jurisdiction over all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

11.      A cause of action is "related to" a bankruptcy case if it becomes property of the estate under section 541(a) of the Bankruptcy Code or "conceivably may have an effect on the bankruptcy estate." *In re Combustion Eng'g*, 391 F.3d 190, 226 (3d Cir. 2018) (citation omitted). "A cause of action is considered property of the estate if the claim existed at the commencement of the filing and the debtor could have asserted the claim on [its] own behalf under state law." *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 n.5

(3d Cir. 2002) (citation omitted). Further, the court's "related to" jurisdiction encompasses an action "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Combustion Eng'g*, 391 F.3d at 226 (citation omitted). The Supreme Court has held that "related to" jurisdiction under 28 U.S.C. § 1334(b) should be interpreted broadly. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307–08 (1995).

12.     A number of the claims at issue in the State Court Action implicate this Court's "arising in" and "arising under" jurisdiction pursuant to 28 U.S.C. § 1334(b). This Court will need to determine whether funds at issue in the State Court Action belong to the Debtors or their estates under section 541 of the Bankruptcy Code and whether the claims in the State Court Action implicate or are in violation of the automatic stay under section 362 of the Bankruptcy Code.

13.     Likewise, other claims at issue in the State Court Action are indisputably related to property, rights, and potential defenses of the Debtors' bankruptcy estates. All of the events giving rise to those claims occurred in relation to the sale transaction and underlying agreements between the Debtors and the Plaintiffs. Thus, the State Court Action seeks relief against the Defendants that is inextricably intertwined with funds that are the property of the Debtors' estates and under the jurisdiction of this Court. The Plaintiffs filed the Complaint after the Petition Date on May 13, 2026. Accordingly, the Bankruptcy Court has "related to jurisdiction" over each of the claims in the Complaint under 28 U.S.C. § 1334(b).

14.     The Bankruptcy Court also has "related to" jurisdiction over each of the causes of action asserted in the State Court Action because of their conceivable effect on the administration of the Debtors' estates and the adjustment of the debtor-creditor relationship.  As discussed above, the State Court Action not only demands monetary damages, but also asserts claims that would redirect future estate funds to the Plaintiffs, would require an accounting using the Debtors' books

and records, and would require the attention and focus of the Debtors' personnel and resources, all of which will inevitably impact the estates' administration, the debtors' rights, and could trigger indemnification and estate-level liability claims. Consequently, these State Court Action claims fall squarely within the Bankruptcy Court's "related to" jurisdiction.

15. Moreover, the Lawsuit is the Plaintiffs' clear attempt to circumvent the automatic stay. The Operations Transfer Agreements which underlie the Complaint's claims are agreements between (a) debtor Merwick Care & Rehabilitation Center, LLC, and plaintiff Merwick Healthcare and Rehab Center LLC, and (b) debtor Venetian Care & Rehabilitation Center, LLC and plaintiff Venetian Healthcare and Rehab Center LLC. *See* **Exhibit B** at Exhibits 1 & 2.

16. A plaintiff cannot avoid naming a debtor in a lawsuit where the debtor is a necessary party in order to circumvent the application of the automatic stay. *See*, e.g., *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 2020) (the bankruptcy court's finding that a lawsuit against the debtor's officers based on the plaintiff's loan agreement with the debtor was merely a "transparent attempt… to end run the automatic stay" supported its determination that the debtor was likely to succeed in having the suit enjoined and the automatic stay enforced); *In re Jefferson County, Ala.*, 491 B.R. 277, 280, 286-87 (Bankr. N.D. Ala. 2013) (staying a lawsuit in which the debtor was not one of the named defendants because the suit was "an attempt to avoid the shield afforded debtors by the automatic stay… based on [the debtor] not having been sued by the plaintiff…", finding it was "obvious" the debtor was a party in interest and that omission of the debtor as a defendant was not controlling as to whether the automatic stay applied); *In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655, 658 (D. Del. 2004) (applying the automatic stay and rejecting the plaintiff's argument that it had only named the debtor's insurer as a defendant, reasoning that "[t]he scope of [the automatic stay] protection is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation.").

7

17.     For these reasons, removal is permitted under 28 U.S.C. § 1452(a).

18.     Removal is timely pursuant to Bankruptcy Rule 9027(a)(3).

19.     Venue is proper in the District of New Jersey under 28 U.S.C. § 1452(a) because the New Jersey state court where the Lawsuit is pending is located in this district. Venue is also proper in the Bankruptcy Court.

**COMPLIANCE WITH RULE 9027 AND LOCAL RULE 9027**

20.     Bankruptcy Rule 9027(a)(1) requires that this Notice of Removal contain a statement that, upon removal of the cause of action, the party filing the notice does or does not consent to the entry of final orders or judgment by the bankruptcy court. The Defendants consent to the entry of final orders or judgments by the Bankruptcy Court.

21.     Local Rule 9027-1(c) requires the removing party to, within 14 days after the filing the Notice of Removal, "file with the clerk of the bankruptcy court a copy of the docket sheet and all pleadings from the original court." **Exhibit B** contains copies of those papers.

22.     Contemporaneously herewith, a Notice of Removal will be filed with the Clerk of Court for the Superior Court of New Jersey Law Division, Union County and on the chapter 11 docket in the Bankruptcy Court.

Dated: May 29, 2026           Respectfully submitted,

By: */s/ Seth A. Goldberg*
Michael S. Stein
Seth A. Goldberg
Katherine R. Beilin
**PASHMAN STEIN WALDER HAYDEN, P.C.**
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: mstein@pashmanstein.com
     sgoldberg@pashmanstein.com
     kbeilin@pashmanstein.com

-and-

Henry J. Jaffe (*pro hac vice* forthcoming)
**PASHMAN STEIN WALDER HAYDEN, P.C.**
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: hjaffe@pashmanstein.com

*Counsel to Defendants Michael Jacobs, Joshua Jacobs, Hyman Jacobs, David Jacobs, Andrew Masetti, Christopher Metternich, Millstone Riverview Real Estate Urban Renewal LLC, and Venetian Healthcare LLC*

# **EXHIBIT A**

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of __New Jersey__
                              (State)

Case number (*If known*): _____ Chapter __11__

☐ Check if this is an
   amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | The Venetian Care & Rehabilitation Center, LLC |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | Venetian Care & Rehabilitation Center, LLC |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 2 6 – 2 2 7 3 4 4 7 |

4. **Debtor's address**

**Principal place of business**

| 275 | John T. O'Leary Blvd. |
|---|---|
| Number | Street |

_____

| South Amboy | NJ | 08879 |
|---|---|---|
| City | State | ZIP Code |

| Middlesex | |
|---|---|
| County | |

**Mailing address, if different from principal place of business**

_____

| Number | Street |
|---|---|

_____
P.O. Box

| City | State | ZIP Code |
|---|---|---|

**Location of principal assets, if different from principal place of business**

| 100 | McClellan Street |
|---|---|
| Number | Street |

_____

| Norwood | NJ | 07648 |
|---|---|---|
| City | State | ZIP Code |

5. **Debtor's website** (URL)    _____

Exhibit 6 - Document A Page 32 of 43        12 of 202

| Debtor | | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

❏ Partnership (excluding LLP)

❏ Other. Specify: _____

---

**7. Describe debtor's business**

A. *Check one:*

❏ Health Care Business (as defined in 11 U.S.C. § 101(27A))

❏ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

❏ Railroad (as defined in 11 U.S.C. § 101(44))

❏ Stockbroker (as defined in 11 U.S.C. § 101(53A))

❏ Commodity Broker (as defined in 11 U.S.C. § 101(6))

❏ Clearing Bank (as defined in 11 U.S.C. § 781(3))

❏ None of the above

B. *Check all that apply:*

❏ Tax-exempt entity (as described in 26 U.S.C. § 501)

❏ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

❏ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___  ___  ___  ___

---

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

❏ Chapter 7

❏ Chapter 9

❏ Chapter 11. *Check all that apply:*

  ❏ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).

  ❏ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  ❏ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

  ❏ A plan is being filed with this petition.

  ❏ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

  ❏ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

  ❏ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

❏ Chapter 12

---

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

❏ No

❏ Yes.  District _____  When _____  Case number _____
                                 MM / DD / YYYY

       District _____  When _____  Case number _____
                                  MM / DD / YYYY

---

Exhibit 6 - Distribution A Report - Page 13 of 202

| Debtor | _____ | Case number (if known)_____ |
|---|---|---|
| | Name | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

☐ Yes.   Debtor _____   Relationship _____

District _____   When _____
MM / DD / YYYY

Case number, if known _____

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☑ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply*.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**_____
Number        Street

_____

_____        _____ _____
City                                          State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

Official Form 201          Voluntary Petition for Non-Individuals Filing for Bankruptcy          page **3**

Debtor _____    Case number *(if known)*_____
     Name

| | | | |
|---|---|---|---|
| **15. Estimated assets** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☑ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

| | | | |
|---|---|---|---|
| **16. Estimated liabilities** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☑ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    04/23/2026
               MM  / DD / YYYY

✖ /s/ Jacen Dinoff                    Jacen Dinoff
Signature of authorized representative of debtor      Printed name

Title   Chief Winddown Officer

**18. Signature of attorney**

✖ Thomas A. Pitta          Date    04/23/2026
Signature of attorney for debtor              MM  / DD / YYYY

Thomas Pitta
Printed name
Emmet, Marvin & Martin, LLP
Firm name
120      Broadway
Number      Street
New York            NY     10271
City             State     ZIP Code

(212) 238-3148         TPITTA@EMMETMARVIN.COM
Contact phone             Email address

00756-2006         NJ
Bar number             State

<table>
<tr><td colspan="2" style="background:black;color:white">Fill in this information to identify the case:</td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the:<br><br>**District of New Jersey**</td></tr>
<tr><td colspan="2" align="center">(State)</td></tr>
<tr><td>Case Number (*if known*):_____</td><td>Chapter__11</td></tr>
</table>

☐ Check if this is an
amended filing

**Rider 1**
**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the District of New Jersey for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Venetian Care & Rehabilitation Center, LLC.

- The Venetian Care & Rehabilitation Center, LLC
- Windsor Healthcare Management Limited Liability Company
- The Buckingham at Norwood Care & Rehabilitation Center, LLC
- Ashbrook Care & Rehabilitation Center, LLC
- Cornell Hall Care & Rehabilitation Center, LLC
- Greenbrook Manor Care & Rehabilitation Center, LLC
- Llanfair House Care & Rehabilitation Center, LLC
- Merwick Care & Rehabilitation Center, LLC
- The Canterbury at Cedar Grove Care & Rehabilitation Center, LLC

# United States Bankruptcy Court
## District of New Jersey

In re   The Venetian Care and Rehabilitation Center, LLC      Case No. _____
                     Debtor(s)      Chapter   11 _____

### CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for The Venetian Care and Rehabilitation Center, LLC in the above captioned action, certifies that the following isa (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

Venetian Healthcare Holdings LLC _____

_____

_____

☒ None [*Check if applicable*]

4/23/2026

_____
Date

/s/ Thomas A. Pitta _____

     Signature of Attorney for The Venetian Care
     and Rehabilitation Center, LLC

9279797v.1

Case 26-45239-WFP   Doc 15   Filed 06/16/26   Entered 06/16/26 13:25:07   Desc Main
Exhibit 6 - Document A   Page 37 of 43   Page 17 of 202

| Fill in this information to identify the case: | |
|---|---|
| Debtor: Venetian Care & Rehabilitation Center, LLC, et al. | |
| United States Bankruptcy Court for the District of New Jersey | |
| Case number (If known): _____ | ☐ Check if this is an amended filing |

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who have the 30 Largest Unsecured Claims and Are Not Insiders

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101 (31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral of setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. CHANGE HEALTHCARE OPERATIONS, LLC | 424 Church St Suite 1400 Nashville, TN 37219 | Trade debt | Unliquidated | | | $8,588,801.18 |
| 2. ENCORE PREAKNESS, INC | P.O. BOX 933195 Cleveland, OH 44193 | Trade Debt | Unliquidated | | | $6,238,891.62 |
| 3. ULTRABENEFITS INC | 22 Elm Street Suite 110, Worcester, MA 01608 | Trade Debt | Unliquidated | | | $4,746,584.18 |
| 4. POWERBACK REHABILITATION | P.O. Box 821322 Philadelphia, PA 19182 | Trade Debt | Unliquidated | | | $2,799,699.04 |

Official Form 204      **Chapter 11 of Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims**      page 1
9277563v.2

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral of setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5. | HEALTHCARE SERVICES GROUP, INC | P.O. Box 829677 Philadelphia, PA 19182 | Trade Debt | Unliquidated | | | $1,295,970.71 |
| 6. | HALL BOOTH SMITH, P.C. | 15 E Midland Ave, Ste 3, Paramus, NJ 07652 | Professional services | Unliquidated | | | $1,293,791.94 |
| 7. | TAKE COMMAND | 1410 E. Renner Rd., Suite 200, Richardson, TX 75082 | Trade Debt | Unliquidated | | | $1,155,884.41 |
| 8. | BUCHANAN INGERSOLL ESQS. | 501 Grant Street Pittsburgh, PA 15219-4413 | Professional services | Unliquidated | | | $692,376.38 |
| 9. | JOHNSON, KENDALL & JOHNSON, INC. | 109 Pleasant Run, Newton, PA 18940 | Trade Debt | Unliquidated | | | $609,150.83 |
| 10. | HEALTHCARE ADVOCATES | 310 West Master Street, Philadelphia, PA 19122 | Trade Debt | Unliquidated | | | $475,585.92 |
| 11. | SEIU NATIONAL INDUSTRY PENSION FUND | P.O. Box 5356 Carol Stream, IL 60197 | Trade Debt | Unliquidated | | | $365,937.06 |
| 12. | SYSCO METRO NEW YORK | 20 Theodore Conrad Drive, Jersey City, NJ 07305 | Trade Debt | Unliquidated | | | $355,084.91 |
| 13. | MEDLINE INDUSTRIES, INC. | P.O. Box 382075, Pittsburgh, PA 15251 | Trade Debt | Unliquidated | | | $343,806.95 |
| 14. | WASTE MANAGEMENT OF NORTHEAST NJ, INC. | P.O. BOX 13648, Philadelphia, PA 19101 | Trade Debt | Unliquidated | | | $326,662.55 |

Official Form 204        **Chapter 11 of Chapter 9 Cases:  List of Creditors Who Have the 30 Largest Unsecured Claims**   page 2

9277563v.2

Case 26-12239-MBK    Doc 15    Filed 06/16/26    Entered 06/16/26 13:25:07    Desc
Exhibit 6 - Exhibit A Page 19 of 202

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount.  If claim is partially secured, fill in total claim amount and deduction for value of collateral of setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15. POINT CLICK CARE TECHNOLOGIES INC. | P.O. Box 674802, Detroit, MI 48267 | Trade Debt | Unliquidated | | | $301,416.13 |
| 16. ADP, LLC | P.O. Box 842875, Boston, MA 02284-2875 | Trade Debt | Unliquidated | | | $242,817.58 |
| 17. BANKDIRECT CAPITAL FINANCE | Two Conway Park 150 North Field Drive, Suite 190, Lake Forest, IL 60045 | Trade Debt | Unliquidated | | | $207,513.15 |
| 18. WELLSKY CORPORATION (REFERRAL) | P.O. Box, 200086 Dallas, TX 75320 | Trade Debt | Unliquidated | | | $170,000.00 |
| 19. INSIGHT PUBLIC SECTOR, INC. | P.O. Box 731072, Dallas, TX 75373-1072 | Trade Debt | Unliquidated | | | $152,142.09 |
| 20. DISTRICT 1199J NATIONAL UNION OF HOSP | 325 Chestnut Street, Suite 215, Philadelphia, PA 19106 | Trade Debt | Unliquidated | | | $140,164.72 |
| 21. WELLSKY CORPORATION | P.O. Box 200086, Dallas, TX 75320 | Trade Debt | Unliquidated | | | $139,784.59 |
| 22. MEDICAL NUTRITION THERAPY ASSOCIATES, LLC | 1382 Lanes Mill Rd, STE 101, Lakewood, NJ 08701 | Trade Debt | Unliquidated | | | $131,300.00 |
| 23. FASTRAD, LLC | 1000 Central Avenue Woodmere, NY 11598 | Trade Debt | Unliquidated | | | $127,667.50 |

9277563v.2

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral of setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 24. NETWORK DOCTOR NJ LLC | 600 Sylvan Avenue, Suite 212, Englewood Cliffs, NJ 07632 | Trade Debt | Unliquidated | | | $125,146.65 |
| 25. ESTATE OF MARILYN JACKSON-STREETER AND | Davis & Brusca, LLC 100 Charles Ewing Blvd, Ewing, NJ 08628 | Trade Debt | Unliquidated | | | $108,900.00 |
| 26. AMTRUST NORTH AMERICA, INC. | P.O. Box 94557, Cleveland, OH 44101 | Trade Debt | Unliquidated | | | $106,277.63 |
| 27. FASTEN HALBERTSTAM LLP | 40 Wall Street, Suite 3602, New York, NY 10005 | Trade Debt | Unliquidated | | | $93,102.00 |
| 28. TEAMSTERS LOCAL #97 BENEFITS FUND | 136 Central Avenue, Clark, NJ 07066 | Trade Debt | Unliquidated | | | $92,363.47 |
| 29. ACULABS, INC. | 2 Kennedy Boulevard, East Brunswick, NJ 08816 | Trade Debt | Unliquidated | | | $85,744.10 |
| 30. LIFE RIDE INC | 70 South Orange Ave, STE 220, Livingston, NJ 07039 | Trade Debt | Unliquidated | | | $84,768.20 |

9277563v.2

# RESOLUTIONS OF MANAGERS OF THE COMPANIES

April 23, 2026

The undersigned, (i) Hyman Jacobs ("**Hyman**"), being (a) the manager of Llanfair House Care & Rehabilitation Center, LLC ("**Llanfair**") and Windsor Healthcare Management Limited Liability Company ("**WHCM**") and (b) the manager of Buckingham-Canterbury Parent, LLC, being the sole member of The Buckingham at Norwood Care & Rehabilitation Center, LLC ("**Buckingham**"), (ii) Joshua Jacobs ("**Joshua**"), being the manager of Cornell Hall Care & Rehabilitation Center, LLC ("**Cornell**"), Merwick Care & Rehabilitation Center, LLC ("**Merwick**") and The Canterbury at Cedar Grove Care & Rehabilitation Center, LLC ("**Canterbury**"), (iii) Batsheva Katz ("**Batsheva**"), being the manager of Greenbrook Manor Care & Rehabilitation Cetner, LLC ("**Greenbrook**") and (iv) Michael Jacobs ("**Michael**", and together with Hyman, Jacob and Batsheva, the "**Managers**"), being the manager of The Venetian Care and Rehabilitation Center, LLC ("**Venetian**") and Ashbrook Care & Rehabilitation Center, LLC ("**Ashbrook**", and together with Llanfair, WHCM, Buckingham, Cornell, Merwick, Canterbury, Greenbrook and Venetian, the "**Companies**" and each, a "**Company**"), do hereby adopt the following resolutions:

**WHEREAS**, the Managers have reviewed and considered the financial and operational condition of the Companies and the Companies' business on the date hereof, including the historical performance of the Companies, the assets of the Companies, the current and long-term liabilities of the Companies, and the market for the Companies' products;

**WHEREAS**, the Managers have received, reviewed and considered the recommendations of the Companies' legal, financial and other advisors as to the relative risks and benefits of pursuing a bankruptcy proceeding under the provisions of chapter 11 of title 11 of the United States Code;

**NOW**, **THEREFORE**, **IT IS**:

**RESOLVED** that, in the judgment of the Managers, it is desirable and in the best interests of the Companies, and its creditors, stockholders and other interested parties, that voluntary petitions be filed by each of the Companies commencing cases under the provisions of chapter 11 of title 11 of the United States Code (the "**Chapter 11 Cases**");

**RESOLVED FURTHER** that Jacen Dinoff, the Chief Winddown Officer of each Company, and/or such other officer(s) as the Managers direct (each, an "**Officer**" and collectively, the "**Officers**") be, and they each hereby are, authorized and directed to execute and file on behalf of the Companies all petitions, schedules, lists and other papers or documents, and to take any and all action which they deem necessary or proper to obtain relief for the Companies under chapter 11 of title 11 of the United States Code;

**RESOLVED FURTHER** that the Officers of the Companies are hereby authorized, and each Officer shall be, and hereby is, authorized, directed and empowered, on behalf of and in the name of the Companies, to employ and retain (i) Emmet, Marvin & Martin,

9278335v.5

LLP, as bankruptcy counsel and (b) KCP Advisory Group, as financial advisor, with Jacen Dinoff serving as Chief Winddown Officer, in each case in connection with the Chapter 11 Cases;

**RESOLVED FURTHER**, that the Officers of the Companies be, and they hereby are, authorized and directed to employ any other individual and/or firm as professionals or consultants to the Companies as are deemed necessary to represent and assist the Companies in carrying out the Companies' duties under title 11 of the United States Code, and in connection therewith, the Officers of the Companies are hereby authorized and directed to execute appropriate retention agreements, and to cause to be filed an appropriate application for authority to retain the services of such firms;

**RESOLVED FURTHER**, that the Officers of the Companies be, and they hereby are, authorized and empowered to take or cause to be taken any and all actions, execute and file any and all documents or pleadings pursuant to the applicable provisions of the title 11 of the United States Code, as may be appropriate in furtherance of a plan of liquidation;

**RESOLVED FURTHER**, that the Officers of the Companies be, and they hereby are, authorized and empowered for, in the name of, and on behalf of the Companies, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his or her discretion, may deem necessary or advisable in order to carry out the purpose and intent of the foregoing resolutions;

**RESOLVED FURTHER**, that all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Managers, in the name and on behalf of the Companies, which acts would have been approved by the foregoing resolutions except that such acts were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved and ratified;

**RESOLVED FURTHER** that the foregoing powers and authorizations shall continue in full force and effect until revoked in writing by the Managers;

**RESOLVED FURTHER** that this certification may be executed by facsimile, telecopy or other reproduction, and such execution shall be considered valid, binding and effective for all purposes.

[Signature page to follow.]

-2-

Case 26-01239-MBK   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:25:07   Desc
Exhibit 6 - Decision At Renewal   Page 23 of 202

In certification of this Resolution of the Managers, I do set my hand and seal this 23rd day of April, 2026.

*Hyman Jacobs*

Name: Hyman Jacobs
Title: Manager of Llanfair House Care & Rehabilitation Center, LLC, Windsor Healthcare Management Limited Liability Company and Buckingham-Canterbury Parent, LLC (as sole member of The Buckingham at Norwood Care & Rehabilitation Center, LLC)

*Michael Jacobs*

Name: Michael Jacobs
Title:   Manager of Ashbrook Care & Rehabilitation Center, LLC and The Venetian Care and Rehabilitation Center, LLC

Name: Joshua Jacobs
Title:   Manager of Merwick Care & Rehabilitation Center, LLC, Cornell Hall Care & Rehabilitation Center, LLC, and The Canterbury at Cedar Grove Care & Rehabilitation Center, LLC

Name: Batsheva Katz
Title: Manager of Greenbrook Manor Care & Rehabilitation Center, LLC

-3-

**EXHIBIT B**

**EXHIBIT B**

**JONATHAN M. PROMAN, ESQ.**
Attorney ID No. 025832004
30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com
*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

---

| | |
|---|---|
| MERWICK HEALTHCARE AND REHAB CENTER LLC, VENETIAN HEALTHCARE AND REHAB CENTER LLC, MERWICK PROPCO URBAN RENEWAL LLC, and VENETIAN PROPCO LLC, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY Docket No. MID-L-            -26 Civil Action CBLP Action |
| Plaintiffs, | |
| - against - | **VERIFIED COMPLAINT, DESIGNATION OF TRIAL COUNSEL, AND RULE 4:5-1 AND 1:38-7(b) CERTIFICATIONS** |
| MICHAEL JACOBS, JOSHUA JACOBS, HYMAN JACOBS, DAVID JACOBS, ANDREW MASETTI, CHRISTOPHER METTERNICH, MILLSTONE RIVERVIEW REAL ESTATE URBAN RENEWAL LLC, VENETIAN HEALTHCARE, LLC, and DOE DEFENDANTS 1-10, | |
| Defendants. | |

---

Plaintiffs Merwick Healthcare and Rehab Center LLC ("Merwick Opco"), Venetian Healthcare and Rehab Center LLC ("Venetian Opco", and collectively with Merwick Opco, the "New Operator Plaintiffs"), Merwick Propco Urban Renewal LLC ("Merwick Propco"), and Venetian Propco LLC ("Venetian Propco", and collectively with Merwick Propco, the "New Propco Plaintiffs"), by their undersigned counsel, for their verified complaint against defendants Michael Jacobs, Joshua Jacobs, Hyman Jacobs, David Jacobs, Andrew Masetti, Christopher

1

Metternich, Millstone Riverview Real Estate Urban Renewal LLC ("Old Merwick Propco"),

Venetian Healthcare, LLC ("Old Venetian Propco"; and collectively with Old Merwick Propco,

the "Old Propco Defendants"), state as follows.

## NATURE OF THE ACTION

1.     The individual defendants converted trust property in excess of $2.8 million owned by the New Operator Plaintiffs, who purchased the rights to operate two Middlesex County skilled nursing facilities ("SNFs") pursuant to agreements dated December 2, 2024.

2.     The massive theft imperials the critical caregiving to residents of the SNFs, including senior citizens and low-income persons.

3.     The SNFs that are the subject of this action are (i) Merwick Care & Rehabilitation Center, located at 100 Plainsboro Road, Plainsboro, NJ 08536 (the "Merwick SNF"); and (ii) Venetian Care & Rehabilitation Center, located at 275 John T. O'Leary Blvd., South Amboy, NJ 08879 (the "Venetian SNF").

4.     As part of the purchase, and as is standard in the SNF industry, the sellers -- which the individual defendants operated at all pertinent times -- entered into two agreements for each SNF: (i) an asset purchase agreement, conveying real property and certain personal property from the Old Propco Defendnats to the New Propco Plaintiffs; and (ii) an operations transfer agreement, transferring to the New Operator Plaintiffs the right to operate the SNFs.

5.     After closing of an asset purchase agreement, a transition period exists during which an old operator participates in an SNF's caregiving, including that -- during the transition period -- a new operator's accounts receivable are paid into a financial institution account in the name of a seller operating company.

6.      The seller holds the receivables payments in trust for the new operator pursuant to an express trust agreement, which funds consist of substantially all of the SNF's revenue.

7.      The individual defendants are the natural persons who caused the sellers to convert the trust property, along with engaging in related torts.

8.      In addition to the plaintiffs' tort claims, the Old Propco Defendants breached the asset purchase agreements, and are liable to the New Propco Plaintiffs for breach of contract.

9.      Defendant Hyman Jacobs guaranteed the obligations of the sellers under the assert purchase and operations transfer agreements, and is liable under those guaranties for the sellers' breaches of contract.

10.     On April 23, 2026, the seller operating companies filed voluntary petitions for bankruptcy protection in the United States Bankruptcy Court for the District of New Jersey.

11.     The automatic stay pursuant to 11 U.S.C. § 362 precludes legal action in this Court against the seller operating companies.

12.     But the automatic stay does not extend to the individuals defendants or to the Old Propco Defendants.

**PARTIES**

13.     Plaintiff Merwick Opco is a limited liability company organized and existing under the laws of the State of New Jersey with its registered office at 1608 Route 88, Suite 200, Brick, New Jersey 08724, and doing business at 100 Plainsboro Road, Plainsboro, New Jersey 08536.

14.     Plaintiff Venetian Opco is a limited liability company organized and existing under the laws of the State of New Jersey with its registered office at 1608 Route 88, Suite 200,

3

Brick, New Jersey 08724, and doing business at 275 John T. O'Leary Boulevard, South Amboy, New Jersey 08879.

15. Plaintiff Merwick Propco is a limited liability company organized and existing under the laws of the State of New Jersey with its registered office at 1608 Route 88, Suite 200, Brick, New Jersey 08724, and doing business at 100 Plainsboro Road, Plainsboro, New Jersey 08536.

16. Plaintiff Venetian Propco is a limited liability company organized and existing under the laws of the State of New Jersey with its registered office at 1608 Route 88, Suite 200, Brick, New Jersey 08724, and doing business at 275 John T. O'Leary Boulevard, South Amboy, New Jersey 08879.

17. Defendant Michael Jacobs is an individual and, upon information and belief, he is domiciled in New York State and Chief Executive Officer of the Old Propco Defendants and the non-party in-bankruptcy sellers of the right to operate the SNFs.

18. Defendant Joshua Jacobs is an individual and, upon information and belief, he is domiciled in New York State and President of the Old Propco Defendants and the non-party in-bankruptcy sellers of the right to operate the SNFs.

19. Defendant David Jacobs is an individual and, upon information and belief, he is domiciled in New York State and an officer of the Old Propco Defendants and the non-party in-bankruptcy sellers of the right to operate the SNFs.

20. Defendant Hyman Jacobs is an individual and, upon information and belief, he is domiciled in New York State, the father of Michael, Joshua, and David Jacobs, and a member and manager of the Old Propco Defendants and the non-party in-bankruptcy sellers of the right to operate the SNFs.

4

21.     Defendant Andrew Masetti is an individual and Chief Financial Officer of the Old Propco Defendants and the non-party in-bankruptcy sellers of the right to operate the SNFs.

22.     Defendant Christopher Metternich is an individual and Chief Operating Officer of the Old Propco Defendants and the non-party in-bankruptcy sellers of the right to operate the SNFs.

23.     Upon information and belief, defendant Old Merwick Propco is a limited liability company organized and existing under the laws of the State of New Jersey with its registered office reportedly at 100 McClellan Street, Norwood, New Jersey 07648.

24.     Upon information and belief, defendant Old Venetian Propco is a limited liability company organized and existing under the laws of the State of New Jersey with its registered office reportedly at 100 McClellan Street, Norwood, New Jersey 07648.

25.     Michael Jacobs, Joshua Jacobs, David Jacobs, Hyman Jacobs, Andrew Masetti, and Christopher Metternich each intentionally caused and participated in the old operators' and Old Propco Defendants' conduct set forth in this verified complaint.

26.     Doe Defendants 1-10 are additional natural persons who participated in an entity defendant's conduct averred in this pleading, along with other persons who engaged in such conduct, and whose identities are currently unknown to the plaintiffs.

## PERTINENT FACTS

*A. The SNF Purchase Agreements*

27.     On or about December 2, 2024, the plaintiffs entered into the purchase agreements for the Merwick SNF and Venetian SNF.

5

28. Each transaction consisted of two main agreements: (i) the asset purchase agreement, governing transfer of an SNF's real property and certain personal property; and (ii) the operations transfer agreement, governing transfer of the right to act as operator of an SNF.

29. An SNF's operator, among other things, is the lessee of the SNF's real property.

30. An SNF typically obtains a substantial portion of its revenue from Medicare and Medicaid.

31. As part of Medicare and Medicaid, an SNF operator is issued (i) a license by the Department of Health of the State of New Jersey; and (ii) provider numbers by Medicare and Medicaid, in order to receive payments from those programs.

32. Medicare and Medicaid typically transfer an old operator's provider number to the new operator, in lieu of issuing a new provider number.

33. State and federal authorities typically require approximately several months to over a year to transfer a provider number.

34. A condition precedent to transfer of Medicare and Medicaid provider numbers is issuance of a license by the Department of Health to the new operator.

35. Absent a provider number and license, Medicare, Medicaid, and also third-party payors such as private insurance, each will not enter into contracts with a new operator.

36. Pending license issuance, the new operators of the Merwick SNF and Venetian SNF each entered into with the old operators (i) a sublease, to lease the SNF back to the old operator pending issuance of a license; and (ii) an administrative services agreement, pursuant to which the old operator -- using its existing license and provider number -- participates in the operation of the SNF, but using a purchasing entity's employees and other personnel.

37.     During the transition period while a sublease and administrative services agreement are in effect, even though the new operator's personnel generates accounts receivable, Medicare, Medicaid, and all other payors remit payment for those receivables into a financial institution account in the name of the old operator, as the old operator is the entity with the license and provider number during the transition period.

38.     The old operator thus receives payments for the new operator's accounts receivable, pending issuance of a new license and transfer of Medicare and Medicaid provider numbers to the new operator.

39.     The old operator holds the post-closing buyer-owned receivables payments in trust for the new operator, pursuant to the parties' operations transfer agreements.

40.     The trust obligation is critical to a new operator because post-closing receivables are the new operator's main revenue source.  Without that revenue, a new operator typically cannot pay nurses and other medical professionals.

41.     Without any excuse whatsoever, and despite demand by the New Operator Plaintiffs, the individual defendants, who operate the sellers, have caused the sellers to refuse to deliver to the New Operator Plaintiffs the receivables payments held in trust and consisting of the New Operator Plaintiffs' property.

42.     Because the usurped New Operator Plaintiff-owned receivables comprise substantially all of the revenue generated by the Middlesex County SNFs that are the subject of this action, conversion of the trust property threatens the SNFs' existence.

43.     To ensure the SNFs' continued operations and critical care to patients, and because conversion of trust property is egregious theft, the plaintiffs seek a permanent mandatory

injunction directing the defendants to deliver in-trust New Operator Plaintiff-owned funds to the New Operator Plaintiffs, an accounting, damages, and related relief.

44.  Separate and independent from the above torts, the Old Propco Defendants have breached contractual indemnification and other obligations owed to the plaintiffs, for which plaintiffs seek money damages, along with specific performance of conditions precedent to the issuance of licenses and transfer of provider numbers to the New Operator Plaintiffs, as set forth below.

45.  As part of the purchase agreements, defendant Hyman Jacobs personally guaranteed obligations of the sellers to the plaintiffs.

46.  Because Hyman Jacobs breached his obligations under his personal guaranties, he is liable to the plaintiffs for money damages.

B. *The Skilled Nursing Facilities*

47.  SNFs, among other things, provide physician-directed medical care to patients following surgical and other procedures to address acute, subacute, and other serious conditions, *e.g.*, hip replacements, heart attacks, etc.  The day-to-day care at an SNF primarily is performed by registered nurses, licensed practical nurses, and certified nursing assistants.

48.  The purchase agreements for the sale of the Merwick SNF and Venetian SNF to the plaintiffs consist in pertinent part of an (i) Operations Transfer Agreement ("OTA"); and (ii) Asset Purchase Agreement ("APA").

49.  Separate OTAs and APAs were entered into for each facility, for a grand total of four such contracts.

50.  The APAs conveyed land, buildings, improvements, and certain personal property to the New Propco Plaintiffs, who are the current landlords of the SNFs.

8

51.     The OTAs conveyed to the New Operator Plaintiffs the right to act as new operators of the SNFs.

52.     The New Operator Plaintiffs are the current lessees of the SNFs.

53.     Through subleases, the SNFs were leased back to the old operators pending issuance of licenses and provider numbers to the New Operator Plaintiffs.

54.     Through administrative services agreements, the old operators have used their existing licenses and Medicare and Medicaid provider numbers to participate in the operation of the SNFs, but using the New Operator Plaintiffs' employees and other personnel.

55.     Accounts receivable for caregiving services are owned by the New Operator Plaintiffs.

56.     The plaintiffs performed all of their obligations under the parties' agreements prior to, upon, and after closings pursuant to those agreements.

C. *Trust Agreements For Post-Closing Receivables*

57.     Trust agreements are standard in the SNF industry pending issuance of a license and transfer of a provider number to the purchaser of an SNF's operations.

58.     The OTAs provide at p. 10 § 6(b):

> Effective on the Closing Date, [an] Old Operator [*i.e.*, an Old Operator Defendant] sells, assigns and conveys to [a New Operator Plaintiff] the Medicare and Medicaid provider number(s) in use at the [Skilled Nursing] Facility (the "Existing Provider Numbers") ....  Old Operator and New Operator shall execute any and all documents necessary for, and will otherwise cooperate in connection with, the assignment of the Existing Medicare Provider Number.  During the pendency of New Operator's CMS Form 855A [*i.e.*, the form reporting a change in ownership and requesting transfer of a provider number] (the "CHOW"), New Operator may bill Medicare and Medicaid under Old Operator's name and the Existing Provider Numbers, until the intermediary changes the electronic funds transfer account or special payment address to the New Operator.

59.     As such, the parties in the OTAs memorialized that the New Operator Plaintiffs would use the old operators' provider numbers pending Medicare and Medicaid's transfer of those numbers to the New Operator Plaintiffs.

60.     The OTAs also provide at § 6(c) that, "Old Operator agrees to cooperate with New Operator as necessary for enrollment of New Operator in the Medicare and Medicaid programs.

61.     The OTAs create trust obligations upon each of the old operators, who are now in bankruptcy.

62.     An old operator holds new operator-owned post-closing receivables in trust for a New Operator Plaintiff whose personnel performed work resulting in the receivables.

63.     Conversion of trust property thus imperils the critical care to senior citizens and low-income persons because it chokes an SNF's revenue stream, thereby depriving the new operator of the new operator-owned funds needed to fund an SNF's operations, such as paying nursing and other professional staff, janitors, administrative staff, insurance, utilities, etc.

64.     The Merwick and Venetian OTAs (at p. 13 § 9(d)) each state:

> To the extent a Party [*i.e.*, a New Operator Plaintiff or Old Operator Defendant] receives any payments for accounts receivable of another Party, the Parties acknowledge that the Party receiving the payment belonging to another Party shall hold the payment **in trust**, that no Party shall have any right to offset with respect to such accounts receivable, and that the Party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the appropriate other Party within ten (10) days of receipt thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.  (Emphasis added.)

65.     The OTAs thus impose upon the old operators the duty to hold Medicare and Medicaid payments for post-closing caregiving in trust for the New Operator Plaintiffs.

66. The trust relationship described above is not unique to this action's OTAs, but is industry practice.

### D. The Individual Defendants Convert the New Operator Plaintiffs' Trust Property

67. By letter dated March 31, 2026, and at earlier times, the New Operator Plaintiffs demanded that the individual defendants cause the old operators to comply with the trust obligation to deliver payments for post-closing receivables to the New Operator Plaintiffs.

68. The old operators refused the above demand.

69. The old operators usurped the trust property.

70. The usurpation was performed by and at the direction of Michael Jacobs, Joshua Jacobs, David Jacobs, Hyman Jacobs, Andrew Masetti, and Christopher Metternich.

71. The Jacobs, Masetti, and Metternich are the principal officers and natural persons through whom the seller entities act.

72. As discussed in Counts One through Four below, because of the conversion of post-closing Medicare and Medicaid receivables payments, a permanent mandatory injunction for the delivery of trust property held by the individual defendants and Old Propco Defendants to the New Operator Plaintiffs, money damages, an accounting, and related relief are appropriate.

**IN ADDITION TO, AND SEPARATE AND INDEPENDENT FROM, CONVERSION OF TRUST PROPERTY, THE OLD PROPCO DEFENDANTS BREACHED CONTRACTUAL INDEMNITY AND OTHER OBLIGATIONS TO THE PLAINTIFFS**

73. The sellers pursuant to the APAs obligated themselves, among other things, to (i) convey assets free and clear of encumbrances and liabilities; (ii) convey assets consistent with representations, warranties, and obligations set forth in those agreements; and (iii) to the extent encumbrances or liabilities existed, eliminate them.

74.     By way of example only, under the APAs § 1(a)-(b), the Old Propco Defendants agreed, among other things, to convey assets "free and clear of all claims, liens, … restrictions, [or] encumbrances ....", along with expressly agreeing that, "[the New Propco Plaintiffs] shall not assume and shall not be liable [for], and [the Old Propco Defendants] shall retain and remain liable, for any debts, liabilities or obligations of any kind or nature ...."

75.     The APAs throughout the agreement reiterate the above obligations. *See, e.g.*, § 5(a)(i) (Purchased Assets delivered free and clear of Exceptions a condition to Closing); § 5 (a)(iv)-(v) (no lawsuits filed or threatened, nor material adverse changes to physical condition or other aspects of Facilities on Closing Date); § 5 (a)(viii) (reps and warranties true and complete as of Closing); § 5 (a)(x) (no government claims); § 7(a) (pending Closing Sellers shall maintain Purchased Assets without deterioration of value); § 7(e)-(f) (creating any Exception or causing reps and warranties to become untrue or violated pending Closing prohibited); § 7(h) (duty to inform Purchasers of a material event adversely affecting Purchased Assets); § 8(c), (h) (good and marketable title to Purchased Assets, and no Exceptions); § 8(d) (building in operating condition and compliant with applicable laws); § 8(e) (no environmental matters); § 8(j) (certificates, licenses and permits in good standing); § 8(o) (no pending or threatened investigations or governmental actions); § 8(p), (q) (compliance with appliable laws, and no notice of violations); § 8(s) (no liabilities expected to be asserted against a Purchaser, except as disclosed on Financial Statements or Schedule 8(s)); and § 8(w) (no untrue facts or omissions).

76.     The OTAs also require a transfer free and clear of all claims, liens, restrictions, or encumbrances.

77.     By way of example only, under the OTAs § 15, the Old Operator Defendants agreed to (i) "discharge any … tax … relating to any period prior to the Closing Date"; (ii)

12

"timely pay all taxes or other obligations and liabilities which are due and payable"; and (iii) "pay before the same shall become due all taxes, duties and other governmental charges that accrue prior to the Closing Date, which, if not paid, would create … a lien on any of the assets of New Operator or for which New Operator could become liable ...."

78.     By way of further example, the Old Operator Defendants represented and warranted, as of an OTA's Effective Date and Closing Date, among other things, that there were no pending or threatened government actions (§ 18(d)); they were in compliance with applicable laws, regulations, and ordinances (§ 18(j)); taxes and governmental charges had been paid (§ 18(y)); there was nothing causing a material adverse effect upon the Sellers or their to-be-sold assets (§ 18(gg)); and no inaccurate or misleading statements were made (§ 18(ii)).

79.     Moreover, the Old Operator Defendants agreed, among other things, to maintain and repair real and personal property (§ 2(b)(ii)); avoid or remove liens, claims and encumbrances (§ 2(b)(vii)); perform all contractual and other obligations (§ 2(b)(xiii)); promptly inform the New Operator Plaintiffs in writing of material events affecting a facility, *e.g.*, a Legionella matter (§ 2(b)(xv)); not cause or permit an Exception to exist (§ 2(c)(vi)); discharge or transfer Delinquent Residents (§ 2(d)); and confirm there are no filed or threatened lawsuits or claims (§ 3(a)(viii)).

80.     The APAs broadly obligate the Old Propco Defendants to indemnify the plaintiffs for losses—including a breach of the above (or other) contractual obligations under an APA or OTA.

81.     By way of example only, the APAs' § 11(b) state:

> From and after the Closing, Seller agrees to indemnify, save, protect, defend and hold harmless Purchaser and its affiliates … from and against all Losses arising from, out of, or relating to (i) Seller's ownership of the Purchased Assets prior to the Closing Date, (i) any inaccuracy or breach of any

13

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 38 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Notice of Removal   Page 15 of 70   Page 38 of 202

representation, warranty, covenant, agreement or obligation of Seller contained in this Agreement or in any of the Other Documents and (ii) any of the Excluded Assets or Retained Liabilities.

82. Losses are broadly defined in the APAs (§ 11(a)) and OTAs (§16 (a)) as, among other things, "claims, liabilities, losses, damages, demands and causes of action of any nature whatsoever … , and all costs and expenses (including penalties and reasonable attorneys' and other professional fees and disbursements … ), whether or not resulting from third-party claims."

83. By letter dated March 31, 2026, and at earlier times, the plaintiffs, among other things, demanded from the sellers indemnity and compensation for damages for Losses, but such demand was refused.

84. The sellers, among other things, refused to discuss the plaintiffs' claims in good faith, much less agree on a resolution, and defendants otherwise breached their obligations.

85. As discussed in Counts five through twenty-six below, defendants breached an array of obligations and have refused to indemnify the plaintiffs.

<div align="center">

**COUNT ONE**
**CONVERSION AGAINST ALL DEFENDANTS**
**<u>(Incorporating All Previous Allegations)</u>**

</div>

86. The old operators, acting through the Jacobs, Masetti, and Metternich, have usurped trust property, as averred above, and each of the individual defendants thus is liable for conversion.

87. The Old Propco and Doe Defendants are liable for conversion to the extent they received or participated in theft of trust property.

**WHEREFORE,** the New Operator Plaintiffs demand judgment against the defendants for compensatory damages of no less than $2,800,000, consequential, and punitive damages, pre-

and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY AGAINST INDIVIDUAL DEFENDANTS
### (Incorporating All Previous Allegations)

88.     The old operators agreed to hold Medicare, Medicaid, and other receivables payments in trust for the New Operator Plaintiffs, as averred above.

89.     By virtue of the trust agreement, the old operators owe fiduciary obligations to the New Operator Plaintiffs, including not to convert trust property.

90.     The old operators, acting through the Jacobs, Masetti, and Metternich, breached their fiduciary duties to the New Operator Plaintiffs.

91.     The individual defendants thus are liable for breach of fiduciary duty because they caused the old operators to usurp trust property.

**WHEREFORE,** the New Operator Plaintiffs demand judgment against the individual defendants for compensatory damages of no less than $2,800,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT THREE
## PERMANENT MANDATORY INJUNCTION AGAINST ALL DEFENDANTS
### (Incorporating All Previous Allegations)

92.     A mandatory injunction directing delivery to the New Operator Plaintiffs of trust property now or in the future in a defendant's possession, custody or control (except property of an old operating company subject to the jurisdiction of the bankruptcy court and/or automatic stay) is necessary to avoid continuing conversion of trust property and irreparable harm, including destruction of the SNFs' business and operations.

15

93. The OTA's contain consent and agreement to the injunctive relief sought by plaintiffs.

94. The OTAs at pp.18-19 § 16(g) state:

> … Old Operator acknowledges that New Operator's right to consummate the transactions contemplated hereby are unique, and recognizes and affirms that that in the event of a breach of this Agreement, money damages will be inadequate and New Operator will have no adequate remedy at law. Accordingly, Old Operator agrees that New Operator shall be entitled, in addition to any other rights and remedies existing in its favor … at law or in equity, to enforce its rights and Old Operator's obligations hereunder not only by an action or proceeding for damages but also by an action or proceeding for specific performance, injunctive and/or other equitable relief (without posting of bond or other security).

95. As such, the parties set forth their understanding and acknowledgement that a grant of injunctive relief would be appropriate.

**WHEREFORE,** the New Operator Plaintiffs demand judgment of a mandatory permanent injunction directing the defendants to turn over all trust property to the New Operator Plaintiffs, whether such trust property is located in or outside of New Jersey (and except property held by an old operating company subject to the jurisdiction of the bankruptcy court and/or automatic stay), plus attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

**COUNT FOUR**
**ACCOUNTING AGAINST ALL DEFENDANTS**
**(Incorporating All Previous Allegations)**

96. The status of the trust property is currently unknown to the plaintiffs.

97. An accounting is necessary to determine the status and location of the trust property.

98. The accounting, among other things, should set forth all transactions relating to the trust property, including without limitation the persons who received the trust property and

16

financial institution account(s) at which trust property now or previously has been held, and disposition of the trust property.

**WHEREFORE,** the New Operator Plaintiffs demand judgment directing the defendants to account for all trust property, plus attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT FIVE**
**FRAUD AGAINST ALL DEFENDANTS**
**(Incorporating All Previous Allegations)**

</div>

99.     The sellers' obligations set forth in this pleading have been breached from the outset of the parties' relationship.

100.     By way of example only, the obligation to hold receivables payments in trust and deliver them to the New Operator Plaintiffs has been violated since the closing of the APAs on or about March 31, 2025.

101.     The sellers represented prior to contract formation and prior to closing that they will perform their obligations when, in fact, the sellers never intended to perform those obligations, and have not performed them.

102.     The above representations were made by the individual defendants in their capacity as the natural persons through whom the sellers operate.

103.     After execution of the purchase agreements, the sellers engaged in the separate and independent fraud of repeatedly representing orally and in e-mails to the plaintiffs that trust property would be delivered to the new operators and that the sellers' other obligations will be performed.

<div align="center">17</div>

104.    By way of example only, on February 27, 2026, the sellers' chief financial officer, defendant Andrew Masetti, stated, "You should have received [trust] funds yesterday and I am sending another $43K today.  I know this does not account for the total amount due."

105.    The sellers thus admitted that they were aware of the "total amount due."

106.    The total amount due, as of February 13, 2026, was approximately $1,800,000, and Mr. Masetti was aware of this sum because affiliates of the New Operator Plaintiffs had advised him of it in writing that day.

107.    Representing that additional trust funds would be delivered to the New Operator Plaintiffs while the sellers' actual intent was not to convey and to convert trust property, is fraud.

108.    Since the closing of the APAs, the above cycle of misrepresentations repeated itself on a continuing basis, consisting of defendants promising delivery of trust property but actually intending to usurp it, along with representing that they would perform their other obligations but not actually intending to do so.

109.    The material representations averred above were knowingly false when they were made.

110.    The misrepresentations were stated for the purpose of causing the plaintiffs to reasonably believe that (i) trust property would be delivered; (ii) the sellers would perform their obligations; and (iii) the sellers would transfer the SNFs to the plaintiffs.

111.    The plaintiffs reasonably relied on the misrepresentations.

112.    The plaintiffs were damaged by defendants misrepresentations.

**WHEREFORE,** the plaintiffs demand judgment against the defendants for compensatory damages of no less than $4,000,000, consequential, and punitive damages, pre-

and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT SIX
### CIVIL CONSPIRACY AGAINST ALL DEFENDANTS
### (Incorporating All Previous Allegations)

113.    The defendants conduct averred herein was part of a common plan to convert the new operators' receivables payments, along with engaging in other misconduct averred herein.

114.    By way of example only, by failing to perform conditions precedent to license issuance and transfer of provider numbers to the new operators, the defendants were able to continue the conspiracy rather than enabling the plaintiffs to operate the SNFs on their own, and without receivables being paid into a seller's financial institution account.

115.    Proceeds of the conspiracy were used by the defendants to satisfy their personal obligations and otherwise to enrich themselves.

116.    The plaintiffs were damaged by the conspiracy through theft of trust property and other damages as averred herein.

**WHEREFORE,** the plaintiffs demand judgment against the defendants for compensatory damages of no less than $4,000,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT SEVEN
### AIDING AND ABETTING AGAINST ALL DEFENDANTS
### (Incorporating All Previous Allegations)

117.    Although the defendants are liable for conversion, breach of fiduciary duty, and fraud as averred above, in the alternative, to the extent the Court holds that the defendants are not directly liable for those torts, the defendants would liable for aiding and abetting the torts.

19

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 44 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/19/26    Entered 06/19/26 13:55:07    Desc
Exhibit 6 - Notice of Removal    Page 21 of 70   Page 44 of 202

118.    The defendants had knowledge of the misconduct averred herein because they are affiliated with the old operators and, as to the individual defendants, operate the sellers.

119.    The defendants substantially assisted the torts of conversion, breach of fiduciary, and fraud because they caused the old operators to steal trust property and otherwise collaborated with the old operators, thereby aiding and abetting conversion and breach of fiduciary duty.

120.    Likewise, the defendants would be liable for aiding and abetting fraud because they caused fraudulent statements averred herein to be made and otherwise collaborated to effect the fraud.

**WHEREFORE,** in the alternative, the plaintiffs demand judgment against the defendants for compensatory damages of no less than $4,000,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

**COUNT EIGHT**
**BREACH OF CONTRACT AGAINST OLD MERWICK PROPCO**
**AND OLD VENETIAN PROPCO**
**MEDICARE AND MEDICAID INELIGIBLE PATIENTS, INCLUDING FAILURE TO**
**DISCHARGE DELINQUENT RESIDENTS**
**(Incorporating All Previous Allegations)**

121.    Medicare and Medicaid are critical to an SNF because those programs often are the only source of payment for caregiving delivered by an SNF.

122.    In order for Medicare and Medicaid to cover an SNF's services, various approvals are needed on a patient-by-patient basis.

123.    A nurse employed by the State of New Jersey must determine that the patient's health merits an SNF stay, and the patient must otherwise complete a process known as pre-admission screening (collectively, "PAS").

124. Upon obtaining a PAS, a patient's application for Medicare or Medicaid then must be approved by those programs.

125. A decision by Medicare or Medicaid approving or denying a patient's application for SNF coverage is not immediate.

126. Prior to admitting a prospective patient, it thus is common practice for an SNF to, among other things, evaluate whether Medicare or Medicaid approval is likely.

127. Approval may be deemed retroactive to the date of a patient's application for Medicare or Medicaid, thereby resulting in full payment to an SNF for services delivered.

128. However, other times approval is not retroactive, thereby resulting in a partial loss to an SNF.

129. Because of the importance of Medicare or Medicaid approval, the sale agreements require a seller to indemnify the purchaser for already-admitted, pre-closing of sale patients who are later deemed by Medicare or Medicaid to be ineligible for coverage.

130. The OTAs state at § 16(b)(vi):

INDEMNIFICATION.

* * *

b. Old Operator shall indemnify, save, protect, defend and hold harmless each of the New Operator Parties from and against all Losses arising from, out of, or relating to … (vi) any resident present at the Facility [*i.e.*, the Merwick or Venetian SNFs] on the Closing Date for whom a recognized payor source cannot be obtained following the Closing.

131. The Old Propco Defendnats under the APAs are required to indemnify the purchasers for a breach of an OTA.

132. In the event a patient admitted pre-closing is deemed ineligible for Medicare or Medicaid and remains at an SNF after closing, the Old Propco Defendants must bear the

21

financial losses associated with those pre-closing patients by indemnifying the New Operator

Plaintiffs for such post-closing losses.

133.   Moreover, the OTAs further provide at § 2(d) as to Medicare and Medicaid

ineligible patients:

> Resident Discharges for Nonpayment.   … prior to Closing, Old Operator shall use commercially reasonable best efforts to voluntarily discharge or transfer each resident of the Facility who has not timely paid his or her financial obligations to the applicable Facility and who owes the Facility in excess of twenty-five thousand dollars ($25,000.00) (each a "Delinquent Resident"). For the avoidance of doubt, the definition of Delinquent Resident shall not include residents who are awaiting approval of payment from a payor source.

134.   The sellers failed to use commercially reasonable best efforts to discharge

Delinquent Residents.

135.   By way of example only, post-closing the New Operator Plaintiffs discovered that

approximately 60-80 patients at the SNFs lacked Medicare or Medicaid approval.

136.   Because the Merick and Venetian SNFs have 200 and 180 beds, respectively,

approximately 20% of pre-closing patients lacked a payor source.

137.   Certain of the above non-paying patients not only are Medicare or Medicaid

ineligible, but the sellers had not even attempted to the start the process of obtaining Medicare or

Medicaid approval.

138.   Where the process of obtaining Medicare or Medicaid approval had been started,

the sellers often failed to comply with requests by those programs for additional documentation

or, as to Medicaid, to comply with patient asset criteria, which failure typically precludes

retroactive Medicaid coverage.

139.   Moreover, the sellers failed to perform the obligation to discharge or transfer

Delinquent Residents.

140.     The Old Propco Defendants have refused to indemnify plaintiffs for losses caused by Medicare and Medicaid ineligible patients.

**WHEREFORE,** the New Operator Plaintiffs demand judgment against the Old Propco Defendants for compensatory damages of no less than $1,030,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

### COUNT NINE
### BREACH OF CONTRACT AGAINST OLD MERWICK PROPCO
### MEDICAID FRAUD AUDIT AND JUDGMENT
### (Incorporating All Previous Allegations)

141.     On July 15, 2025, pursuant to N.J.S.A. 30:4D-1 *et seq.*, the Clerk of the Superior Court entered judgment in favor of the Medicaid Fraud Division of the State of New Jersey against Old Merwick Opco, in the amount of $334,910.78.

142.     The above judgment pertains to a Medicaid fraud audit conducted by the State of New Jersey against Old Merwick Opco.

143.     The OTAs and APAs, among other things, obligated the sellers to deliver assets free of encumbrances.

144.     By way of example only, the APAs, at § 1(a), state, "

> … Seller hereby agrees to … convey … free and clear of all claims, liens, … [or] encumbrances … of any nature whatsoever (collectively, "Exceptions") … all of Seller's right, title and interest in and to all assets of Seller other than the Excluded Assets ....

145.     By way of further example only, the OTAs further state, among other things, at § 2(c)(vi) that the Old Operator Defendants shall not, "cause or permit any Exception (as defined in [an] APA) to exist on, any of the Purchased Assets ...."

23

146. Despite demand, the Old Merwick Propco has not paid the judgment or otherwise satisfied the debts to the State of New Jersey.

**WHEREFORE,** Merwick Propco and Opco demand judgment against Old Merwick Propco for compensatory damages of no less than $334,910.78, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT TEN**
**BREACH OF CONTRACT AGAINST OLD MERWICK PROPCO**
**AND OLD VENETIAN PROPCO**
**MEDICAID OVERPAYMENTS**
**(Incorporating All Previous Allegations)**

</div>

147. Medicaid has determined that it overpaid Old Merwick Opco and Old Venetian Opco for services rendered during those entities' pre-closing operations of the SNFs, in the amounts of (i) $334,910.78 and $236,202.15 for Merwick; and (ii) $608,790.31 for Venetian.

148. The APAs require Old Merwick Propco and Old Venetian Propco to indemnify the plaintiffs from all liabilities which relate to a seller's period of ownership, such as satisfying the above obligations.

149. Despite due demand, the Old Propco Defendants have breached their contractual obligations.

**WHEREFORE,** plaintiffs demand judgment against Old Merwick Propco and Old Venetian Propco for compensatory damages of no less than $571,112.93 and $608,790.31, respectively, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT ELEVEN
## BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO
## FAÇADE REPAIRS
### (Incorporating All Previous Allegations)

150.    The Venetian SNF requires physical repairs because portions of its exterior stone façade are peeling off.

151.    The façade-related losses not only include the cost of repair, but numerous ensuing losses such as damage to the underlying plywood caused by exposure to rain and other moisture.

152.    Moreover, the stone façade's condition has caused residents and their families to view the Venetian SNF unfavorably, together with associated loss of reputation and revenue.

153.    The façade condition, and defendants' failure to repair it, breach the purchase agreements.

154.    Old Venetian Propco has admitted to the breaches and, among other things, represented that it would repair the façade post-closing.

155.    By way of example only, on April 11, 2025 Michael Jacobs stated:

> … I have decided as good deal partners to just strip down the stone and redo it all [*i.e.*, the entire façade].

156.    Later that day, Old Venetian Propco's construction contractor, copying Michael Jacobs, stated:

> Now that we are replacing the stone, all I need from the new ownership team is confirmation of the material you want used.  Once we have this selection, we will order the material and then schedule a kickoff meeting … to review sequencing and schedule … the entire veneer is being replaced.

157.    According to Old Venetian Propco, the façade repairs could be properly performed for $60,000 - $75,000.

158.    On December 5, 2025, Joshua Jacobs said:

I discussed the matter [of façade replacement] with Michael [Jacobs].  He said the offer was made some time ago to have the stone work completed .... He said that based on the … completion estimates you shared … between $60-$75,000 … was reasonable ....

159.    However, despite agreeing to perform the façade replacement, Old Venetian Propco failed to perform the façade work.

160.    Plaintiffs believe that repair costs will be at least $200,000.

161.    Old Venetian Propco breached its contractual obligation to repair the façade and thus is liable for money damages.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco for compensatory damages of no less than $200,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT TWELVE**
**BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO**
**LEGIONELLA COSTS**
**(Incorporating All Previous Allegations)**

</div>

162.    Prior to closing, a Legionella matter arose at the Venetian SNF.

163.    The sellers failed to disclose this material event.

164.    Among other things, the material omission and concealment beached the Venetian SNF purchase agreements.  *See, e.g.*, APA §§ 5(a)(v); 7(a), (h); 8(d), (e), (s), (w); OTA §§ 2(b)(ii), (xv); 18(j), (gg), (ii).

165.    The Legionella matter has resulted in significant expense to Venetian Propco and Opco.

166.    By way of example only, (i) filters on all sinks required replacement every 60 days, at an expense of approximately $25,000 - $30,000; (ii) hyperchlorination was required, at

approximately $600 per month; and (iii) shower and other faucets required filtration, testing was required and, among other things, water treatment systems required re-piping.

167.    Legionella-related costs through the date of this pleading are anticipated to be at least $212,000, for which Old Venetian Propco is liable under the parties' agreements.

168.    Despite due demand, Old Venetian Propco has breached its contractual obligations.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco for compensatory damages of no less than $212,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

### COUNT THIRTEEN
### BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO
### TEMPORARY CERTIFICATE OF OCCUPANCY
### (Incorporating All Previous Allegations)

169.    As of the date of this pleading, the Venetian SNF has been operated pursuant to a temporary certificate of occupancy for approximately 10 years.

170.    Costs to obtain a permanent certificate of occupancy are anticipated to be at least $60,000.

171.    In addition, the Venetian SNF has 11 open and outstanding permits from the sellers' period of ownership.

172.    Among other things, the material omission and concealment beached the Venetian SNF purchase agreements. *See, e.g.*, APA §§ 5 (a)(viii); 5 (a)(x); 8(j), (p), (q); OTA §§ 18(j).

173.    Old Venetian Propco is required to compensate Venetian Propco and Opco for the above losses.

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 52 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Notice of Removal   Page 29 of 70   Page 52 of 202

174. Despite due demand, Old Venetian Propco has breached its contractual obligations.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco for compensatory damages of no less than $60,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT FOURTEEN
## BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO
## CITY OF SOUTH AMBOY SEWER COSTS
### (Incorporating All Previous Allegations)

175. In or about January 2026, the Venetian SNF learned that The City of South Amboy had previously imposed an approximately $40,000 fine because of sewer clog issues allegedly related to the Venetian SNF discharging bandages, plastics, greases and other improper waste in the municipal sewer system.

176. Among other things, this undisclosed dispute between Old Venetian Propco and/or Old Venetian Opco and the City violates APA §§ 1(a); 5(a)(iv)-(v), (x); 8(d), (o), (p), (q), (s); and violates OTA §§ 2(b)(vii); 3(a)(viii); 15; 18(d).

177. Old Venetian Propco is required to indemnify Venetian Propco and Opco for the above losses.

178. Despite due demand, Old Venetian Propco has breached its contractual obligations.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco for compensatory damages of no less than $40,000, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

28

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 53 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Notice of Removal   Page 30 of 70   Page 53 of 202

## COUNT FIFTEEN
## BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO
## AND OLD MERWICK PROPCO
## GRAS LAWN LLC MECHANIC'S LIEN AND DEBTS
### (Incorporating All Previous Allegations)

179.    A mechanic's lien exists upon the Venetian SNF's real property, recorded on June 6, 2025, in the principal amount of approximately $4,051.75.

180.    The lienor, Gras Lawn LLC, a landscaping and snow removal company, performed snow removal work pursuant to a contract dated November 1, 2024.

181.    Snow removal was performed not only at the Venetian SNF, but also the Merwick SNF.

182.    Gras Lawn LLC has asserted that $5,864.38 is owed for snow removal at the Merwick SNF.

183.    Gras Lawn LLC performed any snow removal work prior to March 31, 2025.

184.    The sellers failed to pay Gras Lawn LLC.

185.    Gras Lawn has sought payment for the above debts from the plaintiffs.

186.    Despite due demand, Old Venetian Propco and Old Merwick Propco have breached their contractual obligations as to Gras Lawn LLC's mechanic's lien and payment demands.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco, and Merwick Propco and Opco demand judgment against Old Merwick Propco, for compensatory damages of no less than $4,051.75 and $5,864.38, respectively, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT SIXTEEN
## BREACH OF CONTRACT AGAINST OLD MERWICK PROPCO
## FIRE MARSHAL DEBT
## (Incorporating All Previous Allegations)

187.    On March 2, 2026, William L. Gorka of the Plainsboro Fire Marshal's office advised the Merwick SNF that there is "a balance of $21,899.00 owed to the state" for fire-related matters.

188.    Among other things, outstanding Fire Marshal obligations violate APA §§ 1(a); 5(a)(x); 8(o), (s); and violate OTA §§ 2(b)(vii); 8(a); 15; 18(d), (j), (y).

189.    The outstanding fire marshal obligations have prevented capital expenditures at the Merwick SNF, as the Plainsboro Township has withheld a building permit because of the outstanding debt.

190.    Despite due demand, Old Merwick Propco has breached its contractual obligations, resulting in damages to the Merwick plaintiffs.

**WHEREFORE,** Merwick Propco and Opco demand judgment against Old Merwick Propco for compensatory damages of no less than $21,899.00, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT SEVENTEEN
## BREACH OF CONTRACT AGAINST OLD MERWICK PROPCO
## DAVITA, INC. RENT
## (Incorporating All Previous Allegations)

191.    Davita, Inc., a dialysis company, has rented a portion of the Merwick SNF for dialysis work.

192.    Davita, Inc., however, had received an IRS Notice of Levy because of unsatisfied tax obligations and liens related to the sellers' period of ownership.

193.     As such, Davita had paid rent for April 2025 to the IRS and not to Merwick Propco or Merwick Opco, in the amount of $9,188.33.

194.     The outstanding tax obligations and liens violate, among other things, APA §§ 1(a); 5(a)(i), (iv)-(v), (x); 7(h); 8(c), (h); (o), (p), (q), (s); and violate OTA §§ 2(b)(vii); (c)(vi); 3(a)(viii); 8(a); 15; 18(y).

195.     Despite due demand, Old Merwick Propco has breached its contractual obligations, resulting in damages to the Merwick plaintiffs.

**WHEREFORE,** Merwick Propco and Opco demand judgment against Old Merwick Propco for compensatory damages of no less than $9,188.33, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT EIGHTEEN**
**BREACH OF CONTRACT AGAINST OLD MERWICK PROPCO**
**SOLAR PANELS**
**(Incorporating All Previous Allegations)**

</div>

196.     The sellers during their period of ownership of the Merwick SNF contracted for the installation of solar panels at that facility.

197.     Neither New Merwick Propco nor Opco assumed the solar panel contract.

198.     The Merwick sellers failed to properly terminate the above contract, and the solar panel vendor has threatened to sue New Merwick Propco and/or Opco for breach of contract.

199.     Among other things, solar panel claims violate APA §§ 1(a); 8(s); and violate OTA §§ 8(a); 2(b)(vii), (xiii).

200.     Despite due demand, Old Merwick Propco has breached its contractual obligations, resulting in damages to the Merwick plaintiffs.

**WHEREFORE,** Merwick Propco and Opco demand judgment against Old Merwick Propco for compensatory damages in an amount to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

### COUNT NINETEEN
### BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO
### AND OLD MERWICK PROPCO
### FEDERAL TAXES AND CIVIL MONETARY PENALTIES
### (Incorporating All Previous Allegations)

201. Defendants are subject to outstanding federal tax debts, liens, and civil monetary penalties.

202. The above obligations have resulted in a lien upon the SNFs' real property.

203. The Internal Revenue Service typically will not disclose to a third party, such as the plaintiffs, details about other persons' tax information.

204. However, as of the date of this pleading, plaintiffs are aware of the following tax obligations and civil monetary penalties.

205. Old Merwick Opco has incurred IRS 941-related tax obligations, for the period ending June 2020, in the unpaid principal amount of $61,050.27, and with an approximate total balance of $83,677.33.

206. Old Merwick Opco also is subject to other outstanding tax obligations in the unpaid principal amounts of $29,877.44 and $11,848.89, which have resulted in the Department of Health and Human Services garnishing funds due to Merwick Opco, including per IRS notices dated February 8 and 9, 2026.

207. Old Venetian Propco and/or Old Venetian Opco has incurred outstanding civil monetary penalties in the amounts of approximately $123,000 and $34,000.

32

MID-L-003196-26 05/29/2026 1:00:19 PM Pg 57 of 202 Trans ID: LCV20261440701

Case 26-01239-VFP Doc 15-8 Filed 06/16/26 Entered 06/16/26 13:55:07 Desc
Exhibit 6 - Notice of Removal Page 34 of 70 Page 57 of 202

208.     One or more of the sellers also are subject to at least two additional outstanding civil monetary penalties in the amounts of approximately $96,000 and $59,475, along with tax obligations and liens.

209.     It is defendants' obligation to identify and satisfy tax obligations and civil monetary penalties, and remove liens upon the Merwick and Venetian SNFs.

210.     Tax obligations and liens, and civil monetary penalties, among other things, violate APA §§ 1(a); 5(a)(i), (iv)-(v), (x); 7(h); 8(c), (h); (o), (p), (q), (s); and violate OTA §§ 2(b)(vii), (xii); (c)(vi); 3(a)(v), (viii); 6(g); 8(a); 15; 18(y).

211.     Despite due demand, Old Merwick Propco, and Old Venetian Propco, have breached their contractual obligations as to tax- and civil monetary penalty-related Losses, resulting in damages to the plaintiffs.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco, and Merwick Propco and Opco demand judgment against Old Merwick Propco, for compensatory damages in amounts to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

**COUNT TWENTY**
**BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO**
**AND OLD MERWICK PROPCO**
**ERISA AND FLSA LITIGATIONS**
**(Incorporating All Previous Allegations)**

212.     Merwick Opco is a defendant in the action captioned *Latka v. Merwick Care & Rehabilitation Center, LLC, et al.*, Case No. 25-cv-14150, in the United States District Court for the District of New Jersey (the "Latka Action").

213.     Old Merwick Opco, and related entities, also are defendants in the Latka Action.

33

214.    The Latka Action plaintiff averred claims under the Employee Retirement Income Security Act of 1974, Fair Labor Standards Act, and related state laws, pertaining to, among other things, the Old Merwick Defendants' ownership of the Merwick SNF.

215.    The Latka Action's averments include failure to remit health insurance premiums that were deducted from employees' wages to the plan's administrator, and failure to pay overtime.

216.    The United States Department of Labor has similarly commenced an action against entities related to the defendants, in the action captioned *Chavez-Deremer v. Windsor Healthcare Management, LLC, et al.*, Case No. 25-cv-03773, in the United States District Court for the District of New Jersey (the "DOL Action").

217.    Upon information and belief, defendants have retained counsel in the Latka Action to represent Merwick Opco, jointly with representing the other defendants.

218.    Upon information and belief, the defendants, without Merwick Opco's knowledge, entered into a written settlement agreement in the Latka Action requiring the payment of money to the plaintiff.

219.    Losses, as defined by APA § 11(a) and OTA § 16(a), include "all costs and expenses (including … reasonable attorneys' and other professional fees and disbursements incurred in the investigation or defense of any … claims, or in asserting, pursuing or enforcing any … claims)."

220.    The Latka Action and DOL Action have resulted in Losses to plaintiffs consisting of professional fees to evaluate the above actions, as well as other Losses.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco, and Merwick Propco and Opco demand judgment against Old Merwick Propco, for

compensatory damages in amounts to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

## COUNT TWENTY-ONE
**BREACON OF CONTRACT AND OF IMPLIED COVENANCE OF GOOD FAITH AND FAIR DEALING AGAINST OLD VENETIAN PROPCO AND OLD MERWICK PROPCO FAILURE TO COOPERATE AS TO LICENSE ISSUANCE AND PROVIDER NUMBER TRANSFERS**
**(Incorporating All Previous Allegations)**

221.    As averred above, the defendants have converted the New Operator Plaintiffs' post-closing accounts receivable.

222.    The opportunity for continued conversion exists because, until issuance of licenses, and transfer of Medicare and Medicaid provider numbers to the New Operator Plaintiffs, payments by Medicare, Medicaid, and others for the New Operator Plaintiffs' accounts receivable will continue to be deposited into a financial institution account in the name of a seller.

223.    The Department of Health of the State of New Jersey has not approved the issuance of a new license to the New Operator Plaintiffs, as of the date of this pleading.

224.    Additionally, the old operators' Medicare and Medicaid provider numbers have not been transferred to the New Operator Plaintiffs, as of the date of this pleading.

225.    As such, the New Operator Plaintiffs are operating pursuant to the subleases and administrative services agreements with the old operators.

226.    Among other things, there presently exists the above referenced civil monetary penalties, plus one or more overpayments by Medicare and/or Medicaid to the old operators.

227.    There also are the existing tax liens and other obligations averred above from the defendants' period of ownership.

35

228.    Despite due demand, the Old Propco Defendants have failed to cooperate fully to resolve all outstanding matters, which has negatively affected and impaired issuance of a new license, and transfer of provider numbers to, the New Operator Plaintiffs.

229.    The plaintiffs have no adequate remedy at law for the defendants' failure to cooperate and otherwise perform contractual obligations.

230.    As such, the New Operator Plaintiffs demand specific performance of the duty to cooperate to effect new license issuance and transfer of provider numbers.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco, and Merwick Propco and Opco demand judgment against Old Merwick Propco, directing the specific performance of the duty to cooperate and otherwise perform acts required of the Old Propco Defendants before a license will be issued, and provider numbers transferred to, the New Operator Plaintiffs, or alternatively money damages, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT TWENTY-TWO**
**BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO**
**AND OLD MERWICK PROPCO**
**IRS GARNISHMENTS**
**(Incorporating All Previous Allegations)**

</div>

231.    The Internal Revenue Service has garnished trust property consisting of receivables payments to satisfy the entity defendants' tax obligations pertaining to their period of ownership of the SNFs.

232.    The defendants have not disclosed the reason(s) for the garnishments notwithstanding their obligations to the plaintiffs and that the garnished receivables are the plaintiffs' property.

233.     The plaintiffs believe that the IRS garnishments may be related to, among other things, the defendants' tax obligations as to employee retention credits and deferred payroll taxes.

234.     Because the garnishments pertain to defendants' period of ownership of the SNFs, they must be paid by defendants and were wrongfully paid from plaintiffs' property.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco, and Merwick Propco and Opco demand judgment against Old Merwick Propco, for compensatory damages in amounts to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT TWENTY-THREE**
**BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO**
**AND OLD MERWICK PROPCO**
**FAILURE TO SATISFY OLD OPERATOR DEBTS AT CLOSING**
**(Incorporating All Previous Allegations)**

</div>

235.     As averred above, the sellers contracted to convey unencumbered assets to the purchasers.

236.     Numerous debts and other encumbrances upon the SNFs were satisfied by the sellers at closing from sale proceeds.

237.     However, the parties' agreements require that all debts of the sellers be satisfied at or before closing as part of conveying unencumbered assets to the plaintiffs.

238.      Despite due demand, the Old Propco Defendants breached their contractual obligations by failing to satisfy all of the old operators' debts at closing and otherwise cause the sellers to convey unencumbered assets to the purchasers.

**WHEREFORE,** Venetian Propco and Opco demand judgment against Old Venetian Propco, and Merwick Propco and Opco demand judgment against Old Merwick Propco, for compensatory damages in amounts to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper

<div align="center">

**COUNT TWENTY-FOUR**
**BREACH OF CONTRACT AGAINST OLD VENETIAN PROPCO**
**AND OLD MERWICK PROPCO**
**RECOVERY OF FEES AND EXPENSES**
**(Incorporating All Previous Allegations)**

</div>

239. The APAs state at § 16(g), "In any dispute between the Parties that results in arbitration or litigation, the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, attorneys' fees."

240. The OTAs state at § 26, "In the event any dispute between the parties hereto that results in arbitration or litigation (including any enforcement action of an arbitration award or any action to compel arbitration or change venue), the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, reasonable attorneys' fees."

241. Moreover, Losses, as defined by APA § 11(a) and OTA § 16(a), include "all costs and expenses (including … reasonable attorneys' and other professional fees and disbursements incurred in the investigation or defense of any … claims, or in asserting, pursuing or enforcing any … claims)."

242. As such, the plaintiffs are entitled to recover, among other things, their reasonable attorneys' fees and disbursements incurred in investigating, asserting, pursuing, and enforcing the claims averred in this action.

**WHEREFORE,** plaintiffs demand judgment against Old Merwick Propco and Old Venetian Propco for compensatory damages consisting of reasonable attorneys' and other professional fees and disbursements, in amounts to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, costs and fees, and such other and further relief as may be just and proper.

### COUNT TWENTY-FIVE
### BREACH OF CONTRACT AGAINST HYMAN JACOBS
### GUARANTIES
### (Incorporating All Previous Allegations)

243.   Hyman Jacobs executed and delivered to plaintiffs his personal absolute and unconditional guaranties of the sellers' obligations due and owing to the plaintiffs under the APAs and OTAs.

244.   The Guaranties have not been terminated and remain fully enforceable.

245.   The guaranties each state at pp. 1-2:

> WHEREAS, as a result of Guarantor's [*i.e.,* Hyman Jacobs's] ownership interests in Seller and Old Operator, Guarantor will benefit from the transactions contemplated under the APA, OTA, [and other agreements] (the "Agreements") …

> \* \* \*

> 1.   Guarantor does hereby absolutely, irrevocably, and unconditionally guarantee, upon the terms and conditions hereof, the full, prompt and complete payment of the indemnification and other payment obligations (the "Indemnities") of Seller and Old Operator owed to the Guaranteed Parties [*i.e.,* the plaintiffs] pursuant to the Agreements, but only for so long, and subject to such applicable limitations (including, as applicable, the Cap and Basket (each as defined in the APA)) as the foregoing Indemnities shall survive the Closing (the "Indemnity Survival Period"), as provided in the applicable Agreements (the foregoing, collectively and as so limited, the "Guaranteed Obligations") .... Notwithstanding any provisions of this Guaranty Agreement, the APA and/or the OTA, Guarantor's liability under this Guaranty Agreement shall not, under any circumstance, exceed One Million Eight Hundred Forty Four Thousand Three Hundred Eleven and $^{38}/_{100}$ Dollars ($1,844,311.38) (the "Guaranty Cap").

39

2.      This Guaranty Agreement is an absolute, unconditional, complete and continuing one, and may be proceeded upon by the Guaranteed Parties against Guarantor before taking any other actions, and no notice of Seller's or Old Operators' liability for the Indemnities need be given to Guarantor.

246.    By reason of the foregoing, plaintiffs are entitled to judgment against Hyman Jacobs for breach of his guaranties to pay all of the Indemnities, as defined in the guaranties.

**WHEREFORE,** the plaintiffs demand judgment against Hyman Jacobs for compensatory damages in amounts to be determined at trial, consequential, and punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

**COUNT TWENTY-SIX**
**BREACH OF CONTRACT AGAINST HYMAN JACOBS**
**RECOVERY OF FEES AND EXPENSES**
**<u>(Incorporating All Previous Allegations)</u>**

</div>

247.    The guaranties each state at § 4:

The prevailing party shall be reimbursed by the other party for its reasonable legal fees, costs and expenses incurred in connection with any action, dispute or proceeding arising from or relating to this Guaranty Agreement.

248.    As such, the plaintiffs are entitled to recover all of their reasonable legal fees, costs and expenses arising out of or related to the guaranties.

**WHEREFORE,** the plaintiffs demand judgment against Hyman Jacobs for attorneys' fees, costs and expenses in an amount to be determined by the Court, costs and fees, and such other and further relief as may be just and proper.

<div align="center">

*[signature page follows]*

</div>

Dated: New York, New York
      May 13, 2026

**JONATHAN M. PROMAN, ESQ.**

By: *s/ Jonathan M. Proman*
      Jonathan M. Proman

30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com

*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

## **VERIFICATION**

I, Yitzchok Rokowsky, of full age, hereby certify as follows:

1.     I am Managing Director of each of the plaintiffs.

2.     I have reviewed the allegations contained in this verified complaint and state that they are true to the best of my personal knowledge, except for those matters alleged upon information and belief, and as to those matters, I believe them to be true.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: May 13, 2026

_____
**Yitzchok Rokowsky**

41

## DESIGNATION OF TRIAL COUNSEL

In accordance with *R.* 4:25-4, the Plaintiffs hereby designate Jonathan M. Proman as trial counsel in this action.

Dated: New York, New York
      May 13, 2026

                                     **JONATHAN M. PROMAN, ESQ.**

                                     By: *s/ Jonathan M. Proman*
                                          Jonathan M. Proman

                                     30 Wall Street, Eighth Floor
                                     New York, New York 10005
                                     (917) 524-7566
                                     jproman@promanlaw.com

                                     *Attorneys for Plaintiffs*
                                     *Merwick Healthcare and Rehab Center LLC,*
                                     *Venetian Healthcare and Rehab Center LLC,*
                                     *Merwick Propco Urban Renewal LLC,*
                                     *and Venetian Propco LLC*

## RULE 4:5-1 CERTIFICATION

Pursuant to *R.* 4:5-1(b)(2), the undersigned attorney for the plaintiffs hereby certifies that to the best of my knowledge, information, and belief, this matter is not currently the subject of any other Court or arbitration proceeding and none is contemplated at this time, except that, on April 23, 2026, entities related to the defendants, Merwick Care & Rehabilitation Center, LLC and The Venetian Care and Rehabilitation Center, LLC, filed voluntary petitions for bankruptcy protection and plaintiffs have asserted, or will assert, claims against those entities and/or other persons as part of bankruptcy proceedings, and the plaintiffs may learn of additional claims and parties as this action and/or bankruptcy proceedings progress.  Plaintiffs, to the best of their knowledge, information, and belief, presently know of no other parties who should be joined in

this action at this time, although additional persons may be disclosed following commencement of this action, and the names of Doe Defendants may be disclosed as well.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: New York, New York
        May 13, 2026

**JONATHAN M. PROMAN, ESQ.**

By: *s/ Jonathan M. Proman*
        Jonathan M. Proman

30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com

*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

## RULE 1:38-7(b) CERTIFICATION

I certify that confidential personal identifiers have been redacted from the documents now submitted to the Court and will be redacted from all documents submitted to the Court in the future in accordance with Rule 1:38-7(b).

[*signature block follows*]

Dated: New York, New York
       May 13, 2026

                                   **JONATHAN M. PROMAN, ESQ.**

                                   By: *s/ Jonathan M. Proman*
                                        Jonathan M. Proman

                                 30 Wall Street, Eighth Floor
                                 New York, New York 10005
                                 (917) 524-7566
                                 jproman@promanlaw.com

                                 *Attorneys for Plaintiffs*
                                 *Merwick Healthcare and Rehab Center LLC,*
                                 *Venetian Healthcare and Rehab Center LLC,*
                                 *Merwick Propco Urban Renewal LLC,*
                                 *and Venetian Propco LLC*

**JONATHAN M. PROMAN, ESQ.**
Attorney ID No. 025832004
30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com
*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

---

| | |
|---|---|
| MERWICK HEALTHCARE AND REHAB CENTER LLC, VENETIAN HEALTHCARE AND REHAB CENTER LLC, MERWICK PROPCO URBAN RENEWAL LLC, and VENETIAN PROPCO LLC, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY Docket No. MID-L-      -26 Civil Action CBLP Action |

        Plaintiffs,

    - against -

MICHAEL JACOBS, JOSHUA JACOBS,
HYMAN JACOBS, DAVID JACOBS,
ANDREW MASETTI, CHRISTOPHER
METTERNICH, MILLSTONE RIVERVIEW
REAL ESTATE URBAN RENEWAL LLC,
VENETIAN HEALTHCARE, LLC, and
DOE DEFENDANTS 1-10,

        Defendants.

**ORDER TO SHOW CAUSE**
**WITH TEMPORARY RESTRAINTS**
**PURSUANT TO RULE 4:52**

---

This matter being brought before the court by Jonathan M. Proman, Esq., attorney for the

plaintiffs, seeking relief by way of temporary restraints pursuant to *Rule* 4:52, based upon the

verified complaint, brief, and certification of Yitzchok Rokowsky, each dated May 13, 2026, and

filed herewith; and the defendants having received notice of this application, and for good cause

shown:

It is on this _____ day of May 2026, **ORDERED** that defendants (i) Michael Jacobs; (ii) Joshua Jacobs; (iii) Hyman Jacobs; (iv) David Jacobs; (v) Andrew Masetti; (vi) Christopher Metternich; (vii) Millstone Riverview Real Estate Urban Renewal LLC; and (viii) Venetian Healthcare, LLC, appear and show cause before the Superior Court at the Middlesex County Courthouse, located at 56 Paterson Street, New Brunswick, New Jersey, at _____ o'clock in the _____ noon, or as soon thereafter as counsel can be heard, on the _____ day of _____, 2026, why an order should not be issued:

A. directing the defendants to turn over all property in their possession, custody or control owned by, and held in trust for, plaintiffs, pursuant to Section 9(d) of the Operations Transfer Agreements for the purchase of the Middlesex County skilled nursing facilities ("SNFs") that are the subject of this action (the "Trust Property"), whether such Trust Property is located in or outside of New Jersey, except for property subject to the exclusive jurisdiction of a bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy Debtors (as hereafter defined), to plaintiffs Merwick Healthcare and Rehab Center LLC and Venetian Healthcare and Rehab Center LLC, as applicable, who are the new operators of the SNFs, at their registered offices, each located at 1608 Route 88, Suite 200, Brick, New Jersey 08724, within one business day of defendants' receipt of an Order directing them to do so or within one business day of defendants' subsequent receipt of additional Trust Property;[1]

B. enjoining and restraining the defendants, and any and all of their officers, directors, managers, employees, members, representatives, affiliates, parents, subsidiaries, successors, assigns, agents, executors, and administrators, and those acting in concert with and on their behalf, from dissipating, conveying, transferring, removing, encumbering, assigning or disposing of Trust Property, now or in the future in their possession, custody or control, to any person other than plaintiffs Merwick Healthcare and Rehab Center LLC and Venetian Healthcare and Rehab Center LLC, whether such Trust Property is located in or outside of New Jersey, except for property subject to the exclusive jurisdiction of the bankruptcy court and/or automatic

---

[1] The "Bankruptcy Debtors" -- each of whom, on or about April 23, 2026, filed voluntary petitions for bankruptcy protection in the United States Bankruptcy Court for the District of New Jersey -- are: (i) Merwick Care & Rehabilitation Center, LLC (Case No. 26-14509-VFP); (ii) The Venetian Care & Rehabilitation Center, LLC (Case No. 26-14510-VFP); (iii) Windsor Healthcare Management Limited Liability Company (Case No. 26-14511-VFP); (iv) Ashbrook Care & Rehabilitation Center, LLC (Case No. 26-14512-VFP); (v) Llanfair House Care & Rehabilitation Center, LLC (Case No. 26-14513-VFP); (vi) Greenbrook Manor Care & Rehabilitation Center, LLC (Case No. 26-14514-VFP); (vii) Cornell Hall Care & Rehabilitation Center, LLC (Case No. 26-14515-VFP); (viii) The Canterbury at Cedar Grove Care & Rehabilitation Center, LLC (Case No. 26-14516-VFP); and (ix) The Buckingham at Norwood Care & Rehabilitation Center, LLC (Case No. 26-14517-VFP).

stay in the cases of the non-party Bankruptcy Debtors, and to the extent not already turned over to such plaintiffs pursuant to an Order of this Court;

C. directing the defendants to account to plaintiffs Merwick Healthcare and Rehab Center LLC and Venetian Healthcare and Rehab Center LLC for all transactions relating to Trust Property, from December 2, 2024 to the date of such accounting, including without limitation the Trust Property, disposition thereof, identification of persons who received Trust Property, and the financial institution account(s) at which Trust Property now or previously has been held or transferred to;

D. directing the defendants to take all necessary steps to effect pursuant to the parties' sale agreements issuance of license numbers and transfer of provider numbers to plaintiffs Merwick Healthcare and Rehab Center LLC and Venetian Healthcare and Rehab Center LLC; and

E. granting such other relief as the Court deems equitable and just.

And it is further **ORDERED** that pending the return date herein and the determination of this motion, defendants are enjoined and restrained from:

A. encumbering, pledging, hypothecating, impairing, dissipating, conveying, transferring, removing, assigning or disposing of Trust Property, whether now or in the future in defendants' possession, custody or control, located in or outside of New Jersey, to any person (including without limitation a corporation, limited liability company or other entity or association), except that defendants shall turn over the Trust Property to plaintiffs Merwick Healthcare and Rehab Center LLC and Venetian Healthcare and Rehab Center LLC, as applicable, at their above registered offices, within one business day of defendants' receipt of this Order, except for property subject to the exclusive jurisdiction of the bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy Debtors; and

B. destroying, erasing, mutilating, concealing, altering, or otherwise impairing, in any manner, the defendants' books and records, including but not limited to electronic and paper books and records, laptop and other computers and software, bank records, accounts receivable records, and ledgers, in their possession, custody or control, relating to Trust Property.

And it is further **ORDERED** that:

1. A copy of this order to show cause, and all papers in support thereof and the verified complaint, must be served upon the defendants personally in accordance with *Rule* 4:4-3 and *Rule* 4:4-4, or pursuant to the parties' contractual agreements (Asset Purchase Agreements §

16(f)) by certified mail - return receipt requested, within _____ days of the date hereof, this being original process.

2. Plaintiffs shall file with the Court their proof of service of the above documents upon the defendants no later than three (3) days before the return date.

3. The defendants must file and serve a written response to this order to show cause and the request for entry of injunctive relief and proof of service by the _____ day of _____, 2026. The original documents must be filed with the Clerk of the Superior Court in the county listed above. A directory of these offices is available in the Civil Division Management Office in the county listed above and online at njcourts.gov. You must send a copy of your opposition papers directly to Judge _____, whose address is 56 Paterson Street, New Brunswick, New Jersey. You must also send a copy of your opposition papers to the plaintiffs' attorney whose name and address appears above, or to the plaintiffs, if no attorney is named above. A telephone call will not protect your rights; you must file your opposition and pay the required fee of $175 and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief the plaintiffs are seeking.

4. The plaintiffs must file and serve any written reply to the defendants' order to show cause opposition by _____. The reply papers must be filed with the Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the chambers of Judge _____.

5. If the defendants do not file and serve an opposition to this order to show cause, the application will be decided on the papers on the return date and relief may be granted by

default, provided that the plaintiffs file a proof of service and a proposed form of order at least three (3) days prior to the return date.

6.     If the plaintiffs have not already done so, a proposed form of order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

7.     Defendants take notice that the plaintiffs have filed a lawsuit against you in the Superior Court of New Jersey.  The verified complaint attached to this order to show cause states the basis of the lawsuit.  If you dispute this complaint, you, or your attorney, must file a written answer to the Complaint and proof of service within 35 days from the date of service of this order to show cause; not counting the day you received it.

These documents must be filed with the Clerk of the Superior Court in the county listed above.  A directory of these offices is available in the Civil Division Management Office in the county listed above and online at njcourts.gov.  Include a $175 filing fee payable to the "Treasurer State of New Jersey."  You must also send a copy of your answer to the plaintiffs' attorney whose name and address appear above, or to the plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve your answer (with the fee) or judgment may be entered against you by default.  Please note: opposition to the order to show cause is not an answer and you must file both.  Please note further: if you do not file and serve an answer within 35 days of this Order, the Court may enter a default against you for the relief plaintiffs demand.

8.     If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529).  If you do not have an attorney and are not eligible for free legal

assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.  A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at njcourts.gov.

9.	The court will entertain argument, but not testimony, on the return date of the order to show cause, unless the court and parties are advised to the contrary no later than _____ days before the return date.

<div align="right">
_____

J.S.C.
</div>

**JONATHAN M. PROMAN, ESQ.**
Attorney ID No. 025832004
30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com
*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

---

| | |
|---|---|
| MERWICK HEALTHCARE AND REHAB CENTER LLC, VENETIAN HEALTHCARE AND REHAB CENTER LLC, MERWICK PROPCO URBAN RENEWAL LLC, and VENETIAN PROPCO LLC, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY Docket No. MID-L-      -26 Civil Action CBLP Action |

Plaintiffs,

- against -

MICHAEL JACOBS, JOSHUA JACOBS,
HYMAN JACOBS, DAVID JACOBS,
ANDREW MASETTI, CHRISTOPHER
METTERNICH, MILLSTONE RIVERVIEW
REAL ESTATE URBAN RENEWAL LLC,
VENETIAN HEALTHCARE, LLC, and
DOE DEFENDANTS 1-10,

Defendants.

**ORDER**

---

THIS MATTER having been opened to the Court by way of motion by order to show cause, pursuant to *Rule* 4:52, filed by Jonathan M. Proman, Esq., attorney for the plaintiffs (the "Motion"), upon notice to the defendants, for the entry of an Order (1) directing the defendants to deliver Trust Property (as defined in the Motion) in their possession, custody or control, whether located in or outside of New Jersey, except for property subject to the exclusive jurisdiction of a bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy

Debtors (as defined in the Motion), to plaintiffs Merwick Healthcare and Rehab Center LLC ("Merwick Opco") and Venetian Healthcare and Rehab Center LLC ("Venetian Opco"); (2) enjoining and restraining the defendants from dissipating, conveying, transferring, removing, encumbering, assigning or disposing of Trust Property now or hereafter in their possession, custody or control, except for property subject to the exclusive jurisdiction of a bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy Debtors, whether located in or outside of New Jersey, other than delivery to Merwick Opco and Venetian Opco; (3) directing the defendants to account for all transactions relating to Trust Property, from December 2, 2024 to the date of such accounting; (4) directing the defendants to perform the contractual obligations upon them under the parties' purchase agreements that are conditions precedent to (i) issuance of a license to Merwick Opco and Venetian Opco to operate the skilled nursing facilities that are the subject of this action, and (ii) transfer of Medicare and Medicaid provider numbers to Merwick Opco and Venetian Opco; and (5) granting such other relief as the Court deems equitable and just; and the Court having considered all papers submitted in support of and in opposition to the motion, and having heard the parties' arguments, if any; and for good cause shown,

IT IS on this _____ day of _____, 2026,

ORDERED that the plaintiffs' Motion is hereby granted in all respects; and it is further

ORDERED that, within one (1) business day of the issuance of this Order via eCourts, the defendants shall deliver all Trust Property in their possession, custody or control, except for property subject to the exclusive jurisdiction of a bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy Debtors, whether located in or outside of New Jersey, to Merwick Opco and Venetian Opco, as applicable, at their registered offices located at 1608 Route 88, Suite 200, Brick, New Jersey 08724; and it is further

ORDERED that the defendants, and any and all of their officers, directors, managers, employees, members, representatives, affiliates, parents, subsidiaries, successors, assigns, agents, executors, and administrators, and those acting in concert with and on their behalf, are hereby enjoined and restrained from dissipating, conveying, transferring, removing, encumbering, assigning or disposing of Trust Property, now or hereafter in their possession, custody or control, except for property subject to the exclusive jurisdiction of a bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy Debtors, whether located in or outside of New Jersey, other than delivery to Merwick Opco and Venetian Opco; and it is further

ORDERED that, within fourteen (14) business days of the issuance of this Order via eCourts, defendants shall deliver via e-mail to Merwick Opco and Venetian Opco, via their counsel, Jonathan M. Proman, Esq. (jproman@promanlaw.com), an accounting of all transactions relating to Trust Property, from December 2, 2024 to the date of such accounting, including without limitation the Trust Property, disposition thereof, identification of persons who received Trust Property, and the financial institution account(s) at which Trust Property has been maintained or transferred to; and it is further

ORDERED that defendants shall forthwith, but in no event later than fourteen (14) business days after the issuance of this Order via eCourts, perform the contractual obligations upon them under the parties' purchase agreements that are conditions precedent to (i) issuance of a license to Merwick Opco and Venetian Opco by the Department of Health of the State of New Jersey to operate the skilled nursing facilities that are the subject of this action, and (ii) transfer of their Medicare and Medicaid provider numbers to Merwick Opco and Venetian Opco; and it is further

ORDERED that Trust Property hereafter in the defendants' possession, custody or control, except for property subject to the exclusive jurisdiction of a bankruptcy court and/or automatic stay in the cases of the non-party Bankruptcy Debtors, whether located in or outside of New Jersey, shall be delivered to Merwick Opco or Venetian Opco, at their registered offices located at 1608 Route 88, Suite 200, Brick, New Jersey 08724, within one (1) business day of a defendant's receipt thereof; and it is further

ORDERED that defendants are hereby enjoined and restrained from destroying, erasing, mutilating, concealing, altering, or otherwise impairing, in any manner, their books and records, including but not limited to electronic and paper books and records, laptop and other computers and software, bank records, accounts receivable records, and ledgers, relating to Trust Property; and it is further

ORDERED that plaintiffs' counsel shall serve a copy of this Order upon all counsel of record via e-mail within one (1) day of receipt hereof.

_____

J.S.C.

| | |
|---|---|
| MERWICK HEALTHCARE AND REHAB CENTER LLC, VENETIAN HEALTHCARE AND REHAB CENTER LLC, MERWICK PROPCO URBAN RENEWAL LLC, and VENETIAN PROPCO LLC, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY Docket No. MID-L-            -26 Civil Action CBLP Action |

Plaintiffs,

- against -

MICHAEL JACOBS, JOSHUA JACOBS, HYMAN JACOBS, DAVID JACOBS, ANDREW MASETTI, CHRISTOPHER METTERNICH, MILLSTONE RIVERVIEW REAL ESTATE URBAN RENEWAL LLC, VENETIAN HEALTHCARE, LLC, and DOE DEFENDANTS 1-10,

Defendants.

---

## BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION, ACCOUNTING, AND TEMPORARY RESTRAINTS

---

**JONATHAN M. PROMAN, ESQ.**
Attorney ID No. 025832004
30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com

*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iii

NATURE OF ACTION...........................................................................................................1

PERTINENT FACTS.............................................................................................................3

    A.  THE SKILLED NURSING FACILITIES............................................................3

    B.  POST-CLOSING RECEIVABLES.....................................................................3

    C.  THE TRUST AGREEMENTS...........................................................................5

    D.  PLAINTIFFS DEMAND THE NEW OPERATOR-OWNED IN-TRUST RECEIVABLES PAYMENTS, AND THE DEMAND IS REFUSED WITHOUT ANY PURPORTED JUSTIFICATION.......................6

ARGUMENT........................................................................................................................7

    I.  STANDARD FOR IMMEDIATE INJUNCTIVE RELIEF AND TEMPORARY RESTRAINTS...............7

    II.  PLAINTIFFS HAVE DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE MERITS.................8

        A.  PAYMENTS FOR THE NEW OPERATORS' POST-CLOSING RECEIVABLES WERE HELD IN TRUST.....................8

        B.  TRUST PROPERTY WAS CONVERTED AND THE DEFENDANTS ARE LIABLE FOR THE CONVERSION...................9

        C.  THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR CONVERSION...............................10

    III.  PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM.................................11

    IV.  BALANCE OF THE EQUITIES FAVOR PLAINTIFFS.................................................11

    V.  AN INJUNCTION WOULD ADVANCE THE PUBLIC INTEREST...............................11

    VI.  THE PLAINTIFFS' CLAIMS REST ON A SETTLED LEGAL RIGHT.........................11

    VII.  THE MATERIAL FACTS CANNOT BE LEGITIMATELY DISPUTED.......................12

    VIII.  AN UNDERTAKING, IF ANY, SHOULD BE MINIMAL......................................12

    IX.  AN ACCOUNTING OF TRUST PROPERTY IS APPROPRIATE...............................12

X.    AN ORDER DIRECTING THE DEFENDANTS TO PERFORM CONDITIONS PRECEDENT TO LICENSE ISSUANCE AND TRANSFER OF PROVIDER NUMBERS IS WARRANTED.................. 13

CONCLUSION............................................................................................................................13

ii

# TABLE OF AUTHORITIES

CASES

*Breglia v. Norman & Luba, LLC*,
      2005 N.J. Super. Unpub. LEXIS 108 (App. Div. Dec. 9, 2005)........................................10

*Carbone v. Carbone*, 2025 WL 1156295 (D.N.J. Apr. 21, 2025)........................................ 8

*Charles Bloom & Co. v. Echo Jewelers*, 279 N.J. Super. 372 (App. Div. 1995)...........................10

*Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444 (App. Div. 2009)................................9

*Coffey v. Coffey*, 286 N.J. Super. 42 (App. Div. 1995)............................................... 8

*Community Hospital Group, Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C.*,
      384 N.J. Super. 251 (App. Div. 2006).........................................................7

*Crowe v. De Gioia*, 90 N.J. 126 (1982)................................................................7

*Endowment Research Group, LLC v. Wildcat Venture Partners, LLC*,
      2021 WL 841049 (Del. Ch. Ct. Mar. 5, 2021).................................................. 8

*Flint Ink Corp. v. Calascibetta*, 2007 WL 2687415 (D.N.J. Sept. 10, 2007)..................................8

*In re Env't Ins. Declaratory Judgment Actions*, 149 N.J. 278 (1997)......................................... 13

*In re Niles Trust*, 176 N.J. 282 (2003)................................................................ 9

*Kromah v. Kagan*, 2019 N.J. Super. Unpub. LEXIS 620 (App. Div. Mar. 25, 2019)......................9

*Mason v. Bade (In re Mason)*, 2021 U.S. Dist. LEXIS 62972 (D.N.J. Mar. 31, 2021)...................... 8

*Onderdonk v. Presbyterian Homes of New Jersey*, 85 N.J. 171 (1981)....................................... 12

*Pfeiffer v. Wulster*, 2011 WL 1045355 (Bankr. D.N.J. Mar. 17, 2011),
      *aff'd*, 2012 WL 589564 (D.N.J. Feb. 22, 2012)..............................................9

*Polo North Country Club, Inc. v. Acowre, LLC*, 2025 WL 3719688 (App. Div. Dec. 23, 2025). 12

*State v. United States Steel Co.*, 12 N.J. 51 (1953)........................................................9

*U.S. v. Price*, 688 F.2d 204 (3d Cir. 1982)............................................................. 8

*U.S. Foodservice, Inc. v. Raad*, 2006 WL 1029653 (Sup. Ct. Bergen Co. Apr. 12, 2006).............. 7

*Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452,
489 A.2d 1209 (App. Div. 1985)...................................................................................10

*Waste Mgmt. of N.J., Inc. v. Morris Cty. Mun. Utilities Auth.*,
433 N.J. Super. 445 (App. Div. 2013)............................................................................7

OTHER AUTHORITIES

THE SEDONA CONFERENCE COMMENTARY ON EQUITABLE REMEDIES IN TRADE SECRET
LITIGATION, 23 Sedona Conf. J. 59 (2022)............................................................ 8

Plaintiffs Merwick Healthcare and Rehab Center LLC ("Merwick Opco"), Venetian Healthcare and Rehab Center LLC ("Venetian Opco", and collectively with Merwick Opco, the "New Operator Plaintiffs"), Merwick Propco Urban Renewal LLC ("Merwick Propco"), and Venetian Propco LLC ("Venetian Propco"), respectfully submit this brief, pursuant to *R*. 4:52, in support of their emergency motion by order to show cause for a preliminary injunction, accounting, temporary restraints, and such other relief as the Court deems just and proper.

## NATURE OF ACTION

On or about December 2, 2024, the plaintiffs entered into purchase agreements for two skilled nursing facilities ("SNFs") in Middlesex County. Each transaction consisted of two main agreements: (i) an asset purchase agreement, governing transfer of an SNF's real property; and (ii) an operations transfer agreement, governing transfer of the right to act as operator of an SNF. An SNF's operator, among other things, is the lessee of the SNF's real property.

An SNF typically obtains a substantial portion of its revenue from Medicare and Medicaid. As part of those programs, an SNF generally must have a (i) license issued by the Department of Health of the State of New Jersey; and (ii) provider number issued by Medicare and Medicaid. Although the new operator is issued a new license number, the provider number -- rather than being issued anew -- is transferred by Medicare and Medicaid from the old operator to the new operator.

Because license issuance to a New Operator Plaintiff, and transfer of a provider number from the seller / old operator to the purchaser / New Operator are not instantaneous, upon closing of an asset purchase agreement the New Operator becomes the lessee of an SNF, but cannot then deliver caregiving services on its own. Rather, the New Operator -- until receiving its new license and transferred provider numbers -- subleases the SNF to the old operator.

1

Simultaneously with the sublease, the New Operator enters into an administrative services agreement with the old operator.  The old operator thus continues to deliver caregiving services to SNF residents pursuant to the administrative services agreement.  But during that transition period the old operator generally utilizes the purchaser / New Operator's employees and other personnel to deliver the caregiving services.

Because the old operator provides an SNF's caregiving services until the New Operator obtains a new license and transfer of the old operator's provider number, payments by Medicare and Medicaid for caregiving services using the purchaser's employees and other professionals still are made to a financial institution account in the name of the seller / old operator.  The prior operator thus receives payments from Medicare and Medicaid for the New Operator's accounts receivable, pending license issuance and transfer of a provider number to the New Operator.

During the transition period, the seller holds the post-closing buyer-owned receivables payments from Medicare, Medicaid, and other payors in trust for the new operator.  The trust obligation is critical to a new operator because post-closing receivables are the new SNF operator's main revenue source.  Without that revenue, a new operator of an SNF typically cannot pay nurses and other medical professionals, thereby threatening an SNF's existence.  An emergency mandatory injunction directing the defendants to deliver the in-trust Opco Plaintiffs-owned receivables payments to the Opco Plaintiffs is critical.  Without those funds to pay nurses and other medical staff, custodial staff, utilities, and all of the other needs of an SNF, the critical care that hundreds of senior citizens and low-income patients receive at the two Middlesex County SNFs is immediately imperiled.

Without any excuse whatsoever, and despite due demand, the individual defendants have refused to deliver receivables payments consisting of the New Operator Plaintiffs' property.

2

MID-L-003196-26  05/29/2026 1:00:19 PM  Pg 86 of 202  Trans ID: LCV20261440701

Case 26-01239-WFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Exhibit B Reage 63 of 170 Page 86 of 202

Because the usurped New Opco Plaintiff-owned receivables comprise substantially all of the revenue generated by the Middlesex County SNFs, conversion of the trust property threatens the SNFs' existence. To ensure the SNFs' continued operations and critical care to the patients, and because conversion of trust property is egregious theft, the plaintiffs seek an emergency mandatory injunction directing the immediate delivery of trust property to the Opco Plaintiffs, an accounting, and related relief.

## PERTINENT FACTS

### A. *The Skilled Nursing Facilities*

SNFs provide physician-directed medical care to patients following surgical and other procedures to address acute, subacute, and other serious conditions, *e.g.*, hip replacements, heart attacks, etc. Verified Complaint ¶ 47. The day-to-day care at an SNF primarily is performed by registered nurses, licensed practical nurses, and certified nursing assistants.

The plaintiffs entered into asset purchase agreements and operations transfer agreements for the purchase of (i) Merwick Care & Rehabilitation Center, located at 100 Plainsboro Road, Plainsboro, New Jersey 08536; and (ii) Venetian Care & Rehabilitation Center, located at 275 John T. O'Leary Blvd., South Amboy, New Jersey 08879. Verified Complaint ¶¶ 3, 48-49. The asset purchase agreements conveyed land, buildings, improvements, and certain personal property to the Propco Plaintiffs, who are the new landlords of the SNFs, and -- pertinent to this motion -- the operations transfer agreements conveyed to the Opco Plaintiffs the rights to act as new operators of the SNFs. *Id.* at ¶¶ 49-51.

### B. *Post-Closing Receivables*

Trust agreements are standard in the SNF industry because payment for services mainly is from Medicare and Medicaid and, following purchase of an SNF, in the industry there virtually

always is a delay between a sale's closing and Medicare and Medicaid's processing of the

transfer of provider numbers from the seller to the purchaser operating entity.  Verified

Complaint ¶¶ 34-41, 57-59, 61.  Thus, following the closing of the purchase of an SNF, the old

operator delivers caregiving services, but using the new operator's personnel.  *Id.* ¶ 62.

Medicare and Medicaid then remit payments to an old operator's financial institution account

using their already-existing provider number.  *Id.* at ¶¶ 5-6.  The operations transfer agreements

state:

> b.      Effective on the Closing Date, Old Operator sells, assigns and conveys to New Operator [*i.e.*, the Opco Plaintiffs] the Medicare and Medicaid provider number(s) in use at the [Skilled Nursing] Facility (the "Existing Provider Numbers") ....  Old Operator and New Operator shall execute any and all documents necessary for, and will otherwise cooperate in connection with, the assignment of the Existing Medicare Provider Number.  During the pendency of New Operator's CMS Form 855A [*i.e.*, the form reporting a change in ownership and requesting transfer of a provider number] (the "CHOW"), New Operator may bill Medicare and Medicaid under Old Operator's name and the Existing Provider Numbers, until the intermediary changes the electronic funds transfer account or special payment address to the New Operator ....
>
> c.      … Old Operator agrees to cooperate with New Operator as necessary for enrollment of New Operator in the Medicare and Medicaid programs.

Rokowsky Cert. Ex. 1 and Ex. 2 p. 10 § 6(b)-(c).

The period of time typically required for Medicare and Medicaid to process the transfer

of a provider number from seller to new operator, and to begin remitting funds directly to the

new operator, ranges for approximately several months to over one year.  Verified Complaint ¶

33.  During the transition period, the new operator invoices Medicare and Medicaid for post-

closing caregiving, but payments are delivered to the prior operator.  *Id.* ¶¶ 37-38.

### C. *The Trust Agreements*

The prior operator of an SNF holds new operator-owned post-closing receivables in trust for the new operator whose nurses and other professionals preformed the work resulting in the receivables. Verified Complaint ¶¶ 39, 62, 64-66. Conversion of trust property thus imperils the critical care to senior citizens and low-income persons because it chokes an SNF's revenue stream, thereby depriving the new operator of the new operator-owned funds needed to operate the SNF, such as paying nursing and other medical staff, custodial services, administrative staff, insurance, utilities, etc. *Id.* ¶ 63. An SNFs senior and low-income patients thus are left vulnerable upon a prior operator converting in-trust Medicare and Medicaid payments because, where an SNF cannot pay nurses and other professional staff, those professionals cannot, and will not, continue to render critical medical care.

The operations transfer agreements each state at § 9(d):

> To the extent a Party receives any payments for accounts receivable of another Party, the Parties acknowledge that the Party receiving the payment belonging to another Party shall hold the payment **in trust**, that no Party shall have any right to offset with respect to such accounts receivable, and that the Party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the appropriate other Party within ten (10) days of receipt thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

Rokowsky Cert. Ex. 1 and Ex. 2 p. 13 § 9(d) (emphasis added). (The Default Rate, as defined in the Operations Transfer Agreements, is the prime rate, currently 6.75%, plus 3%—or 9.75% as of the date of this brief. Ex. 1 and Ex. 2 p. 10 § 6(c)).

Under the operations transfer agreements, and applicable law discussed below, it cannot be legitimately disputed that post-closing receivables payments by Medicare and Medicaid are trust property owned by the New Operator Plaintiffs.

Not only is injunctive relief appropriate pursuant to case law discussed below, here, the parties <u>expressly agreed and consented to</u> injunctive relief.  The operations transfer agreements state:

> … Old Operator acknowledges that New Operator's right to consummate the transactions contemplated hereby are unique, and recognizes and affirms that that in the event of a breach of this Agreement, money damages will be inadequate and New Operator will have no adequate remedy at law. Accordingly, Old Operator agrees that New Operator shall be entitled, in addition to any other rights and remedies existing in its favor … at law or in equity, to enforce its rights and Old Operator's obligations hereunder not only by an action or proceeding for damages but also by an action or proceeding for specific performance, **injunctive and/or other equitable relief (without posting of bond or other security)**.

Rokowsky Cert. Ex. 1 and 2 pp. 18-19 § 16(g) (emphasis added).

The sellers thus set forth their understanding and acknowledgement that a grant of injunctive relief would be appropriate.  It underscores and is consistent with the critical nature of receivables payments to an SNF and the fact that they are trust property.

### D. Plaintiffs Demand the New Operator-Owned In-Trust Receivables Payments, and the Demand is Refused Without Any Purported Justification

On March 31, 2026, among other things, the Opco Plaintiffs demanded immediate delivery of trust property to them.  Verified Complaint ¶ 67.  The demand was refused.  *Id.* at ¶ 68.  The refusal was part of a long pattern of misconduct consisting of the sellers repeatedly promising to perform their obligations to the plaintiffs, but always failing to do so.  *Id.* ¶ 99 *et seq.*  Left with no alternative, plaintiffs commenced this action together with the instant motion by order to show cause for temporary restraints and delivery of converted trust property to the New Operator Plaintiffs, and related relief.

On April 23, 2026, the old operators filed voluntary petitions for bankruptcy protection in the United States District Court for the District of New Jersey.  The individuals who own the old

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 90 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Notice Of Removal    Page 67 of 170   Page 90 of 202

operators, and the Old Propco Defendants -- who are the defendants in this action -- have not filed for bankruptcy protection.

<div align="center">**ARGUMENT**</div>

**I.    Standard For Immediate Injunctive Relief and Temporary Restraints**

To obtain an emergency preliminary injunction and temporary restraints, a movant must show (i) reasonable probability of success on the underlying claim's merits; (ii) substantial and imminent irreparable harm is likely absent an injunction; (iii) the balance of equities favors granting injunctive relief; (iv) an injunction would not harm the public interest; (v) a movant's claim rests on a settled legal right; and (vi) the material facts are undisputed.  *Waste Mgmt. of N.J., Inc. v. Morris Cty. Mun. Utilities Auth.*, 433 N.J. Super. 445, 451–52 (App. Div. 2013); *Crowe v. De Gioia*, 90 N.J. 126, 132–34 (1982).

Destruction of a business by usurping its revenue is irreparable harm.  *See Community Hospital Group, Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C.*, 384 N.J. Super. 251, 255 (App. Div. 2006) (discussing "well-settled proposition that … [a]cts destroying a complainant's business, custom and profits do an irreparable injury and authorize the issue of a preliminary injunction") (citation and internal quotations omitted); *U.S. Foodservice, Inc. v. Raad*, 2006 WL 1029653, at *7 (Sup. Ct. Bergen Co. Apr. 12, 2006) ("[I]t [is] well-settled that injury to or destruction of a business constitutes irreparable harm for which preliminary and permanent injunctive relief may be appropriate.") (citation omitted).

Termination of care for vulnerable senior citizens and low-income persons of course also is irreparable harm because continued theft by a defendant would cause those patients to lose essential care.  A mandatory injunction directing immediate delivery of <u>trust</u> property by a defendant to its rightful owner to fund the SNFs thus is necessary to avoid irreparable harm.

<div align="center">7</div>

*U.S. v. Price*, 688 F.2d 204, 212–13 (3d Cir. 1982) (mandatory injunctions are appropriate to avoid irreparable harm, although declining to reverse trial court's decision to decline to issue injunction).

Where there is consent to injunctive relief, it further empowers a Court to issue such relief. *See Endowment Research Group, LLC v. Wildcat Venture Partners, LLC*, 2021 WL 841049, at *8 (Del. Ch. Ct. Mar. 5, 2021) (stipulations acknowledging irreparable harm are given presumptive weight by courts); *see also* THE SEDONA CONFERENCE COMMENTARY ON EQUITABLE REMEDIES IN TRADE SECRET LITIGATION, 23 Sedona Conf. J. 591, 688 (2022) (nationwide survey of cases in the trade secret context giving weight to parties' contractual consent to irreparable harm and an injunction).

## II.   Plaintiffs Have Demonstrated Likelihood of Success on the Merits

### A.   *Payments For the New Operators' Post-Closing Receivables Were Held In Trust*

Where parties to an agreement expressly acknowledge that property is held in trust, Courts enforce the parties' manifest intent. *Carbone v. Carbone*, 2025 WL 1156295, at * 5 (D.N.J. Apr. 21, 2025) (parties' intent controls creation of trust agreement). There are "no particular form of words" required to create a trust relationship. *Coffey v. Coffey*, 286 N.J. Super. 42, 50 (App. Div. 1995) (quoting *Eagles Bldg. & Loan Ass'n v. Fiducia*, 37 A.2d 116 (Ch. 1944), *aff'd*, 40 A.2d 627 (E. & A.1945)). Even absent an explicit trust agreement, a trust will be found to exist where the parties so intended. *Mason v. Bade (In re Mason)*, 2021 U.S. Dist. LEXIS 62972, at *17 (D.N.J. Mar. 31, 2021) ("Although the parties never entered into a formal, explicit trust agreement, such formality is not necessary to create an express trust ....") (citations omitted); *Flint Ink Corp. v. Calascibetta*, 2007 WL 2687415, at *6 (D.N.J. Sept. 10, 2007) ("Although the Agreement between the parties does not set forth the term 'trust,' the implied

8

intent of the parties was evident" and a trust thus existed).  Where money is held in trust, there is no requirement to keep the in-trust funds in a segregated account.  *State v. United States Steel Co.*, 12 N.J. 51, 58 (1953) ("The intermingling of funds in itself does not destroy a trust otherwise evidenced by the intent of the parties.").  Where a trust relationship exists, the person in control of trust property, such as an old operator, is a <u>fiduciary</u> to the property's owner.  *In re Niles Trust*, 176 N.J. 282, 295 (2003) ("There is substantial evidence in this case that Bono committed a tort when he breached his fiduciary duty as … trustee") (citation omitted).

Here, a trust relationship exists because the old operators had expressly agreed in the operations transfer agreements, quoted above, to hold post-closing receivables payments in trust for the New Operator Plaintiffs.  As such, there can be no legitimate dispute that a trust obligation existed upon the operating companies who acted through the individual defendants, and which defendants also control the Old Propco Defendants.

B.  *Trust Property Was Converted and the Defendants Are Liable For the Conversion*

The elements of conversion are: (i) property and a plaintiff's immediate right to possession thereof; and (ii) wrongful interference with that right.  *Kromah v. Kagan*, 2019 N.J. Super. Unpub. LEXIS 620, at *6 (App. Div. Mar. 25, 2019).  Money is properly the subject of a conversion claim.  *Pfeiffer v. Wulster*, 2011 WL 1045355, at *5 (Bankr. D.N.J. Mar. 17, 2011), *aff'd*, 2012 WL 589564 (D.N.J. Feb. 22, 2012) ("New Jersey law has applied the tort of conversion to money where the sum of money belonged to the injured party and is identifiable.") (citations omitted).  It is not necessary to identify specific bill or coins; rather, any identifiable funds are properly the subject of a conversion claim.  *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 455–56 (App. Div. 2009) ("money need not be the identical bills or coins that belong to the owner" to support a conversion claim).

Because Medicare, Medicaid, and other receivables payments are the New Operator Plaintiffs' property, but demand for that trust property was refused through the conduct of the individual defendants, the New Operator Plaintiffs are likely to prevail on their conversion claim.

C. *The Individual Defendants are Liable For Conversion*

Natural persons who cause a business entity to convert property are liable, individually, for conversion. *Charles Bloom & Co. v. Echo Jewelers*, 279 N.J. Super. 372, 381 (App. Div. 1995) ("Any corporate officer, or director who participates by aid, instigation, or assistance in a conversion, is liable.") (citation omitted). The foregoing principle is called the participation theory of liability. *Breglia v. Norman & Luba, LLC*, 2005 N.J. Super. Unpub. LEXIS 108, at *15 (App. Div. Dec. 9, 2005) ("Under the participation theory, an individual is personally liable for all torts he or she commits, even though the person is acting in his or her official capacity as an officer or agent of a corporation; and it is of no consequence that the corporation may also be liable.") (citations omitted); *Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452, 457, 489 A.2d 1209, 1211 (App. Div. 1985) ("A corporate officer or director is liable to persons injured by his own torts, even though he was acting on behalf of a corporation and his intent was to benefit the corporation, even though liability also attaches to the corporation, and even though he derives no personal benefit.") (citations omitted). The participation theory applies with full force to limited liability companies. *Breglia*, 2005 N.J. Super. Unpub. LEXIS 108 at *14–16.

The Opco Plaintiffs have easily demonstrated likelihood of success on the merits because they demanded the trust property from the old operators, and those entities -- acting through chief executive officer Michael Jacobs, president Joshua Jacobs, their father and member Hyman Jacobs, officer David Jacobs, chief financial officer Andrew Masetti, and chief operating officer Christopher Metternich -- have refused the demand and have converted trust property. Any trust

property diverted to the Old Propco Plaintiffs also would be conversion by those entities and the individual defendants.  Stated plainly, defendants have stolen trust funds because they would rather enjoy those funds for themselves rather than deliver them to the Middlesex County SNF operators to continue to deliver critical medical care to senior citizens and low-income patients.

## III. Plaintiffs Have Demonstrated Irreparable Harm

Irreparable harm in this action consists of destruction of the SNF's operations, including critical post-procedure care for senior and low-income patients, because the individual and other defendants have egregiously usurped Medicare and Medicaid trust funds.  People's lives, and quality of life, are at stake.  Irreparable harm has been amply demonstrated.

## IV. Balance of the Equities Favors Plaintiffs

The balance of the equities favor the plaintiffs because they are theft victims who wish to use trust property to operate SNFs to care for senior and low-income patients.  The individual and other defendants, on the other have, have stolen trust funds.  The equities thus tip decidedly in plaintiffs' favor.

## V. An Injunction Would Advance the Public Interest

An emergency mandatory injunction to prevent irreparable harm caused by conversion and to help continue care for senior and low-income persons recovering from medical procedures, of course would not harm the public interest.  It would materially advance the public interest.

## VI. The Plaintiffs' Claims Rest on a Settled Legal Right

Trust, conversion, and injunction case law is well-settled, black-letter law, as discussed above.  As such, plaintiffs' claims rest on settled legal rights.

11

## VII.   <u>The Material Facts Cannot be Legitimately Disputed</u>

The material facts cannot be legitimately disputed because the trust agreements and consents to injunctive relief are contained in signed writings.  All of the plaintiffs' assertions are set forth in a verified pleading, certified under penalties of perjury by the plaintiffs' managing director, Yitzchok Rokowsky.

## VIII.   <u>An Undertaking, If Any, Should be Minimal</u>

Pursuant to *Rule* 4:52-3, "[t]he court, on granting a temporary restraining order or interlocutory injunction or at any time thereafter, may require security or impose such other equitable terms as it deems appropriate."  Plaintiffs respectfully request that the Court not require a bond as a condition to the requested relief because of the (i) New Operator Plaintiffs' clear superior rights to trust funds; (ii) egregious nature of the defendants' conversion; (iii) absence of prejudice to the defendants; (iv) the requested relief would help provde continued critical care to senior and low-income patients; and (v) there was consent to "injunctive and/or other equitable relief (without posting of bond or other security)."  Rokowsky Cert. Ex. 1 and 2 pp. 18-19 § 16(g).  In the event the Court is inclined to direct a bond, it should be set low in view of the equities.

## IX.   <u>An Accounting of Trust Property is Appropriate</u>

An accounting is necessary in order for the plaintiffs to understand the status of the trust property.  *Polo North Country Club, Inc. v. Acowre, LLC*, 2025 WL 3719688, at *5 (App. Div. Dec. 23, 2025).  Because of the trust relationship, and that defendants have knowledge of the state of the plaintiffs-owned trust property while the plaintiffs do not, an accounting is appropriate.  *Id.*; *Onderdonk v. Presbyterian Homes of New Jersey*, 85 N.J. 171, 181 n.4 (1981).

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 96 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Notice of Removal Page 73 of 170   Page 96 of 202

### X.   An Order Directing the Defendants to Perform Conditions Precedent to License Issuance and Transfer of Provider Numbers is Warranted

The purpose of the sale agreements of course was to transfer the SNFs to the purchasers. To avoid the defendants' continuing usurpation of critical operating funds consisting of receivables payments, and to enable those payments to be paid to the new operators without a defendant's involvement, the Court should order the Old Propco Defendants to perform forthwith their contractual obligations that are conditions precedent to (i) issuance of a license to the new operators by the Department of Health of the State of New Jersey, and (ii) transfer of Medicare and Medicaid provider numbers to the new operators.

The New Operator Plaintiffs have been left with no alternative but to stop billing Medicare, Medicaid, and other payors in substantial part until they are able to operate under the own licenses and provider numbers.  Rokowsky Cert. ¶ 4.  Operating an SNF without revenue of course is exceptionally onerous to the plaintiffs.  Still worse, applicable law and rules set time limits on the window during which an SNF may invoice Medicare, Medicaid, and other payment sources for services rendered.  *Id.* ¶ 5.  An Order upon the Old Propco Defendants directing specific performance of contractual conditions precedent to license issuance and transfer of provider numbers is imperative so that the new operators may extricate themselves from thieves and save the SNFs.  *In re Env't Ins. Declaratory Judgment Actions*, 149 N.J. 278, 293-94 (1997) (specific performance appropriate remedy for purchase of unique assets).  After-the-fact money damages cannot resurrect a lost SNF.

### CONCLUSION

For the above reasons, the Court should (i) issue an emergency mandatory injunction directing the defendants to turn over to the Opco Plaintiffs all Medicare, Medicaid, and other trust funds (except those that are subject to bankruptcy proceedings and/or the automatic stay);

13

(ii) Order the defendants to account for trust property; (iii) direct the defendants to perform all contractual conditions precedent to the issuance of licenses and transfer of provider numbers to the New Operator Plaintiffs; and (iv) grant such other relief as is just and proper.

Dated: New York, New York
       May 13, 2026

                    **JONATHAN M. PROMAN, ESQ.**

                    By: *s/ Jonathan M. Proman*
                       Jonathan M. Proman

                    30 Wall Street, Eighth Floor
                    New York, New York 10005
                    (917) 524-7566
                    jproman@promanlaw.com

                    *Attorney for Plaintiffs*
                    *Merwick Healthcare and Rehab Center LLC,*
                    *Venetian Healthcare and Rehab Center LLC,*
                    *Merwick Propco Urban Renewal LLC,*
                    *and Venetian Propco LLC*

**JONATHAN M. PROMAN, ESQ.**
Attorney ID No. 025832004
30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com
*Attorneys for Plaintiffs*
*Merwick Healthcare and Rehab Center LLC,*
*Venetian Healthcare and Rehab Center LLC,*
*Merwick Propco Urban Renewal LLC,*
*and Venetian Propco LLC*

---

| | |
|---|---|
| MERWICK HEALTHCARE AND REHAB CENTER LLC, VENETIAN HEALTHCARE AND REHAB CENTER LLC, MERWICK PROPCO URBAN RENEWAL LLC, and VENETIAN PROPCO LLC, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY<br>Docket No. MID-L-           -26<br>Civil Action<br>CBLP Action |
| Plaintiffs, | |
| - against - | **CERTIFICATION OF YITZCHOK ROKOWSKY IN SUPPORT OF PLAINTIFFS' EMERGENCY ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION, ACCOUNTING, AND TEMPORARY <u>RESTRAINTS</u>** |
| MICHAEL JACOBS, JOSHUA JACOBS, HYMAN JACOBS, DAVID JACOBS, ANDREW MASETTI, CHRISTOPHER METTERNICH, MILLSTONE RIVERVIEW REAL ESTATE URBAN RENEWAL LLC, VENETIAN HEALTHCARE, LLC, and, DOE DEFENDANTS 1-10, | |
| Defendants. | |

---

YITZCHOK ROKOWSKY, of full age, hereby certifies as follows:

1.      I am managing director of the plaintiffs, and respectfully submit this certification in support of their emergency motion by order to show cause for a preliminary injunction, accounting, temporary restraints, and such other relief as the Court deems just and proper.  I have personal knowledge of the matters set forth herein.

2.      Attached are true copies of the following documents, along with amendments:

1

**Exhibit 1**:   Operations Transfer Agreement by and between non-party Merwick Care & Rehabilitation Center, LLC and plaintiff Merwick Healthcare and Rehab Center LLC, dated as of December 2, 2024.

**Exhibit 2**:   Operations Transfer Agreement by and between non-party Venetian Care & Rehabilitation Center, LLC and Venetian Healthcare and Rehab Center LLC, dated as of December 2, 2024.

3.      The plaintiffs' averments in the verified complaint are hereby incorporated herein by reference.

4.      To try to prevent ongoing theft, the New Operator Plaintiffs (as defined in the verified complaint) have been left with no alternative but to stop billing Medicare, Medicaid, and other payment sources in substantial part until such Plaintiffs are able to operate the skilled nursing facilities that are the subject of this action exclusively under their own licenses and provider numbers.

5.      Applicable law and rules impose time limits during which a skilled nursing facility may invoice Medicare, Medicaid, and other payment sources for services rendered to residents.

6.      The plaintiffs have made no previous application to this or any other Court for the relief requested herein.

7.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

[*signature page follows*]

2

Dated: Brick, New Jersey
        May 13, 2026

 

_____

**Yitzchok Rokowsky**

# Exhibit 1

# OPERATIONS TRANSFER AGREEMENT

by and between

**Merwick Care & Rehabilitation Center, LLC,**

a New Jersey limited liability company

"Old Operator"

and

**Merwick Healthcare and Rehab Center LLC**

a New Jersey limited liability company

"New Operator"

Dated as of: December 2, 2024

4930-4874-6496, v. 4

## OPERATIONS TRANSFER AGREEMENT

This **OPERATIONS TRANSFER AGREEMENT** (this "Agreement") is made as of December 2, 2024 (the "Effective Date"), by and between Merwick Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Old Operator") and Merwick Healthcare and Rehab Center LLC, a New Jersey limited liability company ("New Operator"). Each of Old Operator and New Operator are sometimes referred to herein, individually as a "Party" and collectively as the "Parties".

WHEREAS, Millstone Riverview Real Estate LLC, a New Jersey limited liability company and an affiliate of Old Operator ("Seller") and Merwick Propco LLC, a New Jersey limited liability company and an affiliate of New Operator ("Purchaser") have entered into that certain Asset Purchase Agreement (the "APA"), dated as of the date hereof, pursuant to which Purchaser will purchase that certain real property (including the associated parking parcels as more fully described on Exhibit A to the APA, the "Property") improved with a two hundred (200) licensed bed skilled nursing facility commonly known as "Merwick Care & Rehabilitation Center" and located at 100 Plainsboro Road, Plainsboro, NJ 08536 (the "Facility");

WHEREAS, Old Operator currently has the sole rights to act as operator of the Facility and wishes to assign such rights to New Operator;

WHEREAS, Old Operator currently owns certain furniture and equipment and other items of personal property, including as located on, used in connection with, the operation of the Facility (as will not be transferred from Seller to Purchaser pursuant to the APA, the "Personal Property"); and

WHEREAS, in order to ensure an orderly transition of operations of the Facility, the Parties desire to enter into this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and provisions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

1. CLOSING.

a. The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the first business day of the month following the day that all of the conditions to Closing set forth in Section 3 are satisfied or such other date as mutually agreed upon by the Old Operator and New Operator (such date on which the Closing occurs, the "Closing Date"). New Operator shall use commercially reasonable efforts to obtain (i) all approvals that are necessary or appropriate in order for New Operator to operate the Facility under New Jersey law as a two hundred (200) bed skilled nursing facility (collectively, the "License"), including a nursing home license issued by the New Jersey Department of Health ("DOH") and all other permits, consents, approvals and other assurances as are, under local custom and practice, customarily obtained by prudent and reasonable operators of skilled nursing facilities similar to the Facility acting in good faith, before such an operator takes possession of, and begins to operate, a facility similar to the Facility, and (ii) Medicare and Medicaid provider agreements, including all managed care contracts with respect to the Facility (the "Provider Agreements" and collectively, clauses (i) and (ii), the "Regulatory Approvals").

b. License Approval. Within ten (10) business days of the conclusion of the Due Diligence Period (as defined in the APA) ("Application Submission Period"), New Operator shall submit to the DOH its License application (the "Application") seeking establishment and licensure

1

of New Operator as the operator of the Facility ("License Approval"). New Operator will diligently prosecute the Application and will timely submit all information requested by the DOH. New Operator will deliver to Old Operator (i) evidence, reasonably satisfactory to Old Operator, that the Application was submitted pursuant to this Section 1.b and during the Application Submission Period, and (ii) all material correspondence with the DOH (with such redactions as are necessary or advisable in New Operator's reasonable discretion). New Operator will not intentionally take any action prior to the Closing Date that would reasonably be expected to disqualify New Operator as the established and licensed operator of the Facility or materially delay approval of the Application.

2.         <u>DUE DILIGENCE; COOPERATION; INTERIM OPERATIONS OF THE FACILITY</u>.

a.       Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to effect an orderly transfer of the operation of the Facility. Subject to the provisions of this Agreement and provided that such access rights are not disruptive to the Facility operations and are at all times in compliance with all state and federal laws governing the rights of the residents of the Facility, upon reasonable prior notice to Old Operator and subject to any COVID-19 related State of New Jersey mandates or restrictions, New Operator and its agents, employees and contractors shall have the right to enter the Property during reasonable business hours to conduct any necessary diligence, and to, following the expiration of the Due Diligence Period, conduct interviews with employees and observe the day-to-day operations and management of the Facility.

b.       Subject to the express provisions of the ASA (as defined in the APA) from and after the effective date thereof, from the Effective Date until the earlier of the APA Closing, the Closing Date and the date that this Agreement is terminated, Old Operator shall operate the Facility in substantially the same manner as the Facility has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with third parties and use best efforts to keep available the services of all of the Facility's employees, including but not limited to the administrators, the directors of nursing and the employees responsible for public relations and marketing. Without limiting the generality of the foregoing, until the earlier of (i) the APA Closing, or (ii) the Closing Date, or (iii) the termination of this Agreement, Old Operator shall, unless consented to otherwise by New Operator in writing:

i.       operate the Facility in the normal course of business consistent with past practice, diligently and in good faith, and in compliance with all applicable laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

ii.       maintain, repair and replace where appropriate, consistent with past practice, with no less than like kind, the real and personal property, equipment, furniture and fixtures, leasehold improvements in substantially the same condition that exists on the date hereof, reasonable wear and tear excepted and subject to the requirements to repair and replace as set forth in the APA, and refrain from delaying such repair and/or replacement as a result of the pending transfer, except where such delay is consistent with past practice;

iii.       maintain the Facility's licensure status, and Medicare and Medicaid provider agreements, in compliance with all applicable laws, rules and regulations;

<div align="center">2</div>

iv.      exercise its commercially reasonable efforts to preserve Old Operator's existing relationships with suppliers, distributors, customers and others having business relations with Old Operator such that no Facility will be impaired;

v.      maintain the Facility's records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

vi.      use commercially reasonable best efforts to preserve the present residency occupancy levels of the Facility and the goodwill with all of the suppliers, residents and others having business relations with Old Operator or the Facility;

vii.      keep the Property free and clear of all liens, claims and encumbrances and promptly remove any created or caused by Old Operator or its employees or agents;

viii.      maintain all existing policies of insurance (or comparable policies) of or relating to the Facility or assets of Old Operator in full force and effect;

ix.      use its commercially reasonable best efforts maintain the quality of care to the residents of the Facility;

x.      invoice and collect revenue consistent with past practice;

xi.      take reasonable steps to safeguard, maintain and preserve all employee and medical records of the Facility transferred under this Agreement in accordance with the provisions of, and for the periods prescribed by, all applicable laws, which shall in no event be less than the steps taken by Old Operator in the operation of the Facility prior to the transactions contemplated under this Agreement;

xii.      avoid immediate jeopardy violations, maintain provider agreements without suspension, qualification or limitation or revocation, and avoid DPNAs or imposition of civil money penalties or the providing of substandard care;

xiii.      perform all of its obligations in respect of the Facility whether pursuant to any Contract, or other requirement;

xiv.      from the Effective Date through the Closing Date, cooperate with New Operator as necessary for New Operator's receipt of the Regulatory Approvals (including the License Approval); and

xv.      promptly inform New Operator in writing of any material event affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against, including any: violations related to the Facility; notice of termination of the certification issued by DOH or Centers for Medicare and Medicaid Services ("CMS") of the Facility to participate in the Medicare and/or Medicaid reimbursement programs; or notice of termination of the license issued by DOH to operate the Facility.

Notwithstanding that certain of Old Operator's requirements pursuant to this Section 2.b shall expire at the APA Closing, between the APA Closing and the Closing, Old Operator shall not actively take any action that would have been a breach of this Section 2.b prior to the APA Closing.

3

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 106 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 11:35:07   Desc
Exhibit 6 - Notice of Removal Page 33 of 179   Page 106 of 202

c. Without limiting the effect of any other provision of this Agreement, between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Old Operator shall not do any of the following with respect to the Facility without the prior written consent of New Operator:

i. increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any employee of the Facility except those reasonable bonuses and wage increases in the ordinary course of business consistent with past practice;

ii. take any action which will or could reasonably be expected to cause any of the representations or warranties in this Agreement to become untrue;

iii. decrease the private pay rates of the residents of the Facility;

iv. sell, transfer or otherwise dispose of any of the Supplies (as defined below) except in the ordinary course of business consistent with past practice, in which event Old Operator shall replace the same with similar property of equal or greater quality, value and usefulness;

v. enter into any contract, other than residential contracts, which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract (as hereinafter defined) which exists at present;

vi. sell, lease, transfer, convey or otherwise dispose of (other than in the ordinary course of business consistent with past practice), or cause or permit any Exception (as defined in the APA) to exist on, any of the Purchased Assets (as defined in the APA) which will not be released at or prior to the Closing;

vii. cancel any Assumed Contract (as defined below) or materially default in the performance of any Assumed Contract, or obligation, or waive any material default or potential material default by any other party, or waive, release, compromise, settle or assign any rights or claims under any Assumed Contract;

viii. violate in any material respect, terminate, fail to preserve or permit the lapse of, any material license, permit or other authorization relating to the Facility as it exists on the date hereof, including the Facility's certificate of need, if any, or any provider agreements, including its provider agreements with Medicare and Medicaid, which are necessary or desirable for the operation of the Facility;

ix. release, compromise or settle any material claim, action or legal proceeding that would result in a material adverse effect or may be construed as an obligation of New Operator, other than in the ordinary course of business consistent with past practice;

x. enter into any transaction with any owner, officer, director, manager or affiliate of Old Operator or any of its affiliates, or any relative or affiliate of any such owner, officer, director, manager or affiliate;

xi. remove, discharge or transfer residents from the Facility to a nursing facility owned, operated or managed by Old Operator or any of its affiliates, or voluntary

4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 107 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Notice of Removal   Page 84 of 179   Page 107 of 202

transfer any resident from the Facility to any other nursing facility, where such transfer is not in the ordinary course of business and not (A) for reasons relating to the health and well-being of the resident transferred, (B) in accordance with an election to transfer by the applicable resident or his or her family or attorney-in-fact, or (iii) otherwise required by law; or

xii. (A) remove or relocate to any affiliate, any administrator, director of nursing or other key employee, or (B) hire any new employee except in the ordinary course of business consistent with past practice.

d. <u>Resident Discharges for Nonpayment</u>. Notwithstanding the forgoing, prior to Closing, Old Operator shall use commercially reasonable best efforts to voluntarily discharge or transfer each resident of the Facility who has not timely paid his or her financial obligations to the applicable Facility and who owes the Facility in excess of twenty-five thousand dollars ($25,000.00) (each a "<u>Delinquent Resident</u>"). For the avoidance of doubt, the definition of Delinquent Resident shall not include residents who are awaiting approval of payment from a payor source.

e. <u>Financing</u>. Old Operator will reasonably cooperate with New Operator and its financing sources to enter into such agreements as are required by such financing sources.

f. <u>Further Information</u>. Old Operator shall (i) provide weekly census reports with respect to the Facility to New Operator, and (ii) updated year-to-date Financial Statements (as defined below) as they become available. Old Operator hereby covenants to notify New Operator in writing of (A) the occurrence of a survey at the Facility within one (1) business day thereof (but in any case prior to the Closing Date), (B) the communications from any state and/or federal surveyor during the exit interview within two (2) business days thereof (but in any case prior to the Closing Date), and (iii) any citations or deficiencies identified in a survey report or form CMS-2567 related to the Facility within two (2) business days of the receipt thereof (but in any case prior to the Closing Date).

3. <u>CONDITIONS PRECEDENT</u>.

a. New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction (or waiver by New Operator) of the following conditions precedent on and as of the Closing Date:

i. Old Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder and Seller shall have duly and timely performed all of its duties, obligations, promises, covenants and agreements under the APA, in each case, in all material respects.

ii. Each of the representations and warranties of Old Operator contained in this Agreement shall be true and correct in all material respects as of the Effective Date, and (i) with respect to all such representations and warranties that relate to the operation of the Facility, shall be true and correct in all material respects as of the date of the APA Closing and (ii) with respect to all such representations and warranties other than those in the foregoing clause (i), shall be true and correct in all material respects as of the Closing Date, in each case, without giving effect to any materiality or similar qualifier therein, provided, however, that the conditions set forth in this Section 3(a)(ii), shall not apply where failure of the conditions to be met in clause (ii) above result from New Operator's

5

4930-4874-6496, v. 4

or Purchaser's use and operation of the Facility on and after the APA Closing, and through no fault of Seller or Old Operator.

iii.    Old Operator shall not be in material breach of any term, provision or condition of this Agreement and Seller shall not be in material breach of any term, provision or condition of the APA.

iv.    Old Operator shall deliver to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator:

A.    A duly executed assignment by Old Operator, in substantially the form annexed hereto as Exhibit A (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i.    the Patient Trust Funds and Property (as defined herein);

ii.    all resident contracts or other agreements with residents of the Facility;

iii.    all licenses, permits, accreditations, Medicaid and Medicare contracts, and other regulatory approvals, and all rights of Old Operator under any government or non-government provider agreements or any other third party payor programs, if any, issued by any federal, state, municipal or local governmental authority relating to the use, maintenance or operation of the Facility running to, or in favor of, Old Operator, to the extent legally assignable (including all modifications thereto or renewals thereof) (the "Permits");

iv.    all guaranties or warranties then in effect, if any, with respect to the Facility and all Personal Property (the "Warranties"); and

v.    any other assets required to be assigned to New Operator pursuant to this Agreement.

B.    a duly executed Bill of Sale;

C.    a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer or member of Old Operator, dated as of the Closing Date, certifying that the conditions to New Operator's obligations contained in Section 3 have been satisfied;

D.    a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer of Old Operator, certifying the resolutions authorizing the transactions contemplated hereby, and appearing on such certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement (and all documents to be executed and delivered pursuant hereto, (the "Other Documents"));

E.    the Clearance Letter (as defined in the APA);

F.    counterpart copies of all Warranties;

6

4930-4874-6496, v. 4

G.      copies of all Permits; and

H.      a termination of the Existing Lease (as defined below), duly executed by Seller and Old Operator.

v.      As of and on the Closing Date there shall not have been imposed against Old Operator, nor shall have Old Operator received notice of (a) any civil monetary penalty ("CMP") or other federal, state or local fine and/or penalty assessed for the period prior to the APA Closing which has not been paid or remedied by Old Operator or which are reserved for by Old Operator during such time as Old Operator contests such CMP or penalties, or (b) any withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment, including but not limited to state bed tax or assessment, assessed for the period prior to the APA Closing which has not been paid or remedied by Old Operator or which are reserved for by Old Operator during such time as Old Operator contests such withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment;

vi.      On or before the Closing Date, Old Operator shall have transferred to New Operator the Patient Trust Funds and Property (as defined below) in compliance with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5;

vii.      Between the date of this Agreement and the APA Closing, there shall not have been any Material Adverse Effect (as defined below) or any other material adverse change in the regulatory status or condition of any of Old Operator's licenses, permits or certifications, and the Medicare and Medicaid rates of the Facility or the business operations, financial conditions or prospects of the Facility;

viii.      Up to and on the date of the APA Closing, there shall be no (a) lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights or (b) actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of the transactions contemplated hereby;

ix.      The residency occupancy levels at the Facility on the date of the APA Closing shall be at least ninety-two and one-half percent (92.5%) of the occupancy level of the Facility as of the Effective Date; provided that Seller shall have fifteen (15) days to cure any shortfall below such ninety-two and one half percent (92.5%) threshold; provided, further, that any such cure may only be effected with admissions of residents in a manner consistent with past admissions standards and practices of the Facility (including with respect to payor type and ability to pay).

x.      The closing of the transactions contemplated by the APA (the "APA Closing") shall have occurred and the Lease (as defined in the APA) and the ASA, shall have been (A) entered into as of the APA Closing, (B) in effect as of immediately prior to the Closing and (C) terminated (or in the case of the Lease, at New Operator's election, assigned to New Operator) as of the Closing; and

7

4930-4874-6496, v. 4

        xi.      New Operator shall have been issued or otherwise obtained all Regulatory Approvals, including the License (or assurance satisfactory to New Operator that the Regulatory Approvals, including the License will be issued effective as of Closing), consents and Permits that are not otherwise assigned under the General Assignment that are necessary for New Operator's legal operation of the Facility as of the Closing Date in substantially the same manner as operated by Old Operator.  The foregoing contemplates without limitation that New Operator shall have received, to the extent required, all consents for New Operator's assumption of the Assumed Contracts.

        b.      Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction (or waiver by Old Operator) of the following conditions precedent on and as of the Closing Date:

        i.      New Operator shall have duly and timely performed and fulfilled all of their duties, obligations, promises, covenants and agreements hereunder, in each case, in all material respects.

        ii.      Each of the representations and warranties of New Operator contained in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date, without giving effect to any materiality or similar qualifier therein.

        iii.      New Operator shall not be in breach of any term, provision or condition of this Agreement.

        iv.      New Operator shall have executed and delivered to Old Operator the applicable Other Documents.

        v.      New Operator shall deliver to Old Operator on or before the Closing Date the following, each of which shall be in form and substance reasonably satisfactory to Old Operator:  (1) a certificate of New Operator, executed by a duly authorized manager of New Operator, dated the Closing Date, certifying that the representations and warranties of New Operator set forth in this Agreement are true and complete on and as of the Closing Date and (2) a certificate from New Operator, executed by a duly authorized manager of New Operator, certifying the resolutions authorizing the transactions contemplated hereby and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement; and

        vi.      The APA Closing shall have occurred.

In the event that either of the Parties (a "<u>Waiving Party</u>") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies hereunder or at law or equity with respect thereto.

        4.      <u>CONVEYANCE OF SUPPLIES</u>**.**

        a.      In consideration of this Agreement, on the Closing Date, Old Operator shall deliver to New Operator a bill of sale (the "<u>Bill of Sale</u>") for the Supplies (as defined herein), in the form annexed hereto as <u>Exhibit B</u>, as shall be necessary to convey to New Operator good and marketable

8

right, title and interest in and to the Supplies and any other property of Old Operator used in connection with the operation of the Facility, free and clear of all liens, claims, encumbrances, charges, restrictions, rights or interests of others of any kind.

b.      Old Operator shall have no obligation to deliver the Supplies to any location other than that at the Facility, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

5.      TRANSFER OF PATIENT TRUST FUNDS.

a.      On or prior to the Closing Date, Old Operator shall provide to New Operator a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Old Operator of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which is attached hereto as Schedule 5.a ("Patient Trust Funds and Property").

b.      Old Operator hereby agrees to transfer, or to cause to be transferred, to New Operator the Patient Trust Funds and Property on the Closing Date.  Old Operator shall comply with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property.  New Operator hereby agree that they will accept the Patient Trust Funds and Property in trust for the residents, in accordance with applicable statutory and regulatory requirements; provided, however, that such transfer shall not relieve Old Operator of its custodial and fiduciary responsibilities for such funds and property to the beneficiaries thereof for the period prior to the Closing Date.

c.      Old Operator hereby agrees to indemnify, defend and hold New Operator and their respective employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and permitted assigns (collectively, including New Operator, the "New Operator Parties") harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event the amount of funds, if any, transferred to New Operator does not represent the full amount of the funds delivered to Old Operator as custodian or with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Property prior to the Closing Date.

d.      New Operator will indemnify, defend and hold Old Operator and its employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and permitted assigns harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator by a patient for his or her Patient Trust Funds and Property if and to the extent that such funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator on and after the Closing Date with respect to Patient Trust Funds and Property actually received by New Operator.

6.      REGULATORY APPROVALS; COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.

a.      At New Operator's election, if New Operator is unable to obtain any of the Regulatory Approvals prior to the Closing Date, then, subject to applicable law, until such time that New Operator obtains such Regulatory Approval, Old Operator shall authorize New Operator to

use such Regulatory Approval of Old Operator (not including the License), provided, however, that New Operator shall indemnify and hold Old Operator harmless on account of any liabilities that result from New Operator's use of such Regulatory Approval.

b.        Effective on the Closing Date, Old Operator sells, assigns and conveys to New Operator the Medicare and Medicaid provider number(s) in use at the Facility (the "Existing Provider Numbers").  Notwithstanding the foregoing, Old Operator retains any and all rights and liabilities relating to the Existing Provider Numbers relating to any and all periods preceding the Closing Date.  Old Operator and New Operator shall execute any and all documents necessary for, and will otherwise cooperate in connection with, the assignment of the Existing Medicare Provider Number.  During the pendency of New Operator's CMS Form 855A (the "CHOW"), New Operator may bill Medicare and Medicaid under Old Operator's name and the Existing Provider Numbers, until the intermediary changes the electronic funds transfer account or special payment address to the New Operator.  Notwithstanding the foregoing, New Operator shall be responsible for all rights and liabilities relating to the Existing Provider Numbers relating to any and all periods on or after the Closing Date.  This Section 6.b is intended to satisfy the requirements of Chapter Section 15.7.7.1.5 of the Medicare Program Integrity Manual.

c.        Old Operator shall prepare and file with the appropriate Medicare and Medicaid agencies its final cost reports with respect to its operation of the Facility as soon as reasonably practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third-party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports.  To the extent that there are any delays in payment by any third party payor to New Operator as a result of Old Operator's failure to timely file its cost reports under this Section 6.c, upon demand of such New Operator, Old Operator shall pay to such New Operator interest on the amounts withheld by such third party payor(s) equal to the then current prime rate of interest (as announced from time to time by the *Wall Street Journal*) plus three percent (3%) (the "Default Rate").  Old Operator agrees to cooperate with New Operator as necessary for enrollment of New Operator in the Medicare and Medicaid programs.

d.        Each Party agrees to notify the other within three (3) calendar days after receipt of any notice of any claim of recapture by DOH, CMS, the Office of Inspector General for the United States Department of Health ("OIG") or any other governmental or quasi-governmental authority with respect to an alleged Medicare or Medicaid overpayment or any alleged underpayment of any tax or assessment for periods relating prior to the Closing Date (each, a "Recapture Claim").  To the extent ascertainable on or prior to the Closing Date, Old Operator shall pay or cause to be paid any Recapture Claim which relates to or arising from any period prior to the Closing Date; provided, however, that nothing herein shall be deemed to prevent or restrict Old Operator from contesting any such Recapture Claim, and, if, based on the advice of its attorneys, by paying such Recapture Claim, Old Operator shall have forfeited its right to such contest, Old Operator may delay paying such Recapture Claim until final resolution of such contest, so long as Old Operator otherwise complies with the provisions of this Section 6.

e.        In the event DOH, CMS, OIG or any other governmental or quasi-governmental authority or agency making payments to New Operator for services performed at the Facility on or after the Closing Date make any Recapture Claim for any period prior to the Closing Date, then Old Operator shall be entitled to contest such Recapture Claim; provided, however, that New Operator shall be allowed the opportunity to participate in all meetings, and be provided with copies

10

4930-4874-6496, v. 4

of all audit adjustments and work papers.  Old Operator and New Operator shall cooperate to resolve such audit to their mutual satisfaction.  In the event that Old Operator fails to pursue any issue or issues raised in any such appeal, New Operator may, at its own expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.   If Old Operator does not prevail with regard to such contest, Old Operator hereby agrees to save, indemnify, defend and hold the New Operator Parties harmless from and against any loss, damage, injury or expense incurred by any such party arising from or related to any such Recapture Claim.  In connection with the foregoing indemnification obligation, in the event that CMS, DOH or any other governmental or quasi-governmental authority or agency or other third party payor source withholds amounts from any New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to such New Operator within ten (10) days following such New Operator's demand therefor.  Such payment shall be made regardless of whether Old Operator is then contesting such Recapture Claim.

f.      Old Operator shall be and remain obligated for and shall pay on or before the date due thereof all amounts of any license fees or taxes or other amounts payable to any other government authority with jurisdiction over the Facility accrued through the Closing Date, including any Medicaid provider taxes owed to DOH or state bed tax or assessment.  Old Operator shall provide to New Operator, on or before the Closing Date, evidence reasonably satisfactory to New Operator of payment of all of such fees and taxes.

g.      Old Operator shall at its sole and exclusive cost and expense be liable and responsible for the correction of all violations cited by DOH in any survey ("Survey") prior to, on or after the Closing Date as detailed in the Statement of Deficiencies issued by DOH ("Statement"), if any, accompanying such Survey, and all proposed or imposed remedies, including any CMP, that result from a condition or incident at the Facility prior to the Closing Date or as a result of an action or inaction of Old Operator prior to the Closing Date, until the cure thereof and, if applicable, any proposed denial of payment by, or termination of certification to participate in, the Medicare or Medicaid programs set forth in the Statement or otherwise resulting from the Survey or Statement is withdrawn.

h.      Old Operator shall deliver to New Operator copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports.

7.      CONTRACTS; RESIDENT AGREEMENTS.

a.      As soon as practicable after the Effective Date, Old Operator shall deliver to New Operator true, accurate and complete copies of all Contracts, a schedule of which is attached hereto as Schedule 7.a.

b.      Prior to the Closing Date, New Operator shall deliver written notice to Old Operator as to which of the Contracts New Operator desires to assume pursuant to the General Assignment and continue in full force and effect after the Closing Date (the "Assumed Contracts"), a listing of which shall then be attached hereto as Schedule 7.b.  Any Contract that New Operator does not indicate it desires to assume and continue shall be deemed rejected by New Operator ("Rejected Contracts") and Old Operator shall terminate such Rejected Contracts; provided, however, that such termination shall be made in compliance with the applicable provisions under such Rejected Contracts.

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 114 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Exhibit 6 Page 91 of 179   Page 114 of 202

c.       Old Operator shall transfer, convey and assign to New Operator, in accordance with the terms of the General Assignment, on the Closing Date all existing agreements with residents and any guarantors thereof, to the extent assignable by Old Operator (excluding only the right to any payments for periods prior to the Closing Date).

d.       In addition to and not in lieu of any other indemnity set forth elsewhere herein, Old Operator hereby agrees to indemnify, protect, save, defend and hold the New Operator Parties harmless from and against any and all liabilities, obligations, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, asserted against or incurred by any of the New Operator Parties arising out of or connected with any (i)  third parties claiming to have rights under contracts or other agreements that are not set forth or described in Schedule 7.a or (ii) Rejected Contracts.

e.       Concurrently with the APA Closing, (i) Old Operator and New Operator shall enter into the ASA and (ii) Old Operator shall enter into, and New Operator shall ensure that Purchaser enters into, the Lease,

8.       NO ASSUMPTION OF LIABILITIES.

a.       Except for future obligations under contracts and commitments that are expressly assumed by New Operator hereunder, Old Operator has no liabilities, debts, claims or obligations, whether accrued, absolute, contingent or otherwise, whether due or to become due, that may be asserted against New Operator, Purchaser or, following the Closing, the Facility.  Other than as specifically set forth in this Agreement, New Operator does not and shall not assume, and nothing in this Agreement shall be construed as an assumption by New Operator of, any liabilities, obligations or undertakings of Old Operator of any nature whatsoever, whether accrued, absolute, fixed or contingent, known or unknown, due or to become due, unliquidated, or otherwise, and whether or not associated with the Facility or the Purchased Assets.

b.       Except as specifically provided in this Agreement, New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing Date, including any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom, and Old Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility on or after to the Closing Date, including any matters relating to cost reports, collections, audits, hearing, or legal action arising therefrom.

9.       ACCOUNTS RECEIVABLE; ACCOUNTS PAYABLE.

a.       New Operator shall not assume any accounts receivable owed or due to Old Operator from or relating to the operation, ownership or management of the Facility prior to the Closing Date.  Old Operator shall retain the right to collect all unpaid accounts receivable as of the close of business on the day prior to the Closing Date with respect to the Facility, but only to the extent that such accounts receivable relate to services rendered prior to the Closing Date.  All collections shall be conducted in accordance with normal business practices and no patients or residents shall be unreasonably harassed in the collection of such amounts.  Old Operator shall engage sufficient personnel to bill and collect Old Operator's accounts receivable using Old Operator's legacy billing system, which Old Operator shall maintain as required to bill and collect

12

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 115 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Exhibit 6 Page 92 of 179 Page 115 of 202

its accounts receivable hereunder.

b.      If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator.  New Operator and Old Operator shall send copies of all Medicare and Medicaid remittance advices to the other Party for purposes of recording and pursuing accounts receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each Party.  If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to any New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator.  Any such remittances pursuant to this Section 9.b shall occur within ten (10) days from the date the Party required to make such remittance receives payment thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

c.      Payments received by New Operator or Old Operator from non-governmental payment sources shall be paid to the party designated in such payments entitled to the payments for the services provided thereunder within ten (10) days from the date the party required to make such remittance receives payment thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.  Any non-designated payments received by New Operator or Old Operator from non-governmental payments sources after the Closing Date shall first be applied to any post-Closing Date monthly balances due to any New Operator for services provided after the Closing Date, with the excess if any, applied to any pre Closing Date monthly balances due for services rendered by Old Operator prior to the Closing Date. Notwithstanding the foregoing, New Operator hereby acknowledges and agrees that such pre-Closing Date monthly balances are the property of Old Operator and Old Operator reserves the right to continue to directly pursue the collection of such pre-Closing Date monthly balances.

d.      To the extent a Party receives any payments for accounts receivable of another Party, the Parties acknowledge that the Party receiving the payment belonging to another Party shall hold the payment in trust, that no Party shall have any right to offset with respect to such accounts receivable, and that the Party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the appropriate other Party within ten (10) days of receipt thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

e.      Nothing herein shall be deemed to limit in any way any Party's rights and remedies to recover accounts receivable due and owing to it under the terms of this Agreement.

f.      All accounts payable for services provided or goods furnished for or at the Facility prior to the Closing Date, notwithstanding whether such accounts payable were incurred in the name of Old Operator, shall remain the sole responsibility and obligation of Old Operator.  All accounts payable for services provided or goods furnished for or at the Facility on or after the Closing Date, notwithstanding whether such accounts payable were incurred in the name of New Operator (except with respect to Rejected Contracts), shall be the sole responsibility and obligation of New Operator.  To the extent accounts payable have accrued for a period that includes time both before and after the Closing Date, the Parties shall equitably apportion the responsibility for payment of such accounts payable.  The Parties hereby agree to cooperate with each other and to notify the merchants, suppliers or other third parties with respect to which of Old Operator or New Operator bears responsibility for accounts payable of the Facility based on the foregoing clauses of

13

this Section 9.f.

g.        This Section 9 shall be subject to the express provisions of the ASA from and after the effective date of the ASA.

10.        EMPLOYEES.

a.        Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which is attached hereto as Schedule 10.a (such listing, to include the position and current base salary of each such employees) (each, a "Current Employee" and collectively, the "Current Employees"), effective as of the earlier of the Closing Date and the date of the APA Closing.  Old Operator shall be responsible for any "Continuation Coverage" (as that term is defined by COBRA Section 4980B of the tax code and Section 601, et seq. of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) for any employee of Old Operator terminated at any time prior to or on the Closing Date who does not become a Retained Employee (as defined below).  New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party.  From and after the date hereof, Old Operator shall not make any material changes in the compensation or benefits of the employees at the Facility.

b.        New Operator shall determine, in its sole discretion, which of the Current Employees shall be offered employment with New Operator, pursuant to employment terms acceptable to New Operator (each, a "Retained Employee" and collectively, the "Retained Employees").  Notwithstanding the foregoing, New Operator shall rehire or offer to rehire not less than the number of the Current Employees necessary to avoid WARN Act notice or similar notice requirements or other related liability contained in any applicable law.  Notwithstanding the foregoing, nothing in this Section 10.b shall create any right in favor of any person not a party hereto, including the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee or Retained Employee.

c.        At Closing, Old Operator shall provide New Operator with a credit (the "Employee Accrual Credit") in an amount equal to ninety percent (90%) of the accrued, vested and unvested, but unpaid vacation, sick and holiday pay and severance obligations, if any, plus all applicable employer withholding charges and payroll costs (including FICA, FUTA, SUTA and worker's compensation) and costs associated with processing payroll for a total of ten percent (10%) for withholding and payroll, as well as any insurance premium obligations of Old Operator, vested or unvested, with respect to the Retained Employees that have accrued prior to the earlier of the Closing Date and the effective date of the ASA ("Old Operator's Vacation and Holiday Pay Expenses").  New Operator agrees to pay when and as due, all of such Old Operator's Vacation and Holiday Pay Expenses, provided, however, that New Operator shall not be liable for, and Old Operator shall indemnify and hold the New Operator Parties harmless, on account of any and all other liabilities and obligations with regard to any of the Current Employees and with regard to the Retained Employees, any and all other liabilities and obligations that shall have accrued prior to the Closing Date.  A schedule of Old Operator's Vacation and Holiday Pay Expenses is attached hereto as Schedule 10.c.  If New Operator discovers after the Closing Date that the amount credited is less than the amounts required to be credited under this Section 10.c, Old Operator shall pay to New Operator within five (5) days after New Operator provides notice thereof, by an amount equal to such deficiencies, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

d.        New Operator and Old Operator acknowledge and agree that the employees at the

14

4930-4874-6496, v. 4

Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as licensed operator of the Facility is based upon the skills and qualifications of such employees.  As such, in the event that during the period beginning on the Effective Date and ending upon the date that is eighteen (18) months following the Closing Date: (i) any Current Employee is solicited for employment by any person or entity that either directly or indirectly controls, is under common control with or is otherwise affiliated with Old Operator (any of the foregoing, an "Old Operator Party"), or (ii) any of the employees listed on Exhibit C attached hereto (each, a "Scheduled Employee") are hired by an Old Operator Party, then Old Operator shall pay to New Operator an amount equal to the greater of (a) fifty thousand dollars ($50,000.00), or (b) an amount equal to such employee's annual salary as liquidated damages, for each such Current Employee or Scheduled Employee.  The Parties acknowledge and agree that actual damages with respect to the foregoing would be difficult to ascertain and that the amount set forth in the immediately preceding sentence is a fair and reasonable approximation of such actual damages.  This provision shall not in any way limit such other remedies that may be available to New Operator.  Old Operator further acknowledges that the scope and duration of the provisions of this Section 10.d are reasonable.  The Parties acknowledge and agree that advertisements available to the general public, such as through website job postings and newspaper, Internet and trade journals shall not constitute solicitation for purposes of this Section 10.d.

e.        New Operator shall not be required to assume the CBA (as defined below) of the Facility between Old Operator, and the Union (as defined below), and any other union-related contracts or liabilities, including any Pension Liability (as defined below,  provided, however, that New Operator hereby acknowledges and recognizes the Union and covenants to advise the Union and the Retained Employees, either prior to, or at the time of, offering employment to the Retained Employees pursuant to Section 10(b) hereto, that New Operator does not intend to be bound by the existing CBA.

11.        EMPLOYMENT RECORDS.  Prior to the earlier of the Closing Date and the effective date of the ASA, Old Operator shall deliver to New Operator, either the originals or full and complete copies of all available employee records for all Retained Employees in its possession (including all employee employment applications, W-4's, I-9's, employee health records (including PPD results, screening and x-rays), OSHA 300 summary forms, state tax filing, including state unemployment rate determination letters, and any disciplinary reports) (collectively, the "Employee Records").  Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the earlier of the Closing Date and the effective date of the ASA with regard to the Retained Employees.

12.        ACCESS TO RECORDS.

a.        On the Closing Date, Old Operator shall deliver to New Operator all of the records of the Facility, including patient medical and financial records, provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; provided, further, that for a five (5) year period after the Closing Date, Old Operator shall give New Operator access to any information and the right of inspection (including the right to extract or make copies) in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b.        Subsequent to the Closing Date, New Operator shall allow Old Operator and its agents and representatives to have reasonable access to (upon reasonable prior notice and during

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 118 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 12:55:07    Desc
Exhibit 6 - Exhibit 6  Page 95 of 179  Page 118 of 202

normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns or any other government agency actions or notices.

c.      Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove and/or copy any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation.  Any record so removed shall promptly be returned to New Operator (or, at New Operator's election, destroyed) following its use.

d.      New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including patient records and records of patient funds, to the extent required by law.

e.      This <u>Section 12</u> shall be subject to the express provisions of the ASA from and after the effective date of the ASA.

13.     <u>USE OF TELEPHONE NUMBER AND SOCIAL MEDIA WEBSITES</u>   New Operator may use the current name and present telephone numbers of the Facility.  Old Operator shall, as of the Closing Date, transfer or cause to be transferred, at its expense, all right, title and interest in and to the telephone numbers and social media websites (the "<u>Sites</u>") used by the Facility.  Old Operator represents and warrants that the Facility has no website that will be functional or in existence from and after the Closing other than the Sites that will be transferred pursuant to the immediately prior sentence.

14.     <u>POLICY AND PROCEDURE MANUALS</u>.  Old Operator agrees to leave its policy and procedure manuals at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator.

15.     <u>TAXES</u>.  Old Operator shall discharge any provider or other tax charged by DOH or other government agency relating to any period prior to the Closing Date.  Old Operator shall file all returns, reports and filings of any kind or nature, required to be filed by Old Operator on a timely basis and will timely pay all taxes or other obligations and liabilities which are due and payable, including with respect to the Property or the Facility, in the ordinary course of business.  Old Operator shall pay before the same shall become due all taxes, duties and other governmental charges that accrue prior to the Closing Date, which, if not paid, would create or may hereafter create a lien on any of the assets of New Operator or for which New Operator could become liable as a successor operator of the Facility.  Old Operator shall also file any required bulk transfer filings necessary to establish that New Operator shall not succeed to any state tax liabilities.

16.     INDEMNIFICATION.

a.      New Operator shall indemnify, save, protect, defend and hold harmless Old Operator and its respective employees, affiliates, managers, members, partners, officers, directors and agents, from and against all claims, liabilities, losses, damages, demands and causes of action of any nature whatsoever (including demands and causes of action relating to injury or death to persons or loss of or damage to property), and all costs and expenses (including penalties and reasonable attorneys' and other professional fees and disbursements incurred in the investigation

16

or defense of any such claims, or in asserting, pursuing or enforcing any such claims), whether or not resulting from third-party claims (collectively, "Losses") arising from, out of, or relating to (i) operation of the Facility by New Operator on or after the Closing Date, (ii) New Operator's use or occupancy of the Property or the condition thereof on or after the Closing Date, and (iii) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of New Operator contained in this Agreement or in any of the Other Documents.

b.      Old Operator shall indemnify, save, protect, defend and hold harmless each of the New Operator Parties from and against all Losses arising from, out of, or relating to (i) the ownership or operation of the Facility by Old Operation prior to the Closing Date, (ii) Old Operator's use or occupancy of the Property or the condition thereof prior to the Closing Date, (iii) any Recapture Claim, (iv) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of Old Operator contained in this Agreement or in any of the Other Documents, (v) the CBA or Union, including any Pension Liability, and Old Operator's, Seller's or the Facility's receipt of Stimulus Funds, and (vi) any resident present at the Facility on the Closing Date for whom a recognized payor source cannot be obtained following the Closing.

c.      In the event that any liability, claim or demand for Losses which are subject to indemnification by or under any provision of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, such Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within thirty (30) calendar days of Indemnitee's receipt of written notice thereof, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitee's right to receive, and Indemnitor's obligation to provide, indemnification hereunder unless such failure directly and materially prejudices Indemnitor's right or ability to defend the Indemnitee's Claim. Upon receipt of notice of any Indemnitee's Claim(s), Indemnitor shall, subject to Indemnitees other rights as set forth herein, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof promptly upon the final, unappealable resolution of such Indemnitee's Claim. Indemnitor shall keep Indemnitee informed with respect to all aspects of the resolution of an Indemnitee's Claim. Without limiting the foregoing, upon request by Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of any Indemnitee's Claim. Indemnitor shall not, without the prior written consent of Indemnitee, which consent shall not be unreasonably withheld, settle, compromise or offer to settle or compromise any Indemnitee's Claim on a basis that would result in (i) the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of Indemnitor or any affiliate thereof, or (ii) any monetary liability on the part of Indemnitor or any affiliate thereof that will not be paid or reimbursed by the Indemnitee. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be deemed an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law, intervene in and defend, settle or compromise such Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within

17

4930-4874-6496, v. 4

seven (7) calendar days of written demand thereof, Indemnitor shall promptly reimburse Indemnitee all amounts (including attorneys' fees) incurred by Indemnitee with respect to the resolution of such Indemnitee's Claims.

d.     If and when an Indemnitee desires to assert an Indemnitee's Claim in accordance with <u>Section 16.a</u> or <u>Section 16.b</u>, as applicable, other than with respect to a third-party claim in accordance with <u>Section 16.c</u>, Indemnitee shall notify Indemnitor of such Indemnitee's Claim and the Parties shall attempt in good faith to agree on resolution of the disputed amount. Any amount mutually agreed upon or awarded to the Indemnitee under a final judgment shall be paid by Indemnitor within five (5) business days following such agreement or the entering of such judgment, as applicable.

e.     <u>Survival</u>. Other than where a different survival period is expressly set forth (including in <u>Section 16.f</u>), all indemnification obligations of Old Operator and New Operator under this Agreement shall survive the Closing Date and shall continue in effect for a period of two (2) years after the Closing Date; <u>provided</u>, <u>however</u>, that the Fundamental Representations (as defined below) shall survive for forty-eight (48) months after the Closing Date; <u>provided</u>, <u>further</u> that if there is an Indemnitee's Claim made prior to the applicable survival period, such indemnification obligation shall continue to survive until the final, non-appealable resolution of such Indemnitee's Claim. "<u>Fundamental Representations</u>" mean the representations of Old Operator set forth in <u>Section18.a</u> (*Organization and Authority*), and <u>Section 18.c</u> (*No Consent*), <u>Section 18.e</u> (*Overpayments*), <u>Section 18.f</u> (*Audits*), <u>Section 18.g</u> (*Status of Licensure and Certification*), <u>Section 18.h</u> (*Status of Medicare/Medicaid Participation*) <u>Section 18.t</u> (*Labor Unions*) and <u>Section 18.hh</u> (*Stimulus Funds*).

f.     <u>Limitation of Liability</u>. An Indemnitor shall be liable under <u>this Section 16</u> only when the total aggregate indemnification Claims of such Indemnitee under this Agreement and of such Indemnitor's affiliate under the OTA (which, for the avoidance of doubt, in the case of Old Operator is Seller and in the case of New Operator is Purchaser) exceed the Basket Amount (as defined in the APA), after which Indemnitor shall be liable for the amounts in excess of the Basket Amount. Furthermore, no Indemnitor shall be liable for Indemnitee Claims hereunder to the extent Indemnitee Claims paid by such Indemnitor hereunder and such Indemnitor's affiliate under the OTA exceeds the Cap (as defined in the APA). Notwithstanding the foregoing and anything to the contrary herein, all indemnification obligations of Old Operator arising from, relating to (i) any Recapture Claim and any other Losses relating to Medicaid and Medicare programs, (ii) power and authority to enter into this Agreement, (iii) liability for, and payment of, any taxes, (iv) regulatory compliance issues, (v) the CBA or Union, including any Pension Liability, (vi) any Fundamental Representations, (vii) any breach of any covenant or obligation, (viii) Old Operator's, Seller's or the Facility's receipt of Stimulus Funds, including if any payment that would otherwise be due to New Operator is withheld, demanded or recouped by any governmental authority or payor in connection with or relating to any receipt of Stimulus Funds by Old Operator, Seller or the Facility and (x) fraud or intentional misrepresentation, (A) shall survive indefinitely, subject to any applicable statutes of limitations and (B) shall not be subject to the Cap or Basket.

g.     Without limiting any of New Operator's rights pursuant to this <u>Section 16</u>, Old Operator acknowledges that New Operator's right to consummate the transactions contemplated hereby are unique, and recognizes and affirms that that in the event of a breach of this Agreement, money damages will be inadequate and New Operator will have no adequate remedy at law. Accordingly, Old Operator agrees that New Operator shall be entitled, in addition to any other rights and remedies existing in its favor pursuant to any other agreement between Old Operator and New Operator or otherwise at law or in equity, to enforce its rights and Old Operator's obligations

<div align="center">18</div>

hereunder not only by an action or proceeding for damages but also by an action or proceeding for specific performance, injunctive and/or other equitable relief (without posting of bond or other security).

17.     REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR.  As an inducement to Old Operator to enter into this Agreement, New Operator hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

a.     Organization and Authority.  New Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  As of the Closing Date, New Operator will have all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

b.     No Violations.  Neither the execution and delivery of this Agreement, nor any agreement referred to or contemplated hereby, by New Operator will:

i.     violate any provision of the organizational or governing documents of any New Operator; or

ii.     conflict with or constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

c.     Survival of Representations and Warranties of New Operator.  Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all such representations and warranties shall survive the Closing Date for the applicable statute of limitations.

18.     REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR.  As an inducement to New Operator to enter into this Agreement, Old Operator hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

a.     Organization and Authority.  Old Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  Old Operator has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by Old Operator and is enforceable against Old Operator in accordance with its terms.

b.     No Violations.  Neither the execution and delivery of this Agreement, nor any agreement referred to or contemplated hereby, by Old Operator will:

i.     violate any provision of its organizational or governing documents;

ii.     conflict with or constitute a default or create a right of termination or cancellation under any agreement or commitment to which Old Operator is a party or which pertains to the Facility; and

19

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 122 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 11:35:07    Desc
Exhibit 6 - Exhibit 6 Page 99 of 179 Page 122 of 202

       iii.      result in the creation or imposition of any security interest, lien or other encumbrance upon any of the assets of Old Operator.

       c.      <u>No Consent Required</u>.  No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance by Old Operator of this Agreement, prior to, or as of or at the Closing Date, or as a consequence thereof, or with the consummation by Old Operator of transactions contemplated hereby to be consummated prior to, as of or at the Closing Date, except as set forth on <u>Schedule 18.c</u>.

       d.      <u>Litigation</u>.  Except as set forth on <u>Schedule 18.d</u>, there are no pending, nor, to Old Operator's Knowledge, threatened claims, lawsuits, governmental actions or other proceedings, including any desk audit or full audit described in below, involving the Facility or the operation thereof before any court, agency or other judicial, administrative or other governmental body or arbitrator.

       e.      <u>Overpayments</u>.  Except as set forth on <u>Schedule 18.e</u>, there are no pending, nor threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor, nor is Old Operator aware of any grounds from such a claim or demand.

       f.      <u>Audits</u>.  Old Operator represents and warrants that it will fully cooperate with New Operator in connection with any desk audit or full audit by CMS, DOH or other applicable governmental regulatory agency in connection with the desk audit or full audit of any Medicaid or Medicare cost reports filed by Old Operator, including providing New Operator with any and all necessary documentation, supporting schedules and personnel in its possession in order to properly support the dollar figures and classifications/characterizations contained in Old Operator's cost reports so that New Operator's Medicaid or Medicare reimbursements are maximized.

       g.      <u>Status of Licensure and Certification</u>.  The Facility currently holds a license issued by DOH to Old Operator for a two hundred (200) bed skilled nursing facility.  Such license is, and shall through the Closing Date be, unrestricted, unconditional, in good standing and in full force and effect and subject to no waivers or limitations.  There are no pending actions or claims or any threatened actions or claims, which, if adversely determined, could materially and adversely affect such licenses.  Old Operator has not received any written notice from DOH or any other governmental agency requiring the correction of any condition with respect to any such license which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of any such license is in jeopardy.  Old Operator has not received any written notice from DOH or any other governmental or quasi-governmental organization of any life safety code or similar violations, nor does Old Operator have any reason to believe that any condition exists at the Property that would violate any life safety codes or any similar regulations.  All deficiencies and violations cited in any Survey or resurvey have been corrected or corrective action plans have been submitted and approved therefor and will be fully implemented/corrected prior to Closing.  No Facility is currently designated as a "Special Focus Facility" (as such term is defined by the Centers for Medicare and Medicaid Services Special Focus Facility Program), and no Facility received any written notice of inclusion or intended inclusion as a Special Focus Facility.

       h.      The Facility is, and shall on the Closing Date be, certified for participation in the Medicaid and Medicare reimbursement program and such each certification is in full force and

effect and in good standing and subject to no restrictions or limitations.  Old Operator is in material compliance with the conditions of participation or requirements applicable with respect to such participation and is eligible for payment under the applicable Government Reimbursement Programs in which the Facility participates for services rendered to qualified beneficiaries.  There are no pending actions or claims or, to the best of Old Operator's knowledge, any threatened actions or claims, which, if adversely determined, could materially and adversely affect such certification.  Old Operator has not received any notice from DOH, CMS or any other governmental agency requiring the correction of any condition with respect to such certification which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of such certification is in jeopardy.  Old Operator represents and warrants that it shall promptly comply with any violation notices concerning the Facility received after the Effective Date and before the Closing Date to the extent that any such notice requires compliance activities.  Without limiting the generality of, the foregoing, during the three-year period prior to the Closing Date, except as set forth in Schedule 18.h, Old Operator has not received any of the following with respect to the Facility:

     i.     A notice of violations with a scope and severity level of "F" or higher;

     ii.     A notice of termination of the license issued by DOH to operate the Facility as a two hundred (200) bed skilled nursing facility;

     iii.     A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

     iv.     A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

     v.     A notice of a material Life Safety Code deficiency cited by CMS, DOH or state or local building, fire safety or health authorities that have not been corrected as of the Effective Date;

     vi.     A notice that the Facility will be subject to a rate reduction for Medicaid or Medicare services provided therein as a result of a Medicare or Medicaid audit; and

     vii.     A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

     i.     Cost Reports; Audits.  Old Operator has filed, or will file, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed pursuant to Titles XVIII and XIX of the Social Security Act prior to the Effective Date with respect to the Facility.  All such reports have been or will be prepared and filed in good faith and in all material respects in accordance with all applicable laws, rules and regulations.  All amounts shown as due from the Facility in the cost reports either were remitted with such cost reports or will be remitted when required by applicable law and are appropriately reflected in the Financial Statements, and all amounts shown in the Notices of Program Reimbursement as due have been, or prior to the Closing will be, paid when required by applicable law.  Old Operator has been audited by the Medicaid program for all fiscal periods through December 31, 2022.  The status of the pending Medicare and Medicaid audits are attached as Schedule 18.i.  Except as set forth in Schedule 18.i, there are no (A) current, pending or outstanding government reimbursement program audits or appeals, (B) cost reports that are subject to audits, (C) cost reports that remain "open" or unsettled, and (D) current or pending government reimbursement program or private program recoupment

4930-4874-6496, v. 4

efforts (other than those conducted in the ordinary course), in each case with respect to the Facility. Old Operator has not, during the last two (2) years, received written notice of any dispute or claim by any governmental authority, fiscal intermediary or other person regarding the Facility and the government reimbursement programs or the participation by the Facility in such programs that have not been cured, and to Old Operator's knowledge, there are no (1) threatened recoupment claims for services provided by the Business, or (2) threatened suspensions, terminations, or restrictions to any contracts with Government Reimbursement Programs and/or their fiscal intermediaries or paying agents.

j.      Compliance with Applicable Laws.

i.      Old Operator is in compliance (without waivers) and as of the Closing Date will be in compliance (without waivers) with all applicable municipal, county, state and federal laws, regulations, ordinances, standards and orders, including all health, building, fire and zoning ordinances and life safety codes and the Americans with Disabilities Act, as the same may be amended.

ii.     The Property has been and is presently used and operated in compliance in all material respects with, and in no material way violates any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Property or any part thereof, including the Nursing Home Act, Environmental Laws, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits.

iii.    Old Operator has not received written notice of any claim, requirement or demand of any licensing or certifying agency supervising or having authority over Old Operator or otherwise to rework or redesign the Facility so as to conform to or comply with any existing law, code or standard which has not been fully satisfied prior to the Effective Date or which will not be satisfied prior to the Closing Date.

iv.     All billing practices of Old Operator to all third party payors, including the Medicare and Medicaid programs and private insurance companies, have been in compliance with all applicable laws, regulations and policies of such third party payors and the Medicaid and Medicare programs.

k.      Life Care Contracts.  No Facility is party to any life care contract with respect to any resident of the Facility.

l.      Personal Property and Residents.  Unless specifically permitted pursuant to the terms of this Agreement, Old Operator shall not remove any items of Personal Property from the Facility nor shall it transfer residents from the Facility to a skilled care nursing home facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Seller and/or Old Operator.  The information set forth in the admission agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls, and there are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the Facility.

m.      Personal Needs Allowance.  Old Operator is currently in material compliance with all state and federal regulations relating to maintaining and accounting for the personal needs

22

allowance ("PNA") for residents who request the establishment of a PNA account. Except as set forth in Schedule 18.m, Old Operator has no knowledge of and has not received any notice from any governmental authority citing or alleging any violation by Old Operator or the Facility of any state or federal PNA regulations.

n. Furniture. There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility's license. Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by DOH.

o. Supplies. Each and every item constituting the Supplies has been purchased by Old Operator and is owned by Old Operator free and clear of claims of all other parties. Such supplies are sufficient in quantity for the proper conduct and operation of the (A) Facility as a skilled care nursing home facility for at least that number of residents residing at the Facility as of the Closing Date in substantial compliance with all applicable laws, including the minimum standards of DOH and in an amount sufficient to last not less than two (2) weeks.

p. Accounts Receivables. There are no encumbrances or liens against Old Operator's accounts receivables, provider agreements, bank accounts or licenses, and to the extent there are such liens extant, the obligations they secure will be paid in full at Closing and the liens on such assets will be released at Closing.

q. Employees.

i. Old Operator maintains an Employment Eligibility Form on Form I-9 for each employee currently employed by it in the United States in accordance with applicable law.

ii. All employees of Old Operator are employed at-will, and may be terminated at any time with or without notice and for any reason or no reason at all, without material cost or penalty to Old Operator.

iii. Except with respect to transactions contemplated by this Agreement, Old Operator has not implemented any employee layoffs that could implicate the WARN Act or any similar applicable foreign, state or local law, and no such events are currently planned, anticipated or announced and, to Old Operator's knowledge, no officer or executive of Old Operator (A) has any present intention to terminate his or her employment prior to the one (1) year anniversary of the Closing, or (B) is a party to any confidentiality, non-competition, proprietary rights or other such agreement that would materially restrict the performance of such employee's employment duties, or the ability of Old Operator to conduct its business.

r. Independent Contractors. All workers directly engaged by Old Operator (excluding any engagement through a staffing agency) and classified by Old Operator as independent contractors, have in good faith satisfied the requirements of applicable law to be so classified, and Old Operator has in good faith fully and accurately reported each such person's compensation on IRS Forms 1099 during such period when required to do so.

s. Old Operator's Vacation and Holiday Pay Expenses. Schedule 10.c contains a complete and accurate list of Old Operator's Vacation and Holiday Pay Expenses, and except as provided in Schedule 10.c, as of the Closing Date, Old Operator has no outstanding obligations with respect to vacation and holiday pay to any of the Retained Employees.

23

4930-4874-6496, v. 4

t.    Labor Unions.  Old Operator is a party to that certain collective bargaining agreement ("CBA") of the Facility between Old Operator, and UFCW Local 312 (the "Union"). The CBA is the only collective bargaining agreement to which Seller or Old Operator is a party and the Union is the sole collective bargaining representative of Seller's or Old Operator's employees.  Except for the CBA, no Current Employee is presently a member of a collective bargaining unit and there are no threatened in writing or, to the knowledge of Old Operator, contemplated attempts to organize for collective bargaining or joint negotiation purposes any of the Current Employees.  There are no unremedied or outstanding unfair labor practice charges, unlawful practices, unlawful occupational safety practices or any charges, complaints or actions alleging a violation of any local, city, state or federal discrimination safety or employment-related law, statute or regulation, in each case, that would be material to the Facility.  Neither Old Operator nor the Facility has experienced any strikes, disruptions, labor disputes or other work-stoppages, and Old Operator has complied with all legal requirements relating to the employment of personnel and labor, payment of wages and other amounts, occupational safety, plant closing, layoffs, collective bargaining and federal contracting, and has withheld all amounts required by statute, regulation or agreement to be withheld from wages, salaries or other compensation of employees. Old Operator acknowledges that New Operator is expressly not assuming any of (i) the CBA and (ii) and any Union-related rights or obligations, including any obligations related to the Fund (as defined in the CBA) or any other pension-related obligations, including any withdrawal liability (collectively, "Pension Liability"), and the CBA and all such rights and obligations shall be retained by Old Operator as Rejected Contracts and rights and obligations of Old Operator, as applicable. Old Operator shall pay any Pension Liability when due.

u.    Multi-Employer Plans.  Except for the multi-employer plan sponsored by the Union, Old Operator does not, and is not required to, contribute to a multi-employer plan, as defined in ERISA.

v.    Employee Benefit Plans.  Except as provided in Schedule 18.v:

i.    Old Operator does not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

ii.    Old Operator does not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section 414(i) of the Internal Revenue Code of 1986, as amended (the "Code"));

iii.    Old Operator does not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

iv.    Old Operator does not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

v.    Old Operator has not entered into, nor has Old Operator established or maintained, any change-in-control or severance agreements or plans.

w.    Environmental Condition.  Old Operator has not generated, stored or disposed of any Hazardous Substances on the Facility or the Property, and Old Operator does not have any knowledge of any previous or present generation, storage, disposal or existence of any Hazardous Substance or hazardous waste on the Facility or the Property, except in such quantities that is customary in the operation of skilled care and in all events in compliance with all Environmental Laws.

4930-4874-6496, v. 4

x.      Status of Residents.      All of the residents at the Facility have full legal status as citizens of the United States of America.

y.      Taxes.  Old Operator has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns and all other taxes and governmental charges with respect to the Facility.

z.      Insurability.  Old Operator has not received any written notice or request from any insurance company or underwriters setting forth any defects in the Property which might affect the insurability thereof, requesting the performance of any work or alteration of the Property or setting forth any defect or inadequacy in Old Operator's operation of the Property which would materially and adversely affect the ability of New Operator to insure the Facility following Closing.

aa.      Special Assessments.  There are no (i) pending or threatened special assessments affecting the Property or (ii) any contemplated improvements affecting the Property that may result in special assessments affecting the Property.  There are no tax abatements, phase-ins or exemptions affecting the Property.

bb.      Personal Property; Liens.  All of the Personal Property is located at or on the Property and will be transferred to New Operator pursuant to this Agreement.  Such Personal Property is sufficient to operate the Facility in the manner conducted by Old Operator as of the date hereof and as of the Closing Date.  All of the assets necessary to operate the Facility are owned by Old Seller or Operator and shall be conveyed to Purchaser or New Operator pursuant to this Agreement and the APA.  The Property is free and clear of all liens, claims and encumbrances caused or created by Old Operator or its employees or agents.

cc.      Leases.  Other than the (i) lease dated as of March 23, 2009 (including any amendments), by and between Seller and Old Operator (the "Existing Lease"), which has been provided to New Operator and which Old Operator covenants and agrees to terminate as of the APA Closing and, at such time, and (ii) Lease which shall be, at New Operator's election, terminated or assigned to New Operator as of the Closing, there are not currently, and as of the Closing Date there shall not be, any occupancy rights (written or oral), leases or tenancies presently affecting the Facility and the portion of the Property on which it is located, except for any occupancy rights of then existing residents of the Facility. Notwithstanding the foregoing, the Purchaser has agreed to assume that certain sublease with Merrick Dialysis LLC as provided for in the APA.

dd.      Permits.  Old Operator currently maintains in good standing and full force all of the material certificates, licenses and permits from all applicable governmental authorities in connection with the ownership, use, occupancy, operation and maintenance of the Property and the Facility as necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

ee.      Financial Materials.      Old Operator has provided to New Operator true and correct copies of the Financial Statements (as defined in the APA).  The Financial Statements (i) have been prepared in strict accordance with the books and records of Old Operator, (ii) present fairly and accurately, and do not in any respect distort, the financial condition of Old Operator and the Facility as of the date of the applicable balance sheet, (iii) present fairly and accurately, and do not in any respect distort, the results of operations of the Facility for the period covered by such statement, and (iv) have been prepared on the same basis as the Facility's prior financial statements. Except as set forth on the most recent Financial Statements or as disclosed in Schedule 18.ee, there

4930-4874-6496, v. 4

are no liabilities, debts, claims or obligations related to the operation of the Facility by Old Operator prior to the Closing Date, whether accrued, absolute, contingent or otherwise, whether due or to become due, that would reasonably be expected to be asserted against New Operator or Purchaser, and/or the Facility following the Closing Date.

ff.     Anti-Kickback Compliance. Old Operator has complied with and is currently in compliance with all federal and state laws and regulations with respect to illegal kickbacks, referral fees, or payment arrangements, including the federal anti-kickback statute, with respect to ownership and operation of the Facility.  No payment has been made by or on behalf of the Old Operator with the understanding that any part of such payment is to be used for any purpose other than that described in the documents supporting such payment, and neither Old Operator or any director, officer, employee, or agent of Old Operator, or any other person associated with or acting for or on behalf of, Old Operator has, directly or indirectly, made or received any illegal contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to or from any person, private or public, regardless of form, whether in money, property or services, to obtain or induce any patient referrals, purchases, orders or under any federal, state, or commercial health care program that violates federal or state law, including the federal anti-kickback statute.

gg.     Material Adverse Effect.   Since April 1, 2023, other than as set forth on Schedule 18.gg there has not existed any state of facts, condition, change, development, circumstance, event or effect (a "Material Adverse Effect") that, alone or in the aggregate, has, or could reasonably be expected to have, a material adverse effect on the results of operations, prospects or the condition (financial or otherwise), of Seller, Old Operator, the Property or the Facility, including (i) any decrease in the census of the Facility below ninety-two and one half percent (92.5%) of the occupancy level of the Facility as of the Effective Date that continues below such ninety-two and one half percent (92.5%) threshold for fifteen (15) days (and is cured with admissions of residents in a manner consistent with past admissions standards and practices of the Facility (including with respect to payor type and ability to pay)), (ii) the loss of any licensure, certification, or other permit necessary to operate the Facility as a skilled nursing facility, (3) the designation of the Facility as a Special Focus Facility ("SFF") as defined by the Centers for Medicare and Medicaid Services Special Focus Nursing Home Facility Program or the placement of the Facility on the SFF watch list, (4) the decertification of Old Operator, Seller or the Facility from or with respect to participation under Medicare, Medicaid or any other governmental health care program, including being suspended or limited from, or otherwise deemed ineligible for, or having any denial of payment or admissions or other limitation imposed with respect to, whether permanently or temporarily, participation in the Medicare or Medicaid reimbursement program, (5) the issuance of a level "I" or higher survey deficiency, and (6) the identification of any deficiencies as a result of a survey that have not been cured and deemed to be in compliance by the applicable governmental entity within forty-five (45) days after the date of the survey during which such deficiency was first identified.

hh.     Stimulus Funds.  Schedule 18.hh sets forth all amounts that Old Operator or the Facility has received with respect to any of the following (collectively, "Stimulus Funds"): (i) any grants or loan proceeds pursuant to the Paycheck Protection Program under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), (ii) any loan proceeds or funds offered by the U.S. Small Business Administration under its Economic Injury Disaster Loan assistance program, (iii) accelerated Medicare payments under the expanded Accelerated and Advance Payments Program from Centers for Medicare & Medicaid Service or otherwise ("Accelerated Medicare Payments") and (iv) any employer payroll tax deferral afforded by Section 2302 of the CARES Act ("Payroll Tax Deferrals").  Old Operator and the Facility have complied with all applicable legal, regulatory and other requirements related to the Stimulus Funds.  Schedule 18.hh

4930-4874-6496, v. 4

is true, accurate and complete in all respects, and Old Operator shall update <u>Schedule 18.hh</u> prior to Closing.

ii. <u>Accuracy of Representations and Warranties of Old Operator</u>. No representation or warranty by Old Operator contained in this Agreement and no statement by Old Operator in any certificate, list, exhibit or other instrument, including the due diligence materials and financial statements (except for those prepared by a third party, which to Old Operator's knowledge are true and complete), furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement, or omits or will omit to state any fact which is necessary in order to make the statement of material fact contained therein, in light of the circumstances under which they are made, not misleading in any material respect.

jj. <u>Survival of Representations and Warranties of Old Operator</u>. Each representation and warranty of Old Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date. Each representation and warranty of New Operator hereunder shall survive in accordance with <u>Section 16.e</u> and <u>Section 16.f</u>.

19. NON-COMPETE AND NON-SOLICITATION.

a. Neither Old Operator nor any of its affiliates or principals shall knowingly and intentionally solicit any residents of the Facility for a period commencing on the earlier of the effective date of the ASA and the Closing Date and ending on the date that is twelve (12) months following the Closing. Old Operator acknowledges that if there is a violation of any provision of this <u>Section 19.a</u>, then Old Operator shall pay to New Operator an amount equal to fifty thousand dollars ($50,000.00) as liquidated damages, for each such resident. The Parties acknowledge and agree that actual damages with respect to the foregoing would be difficult to ascertain and that fifty thousand dollars ($50,000.00) is a fair and reasonable approximation of such actual damages. This provision shall not in any way limit such other remedies as may be available to New Operator hereunder or at law or in equity. Old Operator further acknowledges that the scope and duration of the provisions of this <u>Section 19.a</u> are reasonable.

b. Except with respect to the Facility prior to Closing and as set forth in <u>Schedule 19.b</u> neither Old Operator nor any of its affiliates or principals, for a period commencing on the earlier of the effective date of the ASA and the Closing Date and ending on the date that is twelve (12) months following the Closing, will not, own, operate, develop, manage or consult a skilled nursing home or otherwise operate, own, develop, manage or consult with an entity or business involved with skilled nursing care within a ten (10) mile radius of the Facility. Old Operator acknowledges that a violation of any provision of this <u>Section 19.b</u> will result in substantial and irreparable damage to the New Operator for which the New Operator will not have an adequate remedy at law and for which money damages would not be a sufficient remedy, and Old Operator agrees that, in addition to all other remedies, in the event of any violation or alleged or threatened violation of any of the provisions of this <u>Section 19.b</u>, New Operator shall be entitled to equitable relief, including temporary or permanent injunctive relief and specific performance, in each case without being required to prove irreparable harm or damages, post a bond or otherwise provide security. This provision shall not in any way limit such other remedies as may be available to New Operator hereunder or at law or in equity. Old Operator further acknowledges that the scope and duration of the provisions of this <u>Section 19.b</u> are reasonable.

20. INFORMATION SYSTEMS.

<div align="center">27</div>

a.     Without limitation of <u>Section 12</u>, Old Operator shall use reasonable efforts to permit transfer of current data in fully operational form for use in New Operator's computer applications. Old Operator further agrees that in order to assist New Operator in ensuring the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility, Old Operator shall, for a period of no longer than ninety (90) days after the Closing Date, provide New Operator access to Old Operator's electronic medical records system to enable New Operator, at its expense, to print the medical treatment records and physician orders for each resident as of the Closing Date that was a resident as of the period between and including the Closing Date and the date that is eighteen (18) months prior to the Closing Date, and cooperate with New Operator regarding the delivery of all such records to New Operator, in electronic form (including the provision to New Operator of the last eighteen (18) months of MDS (Minimum Data Set) history in the format submitted to CMS by Old Operator), in order to enable New Operator to obtain the necessary copies of such medical records and physician orders.

b.     Prior to the Closing, Old Operator shall provide New Operator and its representatives with access to the Facility so that New Operator can install lines necessary for computer hardware, together with servers, computer hardware and software.  In addition, Old Operator shall cooperate with New Operator and provide New Operator with such assistance as New Operator may reasonably request in order to provide for an orderly, efficient and safe transition of the operations from Old Operator to New Operator and the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility.  During such time as Old Operator provides New Operator with access to the Facility under this <u>Section 20.b</u>, New Operator shall not connect with or hook into Old Operator's computer lines or computers.  Such access shall be prescheduled with Old Operator and shall not interrupt normal business operation.  New Operator shall indemnify Old Operator for any damage resulting from such access. If, for any reason, this Agreement terminates prior to the Closing Date, Old Operator shall remove any lines installed, at New Operator's cost and expense, and New Operator shall remit payment to Old Operator within five (5) days of receiving an invoice for such costs and expenses of removal.

c.     Upon reasonable request by New Operator for the purpose of resident care, Old Operator agrees to provide New Operator with printed copies of such files, charts and other information in Old Operator's control and possession or control relating to those residents who previously occupied the Facility for the period between and including the Closing Date and the date that is three (3) years prior to the Closing Date (including, but not limited to, all patient records, medical records, therapy records, pharmacy records, clinical records, and Resident Trust Funds records).

d.     Old Operator shall, at no cost to New Operator, (i) use reasonable efforts to provide to New Operator, upon its request, any pre-Closing Date Facility information technology vendor contact information, (ii) transfer Facility-specific web domains that were used by Old Operator in connection with its operation of the Facility, and (iv) use reasonable efforts to make accessible to New Operator during regular business hours any data or records relating to the past operation of the Facility which are held or stored offsite, to the extent necessary in order to facilitate New Operator's operation of the Facility after the Closing Date in compliance with applicable laws.

e.     Old Operator agrees to arrange for current e-mail addresses of the Facility and its on-site staff to be forwarded to New Operator's new e-mail addresses for a period of ninety (90) days following Closing.

4930-4874-6496, v. 4

21.	COVENANTS.

a.	Effective from and after the Closing Date, Old Operator shall obtain and pay the cost of an extended term or "tail" policy of professional liability insurance for a coverage period of four (4) years after the Closing Date, with respect to any professional liability coverage which is written on a "claims-made" rather than "occurrence" basis for Old Operator's operations at the Facility.  Upon request of New Operator, Old Operator shall furnish evidence of such insurance coverage.

b.	At any time and from time to time after Closing, each Party shall, upon request of another Party, execute, acknowledge and deliver all such further and other assurances and documents, and shall take such action consistent with the terms of this Agreement, as may be reasonably requested to carry out the transactions contemplated herein and to permit each Party to enjoy its rights and benefits hereunder.

c.	Any Stimulus Funds received by Old Operator or the Facility (i) prior to APA Closing, shall remain with Old Operator, and (ii) on or after the date of the APA Closing, shall be immediately delivered to New Operator. From and after the date of the APA Closing, Old Operator shall cooperate with New Operator to enable New Operator to obtain any available Stimulus Funds.

22.	NO JOINT VENTURE.  Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties with respect to the subject matter hereof.  The Parties do not intend that any third party shall have any rights under this Agreement.

23.	EVENTS OF DEFAULT; REMEDIES.  Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by any Party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within five (5) business days of the earlier of such Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity, provided, however, that if a non-monetary breach is not reasonably capable of being cured within such five (5) business day period but the Defaulting Party promptly commences to cure within such period, within such period notifies the Non-Defaulting Party in writing of the commencement of such cure, and thereafter diligently pursues such cure to conclusion and successfully completes such cure within thirty (30) calendar days of its first receipt of notice of such breach or violation, it shall not be an Event of Default hereunder.  The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief.  The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party.

24.	Choice of Law.  THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF NEW JERSEY AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS WITHOUT REGARD TO ITS CONFLICT OF LAW PRINCIPLES THAT WOULD CAUSE THE LAWS OF ANY OTHER STATE TO APPLY.

4930-4874-6496, v. 4

25.     Jurisdiction; Venue.  ANY DISPUTES CONCERNING THIS AGREEMENT MAY BE BROUGHT BEFORE ANY COURT HAVING SITUS IN THE STATE OF NEW JERSEY.  EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID COUNTY AND STATE.  TO THE EXTENT LEGALLY WAIVABLE, EACH OF THE PARTIES HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.  THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.  THE PARTIES HEREBY WAIVE ANY RIGHT THEY MAY HAVE A TO A TRIAL BY JURY.

26.     ATTORNEYS' FEES IN THE EVENT OF DISPUTE.  In the event any dispute between the parties hereto that results in arbitration or litigation (including any enforcement action of an arbitration award or any action to compel arbitration or change venue), the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, reasonable attorneys' fees.

27.     DEFINITIONS.  For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

a.      *"Contracts"* shall mean all contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which the Old Operator or its predecessors or agents is a party and which relate to the Facility and the operations thereof.

b.      *"Environmental Laws"* shall mean all federal, state and local environmental, health, or safety laws or regulations now or hereafter enacted.

c.      *"Hazardous Substances"* shall mean any toxic or hazardous waste or pollutants, or substances, including asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances " or "Toxic Substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") as amended, 42 U.S.C. § 9601, et seq., "Hazardous Materials" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., "Hazardous Waste" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061, et seq., any "Toxic Pollutant" under the Clean Water Act, 33 U.S.C. §1251, et seq., as amended, any "Hazardous Air Pollutant" under the Clean Air Act, 42 U.S.C. § 7401, et seq., and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws.

d.      *"Supplies"* shall mean the food, central supplies, linens and housekeeping supplies and other consumable and non-consumable inventory present at the Facility as of the Closing Date and any other property of Old Operator used in connection with the operation of the Facility.

28.     GENERAL PROVISIONS.

a.      Until the APA Closing, this Agreement is hereby explicitly cross-defaulted with

30

4930-4874-6496, v. 4

the APA and any default or breach by (i) New Operator hereunder shall be a default by Purchaser under the APA, (ii) Purchaser under the APA shall be a default by New Operator hereunder, (iii) Old Operator hereunder shall be a default by Seller under the APA and (iv) Seller under the APA shall be a default by Old Operator hereunder.  This Agreement shall terminate in the event that the APA is terminated in accordance with its terms prior to the APA Closing.

b.       If, with the consent of the Parties, any exhibits or schedules are not completed or attached hereto as of the date of this Agreement, the Parties agree to attach such exhibits and schedules as soon as reasonably practicable, but in any event, this Agreement is subject to New Operator approving all exhibits and schedules or subsequent updates thereto within seven (7) days of submission thereof to New Operator.  Subject to the immediately preceding sentence, the Parties agree that the Party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

c.       Each Party agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date.  Each Party agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.  Each Party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

d.       Old Operator shall file and submit the Old Operator portion of New Operator's CMS Form 855A prior to Closing, as soon as practicable upon New Operator's request.

e.       All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (b) on the third (3rd) business day next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (c) upon recipient's confirmation of the receipt by email transmission (followed by delivery by one of the other means identified in (a)-(b)), addressed as follows:

| | |
|---|---|
| if to Old Operator: | Merwick Care & Rehabilitation Center, LLC |
| | 100 McClellan Street |
| | Norwood NJ 07648 |
| | Attn: Michael Jacobs |
| | Joshua Jacobs |
| | Email:  mjacobs@windsorhc.com |
| | jjacobs@windsorhc.com |
| | |
| with copies to: | Baker, Donelson, Bearman, Caldwell & Berkowitz PC |
| | 1900 Republic Centre |
| | 633 Chestnut Street |
| | Chattanooga, TN 37450 |
| | Attn: Craig A. Penny, Esq. |
| | Email: cpenny@bakerdonelson.com |

31

if to New Operator:          c/o Peace Capital LLC
                             229 NJ-70
                             Toms River, New Jersey 08755
                             Attn:   Sam Stein
                                     Raffi Klugman
                             Email:  sam@peacecap.com
                                     rklugman@peacecap.com

with a copy to:              Jacobowitz Newman Tversky LLP
                             2361 Nostrand Avenue, Suite 902
                             Brooklyn, NY 11210
                             Attn:   Mordechai Biegeleisen, Esq.
                             Email:  mbiegeleisen@jntllp.com

A Party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

f.      Each Party shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

g.      This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

h.      This Agreement may not be modified or amended except in writing signed by the Parties.

i.      No waiver of any term, provision or condition of this Agreement, in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

j.      This Agreement shall bind and inure to the benefit of the respective heirs, executors, administrators, personal representatives, successors and permitted assigns of the parties hereto; provided, however, that neither Party shall assign this Agreement without the prior written consent of the other Party. Notwithstanding the foregoing, however, any New Operator may assign its rights under this Agreement to an affiliated or related entity or entities. Any assignment not permitted hereunder and undertaken without such prior written consent shall be deemed null and void. Notwithstanding anything in this Agreement to the contrary, in the event that New Operator is unable to obtain the Regulatory Approvals on or prior to the one-year anniversary of the date hereof, New Operator may assign this Agreement to any entity that agrees to be bound by New

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 135 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP    Doc 15-8   Filed 06/16/26   Entered 06/16/26 11:35:07   Desc
Exhibit 6 - Exhibit B of Renewal 2 Page 79 135 of 202

Operator's obligations hereunder.

k. Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

l. All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

m. This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement. Signatures sent by telecopy or electronic mail transmissions shall constitute originals.

n. All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

o. The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made a part hereof as if fully set forth herein.

p. All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" and "including" shall mean "including without limitation".

q. If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

r. If the last day provided for in this Agreement for a Party to take a particular action or deliver a particular notice is a Saturday, Sunday or day on which the banking institutions in the State of New Jersey are not open for business, such last day shall be extended until the next day that is not a Saturday, Sunday or day on which the banking institutions in the State of New Jersey are not open for business.

s. Each Party has been represented by counsel of its choosing in the preparation of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

*[Signature page follows]*

33

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 136 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Notice of Renewal 3 Page 136 of 202

**IN WITNESS** WHEREOF, each of Old Operator and New Operator have caused this Operations Transfer Agreement to be executed as of the date first above written.

<div style="margin-left:50%">

**OLD OPERATOR:**

MERWICK CARE & REHABILITATION CENTER, LLC

DocuSigned by:

By: *Joshua Jacobs*

9F8CF9124DFE43E...

Name: Joshua Jacobs

Title: Authorized Representative

**NEW OPERATOR:**

MERWICK HEALTHCARE AND REHAB CENTER LLC

By: _____

Name: Shalom Stein

Title:  Authorized Signatory

</div>

1

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 137 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Notice of Renewal   Page 114   Page 137 of 202

**IN WITNESS** WHEREOF, each of Old Operator and New Operator have caused this Operations Transfer Agreement to be executed as of the date first above written.

**OLD OPERATOR:**

MERWICK CARE & REHABILITATION CENTER, LLC

By: _____
Name: Joshua Jacobs
Title: Authorized Representative

**NEW OPERATOR:**
MERWICK HEALTHCARE AND REHAB CENTER LLC

By: _____
Name: Shalom Stein
Title: Authorized Signatory

1

4930-4874-6496, v. 4

Exhibit A
FORM OF GENERAL ASSIGNMENT

THIS **GENERAL ASSIGNMENT** (this "Assignment"), is made as of the ___ day of _____ 202_, by Merwick Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Assignor"), to Merwick Healthcare and Rehab Center LLC, a New Jersey limited liability company ("Assignee").

W I T N E S S E T H :

**WHEREAS**, by Operations Transfer Agreement (the "OTA"), dated as of [●], 2024, by and among Assignor and Assignee, Assignor agreed to sell to Assignee certain personal property and such other assets, as more fully described in the OTA (the "Transferred Assets") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, the Permits, the Patient Trust Funds and Property, the Warranties, the Assumed Contracts, the resident contracts and agreements and such other items applicable to the Transferred Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agree as follows:

1.      **Transfer of Permits**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the Permits.

2.      **Transfer of Warranties**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the Warranties.

3.      **Transfer of Patient Trust Funds and Property**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Patient Trust Funds and Property.

4.      **Contracts**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Assumed Contracts, as well as all contracts and agreements with residents of the Facility.

5.      **Assumption**.  Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, and 4 hereof, provided, that such assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

6.      **Miscellaneous**.  This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of New Jersey and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  The provisions of Section 28 (Miscellaneous) of the OTA shall apply to this Assignment mutatis mutandis.

4930-4874-6496, v. 4

(*Signature page follows*)

4930-4874-6496, v. 4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 140 of 202   Trans ID: LCV20261440701

Case 26-012399-WFP   Doc 15-8   Filed 06/19/26   Entered 06/19/26 13:55:07   Desc
Exhibit 6 - Notice of Renewal 7 Page 140 of 202

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this General Assignment as of the day and year first above written.

<div style="margin-left:50%">

**ASSIGNOR:**
MERWICK CARE & REHABILITATION CENTER, LLC


By: _____

      Name:  Hyman Jacobs
      Title:  Manager


**ASSIGNEE:**
MERWICK HEALTHCARE AND REHAB CENTER LLC


By: _____

      Name:
      Title:

</div>

4930-4874-6496, v. 4

Exhibit B
FORM OF BILL OF SALE

Merwick Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Old Operator"), in accordance with that certain Operations Transfer Agreement (the "OTA"), dated as of [●], 2024, by and among Old Operator and Merwick Healthcare and Rehab Center LLC, a New Jersey limited liability company ("New Operator") and in consideration of Ten and No/100 Dollars ($10.00) paid by New Operator to Old Operator, receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to, all of its right, title and interest in and to the following described personal property, to-wit:

All of the (i) Personal Property (as defined in the OTA) and (ii) Supplies (as defined in the OTA) (collectively, clauses (i) and (ii), the "Transferred Property").

Old Operator hereby represents and warrants to New Operator that Old Operator is the absolute owner of the Transferred Property, that the Transferred Property is free and clear of all liens, charges and encumbrances, and that Old Operator has full right, power and authority to sell the Transferred Property and to make this Bill of Sale.

(*Signature page follows*)

4930-4874-6496, v. 4

       **IN WITNESS WHEREOF**, Old Operator has caused this Bill of Sale to be signed and sealed in its name by its officer thereunto duly authorized this ___ day of _____, 202_.

**OLD OPERATOR:**
MERWICK CARE & REHABILITATION CENTER, LLC

By: _____
      Name:  Hyman Jacobs
      Title:  Manager

**NEW OPERATOR:**
MERWICK HEALTHCARE AND REHAB CENTER LLC

By: _____
      Name:
      Title:

4930-4874-6496, v. 4

Exhibit C
SCHEDULED EMPLOYEES

Any employee with annual compensation in excess of $60,000.

To be completed pursuant to Section 28(b)

Schedule 19.b

To be completed pursuant to Section 28(b)

4930-4874-6496, v. 4

## FIRST AMENDMENT TO OPERATIONS TRANSFER AGREEMENT

**THIS FIRST AMENDMENT TO OPERATIONS TRANSFER AGREEMENT** (this "Amendment") is made and entered into as of March 19, 2025 (the "Amendment Effective Date") by and between MERWICK CARE & REHABILITATION CENTER, LLC , a New Jersey limited liability company ("Old Operator"), and MERWICK HEALTHCARE AND REHAB CENTER LLC, a New Jersey limited liability company ("New Operator"). Old Operator and New Operator are sometimes collectively referred to as the "Parties."

## RECITALS:

A.      By that certain Operations Transfer Agreement, dated December 2, 2024 (the "OTA") by and between Old Operator and New Operator, Old Operator agreed to transfer to New Operator and New Operator agreed to assume from Old Operator, the operations of that certain skilled nursing facility known as Merwick Care and Rehabilitation Center located in the State of New Jersey, as more particularly described in the OTA and subject to the terms and conditions set forth therein.

B.      Old Operator and New Operator desire to amend the OTA as more particularly set forth herein.

C.      Unless otherwise provided herein, all capitalized words and terms used in this Amendment shall have the same meanings ascribed to such words and terms as in the OTA.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      The following is added to the end of Section 10(c) of the OTA:

Notwithstanding the forgoing, as it relates to each employee of Old Operator represented by the Union who provides an Acknowledgement (as defined below; such employees, "Union Employees"), at Closing, Old Operator shall pay such Union Employee an amount equal to ninety percent (90%) of Old Operator's Vacation and Holiday Pay Expenses (which means the accrued, vested and unvested, but unpaid vacation, sick, personal and holiday pay, any other paid time off and any severance obligations with respect to such Union Employee that has accrued prior to the earlier of the Closing Date and the effective date of the ASA) as payment in full to such Union Employee. An "Acknowledgment" is a writing, signed by a Union Employee, in which he or she (i) accepts such payment as payment in full of all of the Old Operator's Vacation and Holiday Pay Expenses and (ii) agrees that New Operator and Old Operator shall have no obligations as it relates Old Operator's obligations to such Union Employee. This payment shall be made no later than the first payroll date following the Closing. Old Operator hereby indemnifies and holds New Operator Parties harmless for any Old Operator's Vacation and Holiday Pay Expenses to the extent the amount paid to the Union Employees was less than the amount required to be paid, for any discrepancies in the Old Operator's Vacation and Holiday Pay Expenses and for all other amounts related to or owed to such Union Employees, including on account of

any and all other liabilities and obligations with regard to any of the Union Employees that shall have accrued prior to the Closing Date. New Operator indemnifies and holds Old Operator harmless for any claims by any Union Employees that make a claim for more than ninety percent (90%) of the Old Operator's Vacation and Holiday Pay Expenses owed to such Union Employee.  Amounts paid to Union Employees pursuant to this Section 10(c) shall be deducted from the credit otherwise payable to New Operator under this Section 10(c).

Draft acknowledgement language to be included in the Union Employee offer letter is as follows:

> The seller has agreed to pay out any accrued paid time off (including vacation/sick/holiday/personal/extended illness, etc.) at 90% of its value as payment in full. You will be receiving this as a lump sum together with the final pay that is issued from the seller. You agree that in exchange for this sum, you release seller and new operator of all liabilities arising from those paid time off obligations. The new operator will not be carrying over any of those vested or unvested vacation, sick time, holiday time, personal time, extended illness time, or any other paid time off, etc. from the old company.  For the first six months of employment, employees will be eligible to borrow PTO up to a maximum of five (5) days upon execution of the appropriate documentation.

2.    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Amendment may be delivered by facsimile or electronic transmission and facsimile or electronically transmitted signatures shall have the same force and effect as originals.

3.    Except as amended hereby, the OTA shall remain in full force and effect. This Amendment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns under the OTA.

4.     In the event that any of the terms of this Amendment shall be inconsistent with or contradict the terms of the OTA, as heretofore amended, the terms of this Amendment shall control.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

MERWICK CARE & REHABILITATION CENTER, LLC

By:_____
Name: Joshua Jacobs
Title: Authorized Representative

**NEW OPERATOR:**

 MERWICK HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Shalom Stein
Title: Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned have duly executed this Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

MERWICK CARE & REHABILITATION CENTER, LLC

By:_____
Name: Joshua Jacobs
Title: Authorized Representative

**NEW OPERATOR:**

 MERWICK HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Shalom Stein
Title: Authorized Signatory

## SECOND AMENDMENT TO OPERATIONS TRANSFER AGREEMENT

**THIS SECOND AMENDMENT TO OPERATIONS TRANSFER AGREEMENT** (this "Amendment") is made and entered into as of April 1, 2025 (the "Amendment Effective Date") by and between MERWICK CARE & REHABILITATION CENTER, LLC , a New Jersey limited liability company ("Old Operator"), and MERWICK HEALTHCARE AND REHAB CENTER LLC, a New Jersey limited liability company ("New Operator"). Old Operator and New Operator are sometimes collectively referred to as the "Parties."

## RECITALS:

A.      By that certain Operations Transfer Agreement, dated December 2, 2024 (the "OTA") by and between Old Operator and New Operator, Old Operator agreed to transfer to New Operator and New Operator agreed to assume from Old Operator, the operations of that certain skilled nursing facility known as Merwick Care and Rehabilitation Center located in the State of New Jersey, as more particularly described in the OTA and subject to the terms and conditions set forth therein.

B.      On March 19, 2025 Old Operator and New Operator executed the First Amendment to Operations Transfer Agreement (the First Amendment") pursuant to which the PTO for the Union Employees are to be paid out by the Old Operator.

C.      Old Operator and New Operator desire to further amend the OTA to (i) provide for the Old Operator to pay out the Old Operator's Vacation and Holiday Pay Expenses to all of the Retained Employees who are not members of the Union (the "Non-Union Employees"), and (ii) modify the tail insurance requirements set out in the OTA, as more particularly set forth herein.

D.      Unless otherwise provided herein, all capitalized words and terms used in this Amendment shall have the same meanings ascribed to such words and terms as in the OTA.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      The following is added to the end of Section 10(c) of the OTA (following the new provisions related to the Union Employees as set forth in the First Amendment:

> Furthermore, notwithstanding the forgoing portion of Section 10(c) set forth in the original OTA, at Closing, Old Operator shall pay to all of the Non-Union Employees an amount equal to ninety percent (90%) of Old Operator's Vacation and Holiday Pay Expenses (which means the accrued, vested and unvested, but unpaid vacation, sick, personal and holiday pay, any other paid time off and any severance obligations with respect to such Non-Union Employee that has accrued prior to the earlier of the Closing Date and the effective date of the ASA) as payment in full to such Non-Union Employees and New Operator shall have no responsibility for such Old Operator's Vacation and Holiday Pay Expenses.  This payment shall be made no later than the first payroll date following the Closing.  Old Operator hereby indemnifies and holds New Operator Parties harmless for any Old Operator's Vacation and Holiday Pay Expenses

to the extent the amount paid to the Non-Union Employees was less than the amount required to be paid, for any discrepancies in the Old Operator's Vacation and Holiday Pay Expenses and for all other amounts related to or owed to such Non-Union Employees, including on account of any and all other liabilities and obligations with regard to any of the Non-Union Employees that shall have accrued prior to the Closing Date. New Operator indemnifies and holds Old Operator harmless for any claims by any Non-Union Employee that make a claim for more than ninety percent (90%) of the Old Operator's Vacation and Holiday Pay Expenses owed to such Non-Union Employee.  Amounts paid to Non-Union Employees pursuant to this Section 10(c) shall be deducted from the credit otherwise payable to New Operator under this Section 10(c).

2.    The OTA is hereby amended to reduce the period for which Old Operator must maintain a "tail" policy of professional liability insurance, by replacing the words "four (4) years" where they appear in Section 21(a) of the OTA with "three (3) years".

3.    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Amendment may be delivered by facsimile or electronic transmission and facsimile or electronically transmitted signatures shall have the same force and effect as originals.

4.    Except as amended hereby, the OTA, as amended shall remain in full force and effect. This Amendment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns under the OTA.

5.     In the event that any of the terms of this Amendment shall be inconsistent with or contradict the terms of the OTA and/or the First Amendment, as heretofore amended, the terms of this Amendment shall control.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this Second Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

MERWICK CARE & REHABILITATION CENTER, LLC

By:_____
Name: Joshua Jacobs
Title: Authorized Representative

**NEW OPERATOR:**

MERWICK HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Shalom Stein
Title: Authorized Signatory

4921-7596-7792

**IN WITNESS WHEREOF**, the undersigned have duly executed this Second Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

MERWICK CARE & REHABILITATION CENTER, LLC

By:_____
Name: Joshua Jacobs
Title: Authorized Representative

**NEW OPERATOR:**

MERWICK HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Norman Rokeach
Title: Authorized Officer

# Exhibit 2

**OPERATIONS TRANSFER AGREEMENT**

by and between

**Venetian Care & Rehabilitation Center, LLC**

a New Jersey limited liability company

"<u>Old Operator</u>"

and

**Venetian Healthcare and Rehab Center LLC**

a New Jersey limited liability company

"<u>New Operator</u>"

Dated as of: December 2, 2024

4919-5875-2000, v. 5

**OPERATIONS TRANSFER AGREEMENT**

This **OPERATIONS TRANSFER AGREEMENT** (this "Agreement") is made as of December 2, 2024 (the "Effective Date"), by and between Venetian Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Old Operator") and Venetian Healthcare and Rehab Center LLC, a New Jersey limited liability company ("New Operator"). Each of Old Operator and New Operator are sometimes referred to herein, individually as a "Party" and collectively as the "Parties".

WHEREAS, Venetian Healthcare LLC, a New Jersey limited liability company and an affiliate of Old Operator ("Seller") and Venetian Propco LLC, a New Jersey limited liability company and an affiliate of New Operator ("Purchaser") have entered into that certain Asset Purchase Agreement (the "APA"), dated as of the date hereof, pursuant to which Purchaser will purchase that certain real property (including the associated parking parcels as more fully described on Exhibit A to the APA, the "Property") improved with a one hundred eighty (180) licensed bed skilled nursing facility commonly known as "(The) Venetian Care & Rehabilitation Center" and located at 275 John T. O'Leary Blvd., South Amboy, NJ 08879 (the "Facility");

WHEREAS, Old Operator currently has the sole rights to act as operator of the Facility and wishes to assign such rights to New Operator;

WHEREAS, Old Operator currently owns certain furniture and equipment and other items of personal property, including as located on, used in connection with, the operation of the Facility (as will not be transferred from Seller to Purchaser pursuant to the APA, but not including the ERC (as defined in the APA), the "Personal Property"); and

WHEREAS, in order to ensure an orderly transition of operations of the Facility, the Parties desire to enter into this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and provisions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

1.  CLOSING.

a.  The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the first business day of the month following the day that all of the conditions to Closing set forth in Section 3 are satisfied or such other date as mutually agreed upon by the Old Operator and New Operator (such date on which the Closing occurs, the "Closing Date). New Operator shall use commercially reasonable efforts to obtain (i) all approvals that are necessary or appropriate in order for New Operator to operate the Facility under New Jersey law as a one hundred eighty (180) bed skilled nursing facility (collectively, the "License"), including a nursing home license issued by the New Jersey Department of Health ("DOH") and all other permits, consents, approvals and other assurances as are, under local custom and practice, customarily obtained by prudent and reasonable operators of skilled nursing facilities similar to the Facility acting in good faith, before such an operator takes possession of, and begins to operate, a facility similar to the Facility, and (ii) Medicare and Medicaid provider agreements, including all managed care contracts with respect to the Facility (the "Provider Agreements" and collectively, clauses (i) and (ii), the "Regulatory Approvals").

b.  License Approval. Within ten (10) business days of the conclusion of the Due Diligence Period (as defined in the APA) ("Application Submission Period"), New Operator shall

1

submit to the DOH its License application (the "Application") seeking establishment and licensure of New Operator as the operator of the Facility ("License Approval"). New Operator will diligently prosecute the Application and will timely submit all information requested by the DOH. New Operator will deliver to Old Operator (i) evidence, reasonably satisfactory to Old Operator, that the Application was submitted pursuant to this Section 1.b and during the Application Submission Period, and (ii) all material correspondence with the DOH (with such redactions as are necessary or advisable in New Operator's reasonable discretion).  New Operator will not intentionally take any action prior to the Closing Date that would reasonably be expected to disqualify New Operator as the established and licensed operator of the Facility or materially delay approval of the Application.

2.        DUE DILIGENCE; COOPERATION; INTERIM OPERATIONS OF THE FACILITY.

        a.        Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to effect an orderly transfer of the operation of the Facility. Subject to the provisions of this Agreement and provided that such access rights are not disruptive to the Facility operations and are at all times in compliance with all state and federal laws governing the rights of the residents of the Facility, upon reasonable prior notice to Old Operator and subject to any COVID-19 related State of New Jersey mandates or restrictions, New Operator and its agents, employees and contractors shall have the right to enter the Property during reasonable business hours to conduct any necessary diligence, and to, following the expiration of the Due Diligence Period, conduct interviews with employees and observe the day-to-day operations and management of the Facility.

        b.        Subject to the express provisions of the ASA (as defined in the APA) from and after the effective date thereof, from the Effective Date until the earlier of the APA Closing, the Closing Date and the date that this Agreement is terminated, Old Operator shall operate the Facility in substantially the same manner as the Facility has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with third parties and use best efforts to keep available the services of all of the Facility's employees, including but not limited to the administrators, the directors of nursing and the employees responsible for public relations and marketing.  Without limiting the generality of the foregoing, until the earlier of (i) the APA Closing, or (ii) the Closing Date, or (iii) the termination of this Agreement, Old Operator shall, unless consented to otherwise by New Operator in writing:

        i.        operate the Facility in the normal course of business consistent with past practice, diligently and in good faith, and in compliance with all applicable laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

        ii.        maintain, repair and replace where appropriate, consistent with past practice, with no less than like kind, the real and personal property, equipment, furniture and fixtures, leasehold improvements in substantially the same condition that exists on the date hereof, reasonable wear and tear excepted and subject to the requirements to repair and replace as set forth in the APA, and refrain from delaying such repair and/or replacement as a result of the pending transfer, except where such delay is consistent with past practice;

        iii.        maintain the Facility's licensure status, and Medicare and Medicaid provider agreements, in compliance with all applicable laws, rules and regulations;

2

iv.     exercise its commercially reasonable efforts to preserve Old Operator's existing relationships with suppliers, distributors, customers and others having business relations with Old Operator such that no Facility will be impaired;

v.     maintain the Facility's records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

vi.     use commercially reasonable best efforts to preserve the present residency occupancy levels of the Facility and the goodwill with all of the suppliers, residents and others having business relations with Old Operator or the Facility;

vii.     keep the Property free and clear of all liens, claims and encumbrances and promptly remove any created or caused by Old Operator or its employees or agents;

viii.     maintain all existing policies of insurance (or comparable policies) of or relating to the Facility or assets of Old Operator in full force and effect;

ix.     use its commercially reasonable best efforts maintain the quality of care to the residents of the Facility;

x.     invoice and collect revenue consistent with past practice;

xi.     take reasonable steps to safeguard, maintain and preserve all employee and medical records of the Facility transferred under this Agreement in accordance with the provisions of, and for the periods prescribed by, all applicable laws, which shall in no event be less than the steps taken by Old Operator in the operation of the Facility prior to the transactions contemplated under this Agreement;

xii.     avoid immediate jeopardy violations, maintain provider agreements without suspension, qualification or limitation or revocation, and avoid DPNAs or imposition of civil money penalties or the providing of substandard care;

xiii.     perform all of its obligations in respect of the Facility whether pursuant to any Contract, or other requirement;

xiv.     from the Effective Date through the Closing Date, cooperate with New Operator as necessary for New Operator's receipt of the Regulatory Approvals (including the License Approval); and

xv.     promptly inform New Operator in writing of any material event affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against, including any: violations related to the Facility; notice of termination of the certification issued by DOH or Centers for Medicare and Medicaid Services ("CMS") of the Facility to participate in the Medicare and/or Medicaid reimbursement programs; or notice of termination of the license issued by DOH to operate the Facility.

Notwithstanding that certain of Old Operator's requirements pursuant to this Section 2.b shall expire at the APA Closing, between the APA Closing and the Closing, Old Operator shall not actively take any action that would have been a breach of this Section 2.b prior to the APA Closing.

3

4919-5875-2000, v. 5

c.       Without limiting the effect of any other provision of this Agreement, between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Old Operator shall not do any of the following with respect to the Facility without the prior written consent of New Operator:

i.       increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any employee of the Facility except those reasonable bonuses and wage increases in the ordinary course of business consistent with past practice;

ii.       take any action which will or could reasonably be expected to cause any of the representations or warranties in this Agreement to become untrue;

iii.       decrease the private pay rates of the residents of the Facility;

iv.       sell, transfer or otherwise dispose of any of the Supplies (as defined below) except in the ordinary course of business consistent with past practice, in which event Old Operator shall replace the same with similar property of equal or greater quality, value and usefulness;

v.       enter into any contract, other than residential contracts, which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract (as hereinafter defined) which exists at present;

vi.       sell, lease, transfer, convey or otherwise dispose of (other than in the ordinary course of business consistent with past practice), or cause or permit any Exception (as defined in the APA) to exist on, any of the Purchased Assets (as defined in the APA) which will not be released at or prior to the Closing;

vii.       cancel any Assumed Contract (as defined below) or materially default in the performance of any Assumed Contract, or obligation, or waive any material default or potential material default by any other party, or waive, release, compromise, settle or assign any rights or claims under any Assumed Contract;

viii.       violate in any material respect, terminate, fail to preserve or permit the lapse of, any material license, permit or other authorization relating to the Facility as it exists on the date hereof, including the Facility's certificate of need, if any, or any provider agreements, including its provider agreements with Medicare and Medicaid, which are necessary or desirable for the operation of the Facility;

ix.       release, compromise or settle any material claim, action or legal proceeding that would result in a material adverse effect or may be construed as an obligation of New Operator, other than in the ordinary course of business consistent with past practice;

x.       enter into any transaction with any owner, officer, director, manager or affiliate of Old Operator or any of its affiliates, or any relative or affiliate of any such owner, officer, director, manager or affiliate;

xi.       remove, discharge or transfer residents from the Facility to a nursing facility owned, operated or managed by Old Operator or any of its affiliates, or voluntary

4

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 159 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Notice Of Renewal 36 Page 159 of 202

transfer any resident from the Facility to any other nursing facility, where such transfer is not in the ordinary course of business and not (A) for reasons relating to the health and well-being of the resident transferred, (B) in accordance with an election to transfer by the applicable resident or his or her family or attorney-in-fact, or (iii) otherwise required by law; or

xii.     (A) remove or relocate to any affiliate, any administrator, director of nursing or other key employee, or (B) hire any new employee except in the ordinary course of business consistent with past practice.

d.     <u>Resident Discharges for Nonpayment</u>. Notwithstanding the forgoing, prior to Closing, Old Operator shall use commercially reasonable best efforts to voluntarily discharge or transfer each resident of the Facility who has not timely paid his or her financial obligations to the applicable Facility and who owes the Facility in excess of twenty-five thousand dollars ($25,000.00) (each a "<u>Delinquent Resident</u>").  For the avoidance of doubt, the definition of Delinquent Resident shall not include residents who are awaiting approval of payment from a payor source.

e.     <u>Financing</u>.  Old Operator will reasonably cooperate with New Operator and its financing sources to enter into such agreements as are required by such financing sources.

f.     <u>Further Information</u>.  Old Operator shall (i) provide weekly census reports with respect to the Facility to New Operator, and (ii) updated year-to-date Financial Statements (as defined below) as they become available.  Old Operator hereby covenants to notify New Operator in writing of (A) the occurrence of a survey at the Facility within one (1) business day thereof (but in any case prior to the Closing Date), (B) the communications from any state and/or federal surveyor during the exit interview within two (2) business days thereof (but in any case prior to the Closing Date), and (iii) any citations or deficiencies identified in a survey report or form CMS-2567 related to the Facility within two (2) business days of the receipt thereof (but in any case prior to the Closing Date).

3.     <u>CONDITIONS PRECEDENT</u>.

a.     New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction (or waiver by New Operator) of the following conditions precedent on and as of the Closing Date:

i.     Old Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder and Seller shall have duly and timely performed all of its duties, obligations, promises, covenants and agreements under the APA, in each case, in all material respects.

ii.     Each of the representations and warranties of Old Operator contained in this Agreement shall be true and correct in all material respects as of the Effective Date, and (i) with respect to all such representations and warranties that relate to the operation of the Facility, shall be true and correct in all material respects as of the date of the APA Closing and (ii) with respect to all such representations and warranties other than those in the foregoing clause (i), shall be true and correct in all material respects as of the Closing Date, in each case, without giving effect to any materiality or similar qualifier therein, provided, however, that the conditions set forth in this Section 3(a)(ii), shall not apply where failure of the conditions to be met in clause (ii) above result from New Operator's

<div align="center">5</div>

4919-5875-2000, v. 5

or Purchaser's use and operation of the Facility on and after the APA Closing, and through no fault of Seller or Old Operator.

iii.     Old Operator shall not be in material breach of any term, provision or condition of this Agreement and Seller shall not be in material breach of any term, provision or condition of the APA.

iv.     Old Operator shall deliver to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator:

A.     A duly executed assignment by Old Operator, in substantially the form annexed hereto as Exhibit A (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i.   the Patient Trust Funds and Property (as defined herein);

ii.   all resident contracts or other agreements with residents of the Facility;

iii.  all licenses, permits, accreditations, Medicaid and Medicare contracts, and other regulatory approvals, and all rights of Old Operator under any government or non-government provider agreements or any other third party payor programs, if any, issued by any federal, state, municipal or local governmental authority relating to the use, maintenance or operation of the Facility running to, or in favor of, Old Operator, to the extent legally assignable (including all modifications thereto or renewals thereof) (the "Permits");

iv.  all guaranties or warranties then in effect, if any, with respect to the Facility and all Personal Property (the "Warranties"); and

v.   any other assets required to be assigned to New Operator pursuant to this Agreement.

B.     a duly executed Bill of Sale;

C.     a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer or member of Old Operator, dated as of the Closing Date, certifying that the conditions to New Operator's obligations contained in Section 3 have been satisfied;

D.     a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer of Old Operator, certifying the resolutions authorizing the transactions contemplated hereby, and appearing on such certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement (and all documents to be executed and delivered pursuant hereto, (the "Other Documents"));

E.     the Clearance Letter (as defined in the APA);

F.     counterpart copies of all Warranties;

6

4919-5875-2000, v. 5

G.      copies of all Permits; and

H.      a termination of the Existing Lease (as defined below), duly executed by Seller and Old Operator.

v.      As of and on the Closing Date there shall not have been imposed against Old Operator, nor shall have Old Operator received notice of (a) any civil monetary penalty ("CMP") or other federal, state or local fine and/or penalty assessed for the period prior to the APA Closing which has not been paid or remedied by Old Operator or which are reserved for by Old Operator during such time as Old Operator contests such CMP or penalties, or (b) any withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment, including but not limited to state bed tax or assessment, assessed for the period prior to the APA Closing which has not been paid or remedied by Old Operator or which are reserved for by Old Operator during such time as Old Operator contests such withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment;

vi.      On or before the Closing Date, Old Operator shall have transferred to New Operator the Patient Trust Funds and Property (as defined below) in compliance with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5;

vii.      Between the date of this Agreement and the APA Closing, there shall not have been any Material Adverse Effect (as defined below) or any other material adverse change in the regulatory status or condition of any of Old Operator's licenses, permits or certifications, and the Medicare and Medicaid rates of the Facility or the business operations, financial conditions or prospects of the Facility;

viii.      Up to and on the date of the APA Closing, there shall be no (a) lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights or (b) actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of the transactions contemplated hereby;

ix.      The residency occupancy levels at the Facility on the date of the APA Closing shall be at least ninety-two and one-half percent (92.5%) of the occupancy level of the Facility as of the Effective Date; provided that Seller shall have fifteen (15) days to cure any shortfall below such ninety-two and one half percent (92.5%) threshold; provided, further, that any such cure may only be effected with admissions of residents in a manner consistent with past admissions standards and practices of the Facility (including with respect to payor type and ability to pay).

x.      The closing of the transactions contemplated by the APA (the "APA Closing") shall have occurred and the Lease (as defined in the APA) and the ASA, shall have been (A) entered into as of the APA Closing, (B) in effect as of immediately prior to the Closing and (C) terminated (or in the case of the Lease, at New Operator's election, assigned to New Operator) as of the Closing; and

xi.      New Operator shall have been issued or otherwise obtained all Regulatory Approvals, including the License (or assurance satisfactory to New Operator that the Regulatory Approvals, including the License will be issued effective as of Closing), consents and Permits that are not otherwise assigned under the General Assignment that are necessary for New Operator's legal operation of the Facility as of the Closing Date in substantially the same manner as operated by Old Operator.  The foregoing contemplates without limitation that New Operator shall have received, to the extent required, all consents for New Operator's assumption of the Assumed Contracts.

b.      Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction (or waiver by Old Operator) of the following conditions precedent on and as of the Closing Date:

i.      New Operator shall have duly and timely performed and fulfilled all of their duties, obligations, promises, covenants and agreements hereunder, in each case, in all material respects.

ii.      Each of the representations and warranties of New Operator contained in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date, without giving effect to any materiality or similar qualifier therein.

iii.      New Operator shall not be in breach of any term, provision or condition of this Agreement.

iv.      New Operator shall have executed and delivered to Old Operator the applicable Other Documents.

v.      New Operator shall deliver to Old Operator on or before the Closing Date the following, each of which shall be in form and substance reasonably satisfactory to Old Operator:  (1) a certificate of New Operator, executed by a duly authorized manager of New Operator, dated the Closing Date, certifying that the representations and warranties of New Operator set forth in this Agreement are true and complete on and as of the Closing Date and (2) a certificate from New Operator, executed by a duly authorized manager of New Operator, certifying the resolutions authorizing the transactions contemplated hereby and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement; and

vi.      The APA Closing shall have occurred.

In the event that either of the Parties (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies hereunder or at law or equity with respect thereto.

4.      CONVEYANCE OF SUPPLIES.

a.      In consideration of this Agreement, on the Closing Date, Old Operator shall deliver to New Operator a bill of sale (the "Bill of Sale") for the Supplies (as defined herein), in the form annexed hereto as Exhibit B, as shall be necessary to convey to New Operator good and marketable

8

4919-5875-2000, v. 5

right, title and interest in and to the Supplies and any other property of Old Operator used in connection with the operation of the Facility, free and clear of all liens, claims, encumbrances, charges, restrictions, rights or interests of others of any kind.

b.       Old Operator shall have no obligation to deliver the Supplies to any location other than that at the Facility, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

5.       TRANSFER OF PATIENT TRUST FUNDS.

a.       On or prior to the Closing Date, Old Operator shall provide to New Operator a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Old Operator of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which is attached hereto as Schedule 5.a ("Patient Trust Funds and Property").

b.       Old Operator hereby agrees to transfer, or to cause to be transferred, to New Operator the Patient Trust Funds and Property on the Closing Date.  Old Operator shall comply with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property.  New Operator hereby agree that they will accept the Patient Trust Funds and Property in trust for the residents, in accordance with applicable statutory and regulatory requirements; provided, however, that such transfer shall not relieve Old Operator of its custodial and fiduciary responsibilities for such funds and property to the beneficiaries thereof for the period prior to the Closing Date.

c.       Old Operator hereby agrees to indemnify, defend and hold New Operator and their respective employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and permitted assigns (collectively, including New Operator, the "New Operator Parties") harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event the amount of funds, if any, transferred to New Operator does not represent the full amount of the funds delivered to Old Operator as custodian or with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Property prior to the Closing Date.

d.       New Operator will indemnify, defend and hold Old Operator and its employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and permitted assigns harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator by a patient for his or her Patient Trust Funds and Property if and to the extent that such funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator on and after the Closing Date with respect to Patient Trust Funds and Property actually received by New Operator.

6.       REGULATORY APPROVALS; COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.

a.       At New Operator's election, if New Operator is unable to obtain any of the Regulatory Approvals prior to the Closing Date, then, subject to applicable law, until such time that New Operator obtains such Regulatory Approval, Old Operator shall authorize New Operator to

9

4919-5875-2000, v. 5

use such Regulatory Approval of Old Operator (not including the License), provided, however, that New Operator shall indemnify and hold Old Operator harmless on account of any liabilities that result from New Operator's use of such Regulatory Approval.

b.  Effective on the Closing Date, Old Operator sells, assigns and conveys to New Operator the Medicare and Medicaid provider number(s) in use at the Facility (the "Existing Provider Numbers"). Notwithstanding the foregoing, Old Operator retains any and all rights and liabilities relating to the Existing Provider Numbers relating to any and all periods preceding the Closing Date. Old Operator and New Operator shall execute any and all documents necessary for, and will otherwise cooperate in connection with, the assignment of the Existing Medicare Provider Number. During the pendency of New Operator's CMS Form 855A (the "CHOW"), New Operator may bill Medicare and Medicaid under Old Operator's name and the Existing Provider Numbers, until the intermediary changes the electronic funds transfer account or special payment address to the New Operator. Notwithstanding the foregoing, New Operator shall be responsible for all rights and liabilities relating to the Existing Provider Numbers relating to any and all periods on or after the Closing Date. This Section 6.b is intended to satisfy the requirements of Chapter Section 15.7.7.1.5 of the Medicare Program Integrity Manual.

c.  Old Operator shall prepare and file with the appropriate Medicare and Medicaid agencies its final cost reports with respect to its operation of the Facility as soon as reasonably practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third-party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports. To the extent that there are any delays in payment by any third party payor to New Operator as a result of Old Operator's failure to timely file its cost reports under this Section 6.c, upon demand of such New Operator, Old Operator shall pay to such New Operator interest on the amounts withheld by such third party payor(s) equal to the then current prime rate of interest (as announced from time to time by the *Wall Street Journal*) plus three percent (3%) (the "Default Rate"). Old Operator agrees to cooperate with New Operator as necessary for enrollment of New Operator in the Medicare and Medicaid programs.

d.  Each Party agrees to notify the other within three (3) calendar days after receipt of any notice of any claim of recapture by DOH, CMS, the Office of Inspector General for the United States Department of Health ("OIG") or any other governmental or quasi-governmental authority with respect to an alleged Medicare or Medicaid overpayment or any alleged underpayment of any tax or assessment for periods relating prior to the Closing Date (each, a "Recapture Claim"). To the extent ascertainable on or prior to the Closing Date, Old Operator shall pay or cause to be paid any Recapture Claim which relates to or arising from any period prior to the Closing Date; provided, however, that nothing herein shall be deemed to prevent or restrict Old Operator from contesting any such Recapture Claim, and, if, based on the advice of its attorneys, by paying such Recapture Claim, Old Operator shall have forfeited its right to such contest, Old Operator may delay paying such Recapture Claim until final resolution of such contest, so long as Old Operator otherwise complies with the provisions of this Section 6.

e.  In the event DOH, CMS, OIG or any other governmental or quasi-governmental authority or agency making payments to New Operator for services performed at the Facility on or after the Closing Date make any Recapture Claim for any period prior to the Closing Date, then Old Operator shall be entitled to contest such Recapture Claim; provided, however, that New Operator shall be allowed the opportunity to participate in all meetings, and be provided with copies

10

4919-5875-2000, v. 5

of all audit adjustments and work papers.  Old Operator and New Operator shall cooperate to resolve such audit to their mutual satisfaction.  In the event that Old Operator fails to pursue any issue or issues raised in any such appeal, New Operator may, at its own expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.   If Old Operator does not prevail with regard to such contest, Old Operator hereby agrees to save, indemnify, defend and hold the New Operator Parties harmless from and against any loss, damage, injury or expense incurred by any such party arising from or related to any such Recapture Claim.  In connection with the foregoing indemnification obligation, in the event that CMS, DOH or any other governmental or quasi-governmental authority or agency or other third party payor source withholds amounts from any New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to such New Operator within ten (10) days following such New Operator's demand therefor.  Such payment shall be made regardless of whether Old Operator is then contesting such Recapture Claim.

f.      Old Operator shall be and remain obligated for and shall pay on or before the date due thereof all amounts of any license fees or taxes or other amounts payable to any other government authority with jurisdiction over the Facility accrued through the Closing Date, including any Medicaid provider taxes owed to DOH or state bed tax or assessment.  Old Operator shall provide to New Operator, on or before the Closing Date, evidence reasonably satisfactory to New Operator of payment of all of such fees and taxes.

g.      Old Operator shall at its sole and exclusive cost and expense be liable and responsible for the correction of all violations cited by DOH in any survey ("Survey") prior to, on or after the Closing Date as detailed in the Statement of Deficiencies issued by DOH ("Statement"), if any, accompanying such Survey, and all proposed or imposed remedies, including any CMP, that result from a condition or incident at the Facility prior to the Closing Date or as a result of an action or inaction of Old Operator prior to the Closing Date, until the cure thereof and, if applicable, any proposed denial of payment by, or termination of certification to participate in, the Medicare or Medicaid programs set forth in the Statement or otherwise resulting from the Survey or Statement is withdrawn.

h.      Old Operator shall deliver to New Operator copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports.

7.      CONTRACTS; RESIDENT AGREEMENTS.

a.      As soon as practicable after the Effective Date, Old Operator shall deliver to New Operator true, accurate and complete copies of all Contracts, a schedule of which is attached hereto as Schedule 7.a.

b.      Prior to the Closing Date, New Operator shall deliver written notice to Old Operator as to which of the Contracts New Operator desires to assume pursuant to the General Assignment and continue in full force and effect after the Closing Date (the "Assumed Contracts"), a listing of which shall then be attached hereto as Schedule 7.b.  Any Contract that New Operator does not indicate it desires to assume and continue shall be deemed rejected by New Operator ("Rejected Contracts") and Old Operator shall terminate such Rejected Contracts; provided, however, that such termination shall be made in compliance with the applicable provisions under such Rejected Contracts.

    c.    Old Operator shall transfer, convey and assign to New Operator, in accordance with the terms of the General Assignment, on the Closing Date all existing agreements with residents and any guarantors thereof, to the extent assignable by Old Operator (excluding only the right to any payments for periods prior to the Closing Date).

    d.    In addition to and not in lieu of any other indemnity set forth elsewhere herein, Old Operator hereby agrees to indemnify, protect, save, defend and hold the New Operator Parties harmless from and against any and all liabilities, obligations, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, asserted against or incurred by any of the New Operator Parties arising out of or connected with any (i)  third parties claiming to have rights under contracts or other agreements that are not set forth or described in Schedule 7.a or (ii) Rejected Contracts.

    e.    Concurrently with the APA Closing, (i) Old Operator and New Operator shall enter into the ASA and (ii) Old Operator shall enter into, and New Operator shall ensure that Purchaser enters into, the Lease,

8.    <u>NO ASSUMPTION OF LIABILITIES</u>.

    a.    Except for future obligations under contracts and commitments that are expressly assumed by New Operator hereunder, Old Operator has no liabilities, debts, claims or obligations, whether accrued, absolute, contingent or otherwise, whether due or to become due, that may be asserted against New Operator, Purchaser or, following the Closing, the Facility.  Other than as specifically set forth in this Agreement, New Operator does not and shall not assume, and nothing in this Agreement shall be construed as an assumption by New Operator of, any liabilities, obligations or undertakings of Old Operator of any nature whatsoever, whether accrued, absolute, fixed or contingent, known or unknown, due or to become due, unliquidated, or otherwise, and whether or not associated with the Facility or the Purchased Assets.

    b.    Except as specifically provided in this Agreement, New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing Date, including any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom, and Old Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility on or after to the Closing Date, including any matters relating to cost reports, collections, audits, hearing, or legal action arising therefrom.

9.    <u>ACCOUNTS RECEIVABLE; ACCOUNTS PAYABLE</u>.

    a.    New Operator shall not assume any accounts receivable owed or due to Old Operator from or relating to the operation, ownership or management of the Facility prior to the Closing Date.  Old Operator shall retain the right to collect all unpaid accounts receivable as of the close of business on the day prior to the Closing Date with respect to the Facility, but only to the extent that such accounts receivable relate to services rendered prior to the Closing Date.  All collections shall be conducted in accordance with normal business practices and no patients or residents shall be unreasonably harassed in the collection of such amounts.  Old Operator shall engage sufficient personnel to bill and collect Old Operator's accounts receivable using Old Operator's legacy billing system, which Old Operator shall maintain as required to bill and collect

<div align="center">12</div>

its accounts receivable hereunder.

b.      If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator.  New Operator and Old Operator shall send copies of all Medicare and Medicaid remittance advices to the other Party for purposes of recording and pursuing accounts receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each Party.  If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to any New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator.  Any such remittances pursuant to this Section 9.b shall occur within ten (10) days from the date the Party required to make such remittance receives payment thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

c.      Payments received by New Operator or Old Operator from non-governmental payment sources shall be paid to the party designated in such payments entitled to the payments for the services provided thereunder within ten (10) days from the date the party required to make such remittance receives payment thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.  Any non-designated payments received by New Operator or Old Operator from non-governmental payments sources after the Closing Date shall first be applied to any post-Closing Date monthly balances due to any New Operator for services provided after the Closing Date, with the excess if any, applied to any pre Closing Date monthly balances due for services rendered by Old Operator prior to the Closing Date. Notwithstanding the foregoing, New Operator hereby acknowledges and agrees that such pre-Closing Date monthly balances are the property of Old Operator and Old Operator reserves the right to continue to directly pursue the collection of such pre-Closing Date monthly balances.

d.      To the extent a Party receives any payments for accounts receivable of another Party, the Parties acknowledge that the Party receiving the payment belonging to another Party shall hold the payment in trust, that no Party shall have any right to offset with respect to such accounts receivable, and that the Party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the appropriate other Party within ten (10) days of receipt thereof, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

e.      Nothing herein shall be deemed to limit in any way any Party's rights and remedies to recover accounts receivable due and owing to it under the terms of this Agreement.

f.      All accounts payable for services provided or goods furnished for or at the Facility prior to the Closing Date, notwithstanding whether such accounts payable were incurred in the name of Old Operator, shall remain the sole responsibility and obligation of Old Operator.  All accounts payable for services provided or goods furnished for or at the Facility on or after the Closing Date, notwithstanding whether such accounts payable were incurred in the name of New Operator (except with respect to Rejected Contracts), shall be the sole responsibility and obligation of New Operator.  To the extent accounts payable have accrued for a period that includes time both before and after the Closing Date, the Parties shall equitably apportion the responsibility for payment of such accounts payable.  The Parties hereby agree to cooperate with each other and to notify the merchants, suppliers or other third parties with respect to which of Old Operator or New Operator bears responsibility for accounts payable of the Facility based on the foregoing clauses of

13

this Section 9.f.

g.      This Section 9 shall be subject to the express provisions of the ASA from and after the effective date of the ASA.

10.     EMPLOYEES.

a.      Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which is attached hereto as Schedule 10.a (such listing, to include the position and current base salary of each such employees) (each, a "Current Employee" and collectively, the "Current Employees"), effective as of the earlier of the Closing Date and the date of the APA Closing.  Old Operator shall be responsible for any "Continuation Coverage" (as that term is defined by COBRA Section 4980B of the tax code and Section 601, et seq. of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) for any employee of Old Operator terminated at any time prior to or on the Closing Date who does not become a Retained Employee (as defined below).  New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party.  From and after the date hereof, Old Operator shall not make any material changes in the compensation or benefits of the employees at the Facility.

b.      New Operator shall determine, in its sole discretion, which of the Current Employees shall be offered employment with New Operator, pursuant to employment terms acceptable to New Operator (each, a "Retained Employee" and collectively, the "Retained Employees").  Notwithstanding the foregoing, New Operator shall rehire or offer to rehire not less than the number of the Current Employees necessary to avoid WARN Act notice or similar notice requirements or other related liability contained in any applicable law.  Notwithstanding the foregoing, nothing in this Section 10.b shall create any right in favor of any person not a party hereto, including the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee or Retained Employee.

c.      At Closing, Old Operator shall provide New Operator with a credit (the "Employee Accrual Credit") in an amount equal to ninety percent (90%) of the accrued, vested and unvested, but unpaid vacation, sick and holiday pay and severance obligations, if any, plus all applicable employer withholding charges and payroll costs (including FICA, FUTA, SUTA and worker's compensation) and costs associated with processing payroll for a total of ten percent (10%) for withholding and payroll, as well as any insurance premium obligations of Old Operator, vested or unvested, with respect to the Retained Employees that have accrued prior to the earlier of the Closing Date and the effective date of the ASA ("Old Operator's Vacation and Holiday Pay Expenses").  New Operator agrees to pay when and as due, all of such Old Operator's Vacation and Holiday Pay Expenses, provided, however, that New Operator shall not be liable for, and Old Operator shall indemnify and hold the New Operator Parties harmless, on account of any and all other liabilities and obligations with regard to any of the Current Employees and with regard to the Retained Employees, any and all other liabilities and obligations that shall have accrued prior to the Closing Date.  A schedule of Old Operator's Vacation and Holiday Pay Expenses is attached hereto as Schedule 10.c.  If New Operator discovers after the Closing Date that the amount credited is less than the amounts required to be credited under this Section 10.c, Old Operator shall pay to New Operator within five (5) days after New Operator provides notice thereof, by an amount equal to such deficiencies, and if not paid in full by such date, any amount outstanding shall bear interest at the Default Rate until paid in full.

d.      New Operator and Old Operator acknowledge and agree that the employees at the

14

4919-5875-2000, v. 5

Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as licensed operator of the Facility is based upon the skills and qualifications of such employees.  As such, in the event that during the period beginning on the Effective Date and ending upon the date that is eighteen (18) months following the Closing Date: (i) any Current Employee is solicited for employment by any person or entity that either directly or indirectly controls, is under common control with or is otherwise affiliated with Old Operator (any of the foregoing, an "Old Operator Party"), or (ii) any of the employees listed on Exhibit C attached hereto (each, a "Scheduled Employee") are hired by an Old Operator Party, then Old Operator shall pay to New Operator an amount equal to the greater of (a) fifty thousand dollars ($50,000.00), or (b) an amount equal to such employee's annual salary as liquidated damages, for each such Current Employee or Scheduled Employee.  The Parties acknowledge and agree that actual damages with respect to the foregoing would be difficult to ascertain and that the amount set forth in the immediately preceding sentence is a fair and reasonable approximation of such actual damages. This provision shall not in any way limit such other remedies that may be available to New Operator.  Old Operator further acknowledges that the scope and duration of the provisions of this Section 10.d are reasonable.  The Parties acknowledge and agree that advertisements available to the general public, such as through website job postings and newspaper, Internet and trade journals shall not constitute solicitation for purposes of this Section 10.d.

e.      New Operator shall not be required to assume the CBA (as defined below) of the Facility between Old Operator, and the Union (as defined below), and any other union-related contracts or liabilities, including any Pension Liability (as defined below,  provided, however, that New Operator hereby acknowledges and recognizes the Union and covenants to advise the Union and the Retained Employees, either prior to, or at the time of, offering employment to the Retained Employees pursuant to Section 10(b) hereto, that New Operator does not intend to be bound by the existing CBA.

11.      EMPLOYMENT RECORDS.  Prior to the earlier of the Closing Date and the effective date of the ASA, Old Operator shall deliver to New Operator, either the originals or full and complete copies of all available employee records for all Retained Employees in its possession (including all employee employment applications, W-4's, I-9's, employee health records (including PPD results, screening and x-rays), OSHA 300 summary forms, state tax filing, including state unemployment rate determination letters, and any disciplinary reports) (collectively, the "Employee Records").  Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the earlier of the Closing Date and the effective date of the ASA with regard to the Retained Employees.

12.      ACCESS TO RECORDS.

a.      On the Closing Date, Old Operator shall deliver to New Operator all of the records of the Facility, including patient medical and financial records, provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; provided, further, that for a five (5) year period after the Closing Date, Old Operator shall give New Operator access to any information and the right of inspection (including the right to extract or make copies) in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b.      Subsequent to the Closing Date, New Operator shall allow Old Operator and its agents and representatives to have reasonable access to (upon reasonable prior notice and during

normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns or any other government agency actions or notices.

c.      Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove and/or copy any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation. Any record so removed shall promptly be returned to New Operator (or, at New Operator's election, destroyed) following its use.

d.      New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including patient records and records of patient funds, to the extent required by law.

e.      This Section 12 shall be subject to the express provisions of the ASA from and after the effective date of the ASA.

13.      USE OF TELEPHONE NUMBER AND SOCIAL MEDIA WEBSITES   New Operator may use the current name and present telephone numbers of the Facility. Old Operator shall, as of the Closing Date, transfer or cause to be transferred, at its expense, all right, title and interest in and to the telephone numbers and social media websites (the "Sites") used by the Facility. Old Operator represents and warrants that the Facility has no website that will be functional or in existence from and after the Closing other than the Sites that will be transferred pursuant to the immediately prior sentence.

14.      POLICY AND PROCEDURE MANUALS. Old Operator agrees to leave its policy and procedure manuals at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator.

15.      TAXES. Old Operator shall discharge any provider or other tax charged by DOH or other government agency relating to any period prior to the Closing Date. Old Operator shall file all returns, reports and filings of any kind or nature, required to be filed by Old Operator on a timely basis and will timely pay all taxes or other obligations and liabilities which are due and payable, including with respect to the Property or the Facility, in the ordinary course of business. Old Operator shall pay before the same shall become due all taxes, duties and other governmental charges that accrue prior to the Closing Date, which, if not paid, would create or may hereafter create a lien on any of the assets of New Operator or for which New Operator could become liable as a successor operator of the Facility. Old Operator shall also file any required bulk transfer filings necessary to establish that New Operator shall not succeed to any state tax liabilities.

16.      INDEMNIFICATION.

a.      New Operator shall indemnify, save, protect, defend and hold harmless Old Operator and its respective employees, affiliates, managers, members, partners, officers, directors and agents, from and against all claims, liabilities, losses, damages, demands and causes of action of any nature whatsoever (including demands and causes of action relating to injury or death to persons or loss of or damage to property), and all costs and expenses (including penalties and reasonable attorneys' and other professional fees and disbursements incurred in the investigation

16

or defense of any such claims, or in asserting, pursuing or enforcing any such claims), whether or not resulting from third-party claims (collectively, "Losses") arising from, out of, or relating to (i) operation of the Facility by New Operator on or after the Closing Date, (ii) New Operator's use or occupancy of the Property or the condition thereof on or after the Closing Date, and (iii) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of New Operator contained in this Agreement or in any of the Other Documents.

b.      Old Operator shall indemnify, save, protect, defend and hold harmless each of the New Operator Parties from and against all Losses arising from, out of, or relating to (i) the ownership or operation of the Facility by Old Operation prior to the Closing Date, (ii) Old Operator's use or occupancy of the Property or the condition thereof prior to the Closing Date, (iii) any Recapture Claim, (iv) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of Old Operator contained in this Agreement or in any of the Other Documents, (v) the CBA or Union, including any Pension Liability, and Old Operator's, Seller's or the Facility's receipt of Stimulus Funds, (vi) any resident present at the Facility on the Closing Date for whom a recognized payor source cannot be obtained following the Closing, and (vii) the ERC.

c.      In the event that any liability, claim or demand for Losses which are subject to indemnification by or under any provision of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, such Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within thirty (30) calendar days of Indemnitee's receipt of written notice thereof, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitee's right to receive, and Indemnitor's obligation to provide, indemnification hereunder unless such failure directly and materially prejudices Indemnitor's right or ability to defend the Indemnitee's Claim.  Upon receipt of notice of any Indemnitee's Claim(s), Indemnitor shall, subject to Indemnitees other rights as set forth herein, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof promptly upon the final, unappealable resolution of such Indemnitee's Claim.  Indemnitor shall keep Indemnitee informed with respect to all aspects of the resolution of an Indemnitee's Claim.  Without limiting the foregoing, upon request by Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of any Indemnitee's Claim.  Indemnitor shall not, without the prior written consent of Indemnitee, which consent shall not be unreasonably withheld, settle, compromise or offer to settle or compromise any Indemnitee's Claim on a basis that would result in (i) the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of Indemnitor or any affiliate thereof, or (ii) any monetary liability on the part of Indemnitor or any affiliate thereof that will not be paid or reimbursed by the Indemnitee.  Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent.  In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be deemed an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law, intervene in and defend, settle or compromise such Indemnitee's Claim at Indemnitor's sole and

17

exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand thereof, Indemnitor shall promptly reimburse Indemnitee all amounts (including attorneys' fees) incurred by Indemnitee with respect to the resolution of such Indemnitee's Claims.

d.       If and when an Indemnitee desires to assert an Indemnitee's Claim in accordance with Section 16.a or Section 16.b, as applicable, other than with respect to a third-party claim in accordance with Section 16.c, Indemnitee shall notify Indemnitor of such Indemnitee's Claim and the Parties shall attempt in good faith to agree on resolution of the disputed amount.  Any amount mutually agreed upon or awarded to the Indemnitee under a final judgment shall be paid by Indemnitor within five (5) business days following such agreement or the entering of such judgment, as applicable.

e.       Survival.   Other than where a different survival period is expressly set forth (including in Section 16.f), all indemnification obligations of Old Operator and New Operator under this Agreement shall survive the Closing Date and shall continue in effect for a period of two (2) years after the Closing Date; provided, however, that the Fundamental Representations (as defined below) shall survive for forty-eight (48) months after the Closing Date; provided, further that if there is an Indemnitee's Claim made prior to the applicable survival period, such indemnification obligation shall continue to survive until the final, non-appealable resolution of such Indemnitee's Claim.   "Fundamental Representations" mean the representations of Old Operator set forth in Section18.a (*Organization and Authority*), and Section 18.c (*No Consent*), Section 18.e (*Overpayments*), Section 18.f (*Audits*), Section 18.g (*Status of Licensure and Certification*), Section 18.h (*Status of Medicare/Medicaid Participation*) Section 18.t (*Labor Unions*) and Section 18.hh (*Stimulus Funds*).

f.       Limitation of Liability. An Indemnitor shall be liable under this Section 16 only when the total aggregate indemnification Claims of such Indemnitee under this Agreement and of such Indemnitor's affiliate under the OTA (which, for the avoidance of doubt, in the case of Old Operator is Seller and in the case of New Operator is Purchaser) exceed the Basket Amount (as defined in the APA), after which Indemnitor shall be liable for the amounts in excess of the Basket Amount. Furthermore, no Indemnitor shall be liable for Indemnitee Claims hereunder to the extent Indemnitee Claims paid by such Indemnitor hereunder and such Indemnitor's affiliate under the OTA exceeds the Cap (as defined in the APA).  Notwithstanding the foregoing and anything to the contrary herein, all indemnification obligations of Old Operator arising from, relating to (i) any Recapture Claim and any other Losses relating to Medicaid and Medicare programs, (ii) power and authority to enter into this Agreement, (iii) liability for, and payment of, any taxes, (iv) regulatory compliance issues, (v) the CBA or Union, including any Pension Liability, (vi) any Fundamental Representations, (vii) any breach of any covenant or obligation, (viii) Old Operator's, Seller's or the Facility's receipt of Stimulus Funds, including if any payment that would otherwise be due to New Operator is withheld, demanded or recouped by any governmental authority or payor in connection with or relating to any receipt of Stimulus Funds by Old Operator, Seller or the Facility, (x) fraud or intentional misrepresentation, and (xi) the ERC, (A) shall survive indefinitely, subject to any applicable statutes of limitations and (B) shall not be subject to the Cap or Basket.

g.       Without limiting any of New Operator's rights pursuant to this Section 16, Old Operator acknowledges that New Operator's right to consummate the transactions contemplated hereby are unique, and recognizes and affirms that that in the event of a breach of this Agreement, money damages will be inadequate and New Operator will have no adequate remedy at law. Accordingly, Old Operator agrees that New Operator shall be entitled, in addition to any other rights and remedies existing in its favor pursuant to any other agreement between Old Operator and

18

New Operator or otherwise at law or in equity, to enforce its rights and Old Operator's obligations hereunder not only by an action or proceeding for damages but also by an action or proceeding for specific performance, injunctive and/or other equitable relief (without posting of bond or other security).

17.      REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR**.**  As an inducement to Old Operator to enter into this Agreement, New Operator hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

a.      Organization and Authority.  New Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  As of the Closing Date, New Operator will have all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

b.      No Violations.  Neither the execution and delivery of this Agreement, nor any agreement referred to or contemplated hereby, by New Operator will:

i.      violate any provision of the organizational or governing documents of any New Operator; or

ii.      conflict with or constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

c.      Survival of Representations and Warranties of New Operator.  Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all such representations and warranties shall survive the Closing Date for the applicable statute of limitations.

18.      REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR.  As an inducement to New Operator to enter into this Agreement, Old Operator hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

a.      Organization and Authority.  Old Operator is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey.  Old Operator has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by Old Operator and is enforceable against Old Operator in accordance with its terms.

b.      No Violations.  Neither the execution and delivery of this Agreement, nor any agreement referred to or contemplated hereby, by Old Operator will:

i.      violate any provision of its organizational or governing documents;

19

4919-5875-2000, v. 5

        ii.      conflict with or constitute a default or create a right of termination or cancellation under any agreement or commitment to which Old Operator is a party or which pertains to the Facility; and

        iii.      result in the creation or imposition of any security interest, lien or other encumbrance upon any of the assets of Old Operator.

    c.      <u>No Consent Required</u>.  No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance by Old Operator of this Agreement, prior to, or as of or at the Closing Date, or as a consequence thereof, or with the consummation by Old Operator of transactions contemplated hereby to be consummated prior to, as of or at the Closing Date, except as set forth on <u>Schedule 18.c</u>.

    d.      <u>Litigation</u>.  Except as set forth on <u>Schedule 18.d</u>, there are no pending, nor, to Old Operator's Knowledge, threatened claims, lawsuits, governmental actions or other proceedings, including any desk audit or full audit described in below, involving the Facility or the operation thereof before any court, agency or other judicial, administrative or other governmental body or arbitrator.

    e.      <u>Overpayments</u>.  Except as set forth on <u>Schedule 18.e</u>, there are no pending, nor threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor, nor is Old Operator aware of any grounds from such a claim or demand.

    f.      <u>Audits</u>.  Old Operator represents and warrants that it will fully cooperate with New Operator in connection with any desk audit or full audit by CMS, DOH or other applicable governmental regulatory agency in connection with the desk audit or full audit of any Medicaid or Medicare cost reports filed by Old Operator, including providing New Operator with any and all necessary documentation, supporting schedules and personnel in its possession in order to properly support the dollar figures and classifications/characterizations contained in Old Operator's cost reports so that New Operator's Medicaid or Medicare reimbursements are maximized.

    g.      <u>Status of Licensure and Certification</u>.  The Facility currently holds a license issued by DOH to Old Operator for a one hundred eighty (180) bed skilled nursing facility.  Such license is, and shall through the Closing Date be, unrestricted, unconditional, in good standing and in full force and effect and subject to no waivers or limitations.  There are no pending actions or claims or any threatened actions or claims, which, if adversely determined, could materially and adversely affect such licenses.  Old Operator has not received any written notice from DOH or any other governmental agency requiring the correction of any condition with respect to any such license which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of any such license is in jeopardy.  Old Operator has not received any written notice from DOH or any other governmental or quasi-governmental organization of any life safety code or similar violations, nor does Old Operator have any reason to believe that any condition exists at the Property that would violate any life safety codes or any similar regulations.  All deficiencies and violations cited in any Survey or resurvey have been corrected or corrective action plans have been submitted and approved therefor and will be fully implemented/corrected prior to Closing.  No Facility is currently designated as a "Special Focus Facility" (as such term is defined by the Centers for Medicare and Medicaid Services Special Focus Facility Program), and no Facility received any written notice of inclusion or intended

<p align="center">20</p>

inclusion as a Special Focus Facility.

h.       The Facility is, and shall on the Closing Date be, certified for participation in the Medicaid and Medicare reimbursement program and such each certification is in full force and effect and in good standing and subject to no restrictions or limitations.  Old Operator is in material compliance with the conditions of participation or requirements applicable with respect to such participation and is eligible for payment under the applicable Government Reimbursement Programs in which the Facility participates for services rendered to qualified beneficiaries.  There are no pending actions or claims or, to the best of Old Operator's knowledge, any threatened actions or claims, which, if adversely determined, could materially and adversely affect such certification.  Old Operator has not received any notice from DOH, CMS or any other governmental agency requiring the correction of any condition with respect to such certification which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of such certification is in jeopardy.  Old Operator represents and warrants that it shall promptly comply with any violation notices concerning the Facility received after the Effective Date and before the Closing Date to the extent that any such notice requires compliance activities.  Without limiting the generality of, the foregoing, during the three-year period prior to the Closing Date, except as set forth in Schedule 18.h, Old Operator has not received any of the following with respect to the Facility:

i.       A notice of violations with a scope and severity level of "F" or higher;

ii.       A notice of termination of the license issued by DOH to operate the Facility as a one hundred eighty (180) bed skilled nursing facility;

iii.       A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

iv.       A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

v.       A notice of a material Life Safety Code deficiency cited by CMS, DOH or state or local building, fire safety or health authorities that have not been corrected as of the Effective Date;

vi.       A notice that the Facility will be subject to a rate reduction for Medicaid or Medicare services provided therein as a result of a Medicare or Medicaid audit; and

vii.       A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

i.       Cost Reports; Audits.  Old Operator has filed, or will file, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed pursuant to Titles XVIII and XIX of the Social Security Act prior to the Effective Date with respect to the Facility.  All such reports have been or will be prepared and filed in good faith and in all material respects in accordance with all applicable laws, rules and regulations.  All amounts shown as due from the Facility in the cost reports either were remitted with such cost reports or will be remitted when required by applicable law and are appropriately reflected in the Financial Statements, and all amounts shown in the Notices of Program Reimbursement as due have been, or prior to the Closing will be, paid when required by applicable law.  Old Operator has been audited by the Medicaid program for all fiscal periods through December 31, 2020. The status of the pending

21

Medicare and Medicaid audits are attached as <u>Schedule 18.i</u>.  Except as set forth in <u>Schedule 18.i</u>, there are no (A) current, pending or outstanding government reimbursement program audits or appeals, (B) cost reports that are subject to audits, (C) cost reports that remain "open" or unsettled, and (D) current or pending government reimbursement program or private program recoupment efforts (other than those conducted in the ordinary course), in each case with respect to the Facility. Old Operator has not, during the last two (2) years, received written notice of any dispute or claim by any governmental authority, fiscal intermediary or other person regarding the Facility and the government reimbursement programs or the participation by the Facility in such programs that have not been cured, and to Old Operator's knowledge, there are no (1) threatened recoupment claims for services provided by the Business, or (2) threatened suspensions, terminations, or restrictions to any contracts with Government Reimbursement Programs and/or their fiscal intermediaries or paying agents.

       j.      <u>Compliance with Applicable Laws</u>.

       i.      Old Operator is in compliance (without waivers) and as of the Closing Date will be in compliance (without waivers) with all applicable municipal, county, state and federal laws, regulations, ordinances, standards and orders, including all health, building, fire and zoning ordinances and life safety codes and the Americans with Disabilities Act, as the same may be amended.

       ii.      The Property has been and is presently used and operated in compliance in all material respects with, and in no material way violates any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Property or any part thereof, including the Nursing Home Act, Environmental Laws, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits.

       iii.      Old Operator has not received written notice of any claim, requirement or demand of any licensing or certifying agency supervising or having authority over Old Operator or otherwise to rework or redesign the Facility so as to conform to or comply with any existing law, code or standard which has not been fully satisfied prior to the Effective Date or which will not be satisfied prior to the Closing Date.

       iv.      All billing practices of Old Operator to all third party payors, including the Medicare and Medicaid programs and private insurance companies, have been in compliance with all applicable laws, regulations and policies of such third party payors and the Medicaid and Medicare programs.

       k.      <u>Life Care Contracts</u>.  No Facility is party to any life care contract with respect to any resident of the Facility.

       l.      <u>Personal Property and Residents</u>.  Unless specifically permitted pursuant to the terms of this Agreement, Old Operator shall not remove any items of Personal Property from the Facility nor shall it transfer residents from the Facility to a skilled care nursing home facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Seller and/or Old Operator.  The information set forth in the admission agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls, and there are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the

<div align="center">22</div>

Facility.

m.  Personal Needs Allowance.  Old Operator is currently in material compliance with all state and federal regulations relating to maintaining and accounting for the personal needs allowance ("PNA") for residents who request the establishment of a PNA account.  Except as set forth in Schedule 18.m, Old Operator has no knowledge of and has not received any notice from any governmental authority citing or alleging any violation by Old Operator or the Facility of any state or federal PNA regulations.

n.  Furniture.  There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility's license.  Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by DOH.

o.  Supplies.  Each and every item constituting the Supplies has been purchased by Old Operator and is owned by Old Operator free and clear of claims of all other parties.  Such supplies are sufficient in quantity for the proper conduct and operation of the (A) Facility as a skilled care nursing home facility for at least that number of residents residing at the Facility as of the Closing Date in substantial compliance with all applicable laws, including the minimum standards of DOH and in an amount sufficient to last not less than two (2) weeks.

p.  Accounts Receivables. There are no encumbrances or liens against Old Operator's accounts receivables, provider agreements, bank accounts or licenses, and to the extent there are such liens extant, the obligations they secure will be paid in full at Closing and the liens on such assets will be released at Closing.

q.  Employees.

i.  Old Operator maintains an Employment Eligibility Form on Form I-9 for each employee currently employed by it in the United States in accordance with applicable law.

ii.  All employees of Old Operator are employed at-will, and may be terminated at any time with or without notice and for any reason or no reason at all, without material cost or penalty to Old Operator.

iii.  Except with respect to transactions contemplated by this Agreement, Old Operator has not implemented any employee layoffs that could implicate the WARN Act or any similar applicable foreign, state or local law, and no such events are currently planned, anticipated or announced and, to Old Operator's knowledge, no officer or executive of Old Operator (A) has any present intention to terminate his or her employment prior to the one (1) year anniversary of the Closing, or (B) is a party to any confidentiality, non-competition, proprietary rights or other such agreement that would materially restrict the performance of such employee's employment duties, or the ability of Old Operator to conduct its business.

r.  Independent Contractors. All workers directly engaged by Old Operator (excluding any engagement through a staffing agency) and classified by Old Operator as independent contractors, have in good faith satisfied the requirements of applicable law to be so classified, and Old Operator has in good faith fully and accurately reported each such person's compensation on IRS Forms 1099 during such period when required to do so.

23

4919-5875-2000, v. 5

s.    Old Operator's Vacation and Holiday Pay Expenses.  Schedule 10.c contains a complete and accurate list of Old Operator's Vacation and Holiday Pay Expenses, and except as provided in Schedule 10.c, as of the Closing Date, Old Operator has no outstanding obligations with respect to vacation and holiday pay to any of the Retained Employees.

t.    Labor Unions.  Old Operator is a party to that certain collective bargaining agreement ("CBA") of the Facility between Old Operator, and Local 1040, Communication Workers of America, AFL-CIO (the "Union"). The CBA is the only collective bargaining agreement to which Seller or Old Operator is a party and the Union is the sole collective bargaining representative of Seller's or Old Operator's employees.  Except for the CBA, no Current Employee is presently a member of a collective bargaining unit and there are no threatened in writing or, to the knowledge of Old Operator, contemplated attempts to organize for collective bargaining or joint negotiation purposes any of the Current Employees.  There are no unremedied or outstanding unfair labor practice charges, unlawful practices, unlawful occupational safety practices or any charges, complaints or actions alleging a violation of any local, city, state or federal discrimination safety or employment-related law, statute or regulation, in each case, that would be material to the Facility. Neither Old Operator nor the Facility has experienced any strikes, disruptions, labor disputes or other work-stoppages, and Old Operator has complied with all legal requirements relating to the employment of personnel and labor, payment of wages and other amounts, occupational safety, plant closing, layoffs, collective bargaining and federal contracting, and has withheld all amounts required by statute, regulation or agreement to be withheld from wages, salaries or other compensation of employees.  Old Operator acknowledges that New Operator is expressly not assuming any of (i) the CBA and (ii) and any Union-related rights or obligations, including any obligations related to the Fund (as defined in the CBA) or any other pension-related obligations, including any withdrawal liability (collectively, "Pension Liability"), and the CBA and all such rights and obligations shall be retained by Old Operator as Rejected Contracts and rights and obligations of Old Operator, as applicable.  Old Operator shall pay any Pension Liability when due.

u.    Multi-Employer Plans.  Except for the multi-employer plan sponsored by the Union, Old Operator does not, and is not required to, contribute to a multi-employer plan, as defined in ERISA.

v.    Employee Benefit Plans.  Except as provided in Schedule 18.v:

i.    Old Operator does not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

ii.    Old Operator does not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section 414(i) of the Internal Revenue Code of 1986, as amended (the "Code"));

iii.    Old Operator does not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

iv.    Old Operator does not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

v.    Old Operator has not entered into, nor has Old Operator established or maintained, any change-in-control or severance agreements or plans.

w.    Environmental Condition.  Old Operator has not generated, stored or disposed of

4919-5875-2000, v. 5

any Hazardous Substances on the Facility or the Property, and Old Operator does not have any knowledge of any previous or present generation, storage, disposal or existence of any Hazardous Substance or hazardous waste on the Facility or the Property, except in such quantities that is customary in the operation of skilled care and in all events in compliance with all Environmental Laws.

x.      Status of Residents.      All of the residents at the Facility have full legal status as citizens of the United States of America.

y.      Taxes.  Old Operator has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns and all other taxes and governmental charges with respect to the Facility.

z.      Insurability.  Old Operator has not received any written notice or request from any insurance company or underwriters setting forth any defects in the Property which might affect the insurability thereof, requesting the performance of any work or alteration of the Property or setting forth any defect or inadequacy in Old Operator's operation of the Property which would materially and adversely affect the ability of New Operator to insure the Facility following Closing.

aa.      Special Assessments.  There are no (i) pending or threatened special assessments affecting the Property or (ii) any contemplated improvements affecting the Property that may result in special assessments affecting the Property.  There are no tax abatements, phase-ins or exemptions affecting the Property.

bb.      Personal Property; Liens.  All of the Personal Property is located at or on the Property and will be transferred to New Operator pursuant to this Agreement.  Such Personal Property is sufficient to operate the Facility in the manner conducted by Old Operator as of the date hereof and as of the Closing Date.  All of the assets necessary to operate the Facility are owned by Old Seller or Operator and shall be conveyed to Purchaser or New Operator pursuant to this Agreement and the APA.  The Property is free and clear of all liens, claims and encumbrances caused or created by Old Operator or its employees or agents.

cc.      Leases.  Other than the (i) lease dated as of May 12, 2012 (including any amendments), by and between Seller and Old Operator (the "Existing Lease"), which has been provided to New Operator and which Old Operator covenants and agrees to terminate as of the APA Closing and, at such time, and (ii) Lease which shall be, at New Operator's election, terminated or assigned to New Operator as of the Closing, there are not currently, and as of the Closing Date there shall not be, any occupancy rights (written or oral), leases or tenancies presently affecting the Facility and the portion of the Property on which it is located, except for any occupancy rights of then existing residents of the Facility.

dd.      Permits.  Old Operator currently maintains in good standing and full force all of the material certificates, licenses and permits from all applicable governmental authorities in connection with the ownership, use, occupancy, operation and maintenance of the Property and the Facility as necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

ee.      Financial Materials.      Old Operator has provided to New Operator true and correct copies of the Financial Statements (as defined in the APA).  The Financial Statements (i) have been prepared in strict accordance with the books and records of Old Operator, (ii) present fairly and accurately, and do not in any respect distort, the financial condition of Old Operator and

25

the Facility as of the date of the applicable balance sheet, (iii) present fairly and accurately, and do not in any respect distort, the results of operations of the Facility for the period covered by such statement, and (iv) have been prepared on the same basis as the Facility's prior financial statements. Except as set forth on the most recent Financial Statements or as disclosed in Schedule 18.ee, there are no liabilities, debts, claims or obligations related to the operation of the Facility by Old Operator prior to the Closing Date, whether accrued, absolute, contingent or otherwise, whether due or to become due, that would reasonably be expected to be asserted against New Operator or Purchaser, and/or the Facility following the Closing Date.

ff.   Anti-Kickback Compliance. Old Operator has complied with and is currently in compliance with all federal and state laws and regulations with respect to illegal kickbacks, referral fees, or payment arrangements, including the federal anti-kickback statute, with respect to ownership and operation of the Facility.  No payment has been made by or on behalf of the Old Operator with the understanding that any part of such payment is to be used for any purpose other than that described in the documents supporting such payment, and neither Old Operator or any director, officer, employee, or agent of Old Operator, or any other person associated with or acting for or on behalf of, Old Operator has, directly or indirectly, made or received any illegal contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to or from any person, private or public, regardless of form, whether in money, property or services, to obtain or induce any patient referrals, purchases, orders or under any federal, state, or commercial health care program that violates federal or state law, including the federal anti-kickback statute.

gg.   Material Adverse Effect.   Since April 1, 2023, other than as set forth on Schedule 18.gg there has not existed any state of facts, condition, change, development, circumstance, event or effect (a "Material Adverse Effect") that, alone or in the aggregate, has, or could reasonably be expected to have, a material adverse effect on the results of operations, prospects or the condition (financial or otherwise), of Seller, Old Operator, the Property or the Facility, including (i) any decrease in the census of the Facility below ninety-two and one half percent (92.5%) of the occupancy level of the Facility as of the Effective Date that continues below such ninety-two and one half percent (92.5%) threshold for fifteen (15) days (and is cured with admissions of residents in a manner consistent with past admissions standards and practices of the Facility (including with respect to payor type and ability to pay)), (ii) the loss of any licensure, certification, or other permit necessary to operate the Facility as a skilled nursing facility, (3) the designation of the Facility as a Special Focus Facility ("SFF") as defined by the Centers for Medicare and Medicaid Services Special Focus Nursing Home Facility Program or the placement of the Facility on the SFF watch list, (4) the decertification of Old Operator, Seller or the Facility from or with respect to participation under Medicare, Medicaid or any other governmental health care program, including being suspended or limited from, or otherwise deemed ineligible for, or having any denial of payment or admissions or other limitation imposed with respect to, whether permanently or temporarily, participation in the Medicare or Medicaid reimbursement program, (5) the issuance of a level "I" or higher survey deficiency, and (6) the identification of any deficiencies as a result of a survey that have not been cured and deemed to be in compliance by the applicable governmental entity within forty-five (45) days after the date of the survey during which such deficiency was first identified.

hh.   Stimulus Funds.  Schedule 18.hh sets forth all amounts that Old Operator or the Facility has received with respect to any of the following (collectively, "Stimulus Funds"): (i) any grants or loan proceeds pursuant to the Paycheck Protection Program under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), (ii) any loan proceeds or funds offered by the U.S. Small Business Administration under its Economic Injury Disaster Loan assistance program, (iii) accelerated Medicare payments under the expanded Accelerated and Advance

26

Payments Program from Centers for Medicare & Medicaid Service or otherwise ("Accelerated Medicare Payments") and (iv) any employer payroll tax deferral afforded by Section 2302 of the CARES Act ("Payroll Tax Deferrals").  Old Operator and the Facility have complied with all applicable legal, regulatory and other requirements related to the Stimulus Funds.  Schedule 18.hh is true, accurate and complete in all respects, and Old Operator shall update Schedule 18.hh prior to Closing.

ii.       Accuracy of Representations and Warranties of Old Operator.  No representation or warranty by Old Operator contained in this Agreement and no statement by Old Operator in any certificate, list, exhibit or other instrument, including the due diligence materials and financial statements (except for those prepared by a third party, which to Old Operator's knowledge are true and complete), furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement, or omits or will omit to state any fact which is necessary in order to make the statement of material fact contained therein, in light of the circumstances under which they are made, not misleading in any material respect.

jj.       Survival of Representations and Warranties of Old Operator.  Each representation and warranty of Old Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date. Each representation and warranty of New Operator hereunder shall survive in accordance with Section 16.e and Section 16.f.

19.     NON-COMPETE AND NON-SOLICITATION.

a.       Neither Old Operator nor any of its affiliates or principals shall knowingly and intentionally solicit any residents of the Facility for a period commencing on the earlier of the effective date of the ASA and the Closing Date and ending on the date that is twelve (12) months following the Closing.  Old Operator acknowledges that if there is a violation of any provision of this Section 19.a, then Old Operator shall pay to New Operator an amount equal to fifty thousand dollars ($50,000.00) as liquidated damages, for each such resident.  The Parties acknowledge and agree that actual damages with respect to the foregoing would be difficult to ascertain and that fifty thousand dollars ($50,000.00) is a fair and reasonable approximation of such actual damages.  This provision shall not in any way limit such other remedies as may be available to New Operator hereunder or at law or in equity.  Old Operator further acknowledges that the scope and duration of the provisions of this Section 19.a are reasonable.

b.       Except with respect to the Facility prior to Closing and as set forth in Schedule 19.b neither Old Operator nor any of its affiliates or principals, for a period commencing on the earlier of the effective date of the ASA and the Closing Date and ending on the date that is twelve (12) months following the Closing, will not, own, operate, develop, manage or consult a skilled nursing home or otherwise operate, own, develop, manage or consult with an entity or business involved with skilled nursing care within a ten (10) mile radius of the Facility.  Old Operator acknowledges that a violation of any provision of this Section 19.b will result in substantial and irreparable damage to the New Operator for which the New Operator will not have an adequate remedy at law and for which money damages would not be a sufficient remedy, and Old Operator agrees that, in addition to all other remedies, in the event of any violation or alleged or threatened violation of any of the provisions of this Section 19.b, New Operator shall be entitled to equitable relief, including temporary or permanent injunctive relief and specific performance, in each case without being required to prove irreparable harm or damages, post a bond or otherwise provide security.  This provision shall not in any way limit such other remedies as may be available to New Operator hereunder or at law or in equity.  Old Operator further acknowledges that the scope and duration

4919-5875-2000, v. 5

of the provisions of this <u>Section 19.b</u> are reasonable.

20.      INFORMATION SYSTEMS.

     a.      Without limitation of <u>Section 12</u>, Old Operator shall use reasonable efforts to permit transfer of current data in fully operational form for use in New Operator's computer applications. Old Operator further agrees that in order to assist New Operator in ensuring the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility, Old Operator shall, for a period of no longer than ninety (90) days after the Closing Date, provide New Operator access to Old Operator's electronic medical records system to enable New Operator, at its expense, to print the medical treatment records and physician orders for each resident as of the Closing Date that was a resident as of the period between and including the Closing Date and the date that is eighteen (18) months prior to the Closing Date, and cooperate with New Operator regarding the delivery of all such records to New Operator, in electronic form (including the provision to New Operator of the last eighteen (18) months of MDS (Minimum Data Set) history in the format submitted to CMS by Old Operator), in order to enable New Operator to obtain the necessary copies of such medical records and physician orders.

     b.      Prior to the Closing, Old Operator shall provide New Operator and its representatives with access to the Facility so that New Operator can install lines necessary for computer hardware, together with servers, computer hardware and software.  In addition, Old Operator shall cooperate with New Operator and provide New Operator with such assistance as New Operator may reasonably request in order to provide for an orderly, efficient and safe transition of the operations from Old Operator to New Operator and the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility.  During such time as Old Operator provides New Operator with access to the Facility under this <u>Section 20.b</u>, New Operator shall not connect with or hook into Old Operator's computer lines or computers.  Such access shall be prescheduled with Old Operator and shall not interrupt normal business operation.  New Operator shall indemnify Old Operator for any damage resulting from such access. If, for any reason, this Agreement terminates prior to the Closing Date, Old Operator shall remove any lines installed, at New Operator's cost and expense, and New Operator shall remit payment to Old Operator within five (5) days of receiving an invoice for such costs and expenses of removal.

     c.      Upon reasonable request by New Operator for the purpose of resident care, Old Operator agrees to provide New Operator with printed copies of such files, charts and other information in Old Operator's control and possession or control relating to those residents who previously occupied the Facility for the period between and including the Closing Date and the date that is three (3) years prior to the Closing Date (including, but not limited to, all patient records, medical records, therapy records, pharmacy records, clinical records, and Resident Trust Funds records).

     d.      Old Operator shall, at no cost to New Operator, (i) use reasonable efforts to provide to New Operator, upon its request, any pre-Closing Date Facility information technology vendor contact information, (ii) transfer Facility-specific web domains that were used by Old Operator in connection with its operation of the Facility, and (iv) use reasonable efforts to make accessible to New Operator during regular business hours any data or records relating to the past operation of the Facility which are held or stored offsite, to the extent necessary in order to facilitate New Operator's operation of the Facility after the Closing Date in compliance with applicable laws.

e.       Old Operator agrees to arrange for current e-mail addresses of the Facility and its on-site staff to be forwarded to New Operator's new e-mail addresses for a period of ninety (90) days following Closing.

21.       COVENANTS.

a.       Effective from and after the Closing Date, Old Operator shall obtain and pay the cost of an extended term or "tail" policy of professional liability insurance for a coverage period of four (4) years after the Closing Date, with respect to any professional liability coverage which is written on a "claims-made" rather than "occurrence" basis for Old Operator's operations at the Facility.  Upon request of New Operator, Old Operator shall furnish evidence of such insurance coverage.

b.       At any time and from time to time after Closing, each Party shall, upon request of another Party, execute, acknowledge and deliver all such further and other assurances and documents, and shall take such action consistent with the terms of this Agreement, as may be reasonably requested to carry out the transactions contemplated herein and to permit each Party to enjoy its rights and benefits hereunder.

c.       Any Stimulus Funds received by Old Operator or the Facility (i) prior to APA Closing, shall remain with Old Operator, and (ii) on or after the date of the APA Closing, shall be immediately delivered to New Operator. From and after the date of the APA Closing, Old Operator shall cooperate with New Operator to enable New Operator to obtain any available Stimulus Funds.

22.       NO JOINT VENTURE.  Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties with respect to the subject matter hereof.  The Parties do not intend that any third party shall have any rights under this Agreement.

23.       EVENTS OF DEFAULT; REMEDIES.  Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by any Party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within five (5) business days of the earlier of such Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity, provided, however, that if a non-monetary breach is not reasonably capable of being cured within such five (5) business day period but the Defaulting Party promptly commences to cure within such period, within such period notifies the Non-Defaulting Party in writing of the commencement of such cure, and thereafter diligently pursues such cure to conclusion and successfully completes such cure within thirty (30) calendar days of its first receipt of notice of such breach or violation, it shall not be an Event of Default hereunder. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief.  The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party.

24.       Choice of Law.   THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE

4919-5875-2000, v. 5

STATE OF NEW JERSEY AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS WITHOUT REGARD TO ITS CONFLICT OF LAW PRINCIPLES THAT WOULD CAUSE THE LAWS OF ANY OTHER STATE TO APPLY.

25.    Jurisdiction; Venue.  ANY DISPUTES CONCERNING THIS AGREEMENT MAY BE BROUGHT BEFORE ANY COURT HAVING SITUS IN THE STATE OF NEW JERSEY.  EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID COUNTY AND STATE.  TO THE EXTENT LEGALLY WAIVABLE, EACH OF THE PARTIES HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.  THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.  THE PARTIES HEREBY WAIVE ANY RIGHT THEY MAY HAVE A TO A TRIAL BY JURY.

26.    ATTORNEYS' FEES IN THE EVENT OF DISPUTE.  In the event any dispute between the parties hereto that results in arbitration or litigation (including any enforcement action of an arbitration award or any action to compel arbitration or change venue), the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, reasonable attorneys' fees.

27.    DEFINITIONS.  For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

a.    *"Contracts"* shall mean all contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which the Old Operator or its predecessors or agents is a party and which relate to the Facility and the operations thereof.

b.    *"Environmental Laws"* shall mean all federal, state and local environmental, health, or safety laws or regulations now or hereafter enacted.

c.    *"Hazardous Substances"* shall mean any toxic or hazardous waste or pollutants, or substances, including asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances " or "Toxic Substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") as amended, 42 U.S.C. § 9601, et seq., "Hazardous Materials" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., "Hazardous Waste" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061, et seq., any "Toxic Pollutant" under the Clean Water Act, 33 U.S.C. §1251, et seq., as amended, any "Hazardous Air Pollutant" under the Clean Air Act, 42 U.S.C. § 7401, et seq., and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws.

d.    *"Supplies"* shall mean the food, central supplies, linens and housekeeping supplies and other consumable and non-consumable inventory present at the Facility as of the Closing Date

30

4919-5875-2000, v. 5

and any other property of Old Operator used in connection with the operation of the Facility.

28.     GENERAL PROVISIONS.

a.      Until the APA Closing, this Agreement is hereby explicitly cross-defaulted with the APA and any default or breach by (i) New Operator hereunder shall be a default by Purchaser under the APA, (ii) Purchaser under the APA shall be a default by New Operator hereunder, (iii) Old Operator hereunder shall be a default by Seller under the APA and (iv) Seller under the APA shall be a default by Old Operator hereunder.  This Agreement shall terminate in the event that the APA is terminated in accordance with its terms prior to the APA Closing.

b.      If, with the consent of the Parties, any exhibits or schedules are not completed or attached hereto as of the date of this Agreement, the Parties agree to attach such exhibits and schedules as soon as reasonably practicable, but in any event, this Agreement is subject to New Operator approving all exhibits and schedules or subsequent updates thereto within seven (7) days of submission thereof to New Operator.  Subject to the immediately preceding sentence, the Parties agree that the Party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

c.      Each Party agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date.  Each Party agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.  Each Party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

d.      Old Operator shall file and submit the Old Operator portion of New Operator's CMS Form 855A prior to Closing, as soon as practicable upon New Operator's request.

e.      All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (b) on the third (3rd) business day next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (c) upon recipient's confirmation of the receipt by email transmission (followed by delivery by one of the other means identified in (a)-(b)), addressed as follows:

if to Old Operator:            Venetian Care & Rehabilitation Center, LLC
                               100 McClellan Street
                               Norwood NJ 07648
                               Attn: Michael Jacobs
                                    Joshua Jacobs
                               Email:  mjacobs@windsorhc.com
                               jjacobs@windsorhc.com

31

4919-5875-2000, v. 5

<table>
<tr><td>with copies to:</td><td>Baker, Donelson, Bearman, Caldwell & Berkowitz PC<br>1900 Republic Centre<br>633 Chestnut Street<br>Chattanooga, TN 37450<br>Attn: Craig A. Penny, Esq.<br>Email: cpenny@bakerdonelson.com</td></tr>
<tr><td>if to New Operator:</td><td>c/o Peace Capital LLC<br>229 NJ-70<br>Toms River, New Jersey 08755<br>Attn:    Sam Stein<br>          Raffi Klugman<br>Email:  sam@peacecap.com<br>          rklugman@peacecap.com</td></tr>
<tr><td>with a copy to:</td><td>Jacobowitz Newman Tversky LLP<br>2361 Nostrand Avenue, Suite 902<br>Brooklyn, NY 11210<br>Attn:    Mordechai Biegeleisen, Esq.<br>Email:  mbiegeleisen@jntllp.com</td></tr>
</table>

A Party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

f.        Each Party shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

g.        This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

h.        This Agreement may not be modified or amended except in writing signed by the Parties.

i.        No waiver of any term, provision or condition of this Agreement, in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

j.        This Agreement shall bind and inure to the benefit of the respective heirs, executors, administrators, personal representatives, successors and permitted assigns of the parties hereto; provided, however, that neither Party shall assign this Agreement without the prior written consent of the other Party.  Notwithstanding the foregoing, however, any New Operator may assign its rights under this Agreement to an affiliated or related entity or entities.  Any assignment not permitted hereunder and undertaken without such prior written consent shall be deemed null and void.  Notwithstanding anything in this Agreement to the contrary, in the event that New Operator is unable to obtain the Regulatory Approvals on or prior to the one-year anniversary of the date

hereof, New Operator may assign this Agreement to any entity that agrees to be bound by New Operator's obligations hereunder.

k.      Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

l.      All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

m.      This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.  Signatures sent by telecopy or electronic mail transmissions shall constitute originals.

n.      All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

o.      The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made a part hereof as if fully set forth herein.

p.      All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" and "including" shall mean "including without limitation".

q.      If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

r.      If the last day provided for in this Agreement for a Party to take a particular action or deliver a particular notice is a Saturday, Sunday or day on which the banking institutions in the State of New Jersey are not open for business, such last day shall be extended until the next day that is not a Saturday, Sunday or day on which the banking institutions in the State of New Jersey are not open for business.

s.      Each Party has been represented by counsel of its choosing in the preparation of this Agreement.  The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

[*Signature page follows*]

4919-5875-2000, v. 5

**IN WITNESS** WHEREOF**,** each of Old Operator and New Operator have caused this Operations Transfer Agreement to be executed as of the date first above written.

OLD OPERATOR:

VENETIAN CARE & REHABILITATION CENTER, LLC

By: _____
Name: Michael Jacobs
Title: Authorized Representative

**NEW OPERATOR:**
VENETIAN HEALTHCARE AND REHAB CENTER LLC

By: _____
Name: Shalom Stein
Title:  Authorized Signatory

1

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 189 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Exhibit B of Renewal 66   Page 189 of 202

**IN WITNESS** WHEREOF, each of Old Operator and New Operator have caused this Operations Transfer Agreement to be executed as of the date first above written.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By: _____

Name: Michael Jacobs

Title: Authorized Representative

**NEW OPERATOR:**

VENETIAN HEALTHCARE AND REHAB CENTER LLC

By: _____

Name: Shalom Stein

Title: Authorized Signatory

1

4919-5875-2000, v. 5

Exhibit A
FORM OF GENERAL ASSIGNMENT

THIS **GENERAL ASSIGNMENT** (this "<u>Assignment</u>"), is made as of the ___ day of _____ 202_, by Venetian Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("<u>Assignor</u>"), to Venetian Healthcare and Rehab Center LLC, a New Jersey limited liability company ("<u>Assignee</u>").

W I T N E S S E T H:

**WHEREAS**, by Operations Transfer Agreement (the "<u>OTA</u>"), dated as of [●], 2024, by and among Assignor and Assignee, Assignor agreed to sell to Assignee certain personal property and such other assets, as more fully described in the OTA (the "<u>Transferred Assets</u>") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, the Permits, the Patient Trust Funds and Property, the Warranties, the Assumed Contracts, the resident contracts and agreements and such other items applicable to the Transferred Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agree as follows:

1. **Transfer of Permits**. Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the Permits.

2. **Transfer of Warranties**. Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the Warranties.

3. **Transfer of Patient Trust Funds and Property**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Patient Trust Funds and Property.

4. **Contracts**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Assumed Contracts, as well as all contracts and agreements with residents of the Facility.

5. **Assumption**. Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, and 4 hereof, provided, that such assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

6. **Miscellaneous**. This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of New Jersey and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith. The provisions of Section 28 (Miscellaneous) of the OTA shall apply to this Assignment mutatis mutandis.

4919-5875-2000, v. 5

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 191 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Notice of Renewal 68 Page 191 of 202

(*Signature page follows*)

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 192 of 202   Trans ID: LCV20261440701

Case 26-01239-VFP    Doc 15-8    Filed 06/16/26    Entered 06/16/26 13:55:07    Desc
Exhibit 6 - Exhibit B Renewal Page 169 of 202 Page 192 of 202

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this General Assignment as of the day and year first above written.

**ASSIGNOR:**
VENETIAN CARE & REHABILITATION CENTER, LLC


By: _____

      Name:  Hyman Jacobs
      Title:  Manager


**ASSIGNEE:**
VENETIAN HEALTHCARE AND REHAB CENTER LLC


By: _____

      Name:
      Title:

4919-5875-2000, v. 5

Exhibit B
FORM OF BILL OF SALE

Venetian Care & Rehabilitation Center, LLC, a New Jersey limited liability company ("Old Operator"), in accordance with that certain Operations Transfer Agreement (the "OTA"), dated as of [●], 2024, by and among Old Operator and Venetian Healthcare and Rehab Center LLC, a New Jersey limited liability company ("New Operator") and in consideration of Ten and No/100 Dollars ($10.00) paid by New Operator to Old Operator, receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to, all of its right, title and interest in and to the following described personal property, to-wit:

All of the (i) Personal Property (as defined in the OTA) and (ii) Supplies (as defined in the OTA) (collectively, clauses (i) and (ii), the "Transferred Property").

Old Operator hereby represents and warrants to New Operator that Old Operator is the absolute owner of the Transferred Property, that the Transferred Property is free and clear of all liens, charges and encumbrances, and that Old Operator has full right, power and authority to sell the Transferred Property and to make this Bill of Sale.

(*Signature page follows*)

4919-5875-2000, v. 5

IN WITNESS WHEREOF, Old Operator has caused this Bill of Sale to be signed and sealed in its name by its officer thereunto duly authorized this ___ day of _____, 202_.

OLD OPERATOR:
VENETIAN CARE & REHABILITATION CENTER, LLC


By: _____
　　　Name:  Hyman Jacobs
　　　Title:  Manager


NEW OPERATOR:
VENETIAN HEALTHCARE AND REHAB CENTER LLC


By: _____
　　　Name:
　　　Title:

4919-5875-2000, v. 5

Exhibit C
SCHEDULED EMPLOYEES

Any employee with annual compensation in excess of $60,000.

To be completed pursuant to Section 28(b)

4919-5875-2000, v. 5

Schedule 19.b

To be completed pursuant to Section 28(b)

4919-5875-2000, v. 5

MID-L-003196-26   05/29/2026 1:00:19 PM   Pg 197 of 202   Trans ID: LCV20261440701

Case 26-01239-WFP   Doc 15-8   Filed 06/16/26   Entered 06/16/26 13:55:07   Desc
Exhibit 6 - Exhibit B Page 174 of 279 Page 197 of 202

## FIRST AMENDMENT TO OPERATIONS TRANSFER AGREEMENT

**THIS FIRST AMENDMENT TO OPERATIONS TRANSFER AGREEMENT** (this "Amendment") is made and entered into as of April 1, 2025 (the "Amendment Effective Date") by and between VENETIAN CARE & REHABILITATION CENTER, LLC, a New Jersey limited liability company ("Old Operator"), and VENETIAN HEALTHCARE AND REHAB CENTER LLC, a New Jersey limited liability company ("New Operator"). Old Operator and New Operator are sometimes collectively referred to as the "Parties."

## RECITALS:

A.    By that certain Operations Transfer Agreement, dated December 2, 2024 (the "OTA") by and between Old Operator and New Operator, Old Operator agreed to transfer to New Operator and New Operator agreed to assume from Old Operator, the operations of that certain skilled nursing facility known as Venetian Care and Rehabilitation Center located in the State of New Jersey, as more particularly described in the OTA and subject to the terms and conditions set forth therein.

B.    Old Operator and New Operator desire to amend the OTA to (i) provide for the Old Operator to pay out the Old Operator's Vacation and Holiday Pay Expenses to all of the Retained Employees who are not members of the Union  (the "Non-Union Employees"), and (ii) modify the tail insurance requirements set out in the OTA, as more particularly set forth herein.

C.    Unless otherwise provided herein, all capitalized words and terms used in this Amendment shall have the same meanings ascribed to such words and terms as in the OTA.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.    The following is added to the end of Section 10(c) of the OTA:

Furthermore, notwithstanding the forgoing portion of Section 10(c) set forth in the OTA, at Closing, Old Operator shall pay to all of the Non-Union Employees an amount equal to ninety percent (90%) of Old Operator's Vacation and Holiday Pay Expenses (which means the accrued, vested and unvested, but unpaid vacation, sick, personal and holiday pay, any other paid time off and any severance obligations with respect to such Non-Union Employee that has accrued prior to the earlier of the Closing Date and the effective date of the ASA) as payment in full to such Non-Union Employees and New Operator shall have no responsibility for such Old Operator's Vacation and Holiday Pay Expenses.  This payment shall be made no later than the first payroll date following the Closing.  Old Operator hereby indemnifies and holds New Operator Parties harmless for any Old Operator's Vacation and Holiday Pay Expenses to the extent the amount paid to the Non-Union Employees was less than the amount required to be paid, for any discrepancies in the Old Operator's Vacation and Holiday Pay Expenses and for all other amounts related to or owed to such Non-Union Employees, including on account of any and all other liabilities and obligations with regard to any of the Non-Union Employees that shall have accrued prior to the Closing Date. New Operator

indemnifies and holds Old Operator harmless for any claims by any Non-Union Employee that make a claim for more than ninety percent (90%) of the Old Operator's Vacation and Holiday Pay Expenses owed to such Non-Union Employee.  Amounts paid to Non-Union Employees pursuant to this Section 10(c) shall be deducted from the credit otherwise payable to New Operator under this Section 10(c).

2.    The OTA is hereby amended to reduce the period for which Old Operator must maintain a "tail" policy of professional liability insurance, by replacing the words "four (4) years" where they appear in Section 21(a) of the OTA with "three (3) years".

3.    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Amendment may be delivered by facsimile or electronic transmission and facsimile or electronically transmitted signatures shall have the same force and effect as originals.

4.    Except as amended hereby, the OTA, as amended shall remain in full force and effect. This Amendment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns under the OTA.

5.    In the event that any of the terms of this Amendment shall be inconsistent with or contradict the terms of the OTA, the terms of this Amendment shall control.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this First Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By: _____

Name: Michael Jacobs

Title: Manager

**NEW OPERATOR:**

VENETIAN HEALTHCARE AND REHAB CENTER LLC

By: _____

Name: Shalom Stein

Title: Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned have duly executed this First Amendment by persons legally entitled to do so as of the day and year first set forth above.

**OLD OPERATOR:**

VENETIAN CARE & REHABILITATION CENTER, LLC

By:_____
Name: Hyman Jacobs
Title: Manager

**NEW OPERATOR:**

VENETIAN HEALTHCARE AND REHAB CENTER LLC

By:_____
Name: Norman Rokeach
Title: Authorized Officer

# Civil Case Information Statement

## Case Details: MIDDLESEX | Civil Part Docket# L-003196-26

**Case Caption:** MERWICK HEALTHCARE A ND REHAB VS JACOBS MICHAEL

**Case Initiation Date:** 05/13/2026

**Attorney Name:** JONATHAN M PROMAN

**Firm Name:** JONATHAN M. PROMAN ESQ

**Address:** 30 WALL ST EIGHTH FL
NEW YORK NY 10005

**Phone:** 9175247566

**Name of Party:** PLAINTIFF : Merwick Healthcare and Rehab C

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Verified Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Merwick Healthcare and Rehab C?** NO

**Are sexual abuse claims alleged by: Venetian Healthcare and Rehab ?** NO

**Are sexual abuse claims alleged by: Merwick Propco Urban Renewal L?** NO

**Are sexual abuse claims alleged by: Venetian Propco LLC?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
    **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO  **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

05/13/2026                                                                          /s/ JONATHAN M PROMAN
Dated                                                                                              Signed